USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/28/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

FLORA GILLESPIE, *et al.*, :
:
Plaintiffs, :
:
-against- :
:
ST. REGIS RESIDENCE CLUB, NEW YORK :
INC., *et al.*, :
:
Defendants. :

-------------------------------------------------------------X

1:16-cv-9390-GHW

ORDER

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

The Beaux-Arts landmark building at the corner of Fifth Avenue and East Fifty-Fifth Street in Manhattan provides a temporary home for guests of the exclusive St. Regis New York Hotel. Beginning in 2006, individuals were invited to become part of what was known as the St. Regis Residence Club:  for the average price of about $455,000, members of this exclusive club could own an interest in "Club Units"—luxury suites located on a floor that was specially reserved for members of the club, and in which those members were entitled to spend a certain amount of time annually. The interests sold well for approximately two years.  In 2008, however, when the country entered an economic recession, sales began to plummet.

In response, the entities that controlled the St. Regis New York Hotel decided to take the Residence Club in a different direction—without the knowledge or input of its members.  Rather than struggling to sell what was, in effect, a luxury timeshare during the greatest economic downturn in recent memory, they abandoned their efforts to sell the Club Interests, and, instead, decided to rent out the Club Units to the public for overnight use.  This proved successful, drawing an influx of

short-term renters to the Club Units and reducing their resale value, much to the chagrin of the Residence Club's members, who assert that it reduced the resale value of their Units.

Plaintiffs, who are members of the Residence Club, bring this action alleging breach of contract and unjust enrichment. A subgroup of the Plaintiffs also seek to rescind their purchase agreements. Defendants now move to dismiss all of Plaintiffs' claims. For the reasons set forth below, the motion is granted in part and denied in part.

## II. BACKGROUND[1]

### A. The Fifth and Fifty-Fifth Residence Club

Plaintiffs are the purchasers of fractional timeshare interests in a landmark building on the corner of Fifth Avenue and East 55th Street in Manhattan. First Am. Compl. ("FAC") (Dkt. No. 41) ¶ 1. The building is the site of the St. Regis New York Hotel (the "St. Regis"). *Id.* In 2006, Starwood Hotels and Resorts Worldwide, LLC ("Starwood"), as part of a joint venture with other entities, filed a condominium map on the St. Regis, dividing it into four components: the "Hotel Unit," the "Retail Unit," the "Suite Units," and the "Club Units." *Id.* ¶ 3. This action concerns the Club Units and the Suite Units, as they relate to ownership of the Club Units.

The Suite Units and the Club Units are each "governed by an offering plan filed with the New York State Department of Law." *Id.* ¶ 4. The offering is known as the Fifth and Fifty-Fifth Residence Club (the "St. Regis Residence Club" or "Residence Club"). *Id.* ¶ 1. The St. Regis Residence Club, New York, Inc. is the Residence Club Sponsor (the "Sponsor"). *Id.* ¶ 18.

---

[1] Unless otherwise noted, the facts are taken from the first amended complaint and the exhibits thereto. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." (citations omitted)). The alleged facts are accepted as true for the purposes of this motion. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"The Suite Unit offering allows Defendants to market and sell Suite Units, which are wholly-owned condominiums . . . ." *Id.* ¶ 4. The Club Unit offering, governed by the Fractional Offering Plan for the Residence Club (the "Plan") (Dkt. Nos. 41-7 through 41-22), allows Defendants to market and sell fractional "Club Interests" in the Club Units. Each purchaser of a Club Interest owns a 1/13th undivided portion of a specific Club Unit as a tenant-in-common with all other owners of Club Interests in the same Club Unit. *Id.* ¶ 130. When a purchaser acquires a Club Interest in a Club Unit, the purchaser is entitled, subject to certain terms and conditions, to "use and occupy a Club Unit for four weeks annually." *Id.* Persons who "hold fee title, of record, to one or more Club Interests" are known as "Club Members." Plan, at 19.

Plaintiffs purchased Club Interests pursuant to a standardized Purchase Agreement (the "Purchase Agreement") and the 748-page Plan, which was expressly made part of each Purchase Agreement. FAC ¶ 131. As set forth below, Plaintiffs assert that the St. Regis Residence Club is a "fractured" offering—meaning that "(a) the developer failed to sell many of the units, and (b) the value of the units has collapsed"—because of Defendants' conduct. *Id.* ¶ 2.

### B. Conversion of Suite Units Into Club Interests

Defendants began selling Club Interests in August 2006, and sales continued at a "steady pace" through 2007. *Id.* ¶ 5. In mid-2007 and 2008—including shortly after the collapse of Bear Stearns and the beginning of the recession—Defendants increased the inventory of Club Units (and therefore, of Club Interests), by converting a number of the Suite Units into Club Units. *See id.* ¶ 134. Although such conversion is permitted by the Plan, Plaintiffs maintain that Defendants were acting in bad faith to "secretly flood" the Residence Club with new inventory that they never intended to sell. *Id.* ¶ 5, 127. According to Plaintiffs, "but for" these conversions, "*the offering would have been fully sold by the middle of 2008.*" *Id.* ¶ 135(a) (emphasis in the original).

### C. Abandonment of Sales Efforts

Plaintiffs also allege that Defendants took other steps to impede the success of the offering. First, Defendants increased the price of the Club Interests and Club Members' annual fees. Id. ¶ 142. Then, in mid-2009, they withdrew a seller financing option that had previously been offered to purchasers, and closed the Residence Club sales office. Id.[2] Defendants sold only a few Club Interests over the course of the next six and a half years. Id. According to Plaintiffs, Defendants abandoned their sales efforts in order to pursue a large-scale rental program that, while detrimental to Plaintiffs' interests, has been lucrative for Defendants.

### D. Rental Program

In or around 2009, Defendants began renting to the general public the approximately 100 unsold Club Interests over which they retained ownership. Id. ¶ 140. Although Plaintiffs concede that they knew the Sponsor would offer "some rentals," they maintain that the Plan "made clear that these [rentals] were a very limited aspect of the fractional offering," id. ¶ 152 (citing Plan, Club Reservation Procedures, at 90), and that they "reasonably expected that access to the Club would be restricted to Club Members and *their* permitted users"—not the Sponsor's tenants. Id. ¶ 149 (quoting Plan, Special Risk Factors, at 3 § 1(c) ("[u]se of the Club Units is limited solely to the personal, recreational and other use by a Club Member and Club Member's Permitted Users.")).

