# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

FLORA GILLESPIE and BRUCE GILLESPIE;
BRUCE ALLEN ALTER; NEIL ARNOVITZ and
2423-0476 QUEBEC, INC., a Canada corporation;
STAN BATTAT and ZMIRA BATTAT; SAMUEL
BERCHOLZ; CAROL BLACKBURN, HELENE
BLACKBURN, STEVE BLAU, and BLAU
PROPERTY, LLC, a New York limited liability
company; ALEX BLAVATNIK; FRANCINE J.
BLUM; MICHAEL Z. BLUMBERG and BARBARA
S. BLUMBERG, individually and as trustees of the
BARBARA S. BLUMBERG REVOCABLE TRUST;
CRISTINA S. BUAAS, individually and as trustee of
the 2011 CRISTINA BUAAS NONEXEMPT
TRUST, and JIM BUAAS; BERNARD L. BRYANT
and WELSH PROPERTIES-NEW YORK, LLC, a
Louisiana limited partnership; CATHERINE
CANTRELL; PETER CAPOLINO and FRAN
DEITRICH; JOHN CHAPPLE and VIVIAN DIXON,
individually and as trustees of the J.H. PROPERTY
TRUST DATED 2/14/2007; CKNY, INC., a Florida
corporation; DANIEL CLARK; WILLIAM
MICHAEL CLOWES and ANN CHRISTINE
CLOWES; IAN CASEY, KENT GRAY, and CV
PARTNERS, INC., a California corporation; DR.
CLAY COCKERELL, BRENDA COCKERELL, and
RESOLUTION REALTY INVESTMENTS, LLC, a
Texas limited liability company; MICHAEL
COVARRUBIAS, MARK R. KROLL, and SUSAN T.
KROLL, individually and as trustees of the KROLL
FAMILY TRUST U.D.T. 3/20/1989 AS AMENDED;
ORPHEUS S. L. CRUTCHFIELD, d/b/a PYRAMID
BRIDGING; EDWARD DIAO and THERESA DIAO,
individually and as trustees of the DIAO FAMILY
REVOCABLE INTER VIVOS TRUST APRIL 3,
2003; STEVEN DINETZ and LAURI DINETZ,
individually and as trustees of the STEVEN DINETZ
1998 FAMILY TRUST DATED JULY 27, 2005;
PATRICIA DUVALL, formerly known as Patricia
Shapiro; EDWARD W. EASTON and EDWARD W.
EASTON FAMILY LIMITED, a Florida limited
partnership; MARTIN ENGELS and ENGELS, LLC,
a Florida limited liability company; GLENN H.
EPSTEIN; ANDY EVANS and ANN EVANS,

Case No.  1:16-cv-09390-GHW

**SECOND AMENDED
COMPLAINT**

individually and as trustees of the EVANS FAMILY
TRUST DATED NOVEMBER 10, 1990; DR.
MITCHELL C. FEINMAN and JENNIFER M.
FEINMAN; LAURIE FELTHEIMER and THE
HOLLYWOOD COMPANY, LLC, a California
corporation; KATHLEEN PATRICIA FITZGERALD
and BRENDAN VINCENT FITZGERALD;
MICHAEL FITZGERALD and FITZE ENGINEERS
LIMITED, a Pennsylvania corporation; JUNIOR D.
FLETCHER; WILLIAM FRIEDBERG, individually
and as trustee of the WILLIAM FRIEDBERG
DECLARATION OF TRUST; RICHARD GENOW;
LINDA GERINGER and STEVE GERINGER,
individually and as trustees of the GERINGER
FAMILY TRUST UAD JUNE 26, 1996; CARLOS
GIRALDO; THOMAS L. GOTFREDSON and
CHRISTINE P. GOTFREDSON, individually and as
trustees of the THOMAS L. GOTFREDSON AND
CHRISTINE P. GOTFREDSON FAMILY TRUST
DATED 10/24/2006; ROBERT L. GOTFREDSON
and ANN F. GOTFREDSON, individually and as
trustees of the GOTFREDSON FAMILY TRUST
DATED 9/24/91; DR. JEROME GRANATO and
JUDITH GRANATO; LARRY S. GUTSCH and
JAQUA L. GUTSCH, individually and as trustees of
the GUTSCH FAMILY TRUST DATED
DECEMBER 28, 1995; MASAICHI HASEGAWA;
MICHAEL HECHTER; LAWRENCE HEDRICK and
SYLVIA MOISA HEDRICK, individually and as
trustees of the HEDRICK FAMILY TRUST DATED
11/25/03; GALE HIGGS; ROBERT HODGKINSON
and 7804 YUKON, INC., a Nevada corporation; LIA
IACOCCA-ASSAD and VICTOR ALLEN ASSAD,
individually and as trustees of the LIA IACOCCA
ASSAD DECLARATION OF TRUST DATED
12/22/1989, AS AMENDED 2/21/1994; WALTER
JAMES BROWN, JR. and KATHY JUSTICE,
individually and as trustees of THE WALTER JAMES
BROWN, JR. AND KATHRYN SUE JUSTICE
FAMILY TRUST DATED 5/7/2002; ROBERT
KAUFMANN, individually and as trustee of the
ROBERT KAUFMANN LIVING TRUST DATED
MAY 23, 2002; MARYANNE LARSEN; LEWIS S.
LEE, JR.; HOWARD LEVINE and PAMELA
LEVINE; MICHAEL LEVINE and SUSAN LEVINE,
individually and as trustees of the AMENDED AND

RESTATED LEVINE FAMILY TRUST DATED
11/30/1989 (AMENDED AND REVISED
03/29/1995); ROBERT LOJKOVIC and KATHLEEN
LOJKOVIC; JAMES LUSTIG and AMETHYST
INVESTMENTS, LLC, a Colorado limited liability
company; CARY P. MARSHALL and CINDY S.
MARSHALL, individually and as trustees of the
CINDY S. MARSHALL REVOCABLE TRUST
DATED 11/25/98; ANNE A. MASTAIN; IAN
MAUSNER and EVOLUTION LENDING, LLC, a
California limited liability company; ROBERT A.
McCABE, JR., individually and as trustee of the
ROBERT McCABE REVOCABLE TRUST, and
JENNIE T. McCABE; MICHAEL McMILLEN; RCG
VENTURES I, LLC, a Georgia limited liability
company; HARVE MESKIN and LETTY MESKIN,
individually and as trustees of the MESKIN FAMILY
TRUST; SCOTT MEYER, DIANA MEYER, and
MEYER PROPERTIES, LLC, an Illinois limited
liability company; DR. VINCENT MONTICCIOLO,
individually and as trustee of the VINCENT J.
MONTICCIOLO REVOCABLE LIVING TRUST,
and DR. NATALIE MONTICCIOLO; GARY A.
MOSKO and JOANNE F. MOSKO; HARVEY H.
MUELLER, II, PEGGI C. MUELLER, and
PESCADOR PARTNERS, LTD., a Texas limited
partnership; BRUCE NEWBERG and NANCY
NEWBERG, individually and as trustees of the
NEWBERG FAMILY TRUST UTD 12/18/1990;
JERRY A. OREFICE and KAREN G. OREFICE;
BROOKS PACE, JUNE PACE, and STODDARD
LAND COMPANY, LLC, a Utah limited liability
company; DR. WAYNE PERRON; EARL W.
POWELL; MICHAEL R. POLLAK and SHEREEN
M. POLLAK; JACQUES PUTZEYS and
DOMINIQUE PUTZEYS-SCHIFFERS; NANCY
RATZAN and KENNETH RATZAN; ROBERT
REED, GENE REED and WHITSON
INVESTMENTS, LP, a South Carolina limited
partnership; ALEJANDRO RUIZ and CONSTANCE,
LTD., a British Virgin Islands limited company;
MANUEL SACAL; PAUL H. SAUNDERS and
VICTORIA B. SAUNDERS; STEPHEN SAWYER;
PHILIP S. SCHEIN and DOROTHY R. SCHEIN;
VALERIE SEYMOUR and JEFFREY SEYMOUR,
individually and as trustees of the JEFFREY AND

VALERIE SEYMOUR TRUST DATED AUGUST
16, 1994 AS AMENDED ON JULY 17, 2002;
WILLIAM SHENKMAN and BAIX
DEVELOPMENTS, INC., a Canada corporation;
HERBERT J. SIEGEL and PHYLLIS M. SIEGEL;
ED SNYDER; STEPHEN L. SNYDER; STONE,
GENOW, SMELKINSON, BINDER &
CHRISTOPHER, LLP, a California limited liability
partnership; CHARLES STUZIN and ROSALYN F.
STUZIN; JEFFREY TAYLOR and the BANKERS
UNION TRUST DATED 1/16/2011; JOANNE
TYMKIW and SYDNEY BELZBERG; SHEILA
USDIN and JACK USDIN, individually and as
trustees of the SHEILA ANN USDIN REVOCABLE
TRUST DTD 12/16/2005; WILLIAM WADE and
ROBIN GANN; MARCIA WADE; ESTELLE
IVKER WALLACH, individually and as trustee of the
HW-EIW TRUST DATED MAY 20, 2006; HENRY
WARSHAW and SUSAN WARSHAW; FRANK M.
WETCHLER and WENDY L. WETCHLER; ROGER
WOLK and MARILYN WOLK; DENNIS WONG
and PRISM CAPITAL CORPORATION, a Delaware
corporation; JULIE WRIGLEY, individually and as
trustee of the JULIE A. WRIGLEY 1999
REVOCABLE TRUST DATED FEBRUARY 12,
1999; and MARC KORTLANDER and JERYL
KORTLANDER,

        Plaintiffs,

   v.

ST. REGIS RESIDENCE CLUB, NEW YORK INC.;
STARWOOD HOTELS AND RESORTS
WORLDWIDE, LLC; MARRIOTT
INTERNATIONAL, INC.; VISTANA VACATION
OWNERSHIP, INC.; VISTANA SIGNATURE
EXPERIENCES, INC.; MERGER SUB, INC.; and
INTERVAL LEISURE GROUP, INC.,

        Defendants.

Plaintiffs Flora Gillespie and Bruce Gillespie; Bruce Allen Alter; Neil Arnovitz and

2423-0476 Quebec, Inc., a Canada corporation; Stan Battat and Zmira Battat; Samuel Bercholz;

Carol Blackburn, Helene Blackburn, Steve Blau, and Blau Property, LLC, a New York limited

liability company; Alex Blavatnik; Francine J. Blum; Michael Z. Blumberg and Barbara S.

Blumberg, individually and as trustees of the Barbara S. Blumberg Revocable Trust; Cristina S.

Buaas, individually and as trustee of the 2011 Cristina Buass Nonexempt Trust, and Jim Buaas;

Bernard L. Bryant and Welsh Properties-New York, LLC, a Louisiana limited partnership;

Catherine Cantrell; Peter Capolino and Fran Deitrich; John Chapple and Vivian Dixon,

individually and as trustees of the J.H. Property Trust Dated 2/14/2007; CKNY, Inc., a Florida

corporation; Daniel Clark; William Michael Clowes and Ann Christine Clowes; Ian Casey, Kent

Gray, and CV Partners, Inc., a California corporation; Dr. Clay Cockerell, Brenda Cockerell, and

Resolution Realty Investments, LLC, a Texas limited liability company; Michael Covarrubias,

Mark R. Kroll, and Susan T. Kroll, individually and as trustees of the Kroll Family Trust U.D.T.

3/20/1989 as amended; Orpheus S. L. Crutchfield, d/b/a Pyramid Bridging; Edward Diao and

Theresa Diao, individually and as trustees of the Diao Family Revocable Inter Vivos Trust April

3, 2003; Steven Dinetz and Lauri Dinetz, individually and as trustees of the Steven Dinetz 1998

Family Trust Dated July 27, 2005; Patricia Duvall, formerly known as Patricia Shapiro; Edward

W. Easton and Edward W. Easton Family Limited, a Florida limited partnership; Martin Engels

and Engels, LLC, a Florida limited liability company; Glenn H. Epstein; Andy Evans and Ann

Evans, individually and as trustees of the Evans Family Trust Dated November 10, 1990; Dr.

Mitchell C. Feinman and Jennifer M. Feinman; Laurie Feltheimer and the Hollywood Company,

LLC, a California corporation; Kathleen Patricia FitzGerald and Brendan Vincent FitzGerald;

Michael Fitzgerald and Fitze Engineers Limited, a Pennsylvania corporation; Junior D. Fletcher;

William Friedberg, individually and as trustee of the William Friedberg Declaration of Trust;

Richard Genow; Linda Geringer and Steve Geringer, individually and as trustees of the Geringer

Family Trust UAD June 26, 1996; Carlos Giraldo; Thomas L. Gotfredson and Christine P.

Gotfredson, individually and as trustees of the Thomas L. Gotfredson and Christine P.

Gotfredson Family Trust Dated 10/24/2006; Robert L. Gotfredson and Ann F. Gotfredson,

individually and as trustees of the Gotfredson Family Trust Dated 9/24/91; Dr. Jerome Granato

and Judith Granato; Larry S. Gutsch and Jaqua L. Gutsch, individually and as trustees of the

Gutsch Family Trust Dated December 28, 1995; Masaichi Hasegawa; Michael Hechter;

Lawrence Hedrick and Sylvia Moisa Hedrick, individually and as trustees of the Hedrick Family

Trust dated 11/25/03; Gale Higgs; Robert Hodgkinson and 7804 Yukon, Inc., a Nevada

corporation; Lia Iacocca-Assad and Victor Allen Assad, individually and as trustees of the Lia

Iacocca Assad Declaration of Trust Dated 12/22/1989, as amended 2/21/1994; Walter James

Brown, Jr. and Kathy Justice, individually and as trustees of the Walter James Brown, Jr. and

Kathryn Sue Justice Family Trust Dated 5/7/2002; Robert Kaufmann, individually and as trustee

of the Robert Kaufmann Living Trust Dated May 23, 2002; Maryanne Larsen; Lewis S. Lee, Jr.;

Howard Levine and Pamela Levine; Michael Levine and Susan Levine, individually and as

trustees of the Amended and Restated Levine Family Trust Dated 11/30/1989 (Amended and

Revised 03/29/1995); Robert Lojkovic and Kathleen Lojkovic; James Lustig and Amethyst

Investments, LLC, a Colorado limited liability company; Cary P. Marshall and Cindy S.