### III. PROCEDURAL HISTORY

Plaintiffs filed the initial complaint in this action on December 5, 2016. Dkt. No. 1. The FAC was filed on March 6, 2017. Defendants seek to dismiss the FAC's allegations of breach of express and implied contract (Counts One and Three), Rescission (Count Six), and Unjust

---

[2] According to Plaintiffs, Defendants abandoned all sales and marketing efforts in 2009 and Plaintiffs were not informed of that fact until after a tolling agreement went into effect on May 20, 2016. FAC ¶¶ 141, 142.

Enrichment (Count Seven).[3]  Plaintiffs submitted supplemental authority in support of their opposition to the motion on August 1, 2018, Dkt. No. 84, to which Defendants responded the following day.  Dkt. No. 85.

## IV.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[ ]" claims "across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).  However,

> [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'  A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.'  Pleadings that contain 'no more than conclusions . . . are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

---

[3] These constitute all of the claims alleged in the FAC.  The gap in numbering is the result of edits made to the initial complaint.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (alteration in original) (citing *Twombly*, 550 U.S. at 555, 557).

In addition to the facts alleged in the complaint, courts "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . ." *ATSI*, 493 F.3d at 98. Courts may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

## V.    DISCUSSION

### A.  Breach of Contract (Counts One and Three)

In Counts One and Three, Plaintiffs allege that the Sponsor breached the terms of the Plan by abandoning sales efforts and renting out Club Units to the general public. "To properly plead a breach of contract claim under New York law, a party must identify (1) the existence of a contract; (2) performance by one party; (3) breach of the contract by the other party; and (4) resulting damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994). A breach of contract claim will not survive a motion to dismiss where the plaintiff fails to allege "the specific provisions of the contract upon which liability is predicated." *Martinez v. Vakko Holding A.S.*, No. 07 Civ. 3413 (LAP), 2008 WL 2876529, at *2 (S.D.N.Y. July 23, 2008); *see also Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 457 (S.D.N.Y. 2012) (quoting *Atkinson v. Mobil Oil Corp.*, 614 N.Y.S.2d 36 (2d Dep't 1994) and collecting cases) ("Case law is clear that to state a breach of contract claim, the pleadings 'must allege the provisions of the contract upon which the claim is based.'").

In addition, under New York law, the "fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). "The best evidence of what parties to a written agreement

intend is what they say in their writing." *Greenfield*, 98 N.Y.2d at 569 (internal quotation marks

omitted). "Thus, a written agreement that is complete, clear and unambiguous on its face must be

[interpreted] according to the plain meaning of its terms." *Id.*; *see South Rd. Assocs., LLC v. IBM*, 4

N.Y.3d 272, 277 (2005) ("In cases of contract interpretation, it is well settled that when parties set

down their agreement in a clear, complete document, their writing should . . . be enforced according

to its terms." (internal quotation marks omitted)).

Here, Plaintiffs attached copies of the Plan and a template purchase agreement as exhibits to

the FAC, which the Court considers in resolving the motion. For the reasons set forth below, the

motion to dismiss Counts One and Three is granted in part and denied in part.

     **i.**     **Plaintiffs Insufficiently Allege Breach of Express Contract Provision in Connection with Count One**

Plaintiffs' claim for breach of an express contract provision in connection with Count One

cannot proceed because they have not identified any express provision imposing an obligation to sell

Club Units. Plaintiffs allege that the Sponsor "materially breached express and/or implied terms of

the Purchase Agreement and Club Offering Plan by abandoning any effort to sell Club Interests."

FAC ¶ 191. They contend in their opposition that paragraph 132 of the FAC identifies the

contractual provisions allegedly breached, namely the following: the "Introduction" at page 12,

which provides that the "Sponsor anticipates that twelve (12) Club Interests will be sold in each

Club Unit"; the section entitled "General" at page 103, which provides that, "The Offering Plan

does not knowingly omit any material fact or knowingly contain any untrue statement of any

material fact. Sponsor believes that the Offering Plan contains a fair summary of the material

provisions of the documents referred to in the Offering Plan . . . ."; and the "Certification of

Sponsor and Principals" at pages 733 to 734, which provides that "We jointly and severally certify

that the offering plan does . . . not omit any material fact . . . ." Pl.'s Opp., at 10; FAC ¶ 132.

None of these provisions is an express covenant requiring the Sponsor to sell a specific quantity of Club Interests. The representation that the Sponsor "anticipates" that twelve Club Interests will be sold in each Club Unit is a statement of expectation, not a commitment sufficient to impose an obligation to sell all twelve interests. Moreover, Plaintiffs identify no provision that requires the Sponsor to continue its sales efforts indefinitely, until a certain time, or until a certain number of Club Interests were sold. Plaintiffs argue that the Plan "never once states that Defendants retain the right to abandon sales efforts." The absence of such a provision does not amount to an affirmative prohibition on abandoning sales efforts, however. Lacking express language prohibiting Defendants from abandoning sales efforts, the Court will not read such a provision into the Plan. Accordingly, Defendants' motion to dismiss the claim for breach of an express contractual provision to sell all Club Interests, or a sufficient number of Club Interests to make the offering viable, must be granted.

### ii. Plaintiffs Sufficiently Allege Breach of Implied Covenant in Connection with Count One

Significantly for purposes of this motion, however, Plaintiffs allege that the Purchase Agreement and Plan include both an "express *and/or implied*" promise by the Sponsor "to timely sell all of the Club Interests . . . or at least a sufficient number of Club Interests to make this fractional offering viable." FAC ¶ 188 (emphasis added). Although, as described above, Plaintiffs fail to allege that an express covenant to sell Club Interests was breached—or even that such a covenant existed—Plaintiffs sufficiently allege that the implied covenant of good faith and fair dealing was breached.[4]

---

[4] "Generally, under New York law, a cause of action alleging breach of the implied covenant is duplicative of a cause of action alleging breach of contract." *Rojas v. Don King Prods., Inc.*, No. 11-cv-8468 (KBF), 2012 WL 760336, at *3 (S.D.N.Y. Mar. 6, 2012); *see also Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (quoting *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir.1992) (internal quotation marks omitted)) ("Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract."). Because the Court dismisses Plaintiffs' claim for express breach of contract in connection with this claim, *see supra* § V(A)(i), there is no need to dismiss the claim for breach of an implied

Under New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of performance. *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153–54 (2002) (collecting cases); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir. 1991). "This covenant embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Provident Life*, 310 F.3d at 80 (citations omitted). "While the duties of good faith and fair dealing do not imply obligations 'inconsistent with other terms of the contractual relationship' they do encompass 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included.'" *Jennifer*, 98 N.Y.2d at 153 (internal citations omitted).