Marshall, individually and as trustees of the Cindy S. Marshall Revocable Trust Dated 11/25/98;

Anne A. Mastain; Ian Mausner and Evolution Lending, LLC, a California limited liability

company; Robert A. McCabe, Jr., individually and as trustee of the Robert McCabe Revocable

Trust, and Jennie T. McCabe; Michael McMillen; RCG Ventures I, LLC, a Georgia limited

liability company; Harve Meskin and Letty Meskin, individually and as trustees of the Meskin

Family Trust; Scott Meyer, Diana Meyer, and Meyer Properties, LLC, an Illinois limited liability

company; Dr. Vincent Monticciolo, individually and as trustee of the Vincent J. Monticciolo Revocable Living Trust, and Dr. Natalie Monticciolo; Gary A. Mosko and Joanne F. Mosko; Harvey H. Mueller, II, Peggi C. Mueller, and Pescador Partners, Ltd., a Texas limited partnership; Bruce Newberg and Nancy Newberg, individually and as trustees of the Newberg Family Trust UTD 12/18/1990; Jerry A. Orefice and Karen G. Orefice; Brooks Pace, June Pace, and Stoddard Land Company, LLC, a Utah limited liability company; Dr. Wayne Perron; Earl W. Powell; Michael R. Pollak and Shereen M. Pollak; Jacques Putzeys and Dominique Putzeys-Schiffers; Nancy Ratzan and Kenneth Ratzan; Robert Reed, Gene Reed and Whitson Investments, LP, a South Carolina limited partnership; Alejandro Ruiz and Constance, Ltd., a British Virgin Islands limited company; Manuel Sacal; Paul H. Saunders and Victoria B. Saunders; Stephen Sawyer; Philip S. Schein and Dorothy R. Schein; Valerie Seymour and Jeffrey Seymour, individually and as trustees of the Jeffrey and Valerie Seymour Trust Dated August 16, 1994 as amended on July 17, 2002; William Shenkman and Baix Developments, Inc., a Canada corporation; Herbert J. Siegel and Phyllis M. Siegel; Ed Snyder; Stephen L. Snyder; Stone, Genow, Smelkinson, Binder & Christopher, LLP, a California limited liability partnership; Charles Stuzin and Rosalyn F. Stuzin; Jeffrey Taylor and the Bankers Union Trust Dated 1/16/2011; Joanne Tymkiw and Sydney Belzberg; Sheila Usdin and Jack Usdin, individually and as trustees of the Sheila Ann Usdin Revocable Trust DTD 12/16/2005; William Wade and Robin Gann; Marcia Wade; Estelle Ivker Wallach, individually and as trustee of the HW-EIW Trust Dated May 20, 2006; Henry Warshaw and Susan Warshaw; Frank M. Wetchler and Wendy L. Wetchler; Roger Wolk and Marilyn Wolk; Dennis Wong and Prism Capital Corporation, a Delaware corporation; Julie Wrigley, individually and as trustee of the Julie A. Wrigley 1999 Revocable Trust Dated February 12, 1999; and Marc Kortlander and Jeryl

Kortlander (collectively, "Plaintiffs"), hereby allege, through their undersigned counsel, as their Second Amended Complaint against defendants St. Regis Residence Club, New York Inc.; Starwood Hotels and Resorts Worldwide, LLC (f.k.a. Starwood Hotels and Resorts Worldwide, Inc.); Marriott International, Inc.; Vistana Vacation Ownership, Inc. (f.k.a Starwood Vacation Ownership, Inc.); Vistana Signature Experiences, Inc.; Merger Sub, Inc.; and Interval Leisure Group, Inc. (collectively, "Defendants") as follows:

## NATURE OF THE ACTION

1.      Plaintiffs are the purchasers of 107 fractional timeshare interests in an iconic New York City building – the 1904 Beaux Arts landmark on the corner of Fifth Avenue and East 55th Street that houses the internationally acclaimed St. Regis New York Hotel.  Plaintiffs paid premium prices – an average of $455,000 per fractional interest – for an exclusive right of access to luxury units on specially reserved floors.  Defendants call their fractional offering the Fifth and Fifty-Fifth Residence Club ("St. Regis Residence Club" or "Residence Club").

2.      The St. Regis Residence Club is a "fractured" offering.  The term "fractured" is a term of art in the real estate development industry that refers not to a timeshare or other shared form of ownership, but rather to a multi-unit development in which (a) the developer failed to sell many of the units, and (b) the value of the units has collapsed.[1]  Sometimes an offering becomes "fractured" due to a downturn in the economy, but that is not the case here.  The St.

---

[1]      *See Dockside Associates/Pier 30, L.P. v. City of Philadelphia*, No. 2258 C.D. 2014, 2016 WL 197829, at *1 (Pa. Commw. Ct. Jan. 15, 2016) ("The Dictionary of Real Estate Appraisal defines a fractured condominium as: A residential condominium development or conversion project in which many units remain unsold; often a distressed property previously offered for sale as individual condominium units where the remaining units are remarketed as rental units and then sold as an apartment project. Sometimes the remaining units are sold in bulk at a discount") (quoting Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 78 (5th ed. 2010)).

Regis Residence Club is "fractured" because of the audacious and wrongful conduct alleged herein.

3.      In 2006, Starwood Hotels and Resorts Worldwide, LLC (also referred to as "Starwood"), in a joint venture with several other entities, filed a condominium map on this historic property, dividing it into four different components: the "Hotel Unit," the "Retail Unit," the "Suite Units," and the "Club Units."  The Hotel Unit consists of all of the floors of the hotel except floors 8, 9, 10, and 11.  The Retail Unit primarily consists of a high-end retail space at the corner of Fifth Avenue and 55th Street.  The fact that this retail space recently sold for $700 million underscores the cachet of this building.

4.      The Suite Units and the Club Units are the focus of this case.  Each is governed by an offering plan filed with the New York State Department of Law.  The Suite Unit offering allows Defendants to market and sell Suite Units, which are wholly-owned condominiums located on the tenth and eleventh floors.  The fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club ("Club Offering Plan" or "Plan")[2] allows Defendants to market and sell fractional "Club Interests" in Club Units that, initially, were all located on the eighth and ninth floors.  Later, Defendants converted some of the Suite Units on the tenth and eleventh floors into Club Units and thereby created new inventory of Club Interests.  The addition of each Club Unit yields another twelve Club Interests.  As more fully alleged below, these conversions provided Defendants with an expanded inventory of units, which they have wrongfully proceeded to rent (and/or make available to rent) to the general public instead of selling as fractional Club Interests. This conduct violates the implied covenant of good faith and fair dealing and the terms of the parties' contract, and has caused Plaintiffs substantial harm.

---

[2] True and correct copies of the Club Offering Plan and the first 24 amendments thereto are attached hereto as Exhibits 6 through 30, respectively.

5.      Beginning in 2007, the Sponsor, St. Regis New York Residence Club, Inc., also harmed Plaintiffs in another way -- while at the same time unjustly enriching its parent, Defendant Starwood Hotels & Resorts Worldwide, LLC. It began a series of "non-parity" agreements that secretly favored the rental of the St. Regis Hotel room inventory over the fractional Club interests.[3] Indeed, in April 2012, the Sponsor (through its agent St. Regis New York Management, Inc.) and Defendant Starwood Hotels and Resorts Worldwide, LLC (through its wholly owned subsidiary and alter ego, St. Regis New York Operating LLC (collectively, "the Hotel")), entered into a new and secret "non-parity" agreement, wherein the Hotel paid the Sponsor $2.7 million[4] per year to ensure that no Club Interest – including the unsold Club interests and the non-Sponsor owned Club interests utilizing the promised Sponsor run rental program, would be rented *until the hotel units were sold out*. Simply stated, the fractional inventory became solely overflow inventory for the hotel.  It was not lost on the market that owners at the St. Regis Residence Club in New York did not have a viable option to rent their unused time through the Sponsor, unlike owners of units at other high-end private residence clubs, such as the St. Regis Residence Club in Aspen. This too was a substantial factor in the collapse in values.

6.      Defendants sold the first fractional Club Interest in August 2006, and sales of Club Interests continued at a steady pace through 2007.  However, by mid-March 2008, three things were apparent to Defendants.  First, they knew based on sales and absorption rate data (publicly reported to the Department of Law) that they were likely to sell all of the original 264 Club Interests located on the eighth and ninth floors.  Second and conversely, the Suite Units

---

[3] The secret "non-parity" agreements described herein were revealed during discovery.

[4] In addition, the Hotel paid the Sponsor $1.3 million per year for the costs the Sponsor incurred in allowing Club owners to trade weeks for SPG points.

were not selling, probably because few wanted to pay the much higher prices for these wholly-owned units as the economy was worsening. Third, and most important, Defendants knew that the country and the real estate market were sliding into recession, especially after the collapse of Bear Stearns in March 2008.

7.      Rather than suffer the consequences of their inability to sell all of the wholly-owned Suite Units, Defendants converted Suite Units into Club Units – most of them a week after the Bear Stearns collapse. This might have been fine if Defendants actually sold the newly created Club Interests, but that was never their intention. In rapid succession after the late March 2008 conversion of Suite Units, Defendants *raised* the prices of Club Interests as the real estate market was collapsing and withdrew the seller-financing option that had been available to potential purchasers of Club Interests. Defendants quietly closed the sales office in the building, although they continued publishing price schedules and filing Amendments to the Offering Plan to create the appearance that their sales efforts were ongoing. On December 2, 2016, counsel for St. Regis Residence Club, New York Inc., the Sponsor of this Club Offering, conceded that "marketing activities have been suspended" beginning in 2009 and continuing to the present. In short, Defendants made a strategic decision to create "unsold" Club Interests, with no intent to ever sell them, solely so that they could rent them and profit at the Plaintiffs' expense.

8.      Defendants' wrongful conduct was part of a plan to foist upon Plaintiffs losses they would otherwise accrue as a result of their failure to sell Suite Units in the crumbling economy, while unjustly enriching themselves. First, they monetized their inventory of unsold Suite Units by converting them into Club Units and then opening up the greatly expanded inventory of unsold Club Interests to rentals – even though the Club Offering Plan only gave a very narrow right to rent. Second, they made Plaintiffs and other Club Interest purchasers

(defined as "Club Members" by the Plan) pay for the wear and tear resulting from the increased usage of their units.  Then, after several years of reaping unauthorized rental income, Starwood sold the fractional offering, including the unsold Club Interests, to a subsidiary of Defendant Interval Leisure Group, Inc. ("ILG").  On information and belief, ILG is now taking steps to merge the St. Regis Residence Club with its down-market timeshare exchange program approximately a quarter million participants.

9.      The 748-page Club Offering Plan states that Defendants would sell twelve Club Interests in each Club Unit.  Nothing in the governing documents gives Defendants the right to abandon sales efforts and permanently make available for rent time associated with unsold Club Interests.  Indeed, the Club Offering Plan cautioned purchasers about numerous risks, but never once mentioned the risks that Defendants would flood the Residence Club with new inventory available for rental, abandon sales efforts, while at the same time creating millions in ill-gotten revenue for the Hotel by only renting the Club inventory when beneficial to the Hotel, and by otherwise operating the members rental program solely for the benefit of the Hotel. None of these things was within the reasonable expectation of the parties.

10.      This conduct is wrongful because it breaches the implied duty recognized in *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 152 (2002), to refrain from performing in a manner that undermines the fundamental objective of the contract, which is the creation of a viable St. Regis Residence Club.  Defendants could have satisfied that duty, but instead chose to abandon sales at the Residence Club in favor of an apparent massive rental program that was, in secret, revised to protect the profits the Hotel and unjustly enrich Defendant Starwood Hotels and Resorts. These wrongful acts, not the recession, caused Plaintiffs' harm— the decimation of value of fractional interests.

11.     First, Defendants promised not to amend the Club Documents except as necessary to conform to law or "to expedite the sales of Club Interests," and further promised not to amend the Club Documents in a way that had a material adverse effect on Plaintiffs and other purchasers.  Defendants breached both of these promises, including by amending the Club Documents to convert Suite Units into Club Units without ever having the intent to sell the resulting Club Interests.

12.     Second, Defendants promised that any change to the Club Offering Plan would be disclosed in an amendment duly filed with the Department of Law, *and served on Plaintiffs and other purchasers*.  Club Offering Plan, Introduction, at p. 11 ("Sponsor may from time to time amend the Offering Plan by filing an amendment with the New York State Department of Law *… and serving such amendment on Purchasers and Club Members*") (emphasis added).  Yet Defendants made material and adverse amendments to the Club Offering Plan – including almost doubling the size of the offering in order to provide Defendants with a permanent rental pool – without ever serving these amendments on Plaintiffs.

13.     Defendants concealed from Plaintiffs and the Department of Law the most significant amendment to the Club Offering Plan, namely the fact that they abandoned all sales efforts and began operating the Sponsor-run members rental program in a way designed to benefit solely the Hotel, while at the same time vitiating any rental opportunity promised to buyers.  Sponsor Defendant St. Regis Residence Club, New York, Inc. continued to publish price schedules to make it look like their sales efforts were ongoing. In addition, Sponsor concealed from Plaintiffs and the Department of Law their material alteration of a rental option offered to fractional owners. Specifically, as described above, the Sponsor, through the Club Manager, St. Regis New York Management Company, Inc., entered into a series of "non-parity" agreements

with the operator of the Hotel (St. Regis New York Operating LLC) providing, in most instances, that no fractional interests would be rented unless the Hotel was fully booked. While the Sponsor disclosed at the time of purchase that owners of Club Interests would have to compete with Sponsor's rental of its unsold inventory, Plaintiffs were not told that the Sponsor-backed members rental program promised in the offering plan would be subordinate to the much larger inventory of the Hotel. Making matters worse, Defendants then sold the St. Regis Residence Club to ILG, and ILG intends to merge the Residence Club into its down-market timeshare exchange program, which would further dilute the exclusivity for which Plaintiffs paid premium prices.

14.     As a result of Defendants' actions, while the prices of premium condominiums in New York City have skyrocketed after the recession, the value of Plaintiffs' fractional Club Interests has plummeted.  There is virtually no liquidity for those original purchasers seeking to sell.  In recent years, for those rare sales that have actually occurred, prices have dropped by over 60% percent from the original purchase price, and there are indicators that the loss in value is deteriorating further.  Currently, there are no buyers willing to buy Plaintiffs' fractional interests at or anywhere near the premium prices that Plaintiffs paid (and then pay substantial annual fees thereafter) because, as a result of the now ubiquitous rental availability, they can obtain the same access to the St. Regis Residence Club by paying only nightly rental fees. This problem will soon grow worse if ILG is permitted to merge the St. Regis Residence Club with its cheaper, less exclusive, and far less desirable timeshare operations, as it recently indicated was its intention.

15.     The wrongful conduct alleged herein has destroyed the viability of the St. Regis Residence Club and caused its "fractured" state.  Only the legal remedies sought herein can compensate Plaintiffs for the harm Defendants caused.  Plaintiffs seek damages, including the

diminution in value of their Club Interests caused by Defendants' breaches and other unlawful

acts, as well as the disgorgement of all monies Defendant Starwood Hotels and Resorts

Worldwide, LLC, Marriott International, Inc., and Vistana Vacation Ownership unjustly

pocketed as a result of their wrongdoing.  As an alternative remedy, all Plaintiffs except the Non-

Rescinding Plaintiff identified below seek rescission pursuant to a contractual right of rescission

granted in the Club Offering Plan, and also because monetary damages may be insufficient to

fully compensate Plaintiffs for the ongoing harm associated with continued ownership of

fractional interests at the St. Regis.

### JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §

1332(d)(11) in that: (a) this Complaint is brought on behalf of more than 99 plaintiffs who assert

common claims involving common questions of law and fact; (b) the value of each claim

exceeds $75,000; (c) the total amount in controversy exceeds $5,000,000; (d) Defendants are

citizens of Delaware, Florida, and Maryland; and (e) most of the Plaintiffs are domiciled in other

states.

17.     Venue is proper in this Southern District of New York pursuant to 28 U.S.C. §

1391(b)(2) because a substantial part of the events or omissions giving rise to the claims

occurred in this district, and the property that is the subject of this action is situated here.

### DEFENDANTS

18.     Defendant St. Regis Residence Club, New York Inc., which is sometimes referred

to as the "Sponsor," is a Florida corporation, with a principal place of business in Florida.  This

entity is the sponsor of the St. Regis Residence Club, and also the "seller" identified in the

Purchase Agreement pursuant to which Plaintiffs purchased Club Interests at the St. Regis

Residence Club.  Initially, St. Regis Residence Club, New York Inc. was a wholly-owned

subsidiary of Starwood Vacation Ownership, Inc., which in turn was a wholly-owned subsidiary

of Defendant Starwood.

19.     Until its acquisition by Marriott in September 2016, Defendant Starwood (defined

above as Starwood Hotels and Resorts Worldwide, LLC and which was formerly known as

Starwood Hotels and Resorts Worldwide, Inc.) is a Maryland limited liability company

headquartered in Maryland.  Starwood is the former owner of Starwood Vacation Ownership,

Inc., a Florida corporation that has been renamed and acquired by Defendant ILG.  Starwood

described itself as "one of the leading hotel and leisure companies in the world with

approximately 1,300 properties in approximately 100 countries and approximately 188,000

employees at its owned and managed properties."

20.     Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with

a principal place of business in Bethesda, Maryland.  In 2016, Marriott acquired Starwood.

21.     Defendant ILG (Interval Leisure Group, Inc.) is a Delaware corporation with a

principal place of business in Miami, Florida.  ILG became the owner of the St. Regis Residence

Club, New York Inc., and its inventory of unsold Club Interests following the spin-off/merger

described below.  ILG describes itself as "a leading provider of non-traditional lodging, with a

portfolio of leisure businesses rang from vacation exchange and rental to vacation ownership."