The New York Court of Appeals' decision in *Jennifer* commands the Court to deny Defendant's motion to dismiss the Plaintiffs' claim that the Sponsor breached an implied covenant to sell a sufficient number of Club Units. In *Jennifer*, the sponsor of a cooperative apartment building failed to sell more than half of the cooperative's shares. 98 N.Y.2d at 150. In addition, the sponsor allowed the offering plan to lapse and rejected bona fide purchase offers. *Id.* at 151. The plaintiffs in *Jennifer*—the cooperative corporation's board of directors and a number of individual shareholders and proprietary lessees—alleged that the sponsor had breached its contracts with them by retaining most of the cooperative's shares. *Id.* at 150. This conduct, plaintiffs alleged, "so drastically undermined the contract that its fundamental objective—the creation of a viable cooperative—has been subverted." *Id.* at 153. The Court of Appeals affirmed the lower court's denial of the defendants' motion to dismiss, concluding that the plaintiffs had sufficiently alleged that the sponsor had undertaken, and breached, a "duty in good faith to timely sell so many shares in the building as necessary to create a fully viable cooperative." *Id.* at 152.

covenant as redundant. *Wiseman v. ING Groep, N.V.*, No. 16-cv-07587 (AJN), 2017 WL 4712417, at *8 (S.D.N.Y. Sept. 28, 2017).

The Court appreciates that the Court of Appeals adopted this rule in the context of a case involving formerly rent-stabilized apartments, whose owners had presumably fewer means than the purchasers of Club Units at the St. Regis. However, the Court declines to adopt Defendants' suggestion that the Court of Appeals' holding in *Jennifer* not apply here because the Club Units are expensive and available only to the well-heeled, unlike the formerly rent-stabilized tenants affected by the sponsor's alleged misconduct in *Jennifer*. The ultimate basis for the Court of Appeals' conclusion was a reaffirmation of the fundamental principle of New York law that all contracts contain an implied covenant of good faith and fair dealing. *Id.* at 153–54. That obligation applies to real estate purchases by the rich as well as by the poor. The rule established in *Jennifer* has been applied in the context of sales of condominiums—including high cost apartments. *See, e.g., Bauer v. Beekman Int'l Ctr. LLC*, 40 Misc. 3d 1237(A) (Table) (Sup. Ct. 2013), *aff'd*, 1 N.Y.S.3d 808 (1st Dep't 2015); *Board of Managers of the Warren House Condominium v. 34th Street Associates LLC, et al.*, No. 152052/13, 2015 WL 4915600, at *1 (N.Y. Sup. Aug. 18, 2015).

In *Jennifer*, the Court of Appeals concluded that the complaint adequately alleged the creation of a duty to sell sufficient units. Plaintiffs have done so here as well. Here, as in *Jennifer*, Plaintiffs plead that, based on the terms of the Purchase Agreement and Plan, they reasonably expected that the Sponsor "would endeavor to timely sell all Club Interests, or at least a sufficient number to make the St. Regis Residence Club viable," and that it failed to do so. FAC ¶ 189. According to the FAC, the Sponsor, acting in bad faith, engaged in conduct that had the effect of destroying or injuring a viable offering. Specifically, Plaintiffs allege that the Sponsor's conduct— including the alleged abandonment of sales efforts—"frustrated Plaintiffs' rights and reasonable expectations under the contract, deprived Plaintiffs of the value of their Club Interests, and allowed Defendants . . . to profit at Plaintiffs' expense." *Id.* ¶ 190; *see also id.* ¶¶ 146–147 (the "ongoing program of halting sales in favor of renting the unsold units" has "destroyed the viability of the St.

Regis Residence Club."). Plaintiffs also allege that the resulting "massive inventory of nightly rentals" hinders the viability of the offering because it allows the public to enjoy the same benefits as Club Members without the associated burdens of ownership—including the purchase price, annual maintenance fees, and other ownership expenses that Club Members are obligated to pay regardless of whether they actually make use of the Residence Club. FAC ¶ 146.

Furthermore, the facts pleaded in the FAC support the allegation that the Sponsor failed to exercise good faith and deal fairly in satisfying that duty by, among other things, abandoning sales efforts and creating financial disincentives for prospective purchasers, including raising the price of Club Interests. *See Jennifer*, 98 N.Y.2d at 154 ("By spelling out the basis for their claim that the sponsor failed to exercise good faith and deal fairly in fulfilling the terms and promises contemplated by the offering plan, plaintiffs pleaded a valid cause of action for breach of contract.").

As Defendants observe, there are many distinctions between this case and *Jennifer*. "In Jennifer, the sponsor converted a rent-regulated apartment house to a co-op and sold less than 38% of its shares to tenants who 'surrendered their rights pursuant to the Rent Stabilization Code . . . but pa[id] more in monthly maintenance and cooperative loan payments than they had paid in rent as tenants.' The sponsor then allowed its offering plan to lapse, which, pursuant to applicable law, precluded it from selling or marketing the remaining shares." Defs.' Br. at 10 (quoting *Jennifer*, 98 N.Y.2d at 151, 153). Here, by contrast, Plaintiffs allege that the Sponsor sold over 80% of its interests. FAC ¶ 137. And, rather than the cooperative interests of formerly rent-stabilized tenants, the Club Interests here are timeshares in "luxury units" in which owners spend only a fraction of the year. FAC ¶¶ 1, 28–126, 151–52. The Club Units represent only a portion of the property located at the St. Regis hotel—the property is also supported by the hotel, and the Suite Units. These are meaningful distinctions, but the ultimate question whether the Sponsor's failure to sell 20% of the

Club Interests actually undermined the "viability" of the offering is not before the Court at this time—the only question is whether Plaintiffs have adequately pleaded that the Sponsor had an implied duty to sell sufficient units to make the offering viable—they have.

However, the Court declines to expand the holding of *Jennifer*, as Plaintiffs suggest, to imply an obligation that the Sponsor sell "all" of the Club Interests. *See, e.g.,* FAC ¶ 189. *Jennifer* sustained a claim related to an implied obligation to sell a sufficient number of units. *Jennifer* does not support the contention that the Sponsor was under an obligation to sell all of the Club Units or Interests. *Bauer v. Beekman Int'l Ctr. LLC*, 1 N.Y.S.3d 808, 808 (1st Dep't 2015) ("While defendant sponsor sold a majority of the newly-constructed condominium's residential units, contrary to plaintiff unit owner's contention, it was not under an implied obligation to sell all of them. Plaintiff's reliance on [*Jennifer*] where the owner sold a minority of the shares and the pleading was upheld to the extent that it alleged an implied promise to sell 'a sufficient number of shares,' is misplaced."). Similarly, the allegations here do not support the inference of an implied covenant requiring the Sponsor to sell all of the Club Units—to do so would run contrary to the language of the offering documents.