ILG now controls the Sponsor as a result of the merger described below.

22.     Defendant Vistana Vacation Ownership, Inc. ("VVO"), formerly known as

Starwood Vacation Ownership, Inc., is a Florida corporation with a principal place of business in

Orlando, Florida.  Until the spin-off/merger transaction described below, VVO was the corporate

parent of St. Regis Residence Club, New York Inc. and was involved in and responsible for the wrongful conduct alleged herein.

23.     Defendant Vistana Signature Experiences, Inc. ("VSE"), is a Delaware corporation with a principal place of business in Orlando, Florida.  VSE was formed on June 10, 2015 as a wholly owned subsidiary of Starwood, and was used by Starwood "to separate the Vistana Ownership Business from Starwood's other businesses" in the spin-off/merger.

24.     Defendant Merger Sub, Inc. ("Merger Sub") is a direct, wholly owned subsidiary of Interval Leisure Group.  Merger Sub was organized in the State of Delaware on October 26, 2015 for the purpose of merging with and into VSE, and did merge with VSE, as described below.  On information and belief, Merger Sub's principal place of business is in the state of Florida.

25.     On October 28, 2015, Starwood announced that it had entered into a definitive agreement to spin off its vacation ownership businesses, including VVO and St. Regis Residence Club, New York Inc., and to then merge these spun-off entities with a subsidiary of ILG, Merger Sub.  Pursuant to the spin-off/merger, Starwood transferred VVO and St. Regis Residence Club, New York Inc. to VSE.  Then VSE merged with Merger Sub, the ILG subsidiary.

26.     As a result of this spin-off/merger, which was completed by May 2016, ILG came to  St. Regis Residence Club, New York Inc. and its unsold Club Interests at the St. Regis Residence Club.

27.     Defendants ILG, VVO, VSE, and Merger Sub are collectively referred to herein as ILG-Vistana.

28.     Plaintiffs are informed and believe and on that basis allege that, at all times relevant herein, each Defendant was the agent, ostensible agent, servant, aider and abettor, co-

conspirator, partner, joint venturer, representative and/or associate of each of the others, and was

at all times relevant herein acting within the course and scope its authority as agent, ostensible

agent, servant, aider and abettor, co-conspirator, partner, joint venturer, representative and/or

associate, and with the knowledge, authorization, consent, permission, and/or ratification of the

others.  On information and belief, all actions of Sponsor alleged herein were ratified and

approved by the officers and/or managing agents of the other Defendants.  Defendants have

interlocking or overlapping directors and/or officers with their respective principals or

controlling entities, and are undercapitalized and/or spurious such that the corporate veil may be

disregarded to prevent injustice and inequity to Plaintiffs.

### PLAINTIFFS

29.     Plaintiffs Flora and Bruce Gillespie are competent adult residents of Calgary,

Canada (the "Gillespie Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on

or about March 8, 2006, the Gillespie Plaintiffs purchased an undivided 1/13th interest in Club

Interest Unit No. 907 for approximately $314,340.

30.     Plaintiff Bruce Allen Alter is a competent adult resident of Shanghai, China.

Pursuant to a Purchase and Sale Agreement he signed on or about December 31, 2006, Mr. Alter

purchased an undivided 1/13th interest in Club Interest Unit No. 815 for $502,000.

31.     Plaintiff Neil Arnovitz is a competent adult resident of Montreal, Quebec,

Canada, and President of 2423-0476 Quebec, Inc., a Canada corporation (collectively, the

"Arnovitz Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about

November 13, 2006, the Arnovitz Plaintiffs purchased an undivided 1/13th interest in Club

Interest Unit No. 821 for approximately $410,000.  Further, pursuant to a Purchase and Sale

Agreement signed on or about May 2, 2006, the Arnovitz Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 935 for $535,000.

32.     Plaintiffs Stan Battat and Zmira Battat are competent adult residents of Hollywood, Florida (collectively, the "Battat Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about November 21, 2007, the Battat Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 918 for $535,000.

33.     Plaintiff Samuel Bercholz is a competent adult resident of Palm Desert, California.  Pursuant to two Purchase and Sale Agreements he signed on or about October 4, 2007, Mr. Bercholz purchased two undivided 1/13th interests in Club Interest Unit No. 808 for $195,000 each.

34.     Plaintiffs Carol Blackburn, Helene Blackburn and Steve Blau are competent adult residents of the State of New York, and members of Blau Property, LLC, a New York limited liability company, (collectively, the "Blau Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about August 16, 2007, the Blau Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 818 for $549,855.

35.     Plaintiff Alex Blavatnik is a competent adult resident of Aventura, Florida. Pursuant to two Purchase and Sale Agreements he signed on or about March 15, 2006, Mr. Blavatnik purchased two undivided 1/13th interests in Club Interest Unit No. 803 for $670,000 (week 44) and approximately $625,000 (week 21), respectively.  On or about December 7, 2010, Mr. Blavatnik sold his interest in week 44 for $360,000.

36.     Plaintiff Francine J. Blum is a competent adult resident of Longboat Key, Florida. Pursuant to a Purchase and Sale Agreement she signed on or about February 25, 2006, Mrs. Blum purchased an undivided 1/13th interest in Club Interest Unit No. 835 for $480,000.

37.     Plaintiffs Michael Z. Blumberg and Barbara S. Blumberg are competent adult residents of Richmond, Virginia, and trustees of the Barbara S. Blumberg Revocable Trust (collectively, the "Blumberg Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about June 23, 2006, the Blumberg Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 935 for $495,000.

38.     Plaintiffs Cristina S. Buaas and Jim Buaas are competent adult residents of Houston, Texas, and Cristina S. Buaas is currently the sole trustee of the 2011 Cristina Buaas Nonexempt Trust (collectively, the "Buaas Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about November 2, 2007, Linda K. Finger's Living Trust and Linda K. Finger, trustee, (the "Linda K. Finger Owners") purchased an undivided 1/13th interest in Club Interest Unit No. 1135 for approximately $570,220.  Upon Linda K. Finger's passing on September 1, 2011, the Buaas Plaintiffs became the title holders of this Club Interest Unit.

39.     Plaintiff Bernard L. Bryant is a competent adult resident of Monroe, Louisiana, and managing member of Welsh Properties-New York, LLC, a Louisiana limited partnership (collectively, the "Bryant Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about August 27, 2007, the Bryant Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 815 for $507,000.

40.     Plaintiff Catherine Cantrell is a competent adult resident of Wilton, Connecticut. Pursuant to a Purchase and Sale Agreement she signed on or about June 30, 2007, Ms. Cantrell purchased an undivided 1/13th interest in Club Interest Unit No. 809 for $195,000.  On or about June 8, 2009, Ms. Cantrell exchanged her interest in Unit No. 809 for an undivided 1/13th interest in Club Interest Unit No. 1007 for $335,000.

41.     Plaintiffs Peter Capolino and Fran Deitrich are competent adult residents of Philadelphia, Pennsylvania (collectively, the "Capolino/Deitrich Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about March 10, 2006, the Capolino/Deitrich Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 835 for $480,000.

42.     Plaintiffs John Chapple and Vivian Dixon are competent adult residents of Woodinville, Washington, and trustees of the J.H. Property Trust Dated 2/14/2007, (collectively, the "Chapple/Dixon Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about March 19, 2008, the Chapple/Dixon Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1021 for $475,000.

43.     Plaintiff CKNY, Inc. is a Florida corporation with its principal place of business in West Palm Beach, Florida.  Pursuant to a Purchase and Sale Agreement it signed on or about March 7, 2007, CKNY, Inc. purchased an undivided 1/13th interest in Club Interest Unit No. 815 for $542,000.

44.     Plaintiff Daniel Clark is a competent adult resident of Philadelphia, Pennsylvania. Pursuant to a Purchase and Sale Agreement he signed on or about November 16, 2006, Mr. Clark purchased an undivided 1/13th interest in Club Interest Unit No. 809 for $195,000.

45.     Plaintiffs William Michael Clowes and Ann Christine Clowes are competent adult residents of Haverford, Pennsylvania (collectively, the "Clowes Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about April 2, 2006, the Clowes Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 921 for $415,000.

46.     Plaintiffs Ian Casey and Kent Gray are competent adult residents of California, and partners of Plaintiff CV Partners, Inc., a California corporation (collectively, the "CV Partners Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about May 5,

2006, the CV Partners Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 835 for $485,100.  In addition, pursuant to a Purchase and Sale Agreement they signed on or about April 26, 2006, the CV Partners Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 915 for $567,000.

47.     Plaintiffs Dr. Clay Cockerell and Brenda Cockerell are competent adult residents of Dallas, Texas and managing members of Resolution Realty Investments, LLC, a Texas limited liability company (collectively, the "Cockerell Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about May 25, 2007, the Cockerell Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 836 for approximately $575,000.

48.     Plaintiff Michael Covarrubias is a competent adult resident of San Francisco, California.  Pursuant to a Purchase and Sale Agreement he signed on or about April 10, 2007, Mr. Covarrubias purchased an undivided 1/13th interest in Club Interest Unit No. 807 for $315,000 with co-owner, Peter Palmisano.  On or about March 28, 2012, Mr. Palmisano sold his interest to Plaintiffs Mark R. Kroll and Susan T. Kroll, trustees of the Kroll Family Trust U.D.T. 3/20/1989 as amended (collectively, the "Kroll Plaintiffs") for approximately $157,500.  Mr. and Mrs. Kroll are competent adults residents of Los Altos, California.

49.     Plaintiff Orpheus S. L. Crutchfield, d/b/a Pyramid Bridging, is a competent adult resident of Berkeley, California (the "Crutchfield Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 11, 2007, the Crutchfield Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 809 for $195,000.

50.     Plaintiffs Edward Diao and Theresa Diao are competent adult residents of San Francisco, California, and trustees of the Diao Family Revocable Inter Vivos Trust April 3, 2003 (collectively, the "Diao Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or

about May 24, 2008, the Diao Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 822 for approximately $350,000.

51.     Plaintiffs Steven Dinetz and Lauri Dinetz are competent adult residents of Zephyr Cove, Nevada, and trustees of The Steven Dinetz 1998 Family Trust Dated July 27, 2005 (collectively, the "Dinetz Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about November 14, 2006, the Dinetz Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 818 for $535,000.

52.     Plaintiff Patricia Duvall, formerly known as Patricia Shapiro, is an adult resident of St. Louis, Missouri.  Pursuant to a Purchase and Sale Agreement she signed on or about February 27, 2007, Ms. Duvall purchased an undivided 1/13th interest in Club Interest Unit No. 935 for $495,000.

53.     Plaintiff Edward W. Easton is a competent adult resident of Miami, Florida, and manager of Edward W. Easton Family Limited, a Florida limited partnership, (collectively, the "Easton Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about January 31, 2007, the Easton Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 935 for $495,000.

54.     Plaintiff Martin Engels is a competent adult resident of Miami, Florida, and a manager of Engels, LLC, a Florida limited liability company (collectively, the "Engels Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about December 12, 2006, the Engels Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 915 for $502,000.

55.     Plaintiff Glenn H. Epstein is a competent adult resident of Upperville, Virginia. Pursuant to a Purchase and Sale Agreement he signed on or about December 11, 2007, Mr. Epstein purchased an undivided 1/13th interest in Club Interest Unit No. 807 for $325,000.

56.     Plaintiffs Andy Evans and Ann Evans are competent adult residents of Bellevue, Washington, and trustees of the Evans Family Trust dated November 10, 1990 (collectively, the "Evans Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about August 31, 2006, the Evans Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 918 for $621,000.

57.     Plaintiffs Dr. Mitchell C. Feinman and Jennifer M. Feinman are competent adult residents of Daniel Island, South Carolina (the "Feinman Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about September 10, 2007, the Feinman Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1135 for approximately $554,946.

58.     Plaintiff Laurie Feltheimer is a competent adult resident of Los Angeles, California, and a managing member of The Hollywood Company, LLC (collectively, the "Feltheimer Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about November 8, 2007, the Feltheimer Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1036 for $520,000.

59.     Plaintiffs Kathleen Patricia FitzGerald and Brendan Vincent FitzGerald are competent adult residents of Halesite, New York (the "FitzGerald Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 10, 2006, the FitzGerald Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 836 for $495,000.

60.     Plaintiff Michael Fitzgerald is a competent adult resident of Newtown Square, Pennsylvania, and president of Fitze Engineers Limited, a Pennsylvania corporation,

(collectively, the "Fitzgerald Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 6, 2006, the Fitzgerald Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 935 for approximately $554,946.

61.     Plaintiff Junior D. Fletcher is a competent adult resident of Clermont, Florida. Pursuant to a Purchase and Sale Agreement he signed on or about February 25, 2008, Mr. Fletcher purchased an undivided 1/13th interest in Club Interest Unit No. 1007 for approximately $339,690.

62.     Plaintiff William Friedberg is a competent adult resident of Miami Beach, Florida, and trustee of the William Friedberg Declaration of Trust.  Pursuant to a Purchase and Sale Agreement signed on or about September 8, 2006, Mr. Friedberg and his wife, who is now deceased, purchased an undivided 1/13th interest in Club Interest Unit No. 907 for $315,000. In 2014, Mr. Friedberg transferred the interest into the William Friedberg Declaration of Trust.

63.     Plaintiff Richard Genow is a competent adult resident of Pacific Palisades, California.  Pursuant to a Purchase and Sale Agreement he signed on or about March 28, 2006, Mr. Genow purchased an undivided 1/13th interest in Club Interest Unit No. 821 for approximately $485,000.

64.     Plaintiffs Linda Geringer and Steve Geringer are competent adult residents of Nashville, Tennessee, and trustees of the Geringer Family Trust UAD June 26, 1996 (collectively, the "Geringer Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about February 28, 2006, the Geringer Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 936 for approximately $486,720.

65.     Plaintiff Carlos Giraldo is a competent adult resident of Panama City, Panama. Pursuant to a Purchase and Sale Agreement he signed on or about December 4, 2007, Mr. Giraldo purchased an undivided 1/13th interest in Club Interest Unit No. 922 for $347,000.

66.     Plaintiffs Thomas L. and Christine P. Gotfredson are competent adult residents of San Diego, California, and trustees of the Thomas L. Gotfredson and Christine P. Gotfredson Family Trust Dated 10/24/2006, (collectively, the "Gotfredson Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about November 15, 2006, the Gotfredson Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 809 for $195,000.

67.     Plaintiffs Robert L. and Ann F. Gotfredson are competent adult residents of San Diego, California, and trustees of the Gotfredson Family Trust Dated 9/24/91 (collectively, the "Gotfredson 2 Plaintiffs ").  Pursuant to a Purchase and Sale Agreement they signed on or about November 13, 2006, the Gotfredson 2 Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 809 for approximately $263,640.

68.     Plaintiffs Dr. Jerome Granato and Judith Granato are competent adult residents of Pittsburgh, Pennsylvania (the "Granato Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 7, 2008, the Granato Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1021 for $475,000.

69.     Plaintiffs Larry S. Gutsch and Jaqua L. Gutsch are competent adult residents of Scottsdale, Arizona, and trustees of the Gutsch Family Trust dated December 28, 1995 (collectively, the "Gutsch Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about August 15, 2006, the Gutsch Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 835 for $480,000.

70.     Plaintiff Masaichi Hasegawa is a competent adult resident of Tokyo, Japan.

Pursuant to a Purchase and Sale Agreement he signed on or about January 22, 2007, Mr.

Hasegawa purchased an undivided 1/13th interest in Club Interest Unit No. 807 for $294,060.

Mr. Hasegawa sold this interest on or about July 7, 2016.  Mr. Hasegawa also purchased an

undivided 1/13th interest in Club Interest Unit No. 807 for $319,410, pursuant to a Purchase and

Sale Agreement he signed on or about July 17, 2007.

71.     Plaintiff Michael Hechter is a competent adult resident of Phoenix, Arizona.

Pursuant to a Purchase and Sale Agreement he signed on or about April 21, 2007, Mr. Hechter

purchased an undivided 1/13th interest in Club Interest Unit No. 922 for $352,872.