The offering documents specifically advise purchasers of the prospect that the Sponsor will not be able to sell all of the Club Interests. Indeed, the Plan contains a defined term for "Unsold Club Interests," Plan at 25, and it uses the term repeatedly to advise purchasers of the prospect that the Sponsor will not be able to sell all Club Interests, and to identify risks associated with that possibility. For example, the Plan states clearly that the "Sponsor may have a large inventory of Unsold Club Interests." Plan, Special Risk Factors, at 3 § 1(a). The Plan identifies the potential impact of the Sponsor's failure to sell all Club Interests. *See, e.g.,* Plan at 3 § 1(a), 2 ("Any Club Member attempting to rent or resell a Club Interest would have to compete, at a substantial disadvantage, with Sponsor in the rental and sale of its Unsold Club Interests . . . . The successful operation and maintenance of the Club depends upon the ability of Sponsor to meet its financial

obligations with respect to Unsold Club Interests.")  Given the Plan's numerous statements regarding the expectation that the Sponsor would not be able to sell all Club Interests, no obligation to sell all Club Interests can be implied here.[5]

There is similarly no basis to imply the existence of an obligation on the Sponsor to support the resale value of the Club Interests.  Purchasers of Club Interests could not have reasonably expected that the Sponsor would be obligated take steps to support or enhance the resale value of Club Interests.  Purchasers were specifically advised that units should not be purchased with an expectation of resale at a profit.  *See, e.g.*, Plan at 3 § 1(a) ("The purchase of a Club Interest should be based upon its value as a vacation experience, for spending leisure time, or for other personal use, and not considered for purposes of acquiring an appreciating investment or with an expectation that the Club Interest may be rented or resold at a profit.").  This express language does not permit the implication of an obligation on the part of the Sponsor to support the resale value of the Club Interests.

Plaintiffs do not expressly claim breach of such a duty, FAC ¶ 189, but the complaint could be read to suggest that Plaintiffs believe that the offering would not be "viable" unless it resulted in sales sufficient for their Club Interests to maintain their value, or to appreciate in value.  Such a foundation for their surviving claim cannot be sustained in the face of the clear statements in the Plan advising them of the illiquidity of the Club Interests, and that they should not be acquired for

---

[5] There is similarly no basis to imply the existence of an obligation on the Sponsor to support the resale value of the Club Interests.  Purchasers of Club Interests could not have reasonably expected that the Sponsor would be obligated take steps to support or enhance the resale value of Club Interests.  Purchasers were specifically advised that units should not be purchased with an expectation of resale at a profit.  *See, e.g.,* Plan at 3 § 1(a) ("The purchase of a Club Interest should be based upon its value as a vacation experience, for spending leisure time, or for other personal use, and not considered for purposes of acquiring an appreciating investment or with an expectation that the Club Interest may be rented or resold at a profit.").  This express language does not permit the implication of an obligation on the part of the Sponsor to support the resale value of the Club Interests.  Plaintiffs do not expressly claim breach of such a duty. FAC ¶ 189.  Plaintiffs' claim that the Sponsor violated an implied duty to sell sufficient Club Interests to support the "viability" of the offering survives.  But it should be clear that, given the language of the Plan, the surviving claim does not encompass asserted resulting reductions in the resale value of the Club Interests.

investment purposes.  The Court cannot conclude here precisely what constitutes a "viable" offering in this context.  However, given the clear cautionary language contained in the Plan regarding resales, the Court does conclude that Plaintiffs cannot reasonably have expected that the offering would only be viable if the Sponsor's sales were sufficient to support the price and resale value of their Club Interests.  Increasing, or even stable, valuation of the acquired Club Interests was not the fruit of any Plaintiff's contracted purchase of a Club Interest; it was "its value as a vacation experience, for spending leisure time, or for other personal use . . . ."  Plan at 3 § 1(a).

### iii.    Plaintiffs Insufficiently Allege Breach of Express Contract Provision in Connection with Count Three

Plaintiffs' claim that the Sponsor breached an express contract provision in connection with Count Three must fail because the negative covenants concerning Club Unit rentals that are identified by Plaintiffs do not prohibit the Sponsor from renting Club Units to overnight tenants. To the contrary, the offering documents provide clear warning that the Sponsor may rent Club Units owned by it.

In the FAC section entitled "Third Claim for Relief," Plaintiffs fail to identify any express terms of the Plan that they allege were breached.  FAC at 65–66.  In their opposition to the motion to dismiss, Plaintiffs identify a number of provisions that, they contend, expressly limit the Sponsor's ability to rent out the Club Units.  Only one of those provisions contains an express negative covenant concerning rentals, however.  It states that "[u]se of the Club Units is limited solely to the personal, recreational and other use by a Club Member and Club Member's Permitted Users."  Plan, 3 § 1(c).  As a result, they argue, use of the Club Units by individuals who are not Club Members[6] or Club Members' Permitted Users violates the terms of the Plan.  But the Plan's definition of Permitted Users is expansive enough to permit overnight renters.

---

[6] A Club Member is defined, in relevant part, as "any Person or Persons who hold fee title, of record, to one or more Club Interests (including a contract seller, but excluding a contract purchaser) at the time in question."  Plan,

"Permitted Users" are defined in the Plan as:

> any of Declarants, Sponsor, Suite Sponsor, Unit Owners, the Condominium Board, the Club Board, Club Members (and any individual(s) designated by the Primary Owner who may make reservations of Club Weeks for a particular Club Interest) and their successors and assigns, and all officers, stockholders, principals, partners, employees, members, agents (including selling and managing agents), *guests*, exchangers, contractors, *tenants, invitees*, Permitted Mortgagees, invitees and licensees of any of the foregoing who has permission to use a Unit and/or the common Elements, subject to the terms of the Condominium Documents and the Club Documents, whether written or oral, granted by a Unit Owner or Club Member, the condominium Board, the Condominium Documents, the Club Board, the Club Documents, or the Offering Plan.