72.      Plaintiffs Lawrence Hedrick and Sylvia Moisa Hedrick are competent adult

residents of Whittier, California, and trustees of the Hedrick Family Trust dated 11/25/03

(collectively, the "Hedrick Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed

on or about September 26, 2006, the Hedrick Plaintiffs purchased an undivided 1/13th interest in

Club Interest Unit No. 815 for $502,000.

73.     Plaintiff Gale Higgs is a competent adult resident of Virginia Beach, Virginia.

Pursuant to a Purchase and Sale Agreement she signed on or about July 3, 2007, Ms. Higgs

purchased an undivided 1/13th interest in Club Interest Unit No. 921 for approximately

$529,490.

74.     Plaintiff Robert Hodgkinson is a competent adult resident of Vancouver, British

Columbia, and president of 7804 Yukon, Inc., a Nevada corporation (collectively, the

"Hodgkinson Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about

December 11, 2007, the Hodgkinson Plaintiffs purchased an undivided 1/13th interest in Club

Interest Unit No. 1136 for $570,000.  The Hodgkinson Plaintiffs sold this Club Interest Unit for $250,000 on or about October 1, 2015.

75.     Plaintiffs Lia Iacocca-Assad and Victor Allen Assad are competent adult residents of Laguna Beach, California, and trustees of the Lia Iacocca Assad Declaration of Trust dated 12/22/1989, as amended 2/21/1994 (collectively, the "Iacocca-Assad Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about June 12, 2007, the Iacocca-Assad Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 803 for approximately $690,753.

76.     Plaintiffs Walter James Brown, Jr. and Kathy Justice are competent adult residents of Coronado, California, and trustees of The Walter James Brown, Jr. and Kathryn Sue Justice Family Trust Dated 5/7/2002 (collectively, the "Brown/Justice Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about May 5, 2008, the Brown/Justice Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 909 for $195,000.

77.     Plaintiff Robert Kaufmann is a competent adult resident of Cherry Hills Village, Colorado, and trustee of the Robert Kaufmann Living Trust Dated May 23, 2002 (collectively, the "Kaufmann Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about March 29, 2007, the Kaufmann Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 907 for approximately $319,000.  Upon information and belief, the Kaufmann Plaintiffs may have exchanged this interest for another Club Interest.

78.     Plaintiff Maryanne Larsen is a competent adult resident of New York, New York. Pursuant to a Purchase and Sale Agreement she signed on or about June 19, 2008, Mrs. Larsen, along with her late husband, Ray Larsen, purchased an undivided 1/13th interest in Club Interest Unit No. 822 for approximately $356,000.

79.     Plaintiff Lewis S. Lee, Jr. is a competent adult resident of Jacksonville, Florida. Pursuant to a Purchase and Sale Agreement he signed on or about January 16, 2008, Mr. Lee purchased an undivided 1/13th interest in Club Interest Unit No. 808 for $195,000.

80.     Plaintiffs Howard Levine and Pamela Levine are competent adult residents of Beverly Hills, California (the "Levine Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about June 25, 2006, the Levine Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 907 for $315,000.

81.     Plaintiffs Michael B. Levine and Susan L. Levine are competent adult residents of Los Angeles, California, and trustees of the Amended and Restated Levine Family Trust Dated 11/30/1989 (Amended and Revised 03/29/1995) (collectively, the "Levine Trust Plaintiffs"). Pursuant to a Purchase and Sale Agreement they signed on or about March 21, 2007, the Levine Trust Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 815 for $477,000.

82.      Plaintiffs Robert Lojkovic and Kathleen Lojkovic are competent adult residents of Winnetka, Illinois (the "Lojkovic Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about August 14, 2007, the Lojkovic Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1135 for $545,000.

83.     Plaintiff James Lustig is a competent adult resident of Denver, Colorado, and a managing member of Amethyst Investments, LLC, a Colorado limited liability company (collectively, the "Amethyst Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about January 29, 2007, the Amethyst Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 935 for $495,000.

84.     Plaintiffs Cary P. Marshall and Cindy S. Marshall are competent adult residents of Tulsa, Oklahoma, and trustees of the Cindy S. Marshall Revocable Trust Dated 11/25/98 (collectively, the "Marshall Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about January 26, 2007, the Marshall Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 915 for approximately $514,130.

85.     Plaintiff Anne A. Mastain is a competent adult resident of Park City, Utah. Pursuant to a Purchase and Sale Agreement she signed on or about November 28, 2007, Mrs. Mastain purchased an undivided 1/13th interest in Club Interest Unit No. 1036 for $525,000.

86.     Plaintiff Ian Mausner is a competent adult resident of Manhattan Beach, California, and manager of Evolution Lending, LLC, a California limited liability company (collectively, the "Mausner Plaintiffs").  Pursuant to a Purchase and Sale Agreement Mr. Mausner signed on or about August 5, 2008, he purchased an undivided 1/13th interest in Club Interest Unit No. 1035 for $575,000.00.  Mr. Mausner subsequently transferred his interest in Club Interest Unit No. 1035 to Evolution Lending.

87.     Plaintiffs Robert A. McCabe, Jr. and Jennie T. McCabe are competent adult residents of Nashville, Tennessee, and Mr. McCabe is a trustee of the Robert McCabe Revocable Trust (collectively, the "McCabe Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about February 22, 2006, the McCabe Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 922 for $460,000.

88.     Plaintiff McMillen is a managing member of RCG Ventures I, LLC, a Georgia limited liability company.  Pursuant to a Purchase and Sale Agreement it signed on or about March 14, 2006, RCG Ventures purchased an undivided 1/13th interest in Club Interest Unit No. 821 for approximately $476,985.

89.     Plaintiffs Harve Meskin and Letty Meskin are competent adult residents of Encinitas, California, and trustees of the Meskin Family Trust (collectively, the "Meskin Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about April 13, 2007, the Meskin Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 807 for $365,000.

90.     Plaintiffs Scott Meyer and Diana Meyer are competent adult residents of Orange, California, and managing members of the Meyer Properties, LLC, an Illinois limited liability company (collectively, the "Meyer Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about November 7, 2008, the Meyer Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 908 for $195,000.

91.     Plaintiffs Dr. Vincent Monticciolo and Dr. Natalie Monticciolo are competent adult residents of Palm Harbor, Florida, and Dr. Vincent Monticciolo is trustee of the Vincent J. Monticciolo Revocable Living Trust (collectively, the "Monticciolo Plaintiffs").  Pursuant to a Purchase and Sale Agreement on or about October 7, 2006, the Monticciolo Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 815 for approximately $536,000.

92.     Plaintiffs Gary A. Mosko and Joanne F. Mosko are competent adult residents of Englewood, Colorado (the "Mosko Plaintiffs").  Pursuant to a Purchased and Sale Agreement they signed on or about April 28, 2007, the Mosko Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 821 for approximately $451,230.

93.     Plaintiffs Harvey H. Mueller, II and Peggi C. Mueller are competent adult residents of Fort Worth, Texas, and partners in Pescador Partners, Ltd., a Texas limited liability partnership (collectively, the "Mueller Plaintiffs").  Pursuant to a Purchase and Sale Agreement

they signed on or about April 23, 2007, the Mueller Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 936 for $495,000.

94.     Plaintiffs Bruce Newberg and Nancy Newberg are competent adult residents of Los Angeles, California, and trustees of the Newberg Family Trust UTD 12/18/1990 (collectively, the "Newberg Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about February 18, 2007, the Newberg Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 907 for $315,000.

95.     Plaintiffs Jerry A. Orefice and Karen G. Orefice are competent adult residents of Westlake Village, California (the "Orefice Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about March 3, 2006, the Orefice Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 936 for $480,000.

96.     Plaintiffs Brooks Pace and June Pace are competent adult residents of Dammeron Valley, Utah, and managers of the Stoddard Land Company, LLC, a Utah limited liability company (the "Pace Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about May 6, 2007, the Pace Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 803 for $665,000.

97.     Plaintiff Dr. Wayne Perron is a competent adult resident of Calgary, Canada. Pursuant to a Purchase and Sale Agreement he signed on or about May 28, 2007, Dr. Perron purchased an undivided 1/13th interest in Club Interest Unit No. 921 for approximately $602,804.

98.     Plaintiff Earl W. Powell is a competent adult resident of Palm Beach, Florida. Pursuant to a Purchase and Sale Agreement he signed on or about April 23, 2007, Mr. Powell

purchased an undivided 1/13th interest in Club Interest Unit No. 936 for approximately $501,930.

99.     Plaintiffs Michael R. Pollak and Shereen M. Pollak are competent adult residents of Denver, Colorado (the "Pollak Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 18, 2007, the Pollak Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 936 for $500,000.

100.     Plaintiffs Jacques Putzeys and Dominique Putzeys-Schiffers are competent adult residents of Monaco (the "Putzeys Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about April 30, 2007, the Putzeys Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 836 for $501,930.   In addition, pursuant to a Purchase and Sale Agreement signed on or about May 6, 2008, the Putzeys Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 822 for approximately $326,508.

101.     Plaintiffs Nancy Ratzan and Kenneth Ratzan are competent adult residents of Miami, Florida (the "Ratzan Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about May 14, 2008, the Ratzan Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1121 for $455,000.

102.     Plaintiffs Robert Reed and Gene Reed are competent adult residents of Charleston, South Carolina, and Vice President and President, respectively, of Whitson Investments, LP (collectively, the "Reed Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 27, 2007, the Reed Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1135 for approximately $651,680.

103.     Plaintiff Alejandro Ruiz is a competent adult resident of Monterrey, Mexico, and director of Constance, Ltd., a British Virgin Islands limited company (collectively, the "Ruiz

Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about February 28, 2006, the Ruiz Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 815 for approximately $595,000.

104.    Plaintiff Manuel Sacal is a competent adult resident of Aventura, Florida. Pursuant to a Purchase and Sale Agreement he signed on or about April 15, 2007, Mr. Sacal purchased an undivided 1/13th interest in Club Interest Unit No. 807 for $315,000.

105.    Paul H. Saunders and Victoria B. Saunders are competent adult residents of Singer Island, Florida (the "Saunders Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 13, 2008, the Saunders Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1021 for $475,000.  The Saunders Plaintiffs subsequently sold this interest on or about November 30, 2014 for $225,000.  In addition, pursuant to a Purchase and Sale Agreement they signed on or about July 14, 2008, the Saunders Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1021 for $450,000.

106.    Plaintiff Stephen Sawyer is a competent adult resident of Chicago, Illinois. Pursuant to a Purchase and Sale Agreement he signed on or about July 17, 2007, Mr. Sawyer purchased an undivided 1/13th interest in Club Interest Unit No. 809 for $195,000.

107.    Plaintiffs Philip S. Schein and Dorothy R. Schein are competent adult residents of Stuart, Florida (the "Schein Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 27, 2006, the Schein Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 901 for $520,000.

108.    Plaintiffs Valerie J. Seymour and Jeffrey A. Seymour are competent adult residents of Westlake Village, California and trustees of the Jeffrey and Valerie Seymour Trust Dated August 16, 1994 as amended on July 17, 2002 (the "Seymour Plaintiffs"). Pursuant to a

Purchase and Sale Agreement they signed on or about July 2, 2007, the Seymour Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 922 for approximately $352,872.

109.     Plaintiff William Shenkman is a competent adult resident of Ottawa, Canada, and president of Baix Developments, Inc., a Canada corporation (collectively, the "Shenkman Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 15, 2006, the Shenkman Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 835 for $495,000.

110.     Plaintiffs Herbert J. Siegel and Phyllis M. Siegel are competent adult residents of Palm Beach, Florida (collectively, the "Siegel Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about June 23, 2006, the Siegel Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 803 for $665,000.

111.     Plaintiff Ed Snyder is a competent adult resident of Virginia Beach, Virginia. Pursuant to a Purchase and Sale Agreement he signed on or about November 30, 2007, Mr. Snyder purchased an undivided 1/13th interest in Club Interest Unit No. 922 for $345,000.

112.     Plaintiff Stephen L. Snyder is a competent adult resident of Miami, Florida. Pursuant to a Purchase and Sale Agreement he signed on or about January 11, 2008, Mr. Snyder purchased an undivided 1/13th interest in Club Interest Unit No. 1136 for approximately $539,000.

113.     Plaintiff Stone, Genow, Smelkinson, Binder & Christopher, LLP is a California limited liability partnership, formerly known as Stone Meyer & Genow, LLP (collectively, "SGSBC").  Pursuant to a Purchase and Sale Agreement it signed on or about July 12, 2006,

SGSBC purchased an undivided 1/13th interest in Club Interest Unit No. 821 for approximately $420,000.

114.    Plaintiffs Charles Stuzin and Rosalyn F. Stuzin are competent adult residents of Key Biscayne, Florida (the "Stuzin Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about July 18, 2006, the Stuzin Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 936 for $545,000.

115.    Plaintiff Jeffrey Taylor is a competent adult resident of Las Vegas, Nevada, and trustee of The Bankers Union Trust Dated 1/16/2011 (collectively, the "Taylor Plaintiffs"). Pursuant to a Purchase and Sale Agreement they signed on or about April 1, 2007, the Taylor Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 918 for approximately $544,763.

116.    Plaintiffs Joanne Tymkiw and Sydney Belzberg are competent adult residents of Richmond, British Columbia (the "Tymkiw/Belzberg Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 4, 2007, the Tymkiw/Belzberg Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1036 for approximately $525,000.  In addition, pursuant to a Purchase and Sale Agreement they signed on or about October 24, 2007, the Tymkiw/Belzberg Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1136 for approximately $525,000.

117.    Plaintiffs Sheila Usdin and Jack Usdin are competent adult residents of Boca Raton, Florida, and Maplewood, New Jersey, and trustees of the Sheila Ann Usdin Revocable Trust DTD 12/16/2005 (the "Usdin Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about September 8, 2006, the Usdin Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 836 for $495,000.

118.     Plaintiffs William Wade and Robin Gann are competent adult residents of Roswell, Georgia (the "Wade Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about December 5, 2007, the Wade Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 818 for $640,000.

119.     Plaintiffs Estelle Ivker Wallach is a competent adult resident of Aventura, Florida, and a co-trustee of the HW-EIW Trust Dated May 20, 2006 (collectively, the "Wallach Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about November 8, 2008, the Wallach Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 915 for approximately $516,000.

120.     Plaintiff Marcia Wade is a competent adult resident of St. George, Utah.  Pursuant to a Purchase and Sale Agreement she signed on or about October 8, 2006, Mrs. Wade purchased an undivided 1/13th interest in Club Interest Unit No. 901 for $555,000.

121.     Plaintiffs Henry Warshaw and Susan Warshaw are competent adult residents of St. Louis, Missouri (the "Warshaw Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about September 12, 2007, the Warshaw Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 821 for approximately $466,027.

122.     Plaintiffs Frank M. Wetchler and Wendy L. Wetchler are competent adult residents of Merrick, New York (the "Wetchler Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or about March 22, 2006, the Wetchler Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 803 for $680,000.

123.     Plaintiffs Roger Wolk and Marilyn Wolk are competent adult residents of Malibu, California (the "Wolk Plaintiffs").  Pursuant to a Purchase and Sale Agreement they signed on or

about March 16, 2006, the Wolk Plaintiffs purchased an undivided 1/13th interest in Club

Interest Unit No. 936 for $545,000.

124.    Plaintiff Dennis Wong is a competent adult resident of San Francisco, California,

and president of Prism Capital Corporation, a Delaware corporation (collectively, the "Wong

Plaintiffs").  Pursuant to a Purchase and Sale Agreement signed on or about June 20, 2008, the

Wong Plaintiffs purchased an undivided 1/13th interest in Club Interest Unit No. 1021 for

$475,000.

125.    Plaintiff Julie A. Wrigley is a competent adult resident of Ketchum, Idaho, and

trustee of the Julie A. Wrigley 1999 Revocable Trust Dated February 12, 1999.  Pursuant to a

Purchase and Sale Agreement she signed on or about August 2, 2006, Mrs. Wrigley purchased an

undivided 1/13th interest in Club Interest Unit No. 903 for $665,000.