Plan, Definitions, at 23 (emphases added). Thus, guests, tenants, and invitees of the Sponsor and Club Members are Permitted Users. This provision does not prohibit short term rentals of the Units—indeed, Plaintiffs acknowledge that such rentals by the Sponsor are permitted; Plaintiffs allege that "Defendants' status as the owner of unsold inventory arguably makes them a Club Member entitled to rent like any other Club Member . . . ." FAC ¶ 158.

However, Plaintiffs compare this to another provision of the Plan, which states that "[t]he *Suite Units* may be used for . . . transient hotel purposes," to conclude that the Plan contemplates that the Suite Units—and not the Club Units—were intended to be used for "transient hotel purposes," like overnight rentals. *Id.* ¶ 150 (citing Plan, Introduction, at 5 § 13(b) (emphasis added)). If it were otherwise, Plaintiffs contend, the language regarding transient hotel purposes would have appeared in the provision about the use of Club Units. But the Court cannot convert language permitting the use of Suite Units for hotel purposes into an express covenant prohibiting the use of Club Units for that purpose. Because the express provisions of the Plan identified by Plaintiffs does not restrict use by overnight renters, Plaintiffs have failed to state a claim for breach of this express provision of the Plan.

---

Definitions, at 19. The definition encompasses the Sponsor, which holds fee title to Club Interests and is not otherwise excluded.

The other provisions of the Plan that Plaintiffs point to as a basis for their claim for an express contractual breach also do not support the claim. Plaintiffs identify the provision of the Plan stating that "[e]ach Club Interest includes the right to confirm the reservation of seven (7) consecutive days" and "the right to use a maximum of fifteen (15) weekdays and six (6) weekend days . . . fox a maximum total of twenty one (21) days." FAC ¶ 149 (citing Plan, Introduction, at 12). Given these limitations, Plaintiffs argue that the Plan makes clear that the use of the Club Units is "strictly regimented" and not intended to be used for unlimited nightly rentals. However, these limitations do not specifically constrain the Sponsor (or any other Club Member) from renting Units.

Next, Plaintiffs point to paragraph 151 of the FAC, which cites to several provisions prohibiting the subdivision of Club Units. Paragraph 151 cites the Plan's Special Risk Factors and Introduction, which provide, respectively, that "[u]nder the Club Declaration, each Club Unit included shall remain undivided," and "Club Members are strictly prohibited from subdividing their Club Interest." FAC ¶ 151 (citing Plan, Special Risk Factors, at 4 § 17; Plan, Introduction, at 13).[7]

---

[7] Paragraph 151 of the FAC also cites to the Plan's Club Declaration, which provides:

> *Except for Sponsor*, no Club Unit may be used in fact or effect as part of or in furtherance of an Occupancy Plan (defined below). The term Occupancy Plan means a program, plan, agreement or other arrangement for the use, occupancy, marketing, advertising or promotion of one or more Club Units or Club Interests under any timeshare or fractional plan, residence, destination or luxury club, equity or non-equity program, interval exchange (whether the program is based on direct exchange of occupancy rights, cash payments, reward programs or other point or accrual systems) or other membership plans or arrangements through which a participant in the plan or arrangement acquires the right to use and occupy such Club Unit(s) or a portfolio of accommodations including such Club Unit(s).

FAC ¶ 151 (citing Plan, Club Declaration, at 460, Art. 10) (emphasis added). This provision fails to support Plaintiffs' position, however, given that the Sponsor is expressly exempt.

Finally, paragraph 151 cites the Third Amendment to the Plan, which provides that:

> The Club Association has endorsed through an affiliation agreement, the Starwood Residence Network or SRN as the Club's exchange program. *The Club shall not recognize or honor any exchanges from any entity, other than SRN.* SRN will permit Club Members to exchange or "interchange" Club Weeks associated with their Club Interest with Club Members at other Starwood Residence Club locations, *provided such location is also affiliated with SRN.*

Plaintiffs characterize these provisions as protection "against further timesharing."  Pl.'s Opp., at 10.

Again, however, the provision does not expressly prohibit the Sponsor from renting Units to

overnight "guests" and "invitees."  Such overnight rentals cannot reasonably be considered to

constitute subdivisions of the unit interests.

### iv. Plaintiffs Do Not Sufficiently Allege Breach of Implied Covenant in Connection with Count Three

Plaintiffs assert that they "could not reasonably have anticipated based on the Offering Plan,

that Sponsor would retain a significant number of shares which it would itself rent on daily basis at

market rates."  Pls.' Opp., at 9 (citing FAC ¶¶ 155–57, 133–36).  Plaintiffs allege that Defendants are

"frustrating" Plaintiffs' rights under the Plan by engaging in those rentals.  According to Plaintiffs,

Defendants are "making it impossible for [Plaintiffs] to resell their shares while increasing their

maintenance payments" due to the increased wear and tear from the overnight tenants.  *Id.* (citing

FAC ¶¶ 127, 142, 147); *see also* FAC ¶ 127 ("This rental program has suppressed the value of

Plaintiffs' Units.  Adding insult to injury, Defendants have foisted the costs of the increased wear

and tear caused by the rental program on Plaintiffs in the form of increased annual fees.").  Plaintiffs

have also pleaded that the rental program suppresses the value of the Club Interests, FAC ¶ 127, and

makes it difficult for Plaintiffs to access their Club Interests because they have to compete with

renters.  *Id.* ¶ 148.

While the Court has found that Plaintiffs have adequately pleaded an implied covenant on

the part of the Sponsor to sell a sufficient number of Club Interests, Plaintiffs have not adequately

alleged the existence of an independent duty not to rent units.  To conclude that such an implied

covenant existed here would run in the face of the express provisions of the Offering Plan that

---

*Id.*  Plaintiffs have not argued how the exchange program contemplated in this part of the provision is relevant
to the question of overnight rentals, however.

reserved to the Sponsor the right to rent units.  Plaintiffs concede that the "Offering Plan opens with a reference to Sponsor's rental . . . of its Unsold Club Interests," that Plaintiffs knew "there would be some rentals," and that the Sponsor, as owner of unsold Interests, is arguably "entitled to rent like any other Club Member."  FAC ¶¶ 152, 155, 158.  The Plan clearly anticipates that the Sponsor will rent Club Interests.  *See, e.g.,* Plan at 3 § 1(a) ("Any Club Member attempting to rent or resell a Club Interest would have to compete, at a substantial disadvantage, with Sponsor in the rental and sale of its Unsold Club Interests.").  The Court cannot, therefore, find in the Plan an implied covenant for the Sponsor not to rent units—such an implied term is contradicted by the contract's express language.  Accordingly, the motion to dismiss Count Three is granted.