126.    Plaintiffs Marc Kortlander and Jeryl Kortlander are competent adult residents of

Ponte Vedra Beach, Florida (the "Kortlander Plaintiffs").  Pursuant to a Purchase and Sale

Agreement they signed on or about December 17, 2007, the Kortlander Plaintiffs purchased an

undivided 1/13th interest in Club Interest Unit No. 1036 for $520,000.

## FACTS GIVING RISE TO THE ACTION

127.    Plaintiffs paid premium prices and continue to pay very high annual maintenance

fees based on a promise of exclusivity.  They reasonably expected that Defendants would not

breach the Club Offering Plan, or do anything that would deprive them of the benefits they

reasonably expected to receive under the parties' contract.  But Defendants flagrantly ignored the

Club Offering Plan's requirements and prohibitions, instead initiating a series of actions which

enabled Defendants to profit off the units at Plaintiffs' expense, while gutting the value of

Plaintiffs' interests.  Specifically, Defendants secretly flooded the Residence Club with new

inventory as the country was sliding into recession, abandoned any attempt to sell unsold Club

Interests, converted unsold Club Interests into a permanent inventory of rentals and, finally,

began operating a massive and contractually unauthorized rental program to this day.  The

operation of the rental program through the non-parity agreements described herein has severely

negatively impacted the value and liquidity of Plaintiffs' Units. Adding insult to injury,

Defendants have foisted the costs of the increased wear and tear caused by the rental program on

Plaintiffs in the form of increased annual fees.

128.    Defendants' wrongful conduct has caused the St. Regis Residence Club to be a

"fractured" offering, and nothing but the remedies sought herein can remedy the resulting harm

to Plaintiffs.  Defendants have gutted the value of Plaintiffs' Club Interests through their self-

dealing and other wrongful conduct.  No rational buyer will pay a premium price and steep

annual fees for fractional interests if they can readily obtain the same access to the same units by

other, cheaper means offered by Defendants.

## Overview of Building and Club Offering Plan

129.    This historic building is subdivided as follows pursuant to the "Declaration for the

Fifth and Fifty-Fifth Condominium," recorded on June 14, 2006 ("Condominium Declaration"):

There are two "Commercial Units," one of which is the Hotel Unit operated as a hotel, and the

other of which is the Retail Unit, consisting of a couple of retail units on the ground floor.  There

is also the Fifth and Fifty-Fifth Condominium, consisting of 46 residential condominiums.

These 46 units are classified into two categories – Suite Units intended to be sold as wholly-

owned condominiums, and Club Units in which 1/13th fractional interests, known as Club

Interests, were sold to Plaintiffs and others.

130.     A Club Interest consists of a 4/52nd (or 1/13th) undivided portion of a specific Club Unit.  Stated another way, the purchaser of a Club Interest owns a 1/13th undivided portion of a specific Club Unit as tenant-in-common with all other owners of Club Interests in the same Club Unit.  When a purchaser acquires a Club Interest in a Club Unit, the purchaser is entitled, subject to the terms and conditions set forth in the Club Documents,[5] to use and occupy a Club Unit for four weeks annually.

131.     Plaintiffs purchased these Club Interests pursuant to a standardized Purchase Agreement and 748-page Club Offering Plan, which collectively comprise a contract of adhesion offered to purchasers on a take-it-or-leave-it basis.  The Club Offering Plan was expressly made part of the Purchase Agreement, and is also considered a contract by operation of New York law.  Purchase Agreement at p. 1, § 1 ("The Offering Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length"); *Jennifer Realty Co.*, 98 N.Y.2d at 146.  The model Purchase Agreement from the Club Offering Plan is attached hereto as Exhibit 1.

132.     The Club Offering Plan provides "Sponsor anticipates that twelve (12) Club Interests will be sold in each Club Unit," and never once states that Defendants retain the right to abandon sales efforts.  It further represents and warrants that the Club Offering Plan "does not knowingly omit any material facts or knowingly contain any untrue statement of material fact" and that the "Sponsor believes that the Offering Plan contains a fair summary of the material provisions of the documents referred to in the Offering Plan."  Club Offering Plan, Introduction,

---

[5]     The Club Offering Plan defines "Club Documents" to mean "Club Declarations, the Club By-Laws, the Club Reservation Procedures, the Club Articles, the Club Power of Attorney, the Club Rules and Regulations and any other documents which govern the operating of the Club, as the same may be amended from time to time."  Club Offering Plan, Definitions, at p. 19.

at p. 12; Club Offering Plan, General, at p. 103; *see also* Club Offering Plan, Certification of

Sponsor and Principals, at pp. 733-734.

### As the Country Was Sliding Into Recession, Defendants Flooded the Residence Club With New Club Units and New Club Interests for the Purpose of Profiting From Rentals

133.    Initially, Defendants classified 24 of the residential condominiums as Suite Units,

and 22 as Club Units.  Over time, however, Defendants "reclassified" Suite Units into Club Units

in a highly strategic manner that served Defendants' interests and harmed Plaintiffs.  This

reclassification provided Defendants with an expanded inventory of units which they would later

rent to the general public, in violation of the Offering Plan.

134.    Pursuant to the First Amendment of the Club Declaration, dated May 1, 2007 and

recorded on July 9, 2007, Defendants "reclassified" four of the Suite Units to Club Units.

Following this reclassification, the Club Declaration and Club Offering Plan now provided for 26

Club Units and the sale of 312 Club Interests.  On March 27, 2008, two weeks after the Bear

Stearns collapse that many point to as the start of the recession, Defendants recorded Second and

Third Amendments to the Club Declaration that, respectively, reclassified seven and five Suite

Units into Club Units, raising the total number of Club Units from 26 to 38 and the total number

of Club Interests from 312 to 456 (excluding the Thirteenth Shares discussed below).

135.    Defendants made these material and significantly adverse changes to the Club

Offering Plan and Club Documents when three very significant things were apparent:

a.    First, Defendants added these new Club Units and Club Interests to the

fractional offering just as Defendants were about to sell all of the 264 Club Interests announced

in the original Offering Plan.  As of February 1, 2008, Defendants had closed escrow on 236

Club Interests.  By the middle of 2008, Defendants had exceeded the initial offering of 264 Club

Units by ten Club Interests.  Stated another way, but for these amendments, *the offering would have been fully sold by the middle of 2008.*

b.    Second, Defendants knew that they were not going to be able to sell all of the much more expensive Suite Units.

c.    Third, Defendants converted additional Suite Units into Club Units as the country was sliding into a deep recession.  Bear Stearns had collapsed before Defendants increased the number of Club Units from 26 to 38.

136.    On or about March 16, 2011, Defendants reversed some of the conversions by returning 7 of the 16 units converted into Club Units back to Suite Units (at a cost of $26 million).  This lowered the number of Club Units to 31 and the number of Club Interests to 372, but it was not enough to undo the harm.  Defendants retained nearly 80 Club Interests around that time, and have since come into possession of another 20 Club Interests through foreclosures and otherwise.

137.    Defendants have no intention of selling these Club Interests, but instead plan to continue to rent them pursuant to a non-parity arrangement and/or merge them into a much less exclusive, much less desirable timeshare exchange program.

**Summary of Sales**

138.    The following chart shows the progression of sales, and also notes the increases in inventory as a result of these "reclassifications":

| Date | Club Interests Sold | Sponsor-Owned |
|------|---------------------|---------------|
| 12/1/2006 | 74 (in 22 Club Units) | 190 (or 212 with 13th shares) |
| 2/15/2007 | 97 (in 26 Club Units) | 215 (or 241 with 13th shares) |
| 7/31/2007 | 193 (in 26 Club Units) | 119 (or 145 with 13th shares) |
| 10/1/2007 | 187 (in 26 Club Units) | 125 (or 151 with 13th shares) |

| 2/1/2008 | 236 (in 26 Club Units) | 160 (or 193 with 13th shares) |
| 8/12/2008 | 274 (in 38 Club Units) | 182 (or 220 with 13th shares) |
| 12/31/2008 | 287 (in 38 Club Units) | 169 (or 207 with 13th shares) |
| 11/30/2009 | 293 (in 38 Club Units) | 163 (or 201 with 13th shares) |
| 3/15/2013 | 294 (in 31 Club Units) | 78 (or 109 with 13th shares) |
| 9/23/2016 | 301 (in 31 Club Units) | 71 (or 102 with 13th shares) |

139.    Defendants have sold almost no Club Interests since 2008.  Since then, there has been a net[6] increase of only Club Interests sold by Defendants, and it appears that the last seven reported sales were not arm's length transactions resulting from a good faith marketing of Club Interests, as Defendants conceded on December 2, 2016 that they halted all marketing efforts in 2009 and have not resumed marketing.  Instead of marketing the Club Interests, they have been operating, and have continued to operate in various forms, a massive rental program.

140.    Defendants recently reported that ILG-Vistana owns 98[7] of 372 available Club Interests (or 129 of 403 available Club Interests if the Thirteenth Shares are treated as unsold inventory, as Defendants' filings with the Department of Law suggest, as more fully alleged below).  Stated another way, ILG-Vistana owns at least 25% of the available fractional inventory (and possibly as much as 32%).  Plaintiffs own 107 Club Interests, and other purchasers own approximately 167.

---

[6]    For reasons that are not yet known, the Defendants reported 298 Club Interest sales as of June 30, 2009, but only 293 as of November 30, 2009.

[7]    As indicated, Defendants have taken possession of additional Club Interests through foreclosures and otherwise.

**Defendants Materially and Adversely Amended the Club Offering Plan by
Abandoning All Sales Efforts, Renting Unsold Inventory on a Massive Scale, and Then
Selling the St. Regis Residence Club to a Timeshare Exchange Company**

141.    Since 2009 when Defendants quietly ended sales and marketing efforts, they have
been monetizing the unsold Sponsor-owned inventory of approximately 100 Club Interests by
retaining ownership of the unsold Club Interests, and renting those units to the general public.
Among other things, this monetization of the "sponsor inventory" of "unsold" fractional Club
Interests breaches the covenant of good faith and fair dealing implied by New York law, which
embraces a pledge that neither party shall do anything which will have the effect of destroying or
injuring the right of the other party to receive the fruits of the contract, or which will defeat the
purpose of the contract. *Jennifer Realty Co.*, 98 N.Y.2d at 152-154.  The implied covenant
requires the sponsor to timely sell a sufficient number of units to make the offering viable, which
Defendants have not done. *Id.*

142.    Plaintiffs were never informed that the sales and marketing efforts had ended and
only learned of it after a tolling agreement went into effect on May 20, 2016.  Indeed,
Defendants continued to act as if they were marketing the units, posting price schedules with
each subsequent amendment to the offering plan.

143.    That Defendants decided to abandon all sales efforts is apparent from the
following:  The month after they flooded the St. Regis Residence Club with new fractional
inventory and as the country was sliding into a deep recession, Defendants *raised* the prices of
Club Interests and also caused the annual fees charged to Plaintiffs and other Club Members to
spike by changing the way costs were allocated among the different parts of the building.  In
mid-2009, Defendants withdrew the seller financing option that it had previously offered to
purchasers, and this option continues to be unavailable.  Defendants quietly closed the sales

office at the St. Regis.  Sales of Club Interests slowed to a trickle before stopping entirely.  As

indicated, Defendants have sold only a few Club Interests in the last six and a half years.

144.    ILG-Vistana have indicated that they have no intention of selling the unsold

fractional inventory they acquired from Starwood.  In a letter dated December 2, 2016, counsel

for the Sponsor, ILG-Vistana's wholly owned subsidiary, conceded that "marketing activities

have been suspended" since 2009.  What ILG-Vistana is doing is aggressively marketing its

nightly rental program, using the same exclusivity promised to Plaintiffs to promote ILG-

Vistana's use of the St. Regis Residence Club for transient hotel purposes:

> SAVE 20% AT THE ST. REGIS RESIDENCE CLUB, NEW YORK
>
> Located in the heart of Manhattan, The St. Regis Residence Club, New York gives you access to all the luxuries of New York City.
>
> Experience **the quintessential spot from which to access some of the city's most celebrated landmarks, history, and culture.** Within walking distance to Central Park, Fifth-Avenue shopping, Rockefeller Center, the Museum of Modern Art, world-class restaurants and award-winning theaters, The St. Regis New York is the definition of incomparable service and sophistication.
>
> Owners have the **rare opportunity to stay in the private residences of the best address in New York City** and enjoy a special offer of 20% off nightly rates. **Book now to experience this exclusive offer.** Offer based on availability.
>
> To confirm a Residence Studio, simply click on the first room category displayed, called a "Superior Room." To confirm a Residence One Bedroom, click on the second room category displayed, or the One Bedroom Suite. Nightly Rates displayed will represent 20% off of the Best Available nightly rate, are based upon availability and are subject to change.
>
> Offer valid for run-of-house Residence Studio and Residence One bedroom room types and specific floor plans. Views and amenities cannot be requested or confirmed in advance.

Exhibit 2 (emphasis in original).  Another portion of the Vistana website showcases the iconic

nature of the property, and then makes a "special offer" to its "Vistana Signature

Network™ Owners":

THE STORY BEHIND ONE OF THE WORLD'S MOST ICONIC LUXURY
BRANDS.

Over the past century, the St. Regis brand has evolved from the legendary flagship hotel
in the heart of New York City to become one of the most internationally revered names in
the hospitality industry.

With more than 30 properties in premier destinations around the world, the story of St.
Regis begins during New York's Gilded Age, when founder John Jacob Astor IV built
the original St. Regis Hotel at the famed corner of 55th Street and Fifth Avenue.

Back when the prestigious hotel debuted in 1904, **the 18-story landmark was the tallest
building in the city, and the tallest hotel in the world.** The St. Regis quickly attracted
the world's most renowned guests, who regarded it as the place to see and be seen in New
York.

The distinct Metropolitan Manor architectural and design styles of the hotel embody the
vision of Astor's formal residence, with its **rich tapestry, grandiose details and
exquisite ornamentation.** Look around and you'll notice signature elements. Bronze
facades and interiors harken back to the Beaux-Arts movement of the 20th century, while
diamond designs are integrated discreetly into patterns as a nod to Caroline Astor's love
of diamonds.

As an innovator, Astor introduced "modern" conveniences at The St. Regis New York
that have inspired state-of-the-art technology and advancements to be integrated at other
St. Regis hotels. Not only was the flagship property the first hotel to have central air
conditioning, but it was also the first to offer a central vacuum system and mail delivery
chutes.

It was also here that **signature amenities and services became the hotel's standard
over a century ago, setting the hotel apart from others.** The Astor family's rituals,
innovations and luxuries inspired the unparalleled standards that have become
synonymous with the brand today—from the **St. Regis Butler Service** to afternoon tea
and midnight supper events.

…

*Now Vistana Signature Network™ Owners have the exclusive opportunity to experience
the rich history and esteemed traditions of this classic hotel in the heart of New York
City.*

***Experience 20% off nightly rates at The St. Regis Residence Club, New York.***

*To confirm a Residence Studio, simply click on the first room category displayed, called a
"Superior Room." To confirm a Residence One Bedroom, click on the second room
category displayed, or the One Bedroom Suite. Nightly Rates displayed will represent
20% off of the Best Available nightly rate, are based upon availability and are subject to
change.*

*Offer valid for run-of-house Residence Studio and Residence One bedroom room types
and specific floor plans. Views and amenities cannot be requested or confirmed in
advance.*

Exhibit 3 (bold in original, italics added).

145.    As more fully alleged below, the Club Offering Plan granted Defendants a very limited right to rent – *at most* just one Club Week in each of the 31 Club Units, or 217 nights per year, plus any nights that purchasers trade in for Starwood Points. Yet Defendants have rented thousands of nights in the St. Regis Residence Club per year.  At a minimum, it appears that Defendants are renting not only the 217 nights that might be allowed in the Club Offering Plan, but also all 28 nights in each of the 98 Club Interests they own, which equals 2,744 nights. Nothing in the Club Offering Plan confers that right on them.  Meanwhile, a purchaser of a Club Interest could rent no more than 14 of their 28 nights, which equals 1,372 nights.