### v.    Statute of Limitations for Breach of Contract Claims

Finally, the parties dispute whether the breach of contract claims asserted in Counts One and Three are time-barred.[8]  New York's statute of limitations for breach of contract—express and implied—is six years, C.P.L.R. §213(2), and "accrues at the time of the breach . . . even though the injured party may be ignorant of the existence of the wrong or injury" at that time.  *Ely-Cruikshank Co. v. Bank of Montreal*, 81 N.Y.2d 399, 402–03 (1993); *V.E.C. Corp. of Del.*, 896 F. Supp. 2d at 259.

According to Plaintiffs, the statute of limitations for the alleged breaches has not yet expired.[9]  According to Defendants, however, the claims would have accrued in or around 2008 and 2009, when Defendants allegedly abandoned their sales efforts and implemented the overnight rental program.  If Defendants are correct, the claims expired prior to the tolling agreement entered into by the parties approximately seven or eight years later, in 2016.  *See* Defs.' Br. at 18.  For the reasons set forth below, the Court cannot conclude, at this time, that the contract claims are time-barred.

---

[8] The Court does not address the parties' arguments regarding Count Three because it has been dismissed.
[9] In the alternative, Plaintiffs maintain that (i) Defendants annually reaffirmed their duty to sell the Club Units by filing annual amendments to the Plan; and (ii) the duty to sell requires continuing performance and therefore implicates the continuing violation doctrine.

Count One derives from the Sponsor's implied covenant to sell a sufficient number of Club Interests to permit the fractional offering to become viable. "Nonperformance of a required duty under a contract is not a breach of the contract until the performance is due." *N.Y. State Elec. & Gas Corp. v. State*, 630 N.Y.S.2d 412, 414 (3d Dep't 1995) (citing Restatement (Second) of Contracts § 235 cmt. b (1981)). Where, as here, no time for contract performance is specified, a party to a contract is permitted a "reasonable time" to perform. *See Jennifer*, 98 N.Y.2d at 154. What constitutes a reasonable time is a question of fact for the jury. *See Sands v. Bernstein*, No. 07-cv-9824 (RWS), 2009 WL 151729, at *4 (S.D.N.Y. Jan. 21, 2009) ("The question of what is a reasonable period of time for performance of a particular contract is a question of fact for a jury, unless the facts are undisputed, in which case the question becomes one appropriate for summary judgment.") (internal quotations and citations omitted); *Baisch, Inc. v. Pike Co.*, 959 N.Y.S.2d 786, 787 (4th Dep't 2013) ("What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case."); *Lituchy v. Guinan Lithographic Co. Inc.*, 400 N.Y.S.2d 158, 159 (2d Dep't 1977) ("[T]he question as to what constitutes a reasonable time under the circumstances presented here is a factual one requiring a trial.").

Given that the governing documents do not specify a deadline for the Sponsor's performance, the Sponsor is entitled to a "reasonable time" to perform.[10] Because the question of "reasonable time" is a question of fact, however, the Court declines to dismiss Count One as untimely at this stage.

---

[10] In their opposition, Plaintiffs assert repeatedly that "both sides agree that the recession suspended Sponsor's duty to sell," and, therefore, that the statute of limitations did not begin to run until a reasonable time after the recession. Pls.' Opp., at 12–13. It is not apparent to the Court, however, that both sides do, in fact, agree on that issue. Moreover, the question of when the statute began to run—whether before or after the recession—requires the Court to evaluate additional facts that are not available at this early stage of the litigation.

### B. Rescission (Sixth Count)

Defendants' motion to dismiss Plaintiffs' claim for rescission is denied because the contractual language upon which Plaintiffs' motion is predicated is ambiguous. Plaintiffs, with the exception of a small subset of "Non-Rescinding Plaintiffs," move to rescind their purchase agreements, as an alternative to their breach of contract claims. FAC ¶ 198. The section of the Plan on which they rely provides, in relevant part, that:

> Sponsor reserves the right, from time to time prior to the First Closing of a Club Interest, without obtaining the consent of Purchasers or others, to substantially revise the terms and conditions upon which the Club Interests are to be sold, including changes affecting the rights, obligations and liabilities of Sponsor, *the Purchasers and/or prospective Purchasers* under the Offering Plan . . . . All substantive or material revisions will be contained in a duly filed amendment to the Offering Plan. If there is a substantial amendment to the Offering Plan that materially and adversely affects Purchasers, *except as otherwise provided herein,* Purchasers will have a right of rescission for a period of fifteen (15) days from the Presentation Date[11] of such amendment to them, sponsor shall promptly return any Deposit to Purchasers who rescind . . . .

Plan at 103 (emphasis added). Both parties have presented reasonable alternative constructions of several components of this language, which renders it ambiguous.

"In a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous." *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011). The question of "[w]hether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990). "It is well settled that a contract is unambiguous if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion. Conversely, . . . the language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Lockheed*

---

[11] The "Presentation Date" is the "date on which the Offering Plan or an amendment thereto . . . is personally delivered or the fifth day after mailing to prospective Purchasers and Club Members." Plan, at 23.

*Martin Corp.*, 639 F.3d at 69. "'Ambiguity is determined by looking within the four corners of the document, not to outside sources.'" *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (quoting *Kass v. Kass*, 91 N.Y.2d 554, 566 (1998)).

The parties first dispute the meaning of the term "Purchaser," which is used in the rescission provision to define the category of people with the right to claim rescission. "Purchaser" is defined in the Plan as "a purchaser of a Club Interest *under a* Purchase Agreement with Sponsor." Plan at 24 (emphasis added).[12]

Defendants argue reasonably that the term "Purchaser" applies only to persons who are still "under" their Purchase Agreements, in that the purchase has not yet closed. Defendants argue that "[t]he Plan's definition of 'Purchasers' implements a right to rescind afforded under the Martin Act regulations to 'purchasers under contract.'" Defs.' Br. at 20 (citing 13 N.Y.C.R.R. § 24.5(a)(5)). Defendants argue that their proposed construction of the contract is bolstered by the limited nature of the remedy available for those who opt to rescind; they are entitled to the return of their deposit—a remedy which, they reasonably argue, would not redress all harm to a person who has already closed their purchase.