146.    On information and belief, Defendants have rented on average well over 4,000 nights a year.  The following illustrates the massive disproportionality between the very limited right to rent that the Club Offering Plan granted to Defendants – basically a week a year in each Club Unit – and the massive scale of Defendants' rentals of Club Units: Rentals of 4,000 nights a year in Club Units translates to 128 nights in each Club Unit – more than a third of the total nights.  Absolutely nothing in the Club Offering Plan authorized Defendants' rentals on this scale.

147.    Relatedly, starting in 2007, the Hotel and the Sponsor began entering into "non-parity" agreements regarding the rentals of Club Interests. Between 2007 and 2012, the Sponsor would release all its available rental nights to the hotel (both Sponsor and any club member inventory), and the Hotel would rent out that inventory in the event that it was fully booked on any given night.[8]

---

[8] What changed in April 2012 was that the Sponsor demanded $2.7 million per year to continue to take its inventory off the market (and release it to the Hotel). Sponsor showed no such concern for the rental rights of the members that they also, in secret, subordinated to the interests of the Hotel.

148.     In April 2012, the Hotel entered into a formal agreement with the Sponsor, through the Club Manager, wherein the Hotel would pay approximately $2.7 million annually to Sponsor in exchange for allowing the Hotel to operate the members rental program in a way which greatly suppressed rentals of fractional units -- both unsold Sponsor Inventory and members inventory.  The April 2012 agreement released all available nights in the Sponsor's members rental program (both Sponsors' unsold Club Interests and members' Club Units who had joined the member rental program) to the Hotel. The Hotel would then only rent unsold Club Interests if it was fully booked for any given night. Under the agreement, the hotel would pay all maintenance fees, taxes, and depreciation relating to the Sponsor's unsold Club Interests, totaling approximately $2.7 million per year.[9]

149.     This lease agreement ended around September 2015, when a new rental agreement was put into place. Under this new agreement, the Sponsor was to make all unsold Club Interests, as well as inventory the Sponsor received when Club members traded their weeks for SPG points, available for the hotel to rent through its own channels. The hotel would then pay the Sponsor 50% of all the gross revenue generated from any rentals of Club interests. This rental agreement was amended in 2016 to substitute Vistana for Starwood Vacation Ownership ("SVO") after SVO spun-off from Starwood Hotels and Resorts.

150.     Importantly, this rental agreement (which is currently still in place) also gives to the Hotel the task of renting out any nights that Plaintiffs or other owners place in the rental pool. But under the agreement, the Hotel has no obligation whatsoever to rent *any* units in the Club – whether those units belong to the Sponsor or any other owner. The Hotel is thus free to act in its

---

[9] No commensurate payments were made to the other members, despite the fact that the agreement called for *all inventory* in the rental program, Sponsor and member inventory alike, be subordinated to the rental of the much larger number of hotel rooms owned by Defendant Starwood Hotels and Resorts Worldwide, LLC.

own best interests and focus exclusively on renting out its own rooms each night. As a result, Club interests are rarely – if ever – rented out. Plaintiffs are thus deprived of one of the key components that was promised with their ownership – the ability to rent out their nights through a Club rental agent. This rental agreement (as well as previous rental arrangements with the hotel) are essentially non-parity agreements with the hotel, meaning the hotel has no obligation to maintain parity in occupancy between itself and the Club. This has unjustly enriched, at Plaintiffs' expense, the non-Sponsor Defendants, who have owned the Hotel (first Starwood Hotels and Resorts Worldwide, LLC and since 2016, Marriott International). Further, these arrangements between the Hotel and the Club have caused the value of Plaintiffs' interests to decline.

151.    Defendants' ongoing program of halting sales in favor of renting the unsold units, as well as their decision to enter into the non-parity agreements described above with the Hotel, have been gravely injurious to the property rights of Plaintiffs, causing the market for Club Interests at the St. Regis Residence Club to collapse.  The deleterious effects of rentals on the value of multi-unit properties is well known and demonstrated by the mortgage lenders' refusal to lend on such properties.  *See, e.g.*, *Bd. of Managers of the Warren House Condominium v. 34th Street Assoc. LLC*, 2015 WL 4915600, \*2 (N.Y. Sup. 2015).  As well, with the massive inventory of nightly rentals created by Defendants, members of the general public can spend just as many days at the St. Regis Residence Club as Plaintiffs, without having to pay premium purchase prices and without the obligation to pay the ever increasing annual maintenance fees and ownership expenses that Plaintiffs must pay regardless of Plaintiffs' actual use of the St. Regis Residence Club.

152.     Defendants' conduct has destroyed the viability of the St. Regis Residence Club. There is virtually no market or liquidity for those purchasers seeking to sell.  In recent years, for those rare cash sales that have actually occurred, prices have dropped by over 60% percent from the original purchase price, and there are indicators that the loss in value is deteriorating further.

**Plaintiffs Reasonably Expected Highly Restricted Access to the Club Units**

153.     Plaintiffs and other purchasers paid premium prices for exclusive access to a segregated portion of an iconic building.  They reasonably expected that access to the Club would be restricted to Club Members and *their* permitted users because that is what the Club Offering Plan provides: "Use of the Club Units is limited solely to the personal, recreational and other use by a Club Member and *Club Member's* Permitted Users."  Club Offering Plan, Special Risk Factors, at p. 3, § 1(c) (emphasis added).  Indeed, a Purchaser's right to access Club Units is strictly regimented.  Club Offering Plan, Introduction, at p. 12.  They can reserve "Fixed Time" of one consecutive week, and then "Float Time" of up to 21 days, for a total of four weeks per Club Interest purchased.  *Id*.

154.     Underscoring the promised exclusivity, the Club Offering Plan assured Plaintiffs that only the Suite Units would be used for "transient hotel purposes."  *Cf.* Club Offering Plan, Introduction, at p. 5 § 13(b) ("The *Suite Units* may be used for … transient hotel purposes") with Club Offering Plan, Special Risk Factors, at p. 3, § 1(c) ("Use of the *Club Units* is limited solely to the personal, recreational and other use by a Club Member and Club Member's Permitted Users") (emphasis added).

155.     Multiple provisions of the Plan purported to protect Plaintiffs and other purchasers against further timesharing.  For example, it provided: "Under the Club Declaration, each Club Unit shall remain undivided."  Club Offering Plan, Special Risk Factors, at p. 4, § 7.

"Club Members are strictly prohibited from subdividing their Club Interests."  Club Offering

Plan, Introduction, at p. 13.  The Club Declaration specifically provided:

> Except for Sponsor, no Club Unit may be used in fact or effect as part of or in furtherance
> of an Occupancy Plan (defined below). The term Occupancy Plan means a program, plan,
> agreement or other arrangement for the use, occupancy, marketing, advertising or
> promotion of one or more Club Units or Club Interests under any timeshare or fractional
> plan, residence, destination or luxury club, equity or non-equity program, interval
> exchange (whether the program is based on direct exchange of occupancy rights, cash
> payments, reward programs or other point or accrual systems) or other membership plans
> or arrangements through which a participant in the plan or arrangement acquires the right
> to use and occupy such Club Unit(s) or a portfolio of accommodations including such
> Club Unit(s).

Club Offering Plan, Club Declaration, at p. 460, Art. 10.  And the Club Reservation Rules made

part of the Club Offering Plan in the Third Amendment to the Club Offering Plan filed with the

Department of Law on or about January 3, 2007, specifically provided:

> The Club Association has endorsed through an affiliation agreement, the Starwood
> Residence Network or SRN as the Club's exchange program. *The Club shall not
> recognize or honor any exchanges from any entity, other than SRN*. SRN will permit
> Club Members to exchange or "interchange" Club Weeks associated with their Club
> Interest with Club Members at other Starwood Residence Club locations, *provided such
> location is also affiliated with SRN*.

Third Amendment to Club Offering Plan, at Exhibit A, p. 8, § C (emphasis added).

156.    While it is true that Plaintiffs knew there would be some rentals, the Club

Offering Plan made clear that these were a very limited aspect of the fractional offering.  The

Club Offering Plan only allowed Plaintiffs and other purchasers to rent in one-week blocks

called "Club Weeks."  Club Offering Plan, Club Reservation Procedures, at p. 90 ("Only Fixed

Time or Floating Time *reserved as a full Club Week* may be rented") (emphasis added); *see also*

Club Offering Plan, Definitions, at p. 20 (defining a Club Week as "seven (7) consecutive days

of exclusive possession and occupancy of a Club Unit").  The Club Offering Plan repeatedly

warned Plaintiffs and other purchasers not to expect many rentals, underscoring the purely

ancillary nature of the rental component to the Offering.  For example, the Club Offering Plan warned:

> The purchase of a Club Interest should be based upon its value as a vacation experience, for spending leisure time, or for other personal use, and not considered for purposes of acquiring an appreciating investment or with an expectation that the Club Interest may be rented or resold at a profit. Generally, there is no established market for the rental or resale of Club Interests and the rental and resale value, if any, is uncertain.

Club Offering Plan, Special Risk Factors, at p. 3.

> Notwithstanding the fact that Club Members may rent their Club Interests and/or confirmed reservations, the Club Interests: (i) are *not* being offered and sold by Sponsor with emphasis on the economic benefits, if any, to a Club Member to be derived from the managerial efforts of Sponsor or a third party designated or arranged for by Sponsor, for rental of Club Interests; (ii) do *not* involve the offering by Sponsor of participation in a rental pool arrangement; and (iii) do *not* require a Club Member to hold the Club Interest available for any part of the year, or use an exclusive rental agent or to be materially restricted in Owner's use or rental of the Club Interest.

*Id.* (emphasis in original).

157.    More importantly, with two narrow exceptions described below, the fruits of these limited rentals belonged to Plaintiffs and other purchasers – *not Defendants*.

158.    As a result of Defendants massive and unauthorized rental program, Plaintiffs are forced to compete with renters for access to their Club Interests, which was not within the reasonable expectation of the parties.

**The Club Offering Plan Does Not Confer a Permanent,<br>Broad Right To Rent on Defendants**

159.    The Club Offering Plan opens with a reference to the Sponsor's "rental … of its Unsold Club Interests."  Club Offering Plan, Special Risk Factors, at p. 3, § 1(a).  But the only substantive provision of the Club Offering Plan describing Defendants' rights to use unsold inventory does not disclose or confer a right to rent: "Sponsor reserves the right, without prior notice or amendment to the Club Offering Plan, to use any Unsold Club Units not included in the

Club *as sales and rental offices and models.*"  Club Offering Plan, Rights and Obligations of Sponsor, at p. 81, § (v)(ii).

160.    There are only four provisions granting rental rights not directly belonging to purchasers explained in the Club Offering Plan, and none of them authorizes what Defendants have done.

a.    The first grants a very limited right of rental to the *Club Association – i.e.*, the association of Club Members.  A provision of the Club Reservation Procedures notes that the Club Association will have the right to one *or more* Club Weeks in each Club Unit.  Club Offering Plan, Club Reservation Procedures, at pp. 506-507, § 6.  It explains that the Club Association will use one of these Club Weeks for maintenance, and then states the following with respect to any additional Club Weeks owned by the Club Association: "Any additional Club Weeks owned by the Club Association will be made available for the reservation of Club Members. *If any of the Club Association owned Club Weeks are not reserved by Club Members, the Club Association reserves the right to rent such unreserved Club Association owned Club Weeks to members of the general public at any time.*"  *Id.* at p. 90 (emphasis added).  Needless to say, any rental income received by the Club Association belongs to Plaintiffs and other purchasers, not Defendants.

b.    The second is the only provision in the Club Offering Plan conferring rental rights to Defendants, but this right is extremely limited.  Section Seven of the Club Reservation Procedures allows the Sponsor to rent, at most, just one Club Week in each Club Unit: "Sponsor has reserved the right to use or rent for its own purpose, Club Week 53 *when that time period occurs in all Club Units*.  Sponsor reserves the right to assign or convey its use rights in Club Week 53 to the Club Association or any other entity."  Club Offering Plan, Club

Reservation Procedures, at p. 507, § 7 (emphasis added).  The term "Club Week 53" is not defined anywhere in the Club Offering Plan.

      c.     The third gives the Club Manager the right to recoup unpaid fees by renting a delinquent owner's fractional time.  Club Offering Plan, Club Management Agreement, at p. 556, § 5(e) ("In addition, Club Manager is authorized, by the Club Declaration and other provisions of the Club Documents, to reserve and rent out Club Weeks assigned to the Club Interests of delinquent Club Members and apply the proceeds of such rental, less [various deductions], to the delinquent Club Member's account").

      d.     The fourth refers to the Club Manager's right to rent fractional time not for Defendants' benefit, but for "*for the benefit of the Club and/or Club Members*," an apparent reference to the option of Club Members to rent half their allotted time through an option to have the Sponsor act as their rental agent.  *Id.* at p. 557, §5(h) ("*Club Manager may, as agent for and on behalf of Club Association* in compliance with the Club Documents, lease or *rent real property for the benefit of the Club and/or Club Members*") (emphasis added).

161.     None of these provisions confers a broad right to rent on Defendants.  If Defendants had any *specifically* enumerated right to rent at all, it was limited to one Club Week in each Club Unit, presumably taken from the reserved Thirteenth Share (described below).  Club Offering Plan, Club Reservation Procedures, at p. 507, § 7 ("Sponsor has reserved the right to use or rent for its own purpose, Club Week 53 when that time period occurs in all Club Units").

162.     Defendants' status as the owner of unsold inventory arguably makes them a Club Member entitled to rent like any other Club Member, but that does not authorize their massive rental program for at least five reasons.

a.      First, applicable New York law required Defendants to clearly and fully explain all material terms, not compel purchasers to deduce what might theoretically be allowed by a 748-page Plan.  *See* 13 NYCRR § 24.1(b) ("An offering plan must, at a minimum: (1) contain *in detail* the terms of the transaction and be complete, current and accurate; (2) afford potential investors, purchasers and participants an adequate basis upon which to found their judgment") (emphasis added); 13 NYCRR § 24.3(a) ("The outside front cover of the offering plan shall contain the following information in the following order: … (7) The following statement must be printed in capital letters in boldface roman type at least as large as eight-point modern type and at least two points leaded: … **NEW YORK LAW REQUIRES THE SPONSOR TO DISCLOSE ALL MATERIAL INFORMATION IN THIS PLAN**") (emphasis in original).

b.      Second, as more fully alleged below, Defendants knew anything more than a very narrow right to rent would have to be disclosed in the Special Risk Factors section, 13 NYCRR § 24.1(b), but that section of the Club Offering Plan contains only an oblique reference to a right to rent unsold inventory that is not sufficient to give a reasonable purchaser fair warning of the massive rentals by Defendants.  Club Offering Plan, Special Risk Factors, at p. 3, § 1(a).

c.      Third, other portions of the Club Offering Plan lead a reasonable purchaser to believe that Defendants would not rent time associated with unsold Club Interests. The Plan stated that only Suite Units would be used for "transient hotel purposes."  *Cf.* Club Offering Plan, Introduction, at p. 5 § 13(b) ("The *Suite Units* may be used for … transient hotel purposes") with Club Offering Plan, Special Risk Factors, at p. 3, § 1(c) ("Use of the *Club Units* is limited solely to the personal, recreational and other use by a Club Member and Club

Member's Permitted Users") (emphasis added).  The portion addressing Defendants' right to rent disclosed only the narrow rental rights explained above, suggesting to a reasonable purchaser that there is no broader right to rent.

        d.     Fourth, Defendants cannot logically invoke a Club Members' right to rent full Club Weeks to justify their nightly rentals of Club Units.  Stated another way, the provisions of the Club Offering Plan granting Club Members the right to rent their Club Units *in one-week blocks* does not authorize Defendants to use those units *on per-night basis* or, in other words, for "transient hotel purposes," especially where the Plan states that only Suite Units will be so used.

        e.     Fifth, the provisions of the Club Offering Plan granting Club Members the right to rent their time, even if they applied to Defendants, contain no language suggesting that Defendants can abandon sales efforts and use unsold Club Interests for "transient hotel purposes" in perpetuity, as Defendants have done.