Defendants' argument that the language is clear and unambiguous, however, is foiled by an article—the word "a" in the definition of Purchaser. Unlike the language in the Martin Act regulation which Defendants cite, the definition of "Purchaser" here does not refer to a "purchaser under contract"—which in this context the Court might readily construe to be an unambiguous reference to a purchaser who is subject to the terms of a contract that has not yet closed. Instead, the definition refers to "a purchaser of a Club Interest under a Purchase Agreement." This language, which introduces the article "a" and uses the defined term "Purchase Agreement," rather

---

[12] A "Purchase Agreement" is defined as "the agreement to purchase a Club Interest entered into between Sponsor and Purchaser." *Id.*

21

than a generic reference to a contract, permits the alternative construction forwarded by Plaintiffs—namely that the term refers to any person who purchased a Club Interest pursuant to a Purchase Agreement with the Sponsor, as opposed to a purchaser from a third party.

When viewed in the context of the document as a whole, the term "Purchaser" is used variably in ways that support both Plaintiffs' and Defendants' proposed construction of the term. As an illustration, the Plan states that "each Purchaser of a Club Interest will acquire a 4/52 undivided interest in a Club Unit, as tenant-in-common with all other Purchasers of Club Interests in such Club Unit." Plan at 12. This provision makes little sense if the term "Purchaser" is defined, as Defendants argue, to refer only to people currently under contract to buy a unit, but not to people who have closed the sale. While this may not have been the intent of the parties or the scrivener, as drafted, the text of the contract permits alternative constructions of the term "Purchaser" as used. Since the term as used here is ambiguous, the Court cannot dismiss the rescission claim on this ground.[13]

The Court fully appreciates Defendants' argument that the first sentence of the paragraph establishing the rescission right should inform the analysis of the contractual provision. Defendants present the provision as one that clearly relates solely to rights in the event of an exercise by the Sponsor of its expressly reserved right to revise sales terms "prior to the First Closing of a Club Interest." Plan at 103. This is a valid argument, but one that is weakened by the contract's use of the defined term quoted above. For the "First Closing of a Club Interest" does not mean the first

---

[13] Neither Plaintiffs nor Defendants discuss the waiver of claims made by "Purchasers" and their effect on Plaintiffs' claims in the event that Plaintiffs do qualify as Purchasers, as they argue. The Plan contains a number of provisions limiting the Sponsor's liability to Purchasers. It also includes limitations on Purchasers' rights to bring action against third parties, such as the following: "Under no circumstances shall any Purchasers and offerees under the Offering Plan (or their purchasers or tenants or invitees others) have any claim or recourse whatsoever against or privity with Fee Owner, any Commercial Unit Owner, the Club Sponsor or Starwood or any of their respective affiliates (other than Sponsor), or any of their respective officers, directors, partners, members, managers, shareholders, agents, employees or successors-in-interest or other party/ies claiming through, in connection with the Offering Plan, the renovation of the Suite Units (or any other Unit in the Condominium or element thereof), any 'fiscal' matters (e.g., adequacy of budgets, reserves, etc.) or the purchase of a Club Interest or any other matter relating to the Building." Plan at 27.

closing of *any* Club Interest or Club Unit. Instead, it is defined as "the Closing of Title with respect to the first Club Interest *in a particular* Club Unit." Plan at 22. Because of the use of this defined term, rather than natural language, the Sponsor's reserved right described in the paragraph can be argued to apply not only once at the outset of sales, but a multitude of times as it begins sales in each separate particular Club Unit.

Defendants also argue that the rescission claim must be dismissed because the preconditions for exercising the right to rescind have not been satisfied. As noted above, there must have been "a substantial amendment to the Offering Plan that materially and adversely affects Purchasers" to trigger the right to rescind. Plan, at 103. Here, the parties dispute whether the complaint sufficiently pleads the existence of such substantial amendments.

According to Plaintiffs, the alleged substantial amendments are (i) the conversions of Suite Units into Club Units and changes in expense allocations, which were endorsed formal amendments to the Plan—namely, the Seventh and Eighth Amendments; and (ii) the Sponsor's decision to abandon sales and instead pursue a large-scale rental program, which Plaintiffs classify as a "*de facto*" amendment. *See* FAC ¶ 201.

Defendants argue that these changes do not constitute "substantive or material revisions" sufficient to satisfy the rescission provision's preconditions. Defs.' Br. at 21. In particular, Defendants argue that the Plan "plainly contemplates rescission only based on amendments that have been 'duly filed,'"—which excludes the *de facto* amendments.[14] The rescission provision provides that "*[a]ll substantive or material revisions will be contained in a duly filed amendment to the Offering Plan.* If there is a substantial amendment to the Offering Plan that materially and adversely affects

_____

[14] With respect to the Seventh and Eighth Amendments, Plaintiffs allege that the changes were concealed and Plaintiffs did not learn of them until a tolling agreement went into effect on May 20, 2016. *Id.* ¶ 204. Accepting the allegations of the FAC as true, the time to exercise the right of rescission has not expired because it runs from the Presentation Date—which has not yet occurred. *Id.* ¶ 205.

Purchasers, except as otherwise provided herein, Purchasers will have a right of rescission." Defs.'

Br. at 21 (quoting FAC ¶ 201) (emphasis added). It is reasonable to construe the plain language of

the rescission provision to limit the right of rescission to Purchasers who have been subjected to

"substantive or material revisions" that are contained in duly filed amendments. Plaintiffs do not

propose another reading of this clause, and the Court does not find that the language is capable of a

different interpretation. Accordingly, the Court grants the motion to dismiss with respect to

rescission rights allegedly derived from the *de facto* amendments.

Defendants' other substantive argument rests on selective quotation from the relevant

contractual provision, and falls on the back of the ambiguous language of the complete text.

Defendants argue that a "substantial amendment" for purposes of the rescission provision is one

that "materially and adversely affects Purchasers, *except as otherwise provided herein* . . . ." Defendants

then point to provisions in the Plan granting the Sponsor the "right to create and add additional

Club Units . . . by subdividing . . . and/or converting the Suite Units" and noting that "it is

anticipated that the methods of allocation of [expenses] will be periodically adjusted." Plan, at 7–8 §

20(e), 42. Defendants argue that because of the fact that unit conversion and expense allocation are

provided for elsewhere in the Plan, those actions cannot constitute substantial amendments that

trigger the right to rescind. This argument is not implausible as presented.