     163.    Defendants knew how to retain – and properly disclose – an unfettered right to halt sales and rent unsold inventory in perpetuity, but made a deliberate decision to grant themselves such rights only in the Suite Units.  For example, the offering plan for the Suite Units, which was never provided to Plaintiffs, included the following very clear disclosure in the special risk factor section:

> Sponsor will endeavor in good faith to sell, but nevertheless reserves the unconditional right, to rent, rather than sell, the Suite Units offered hereunder to Purchasers and others…. Moreover, Sponsor may, from time to time prior to the closing of title to any Suite Unit, cause such Unit to be included in and used as part of the Hotel Operating Program.

Suite offering plan, Special Risks to be Considered by Purchasers, at p. xi, § 11.

     164.    This disclosure in the Suite offering plan shows that Defendants properly viewed rentals as a risk factor that must be disclosed by statute, making the absence of a clear disclosure in the risk factors section of the Club Offering Plan a concession that they did not grant

themselves similar rights with respect to the Club Units and Club Interests.  *See* 13 NYCRR §
24.1(b) ("All features of a plan which involve significant risk or will disproportionately or
unusually affect maintenance charges or obligations of timeshare owners in future years of
timeshare operation must be conspicuously disclosed and highlighted in consecutively numbered
paragraphs in order of decreasing significance").

165.    The Condominium Declaration, but not the Club Declaration, contains a general
provision allowing Defendants to use any "Unsold Unit" for "any lawful purpose, including, but
not limited to, as models and sales and/or promotion offices in connection with the sale or rental
of the Units or for any other purpose, subject only to compliance with all Laws applicable to any
such use."  Club Offering Plan, Fifth and Fifty-Fifth Condominium Declaration, at p. 608, §
8.1(f).  Given the rules of construction applicable to contracts of adhesion and Defendants' duty
to fully and completely disclose all of the terms of the transaction, this very general provision
cannot be construed to confer rental rights on Defendants; it doesn't even mention rentals.  It
certainly does not allow Defendants to abandon sales efforts and rent in perpetuity.

166.    Moreover, this provision only applies to unsold Suite Units and *unsold* Club Units
because that is how Defendants chose to define the term "Unsold Unit."[10]  Any Club Unit in
which Defendants have sold a deeded one-thirteenth fractional interest cannot be considered
"unsold."  Defendants would have included the defined term "Unsold Club Interests" in this
clause had they intended it to permit their current actions.  Club Offering Plan, Definitions, at p.

---

[10]    Club Offering Plan, Club Declaration, at p. 611, § 9.2 ("The Unsold Suite Units and the
Unsold Club Units are collectively referred to herein … as the 'Unsold Units'"); Club Offering
Plan, Definitions, at p. 25 ("'*Unsold Unit*' shall mean any Unit owned or retained, by way of
lease or any other arrangement by which management and/or financial responsibility is retained,
by Sponsor or any of the Declarants at the time in question"); *id.* ("'*Unit*' shall mean any space
designated as a Unit in the Condominium Declaration together with its Common Interest. All
such Units are collectively, referred to as the 'Units'"); *id.* ("'*Unsold Club Interest*' shall mean
any Club Interest owned or retained by lease or any arrangement bywhich management and/or
financial responsibility is retained, by Sponsor at the time in question").

25  ("*'Unsold Club Interest'* shall mean any Club Interest owned or retained by lease or any

arrangement by which management and/or financial responsibility is retained, by Sponsor at the

time in question").

<b>Defendants Promised Under Penalty of Perjury That<br>the Club Offering Plan Disclosed All Material Terms,<br>and That No Material Terms Were Concealed</b>

167.    Plaintiffs reasonably believed that there were no undisclosed aspects of the

fractional offering because the Club Offering Plan repeatedly so states.  The cover includes this

statement: "THIS OFFERING PLAN IS SPONSOR'S ENTIRE OFFER TO SELL THESE

CLUB INTERESTS.  NEW YORK LAW REQUIRES SPONSOR TO DISCLOSE ALL

MATERIAL INFORMATION IN THIS OFFERING PLAN…"  Inside, the Club Offering Plan

states: "The Offering Plan contains all of the detailed terms of the transaction."  Club Offering

Plan, Introduction, at p. 11.

168.    Elsewhere, the Club Offering Plan is even more explicit on this point: "The

Offering Plan does not knowingly omit any material fact or knowingly contain any untrue

statement of any material fact.  Sponsor believes that the Offering Plan contains a fair summary

of the material provisions of the documents referred to in the Offering Plan."  Club Offering

Plan, General, at p. 103.  Moreover, the Club Offering Plan includes a "Certification of Sponsor

and Principals" similar to the one excerpted below.  Club Offering Plan, Certification of Sponsor

and Principals, at p. 733-34; *see also* ¶ 172, *infra*.

<b>Defendants Compounded the Harm Inflicted on Plaintiffs<br>and Other Purchasers by Surreptitiously Amending the Club Offering Plan to<br>Make Them Bear the Costs of the Increased Use</b>

169.    The Club Offering Plan promised: "The Club Property will be subject *to ordinary*

*wear and tear*," which led Plaintiffs to believe that, unlike the Suite Units, their Club Units

would not be used for "transient hotel purposes."  Club Offering Plan, Special Risk Factors, at p.

4, § 6 (emphasis added).  It also included this specific representation about the manner in which

costs would be allocated to the Club Units: "The cost of operating the Building will be borne

entirely by the Unit Owners *in proportion to their respective share of the Common Interests.*"

Club Offering Plan, Introduction, at 16.  "Unit Owners" is defined to include the owners of the

Suite Units, Club Units, and the Commercial Units, most notably the hotel.  Club Offering Plan,

Definitions, at p. 25.

170.    Defendants were not content with the profits from their unauthorized rental

program; they pushed their scheme further by making Plaintiffs pay for the increased costs

associated with those rentals.  On or about April 16, 2008, Defendants set the stage by filing an

Eighth Amendment to the Club Offering Plan with the Department of Law that included the

following radical change in the share of building expenses paid by Plaintiffs and other

purchasers:

> In accordance with Article 6 of the Condominium Declaration and as a result of the
> number of Suite Units reclassified as Club Units, the Condominium Board has reviewed
> the previously approved 2008 Condominium Budget to determine whether each category
> of Unit Owners is paying an appropriate share of the General Common Expenses.  In
> connection with such review, the Condominium Board has determined that it is fair and
> reasonable to allocate certain General Common Expenses on the basis of "usage" rather
> than on the basis of "key" count.  Therefore, the Condominium Board unanimously
> approved a revised 2008 Condominium Budget.

Eighth Amendment to the Club Offering Plan, at p. 2, § 5.  In fact, Article 6 of the Condominium

Declaration, cited in the above amendment, does not confer any authority on Defendants to make

this change.

171.    After this surreptitious Amendment, which Defendants never disclosed to

Plaintiffs or other purchasers as required by the Club Offering Plan, annual common expenses

billed to Plaintiffs and other purchasers spiked from $2,341,949 to $3,446,196.  At the same

time, the Suite Units' share of these same common expenses dropped from $1,508,900 to $416,040.[11]  Around the same time, Defendants began billing Plaintiffs and other Club Interest purchasers for the increased usage associated with Defendants' massive and unauthorized rentals.

172.    In short, Defendants radically increased the "usage" of the Club Units by renting out time associated with unsold Club Interests, and then made Plaintiffs pay for the increased usage even though all profits from the unauthorized rentals flowed to Defendants.

### Defendants' Improper Use of the Thirteenth Shares

173.    Defendants also seek to profit from the Thirteenth Shares, which the Club Offering Plan stated would be reserved for maintenance purposes and the limited rental rights described above.  *See* ¶¶ 154(a), *supra.*

174.    The Club Offering Plan represented that the Sponsor would sell twelve fractional interests in each Club Unit defined as "a 4/52 undivided interest in a Club Unit, as tenant-in-common with all other purchasers of Club Interests in such Club Unit."  Club Offering Plan, Introduction, at p. 12.  With respect to the remaining thirteenth share, the Club Offering Plan provides that it "*will be* conveyed by Sponsor to the Club Association for use in the reservation system, maintenance and rental."[12]  *Id.* (emphasis added).  Defendants never disclosed the true state of affairs, which is that they treat the thirteenth share as part of the unsold inventory to be monetized in whatever fashion benefits Defendants most.

175.    Indeed, Defendants have surreptitiously converted the Thirteenth Shares for their own use and benefit.  In the original Club Offering Plan and each of the first six amendments

---

[11]    Despite this shift in cost caused by the increased rental of the Club Units, it was Defendants alone who benefitted through receipt of over 95% of rental nights and the millions of dollars in rental revenues generated from rentals.
[12]    The Club Association's rental right is explained in Paragraph 161(a), *supra.*

thereto, Defendants calculated the total number of Club Interests by multiplying the total number of Club Units by twelve.  For example, the Sixth Amendment to the Club Offering Plan, submitted at a time when there were 26 Club Units, includes this summary of sales: "As of July 31, 2007, Sponsor closed title on the sale of approximately 193 Club Interests out of a total of 312 Club Interests, leaving approximately 119 Club Interests for sale."  The next amendment, filed when there was the same number of Club Units, includes the thirteenth fractional share in this calculation, stating: "As of October 1, 2007, Sponsor closed title on the sale of approximately 187 Club Interests out of a total of 338 Club Interests, leaving approximately 151 Club Interests for sale."  Defendants continue to include the Thirteenth Share at present; the Twenty-Fourth Amendment, dated September 16, 2015, states, "As of June 8, 2015, Sponsor closed title on the sale of approximately 294 Club Interests out of a total of 494 Club Interests, leaving approximately 200 Club Interests available for sale."  Defendants provided no disclosure of this subtle, but very detrimental change in the Club Offering Plan.

**Defendants Concealed Their Wrongdoing and Lied to the Department of Law**

176.    Defendants drastically changed their management of the property in a manner that is inconsistent with the Club Offering Plan.  Defendants' conduct constitutes material and adverse changes to the Club Offering Plan that Defendants never disclosed to Plaintiffs, other purchasers, or the Department of Law.

177.    To the contrary, over the last seven years, Defendants have sold only a handful of Club Interests, but have submitted fourteen amendments to the Department of Law.  None disclosed the abandonment of sales or the implementation of a massive rental program.  Instead, these amendments falsely led the Department of Law to believe that sales efforts were continuing by including new price schedules.  Each amendment included the following patently false

statement that masked the abandonment of sales efforts: "Except as set forth in this Amendment, there have been no material changes of facts or circumstances affecting the Property or the offering."

178.    Worse, Robin Suarez and Stephen Williams, both senior executives at Starwood, submitted the following false affidavit to the Department of Law with the 20th amendment to the Club Offering Plan in or about October 2013:

> We are the sponsor and the principals of sponsor of the fractional offering plan for the fractional captioned property.
>
> *We understand that we have primary responsibility for compliance with the provisions of Article 23-A of the General Business Law*, the regulations promulgated by the Department of Law in Part 24 and such other laws and regulations as may be applicable.
>
> *We have read the entire offering plan. We have investigated the facts set forth in the offering plan and the underlying facts. We have exercised due diligence to form a basis for this certification. We jointly and severally certify that the offering plan does, and that documents submitted hereafter by us which amend or supplement the offering plan will:*
>
> (i)  *set forth the detailed terms of the transaction and be complete, current and accurate;*
>
> (ii)  afford potential investors, purchasers and participants an adequate basis upon which to found their judgment;
>
> (iii)  *not omit any material fact;*
>
> (iv)  *not contain any untrue statement of a material fact;*
>
> (v)  not contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;
>
> (vi)  not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;
>
> (vii)  *not contain any representation which is false, where we:*
>> (a)  *knew the truth;*
>> (b)  *with reasonable effort could have known the truth;*
>> (c)  *made no reasonable effort to ascertain the truth; or*
>> (d)  *did not have knowledge concerning the representation or statement made.*
>
> This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

Twentieth Amendment to Club Offering Plan, Certification of Sponsor and Principals (emphasis added).  This certification is patently false because Defendants had, by then, secretly abandoned all sales efforts, and reaped huge profits from unauthorized, undisclosed rentals.

179.    As a result of Defendants' fraudulent concealment of their wrongful conduct, Plaintiffs did not learn of the facts giving rise to the claims asserted herein until after May 20, 2016.

### Recent Changes Made by ILG-Vistana

180.    ILG-Vistana recently caused the Sponsor, their wholly-owned subsidiary, to make a substantial change to the Club Offering in a 25th Amendment to the Club Offering Plan dated November 15, 2016.  Because Defendants do not serve amendments on those who have already purchased, as the Club Offering Plan required, Plaintiffs obtained a copy of this amendment on December 2, 2016 pursuant to a Freedom of Information Act Request.

181.    After disclosing ILG's acquisition of the St. Regis Residence Club (through the Starwood spinoff of Vistana and subsequent acquisition of that entity by ILG, as described above), the 25th Amendment announces what purports to be an innocuous name change.  In the section entitled "New Definitions," the 25th Amendment states:

> Exchange Network means the Vistana Residence Network, the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions imposed by the Exchange Company for resorts affiliated with the Exchange Network.  Note that the Exchange Network was formally known as Starwood Residence Network and by the acronym SRN and may be referred to by such former name and acronym in various documents and agreements.

> Exchange Company means Vistana Signature Network, Inc., a Delaware corporation, its successors and permitted assigns….

25th Amendment to Club Offering Plan at p. 2.  On information and belief, this is not merely a name change, but rather the first step in a plan by ILG-Vistana to give the approximately quarter

million members of the Vistana Residence Network a special right of access (beyond the unauthorized nightly rentals) to the St. Regis Residence Club.

182.     The Club Offering Plan promised Plaintiffs that the *only* exchange program whose members would have access to the St. Regis Residence Club was the Starwood Residence Network, and that only the Club Association, which Plaintiffs and the other Club Members now control, could replace the Starwood Exchange Network with another exchange company.  *See* Second Amendment[13] to Club Offering Plan at p. 2 ("The Club Association has endorsed through an affiliation agreement, the Starwood Residence Network or SRN as the Club's exchange program.  *The Club will not recognize or honor any exchanges from any entity other than SRN*") (emphasis added); Third Amendment to Club Offering Plan, at Exhibit A, p. 8, § C ("The Club Association has endorsed through an affiliation agreement, the Starwood Residence Network or SRN as the Club's exchange program. *The Club shall not recognize or honor any exchanges from any entity, other than SRN*. SRN will permit Club Members to exchange or "interchange" Club Weeks associated with their Club Interest with Club Members at other Starwood Residence Club locations, *provided such location is also affiliated with SRN*") (emphasis added).

183.     In recent years, the only other properties participating in the Starwood Residence Network are the Camelback Residence Club Condominium and the Aspen Residence Club and Hotel Condominium.  The 25th Amendment includes a version of the "Vistana Signature Network Disclosure Guide" that purports to maintain the status quo in this regard, listing only the Camelback Residence Club Condominium, the St. Regis Residence Club, and the Aspen Residence Club and Hotel Condominium as participants in the Vistana Signature Network.  This

---

[13]     The Second Amendment predated the first sale, and was one of the few amendments given to all purchasers.

document also states: "As of December 31, 2015, there were 1,118 Residence Network Members enrolled in Residence Network."

184.    The problem is that other publicly available information indicates that the Vistana Signature Network is actually far larger – approximately a quarter million owners in between twenty and thirty-five (depending upon how one counts) far less desirable properties.  Indeed, another version of the "Vistana Signature Network Disclosure Guide" that is readily available online[14] lists thirty-five destinations and discloses a whopping "249,565 Network Members enrolled in the Network."  For purposes of comparison, the two versions are attached to this Complaint as Exhibits 4 and 5.