However, Defendants' argument rests on selective quotation from the contract. The full

clause of the contractual provision at issue reads as follows: "If there is a substantial amendment to

the Offering Plan that materially and adversely affects Purchasers, *except as otherwise provided herein,*

Purchasers will have a right of rescission for a period of fifteen (15) days . . . ." In the complete text,

the clause "except as otherwise provided herein" can be read to caveat the language that follows it—

in other words, that the Purchasers will have a right of rescission for a period of time, except as

otherwise provided in the agreement. This is a more natural construction of that language in

context than Defendants' suggestion that the clause caveats what constitutes a material and adverse effect on Purchaser. Defendants' argument, which rests on its selective quotation from the contract, does not provide sufficient basis to dismiss this claim.

### C. Plaintiffs' Unjust Enrichment Claim Must be Dismissed (Seventh Count)

Finally, Plaintiffs' unjust enrichment claims against Defendants other than the Sponsor are inadequately pleaded.[15] "The essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (quoting *Paramount Film Distrib. Corp. v. State of New York,* 30 N.Y.2d 415, 421 (1972)). "A plaintiff must show 'that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.'" *Id.* (quoting *Citibank, N.A. v. Walker,* 787 N.Y.S.2d 48 (2d Dep't 2004)); *see also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and good conscience' require restitution.").

The Plaintiffs' unjust enrichment claims rely on improper group pleading. The FAC defines "Defendants" as the collective term for Starwood, Marriott International, Vistana Vacation Ownership, Inc., Vistana Signature Experiences, Inc., Merger Sub, Inc., and Interval Leisure Group, Inc. (collectively, the "Non-Sponsor Defendants"), together with the Sponsor. FAC at 8. Throughout the complaint, Plaintiffs consistently refer to the actions of Defendants collectively without specific attribution.

---

[15] A claim of unjust enrichment "cannot be maintained alongside a properly asserted breach of contract claim as a matter of law." *Adams v. Labaton, Sucharow & Rudoff LLP*, No. 07-cv-7017 (DAB), 2009 WL 928143, at *7 (S.D.N.Y. Mar. 20, 2009). Here, however, the breach of contract claims are asserted only as to the Sponsor and the unjust enrichment claim is asserted only as to Defendants other than the Sponsor.

Complaints that rely on group pleading "fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim." *Adamou v. Cty. of Spotsylvania, Va.*, No. 12-cv-7789 (ALC), 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) (citing *Atuahene v. City of Hartford*, 10 Fed. App'x 33, 34 (2d Cir. 2001) (observing that Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests," and that a complaint fails to meet that minimum where it "lump[s] all the defendants together in each claim and provide[s] no factual basis to distinguish their conduct"); *see also Spring v. Allegany-Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 293 (W.D.N.Y. 2015*), aff'd in part*, *vacated in part*, 655 F. App'x 25 (2d Cir. 2016), *remanded to* No. 14-cv-476S (WMS), 2017 WL 6512858 (W.D.N.Y. Dec. 20, 2017) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations."); *Thomas v. Venditto*, 925 F. Supp. 2d 352, 363 (E.D.N.Y. 2013) ("[I]t is insufficient for the plaintiffs to rely on group pleading against [these defendants] without making specific factual allegations [against them]." (alterations in original) (internal quotation marks and citation omitted)); *cf. Iqbal*, 556 U.S. at 676 ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

While Plaintiffs' reliance on imprecise group pleading is not fatal to their other claims, their practice leaves the complaint bare of sufficient facts to sustain their pleading burden with respect to the unjust enrichment claim. Plaintiffs fail to plead that the Non-Sponsor Defendants specifically profited at Plaintiffs' expense. Instead, the allegations pertaining to their unjust enrichment claim refer to "Defendants"—meaning all defendants, including the Sponsor. Plaintiffs contend that their interests were harmed because "rental income that rightfully belongs to them" was "diverted to Defendants." Pls.' Opp., at 24. They point to the allegations in the FAC that claim "Defendants

have unlawfully profited at Plaintiffs' expense, including by renting time associated with unsold Club Interests in violation of the Club Offering Plan" and that "[e]quity and good conscience require that all sums improperly obtained by Defendants be disgorged by Defendants and restored to Plaintiffs." FAC ¶¶ 208–209.[16]

But these blanket assertions as to all Defendants are not sufficient to state a claim. There are no specific facts that would suggest how, for example, Defendants other than the Sponsor profited by renting time in the Club Units, or how rental income was diverted to them. Given the few specific facts that are pleaded regarding the Non-Sponsor Defendants' involvement in the transactions at issue, the Court is unable to look through the group pleading to find facts sufficient to allow the unjust enrichment claims to proceed as to any of the Non-Sponsor Defendants. Accordingly, the motion to dismiss Count Seven must be granted.[17]

---

[16] Moreover, the few allegations relating specifically to the Non-Sponsor Defendants do not plausibly allege that they were unjustly enriched. The FAC asserts that Starwood, in a joint venture with several other entities, filed the condominium map on the building housing the St. Regis, which created the Club Units. FAC ¶ 3. Starwood is the former owner of Starwood Vacation Ownership, Inc., which has been renamed and acquired by defendant ILG. *Id.* ¶ 19. On October 28, 2015, Starwood announced that it had entered into a definitive agreement to spin off its vacation ownership businesses, including VVO and the Sponsor, and to then merge these spun-off entities with a subsidiary of ILG, Merger Sub (the "Spin-Off/Merger"). *Id.* ¶ 25. The Spin-Off/Merger was completed by May 2016 and ILG became the owner of the Sponsor and its unsold Club Interests. *Id.* Defendants ILG, VVO, VSE, and Merger sub are referred to collectively in the FAC as "ILG-Vistana." *Id.* ¶ 26. Defendant Marriott acquired Starwood in 2016. *Id.* ¶ 20. While these connections explain why the Non-Sponsor Defendants were named in this action, there is no factual basis from which the Court can discern that they were unjustly enriched.

[17] Because the unjust enrichment claim is dismissed on this ground, the Court need not address Defendants' remaining arguments—namely, that the unjust enrichment claim is conclusory, was released against the relevant defendants, and that it is untimely.

## VI.    CONCLUSION

For the reasons set forth above, the motion to dismiss is granted in part and denied in part as to Count One.  The motion to dismiss is granted as to Count Three with prejudice.  The motion to dismiss is denied as to Count Six and granted as to Count Seven.  Count Seven is dismissed without prejudice.  Plaintiffs are granted leave to replead Count Seven.  Any amended complaint must be filed no later than 21 days after the date of this order.

SO ORDERED.

Dated:  September 28, 2018
New York, New York

_____
GREGORY H. WOODS
United States District Judge