185.    A visit to the Vistana website confirms that the aforementioned online version of the "Vistana Signature Network Disclosure Guide" correctly describes the massive size of the Vistana Residence Network.  Comparing the addresses and descriptions of the properties on the "Destinations" portion of the Vistana website to the properties listed in the online version of the "Vistana Signature Network Disclosure Guide" reveals that they are essentially the same list; all of the "Network Resorts" listed in the latter are "Destinations" on the Vistana website, although there is some variation in the names and the website appears to consolidate some of the listings.

186.    The Vistana website states that these properties are part of the "Sheraton Destination Club" and the "Westin Destination Club," which are clearly part of the ILG-Vistana portfolio.  As stated in the 25th Amendment:

> ILG is a leading provider of professionally delivered vacation experiences and the exclusive global licensee for the Westin®, and Sheraton® brands in vacation ownership. The company offers its owners, members, and guests access to … world-class destinations through its international portfolio of resorts and clubs. ILG's subsidiary Vistana owns and manages the Westin Vacation Club and the Sheraton Vacation Club

---

[14]    *See* http://uploads.tapatalk-cdn.com/files-114/2015-svn-rules-mandatory.pdf.

and, through Vistana's various subsidiary and affiliate entities such as Sponsor, offers Club Interests to the general public.

25th Amendment to Club Offering Plan at p. 1.

187.    In early November 2016, Defendants attempted to get the board of the Club

Association to sanction this supposedly innocuous name change.   Defendants scheduled a

meeting of the board of the Residence Club Association for Election Day, November 8, 2016, a

day when it knew that few Club Members would attend.  Plaintiffs and other purchasers live

around the country (and beyond) and would not likely travel to New York on short notice, let

alone on Election Day.  The vote was taken off calendar when some of the above information

was made known to the Board.

188.    Unless ILG-Vistana is intending to operate two different "Vistana Signature

Networks" – one with the three properties formerly part of the Starwood Residence Network, the

other the much larger one described on the Vistana website and other publicly available

documents – it appears that ILG-Vistana will merge the two into a single exchange network and

thereby open up the St. Regis Residence Club to nearly the approximately quarter million new

participants.  Such a radical change in the Club Offering is not within the reasonable expectation

of the parties, and is a breach the implied covenant of good faith and fair dealing.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract – Abandonment of Sales)
### (All Plaintiffs Against St. Regis Residence Club, New York Inc.)

189.    Plaintiffs incorporate by reference the allegations contained in the preceding and

subsequent paragraphs as if fully set forth herein.

190.    The standardized Purchase Agreement and Club Offering Plan constitute an

enforceable contract between Plaintiffs and St. Regis Residence Club, New York Inc.

191.    Plaintiffs paid in full for their Club Interests and performed all, or substantially all, of the significant things that the Purchase Agreement and Club Offering Plan required them to do, and/or they were excused from doing those things.

192.    The Purchase Agreement and Club Offering Plan includes an implied promise by St. Regis Residence Club, New York Inc. to timely sell a sufficient number of Club Interests to make this fractional offering viable. *Jennifer Realty Co.*, 98 N.Y.2d at 152.

193.    Based on the language of the Purchase Agreement and Club Offering Plan, Plaintiffs reasonably expected that Defendants (including St. Regis Residence Club, New York Inc.) would not add Club Interests to the Offering for the sole purpose of creating unsold inventory for use in a permanent rental program, but would instead endeavor to timely sell all Club Interests, or at least a sufficient number to make the St. Regis Residence Club viable. *Jennifer Realty Co.*, 98 N.Y.2d at 152.

194.    The wrongful conduct of Defendants (including St. Regis Residence Club, New York Inc.) alleged elsewhere in this Complaint – namely their program of self-servingly increasing the inventory of Club Units and Club Interests while ceasing sales efforts, and then renting this inventory for their own profit – has frustrated Plaintiffs' rights and reasonable expectations under the parties' contract, deprived Plaintiffs of the value of their Club Interests, and allowed Defendants (including St. Regis Residence Club, New York Inc.) to profit at Plaintiffs' expense.  Defendants (including St. Regis Residence Club, New York Inc.) have destroyed and/or injured Plaintiffs' rights to receive the fruits of the Purchase Agreement and Offering Plan, and/or defeated the purpose of that contract.

195.    St. Regis Residence Club, New York Inc. materially breached implied terms of the Purchase Agreement and Club Offering Plan by abandoning any effort to sell Club Interests.

196.    At a minimum, Plaintiffs are entitled to damages in an amount to be proven at trial as a result of this breach of the Purchase Agreement and Club Offering Plan.  Because the offering has been materially changed in an adverse way such that the harm will continue into the future, monetary damages may not fully compensate Plaintiffs for their harm.  Plaintiffs therefore may seek equitable relief and/or rescission as an alternative remedy.

## SIXTH CLAIM FOR RELIEF[15]
### (Rescission Pursuant to Contractual Right)
### (All Plaintiffs Except the Non-Rescinding Plaintiff
### Against St. Regis Residence Club, New York Inc.)

197.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth herein.

198.    As an alternative to the above claims, all Plaintiffs except Francine Blum, ("Non-Rescinding Plaintiff"), seek an Order declaring that their Purchase Agreements are rescinded and null and void pursuant to a properly exercised contractual right to rescind contained in the Club Offering Plan.

199.    The Club Offering Plan includes the following right of rescission: "If there is a substantial amendment to the Club Offering Plan that materially and adversely affects Purchasers, except as otherwise provided herein, Purchasers will have a right of rescission for a period of fifteen (15) days from the Presentation Date of such amendment to them."  Club Offering Plan, General, at p. 103.  Plaintiffs are specifically defined as "Purchasers" in their respective Purchase Agreements in accordance with the generally accepted meaning of the

---

[15] Plaintiffs have maintained the claim for relief numbering from the original Complaint to avoid confusion.

term.[16]  *See Bay City-Abrahams Bros. v. Estee Lauder, Inc.*, 375 F. Supp. 1206, 1218 (S.D.N.Y. 1974); NY Uniform Commercial Code, § 1–201(33) ("'Purchaser means' a person who takes by purchase").

200.   Plaintiffs' status as "Purchasers" within the meaning of the contractual right of rescission is confirmed by the definition of "Purchaser" in the Club Offering Plan: "*'Purchaser'* shall mean a purchaser of a Club Interest under <u>a</u> Purchase Agreement with Sponsor."  Club Offering Plan, Definitions, at p. 24 (underlining added).  This definition tracks the generally accepted meaning of "purchaser," but clarifies that buyers on the secondary market (*i.e.*, not "under a Purchase Agreement with Sponsor") are excluded from the definition.

201.   The following material and adverse amendments to the Club Offering Plan trigger this contractual right of rescission:

a.   In the Seventh and especially the Eighth Amendments to the Club Offering Plan, Defendants flooded the St. Regis Residence Club with new Club Interests – as the country was sliding into a deep recession – by converting Suite Units into Club Units; and

b.   Also in the Eighth Amendment, Defendants changed the way costs were allocated among the various components of the building, adopting an unauthorized usage-based allocation formula that drove up the fees charged to Plaintiffs.

c.   Further, in the Eleventh Amendment, Defendants announced that the Sponsor was no longer offering financing in connection with the purchase of Club Interests.

---

[16]   Several provisions of the Club Offering Plan use the term "Purchaser" in exactly this way.  *See, e.g.,* Club Offering Plan, Special Risk Factors, at p. 7, § 19 ("Purchaser may use the Condominium name for the resale or rental of a Club Interest, but is strictly prohibited from using the St. Regis name or marks in connection with the resale or rental of a Club Interest through any Person other than Sponsor, Club Manager or their affiliates"); *id.* at 14 ("Each Purchaser is responsible to the Club Association for all regular Club Charges and special Assessments and personal charges under the Club Documents, beginning in the calendar year in which Closing occurs").

       d.      Shortly thereafter, the Sponsor Defendants abandoned all sales and marketing efforts.

       e.      Additionally, Defendants began renting unsold Club units in a manner not authorized or contemplated in the Club Offering Plan.

202.     The Club Offering Plan specifically requires that all changes be stated in amendments to the Club Offering Plan filed with the Department of Law.  *See, e.g.,* Club Offering Plan, Special Risk Factors, at pp. 7-8, § 20(e), Introduction at p. 13, Changes in Prices and Facilities, at p. 61.  St. Regis Residence Club, New York Inc. breached this provision of the parties' contract by failing to file or disclose amendments to the Club Offering Plan regarding the material and adverse changes described above.

203.     The Club Offering Plan required St. Regis Residence Club, New York Inc. to serve and present these amendments to Plaintiffs.  Club Offering Plan, Special Risk Factors, at p. 11 ("Sponsor may from time to time amend the Offering Plan by filing an amendment with the New York State Department of Law… *and serving such amendment on Purchasers and Club Members*") (emphasis added); *see also* Club Offering Plan, Definitions, at p. 23 ("*'Presentation Date'* shall mean the date on which the Offering Plan or an amendment thereto, as the case may be, *is personally delivered or the fifth day after mailing to prospective* Purchasers and Club Members following acceptance of the Offering Plan or amendment thereto for filing by the Department of Law") (emphasis added).

204.     St. Regis Residence Club, New York Inc. did not disclose the above amendments as required by the Offering Plan.  In fact Defendants (including St. Regis Residence Club, New York Inc.) concealed them.  As a result, Plaintiffs did not learn of any of the changes set forth herein until after a tolling agreement went into effect on May 20, 2016.

205.    This claim is timely because Plaintiffs' contractual right of rescission runs from the Presentation Date of the amendment to Purchasers, something that has not yet happened. Club Offering Plan, Definitions, at p. 23 ("*'Presentation Date'* shall mean the date on which the Offering Plan or an amendment thereto, as the case may be, *is personally delivered or the fifth day after mailing to prospective* Purchasers and Club Members following acceptance of the Offering Plan or amendment thereto for filing by the Department of Law") (emphasis added). Defendants never even filed an amendment to the Club Offering Plan disclosing their abandonment of sales, and so no such amendment was ever presented to Plaintiffs.  Defendants filed the Seventh and Eighth Amendments to the Club Offering Plan with the Department of Law, but never personally delivered or mailed those amendments to Plaintiffs.

206.    All Plaintiffs except Maryanne Larsen, the Amethyst Plaintiffs, the McCabe Plaintiffs, the Reed Plaintiffs, and the Siegel Plaintiffs asked St. Regis Residence Club, New York Inc. to rescind their Purchase Agreements, but St. Regis Residence Club, New York Inc. refused in a letter dated December 2, 2016. By this Complaint, Maryanne Larsen, the Amethyst Plaintiffs, the McCabe Plaintiffs, the Reed Plaintiffs and the Siegel Plaintiffs hereby notify Sponsor that they are exercising their right of rescission under the Club Offering Plan, General, at p. 103.

## SEVENTH CLAIM FOR RELIEF

### (Unjust Enrichment)

### (All Plaintiffs Against Starwood Hotels and Resorts Worldwide, LLC; Marriott International, Inc., and Vistana Vacation Ownership)

207.    Plaintiffs incorporate by reference the allegations contained in the preceding and subsequent paragraphs as if fully set forth herein.

208.    The Defendants who have owned the St. Regis Hotel in New York, first Starwood Hotels and Resorts Worldwide, LLC, and since 2016, Marriott International, Inc. (the "Hotel

Owner Defendants") have both unlawfully profited and been unjustly enriched at Plaintiffs'
expense. Specifically, during the period from 2007 to the present: (a) The Hotel Owner
Defendants have unjustly profited by selling more room nights as a result of the non-parity
agreements described herein; (b) the Hotel Owner Defendants have profited by over $3.1 million
per year from not having to pay the Plaintiffs for taking their Club Units off of the rental market.

209.    Defendant Starwood Hotel and Resorts Worldwide, Inc. was also unjustly
enriched by achieving a higher purchase price for the St. Regis Hotel when the hotel was sold to
Marriott International, Inc. in 2016 (since the value of a hotel was inflated because of the higher
net revenue the hotel achieved as a result of the secret non-parity agreements).

210.    Defendant Starwood Vacation Ownership, Inc. (now Vistana Vacation
Ownership, Inc.) was unjustly enriched at Plaintiffs' expense by at least $2.7 million per year by
accepting payments from Starwood Hotels & Resorts in exchange for allowing Starwood Hotels
& Resorts to have full control over renting fractional interests (including those interests owned
by Plaintiffs and other Club members who opted or would have opted to have the Sponsor serve
as their rental agent), which unjustly harmed Plaintiffs as described above. In other words, these
Defendants benefitted from a near total lack of rentals of Plaintiffs' and other members' Club
Interests.

211.    Equity and good conscience require that all sums improperly obtained by
Defendants Starwood Hotels and Resorts Worldwide LLC, Marriott International, and Vistana
Vacation Ownership, Inc. as a result of these unjust and secret non-parity agreements be
disgorged from these Defendants and paid to Plaintiffs.  Plaintiffs seek an accounting to
determine the amount of those improperly obtained profits.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment against Defendants as follows:

1.      For an award of damages from Defendants, jointly and severally in an amount to be proven at trial;

2.      As to all Plaintiffs except the Non-Rescinding Plaintiff, for an Order declaring that the Purchase Agreements are rescinded and null and void, that Defendants account for all consideration obtained from the rescinding Plaintiffs and return said consideration to them, and that title to the rescinded Club Interests be restored to St. Regis Residence Club, New York Inc.;

3.      For an accounting and disgorgement of all funds improperly obtained by Defendants to prevent their unjust enrichment;

4.      For attorneys' fees and costs according to proof;

5.      For pre-judgment and post-judgment interest; and

6.      For such other and further relief as the Court deems just and proper.

Dated:  October 19, 2018            Respectfully submitted,

By: /s/ Michael Schrag

Michael Schrag, Esq. (admitted pro hac vice)
Linda Lam, Esq. (admitted pro hac vice)
GIBBS LAW GROUP LLP
505 14th Street, Suite 1110
Oakland, CA  94612
Telephone: (510) 530-9700
Facsimile: (510) 350-9701
mls@classlawgroup.com
lpl@classlawgroup.com

Tyler Meade
Annie Decker
THE MEADE FIRM P.C.
California Office:

12 Funston Ave., Suite A
San Francisco, CA  94129
New York Office:
111 Broadway, Suite 2002
New York, NY 10006
Telephone: (415) 724-9600
Facsimile: (415) 510-2544
tyler@meadefirm.com
annie@meadefirm.com

Matthew C. Ferguson
THE MATTHEW C. FERGUSON LAW FIRM, P.C.
119 South Spring, Suite 201
Aspen, Colorado 81611
Telephone: (970) 925-6288
Facsimile: (970) 925-2273
matt@matthewfergusonlaw.com

Michael J. Reiser, Esq. (admitted pro hac vice)
Matthew W. Reiser, Esq. (admitted pro hac vice)
Isabella Martinez, Esq. (admitted pro hac vice)
REISER LAW, P.C.
1475 N. Broadway, Suite 300
Walnut Creek, California 94596
Telephone: (925) 256-0400
Facsimile: (925) 476-0304
michael@reiserlaw.com

Attorneys for Plaintiffs

## PROOF OF SERVICE

*Flora Gillespie, et al. v. St. Regis Residence Club, et al.*
United States District Court, Southern District of New York
Case No. 1:16-cv09390-GHW

I declare that I am over the age of 18, and not a party to this action. My business address is 505 14th Street, Oakland, CA 94612. On the date set forth below, I served the following document(s):

### SECOND AMENDED COMPLAINT

On all interested parties in this action as follows:

**VIA ECF:**
Chris LaRocco, Esq. (*chris.larocco@bclplaw.com*)
William Hibsher, Esq. (*wjhibsher@bclplaw.com*)
Bryan Cave Leighton Paisner LLP
1290 Avenue of the Americas
New York, NY 10104

[X] (BY ECF) By electronically filing the foregoing through the ECF system which will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. Executed on October 19, 2018 in Oakland, California.

/s/ Linda Lam
Linda Lam