## **EXHIBIT B**

COST ALLOCATION SCHEDULE
Exhibit B to Condominium By-Laws
of Fifth and Fifty-Fifth Condominium

The Common Expenses of the Condominium shall be allocated among the Units (or, in the case of the Suite Units and Club Units, categories of Units) as more particularly described in this Exhibit. Except with respect to the Retail Unit which does not use or benefit from many of the Common Elements or services of the Condominium and therefore is allocated only its appropriate share of the expenses in connection therewith, the allocation of such Common Expenses is generally determined based upon either: (1) percentage of relative Common Interest; or (2) as appropriate, per "key" (i.e., allocated equally to each separately keyed hotel room or suite of rooms), but in any event, in conformity with Section 339-m of the New York State Real Property Law.

As described in this Exhibit, an allocation of expense to the Suite Units or Club Units refers to such expense being allocated to such category of Units as a whole. Among the Suite Units or Club Units themselves, the Common Expenses allocated to the Suite Units as a whole or the Club Units as a whole are ultimately allocated among the various Suite Units or Club Units, as the case may be, based on the relative percentage of Common Interests of such Suite Units or Club Units, as the case may be.

After operation of the Condominium has commenced, it is anticipated that the methods of allocation of the Common Expenses may be periodically adjusted as provided in Section 6.1.2 of the By-Laws, but not more frequently than once each year, to reflect the differing proportions fairly attributable to the then amount of usage by such category of Unit Owner of the services and the General Common Elements and Hotel Limited Common Elements in question. If any category of Unit Owners contends that any method of allocation determined by the Board is inequitable, the dispute may be submitted to arbitration as provided in, and subject to the terms and conditions of, the By-Laws. Since the per-key allocations include "lock-off" rooms and suites (i.e., where separate entrances to adjoining hallways allow separate lock-off and rental of a portion of a Suite Unit, Club Unit or Hotel Unit guest room or guest suite), the key counts reflected in the current Floor Plans are as follows: Hotel Unit: 243 keys; Suite Units: 36 keys; and Club Units: 34 keys.

It is expected, at least initially, that the operator of the Hotel will be the Managing Agent of the Condominium. Accordingly, this Exhibit anticipates that many of the Common Expenses will be incurred pursuant to contracts, labor, purchase programs, etc. arranged by the Hotel operator, which will then allocate to the Condominium the appropriate share of expenses pursuant to the allocation methods described in this Exhibit. Except as otherwise indicated, where a portion of an expense line item is said to be absorbed directly by the Hotel Unit, this refers to Hotel operator having incurred the expense for both the Hotel and Condominium, and allocating such portion directly to the Hotel Unit in order to determine the balance remaining to be allocated among the various categories of Units (including the Hotel Unit, as applicable) as a Common Expense. Each category of expense in the Condominium Budget would reflect only

-1-

the Common Expense of the Condominium (i.e., after the Hotel operator's deduction of amounts directly absorbed by the Hotel Unit).

1.   Payroll, Benefits and Related Expenses:

This Section 1 assumes, at least initially, that the Hotel operator would provide certain services on behalf of the Condominium using employees of the Hotel, and includes the wages, workers compensation, disability insurance, welfare and pension costs, payroll taxes and the cost of sick days, personal days, holidays and vacation pay, and other fringe benefit costs for such employees (collectively, "Wage and Fringe Benefit Costs"). Related expenses include, without limitation, any costs associated with training, employment checks, employee recognition programs and payroll services. It is anticipated that most of the employees will be members of the New York Hotel-Motel Trades Council, AFL-CIO Union. However, no warranty is made as to which unions, if any, will represent the Building employees.

As with any building providing hotel-type services, staffing levels are higher than for a customary residential condominium building, reflecting the additional level and availability of services. Staffing levels will also vary from time to time based on variations in occupancy levels and seasonality, and may involve use of part-time and/or overtime labor services as well as contract labor.

Except as otherwise indicated to the contrary, the Payroll, Benefits and Related Expenses are allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis. The following exceptions apply:

(a)   Forty-four percent (44%) of expense incurred by the Hotel operator for the Hotel and Condominium with respect to employee training, employee recognition and payroll service is absorbed directly by the Hotel Unit based on estimates provided by the existing Hotel operator relative to human resource matters solely benefiting the Hotel, and the balance is allocated among the Hotel Unit, the Suites Units, the Club Units and, only where applicable, the Retail Unit based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

(b)   17.60% of expense incurred by the Hotel operator for the Hotel and Condominium relative to Wage and Fringe Benefit Costs for Doorman staff is absorbed directly by the Hotel Unit based on the relative square footage of food and beverage areas to the aggregate square footage of the Hotel Unit, the Suite Units and the Club Units. The balance is allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis.

(c)   Wage and Fringe Benefit Costs relative to Housekeeping Supervisors, Housepersons and Public Area Attendant staff are allocated based on percentage of relative Common Interest of the Hotel Unit, Suite Units and Club Units.

(d)   44% of expense incurred by the Hotel operator for the Hotel and Condominium relative to Wage and Fringe Benefit Costs for Managers and Human Resources staff under the Hotel's administration and general cost center is absorbed directly by the Hotel Unit based on estimates provided by the existing Hotel operator relative to human resource

- 2 -

matters solely benefiting the Hotel. The balance is allocated among the Hotel Unit, the Suite Units and the Club Units based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

(e)     33% of expense incurred by the Hotel operator for the Hotel and Condominium relative to Wage and Fringe Benefit Costs for Accounting Office, Administration, MIS and Security staff is absorbed directly by the Hotel Unit based on estimates provided by the existing Hotel operator relative to administrative and general matters solely benefiting the Hotel. In addition, based on estimates provided by the existing Hotel operator, the Hotel Unit directly absorbs an additional 40% of the expense incurred by the Hotel operator for the Hotel and Condominium with respect to the Accounting Office only. The balance is allocated among the Hotel Unit, the Suites Units, the Club Units and the Retail based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

(f)     63.4% of expense incurred by the Hotel operator for the Hotel and Condominium relative to Wage and Fringe Benefit Costs for laundry staff is absorbed directly by the Hotel Unit based on estimates provided by the existing Hotel operator relative to laundry matters solely benefiting the Hotel. The balance is allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis.

(g)     Wage and Fringe Benefit Costs relative to staff under the Hotel's repairs and maintenance cost center is allocated among the Hotel Unit, the Suite Units, the Club Units and the Retail Unit based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

2.     Electricity:

Electricity expense charges for the entire Building, other than the Retail Unit (which is separately metered), are allocated among the Hotel Unit, the Suite Units and the Club Units based on the percentage of relative Common Interest.

3.     Steam:

Steam expenses are allocated among all Units based on percentage of relative Common Interest. It is contemplated that the Retail Unit or a portion thereof may be sub-metered for steam service, in which event, the Retail Unit (or relevant portion thereof) would be excluded from the allocation and billed based on measured consumption (with such payment reducing the remaining steam costs to be allocated among the remaining Unit Owners).

4.     Water Charges and Sewer Rent:

Water Charges and Sewer Rent expenses are allocated among all Units based on percentage of relative Common Interest.

5.    Repairs, Supplies and Maintenance:

This expense includes expenses associated with the painting, maintenance and repair costs of the Common Elements. Unit Owners are directly responsible for the cost of repairs, supplies and maintenance in the interiors of their Units. The Condominium Board may also determine to arrange from time to time for certain excess repair, supplies and maintenance services to be provided within the Units as a Condominium service, and assess the cost thereof as a Common Charge to the benefited categories of Unit Owners. By way of example, the following are initially to be provided as excess services: minor repair (but not replacement) of building standard carpet, curtain and drapes; replacement of building standard light bulbs; repair and replacement of building standard faucets and shower heads; minor repair (but not replacement) of building standard furnishings; restocking of building standard china, glassware and silverware; repair and replacement of building standard guest phones; and certain other such maintenance services provided on equal availability to the Hotel Unit, the Suite Units and the Club Units (subject to right to assess a particular Unit Owner, in appropriate circumstances, additional charge to reflect any abuse of such service). The Condominium Board may determine to discontinue any such excess services at any time, in which event the cost of the discontinued service will thereafter cease to be a Common Expense. The Retail Unit shares only in categories of Repairs, Supplies and Maintenance expenses that benefit the Retail Unit.

Certain Repairs, Supplies and Maintenance Expenses incurred by the Hotel operator on behalf of the Hotel and the Condominium are absorbed directly by the Hotel Unit, as follows, with all allocation percentages based on estimates provided by the current Hotel Operator: 80% of floor covering expenses reflecting replacement, rather than minor repair of Hotel floor coverings; 79% of laundry equipment expenses; 81.31% of miscellaneous expenses associated with the Hotel's rooms department; 20% of computer system maintenance support reflecting allocation to the hotel's reservations department; 74.71% of cleaning supplies associated with the Hotel's rooms department; 59.88% of decorations expenses associated with the Hotel's rooms department; and 63.4% of laundry supplies, print and stationary and uniform expenses, and other miscellaneous expenses associated with the Hotel's laundry department.

Except as otherwise indicated, the Repairs, Supplies and Maintenance Expenses are allocated among the Hotel Unit, the Suite Units, the Club Units and, only where applicable, the Retail Unit, on the basis of percentage of relative Common Interest. For the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit, except in cases where the Retail Unit is appropriately charged based on its full Common Interest (such as, by way of example and not limitation, with respect to any maintenance and/or repair of the Building's structure, foundations, façade, roof, heating system, adjoining sidewalks, etc.).

Subject to any costs directly absorbed by the Hotel Unit as described above, the following Repairs, Supplies and Maintenance Expenses are allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis: china, glassware and silverware supplies; uniforms relating to the Hotel's rooms, security and laundry departments; operating and cleaning supplies attributable to the Hotel's rooms department; operating supplies attributable to accounting and general administration; and laundry supplies, print and stationary expenses, and other miscellaneous expenses associated with the Hotel's laundry department.

6.    Insurance:

This Section 6 assumes, at least initially, that insurance coverage would be provided by participation in the Hotel operator's blanket insurance program available to hotels owned and managed by the Hotel operator, and that premium allocations would be made among the various properties participating in the program in accordance with the standard rating practices applicable to the program.

Except as otherwise indicated, insurance premiums are allocated among all of the Units/or categories of Units on the basis of percentage of relative Common Interest.  The following exceptions would apply:

(a)    With respect to "all risk," flood, earthquakes insurance, terrorism coverage (if any) and other property loss coverage, the Hotel Unit directly absorbs the entire portion of the premium relating to FF&E, fine arts and business interruption, and the balance of the premium relative to the real property is allocated among all the Units on the basis of percentage of relative Common Interest.

(b)    With respect to "all risk," flood, earthquakes insurance, terrorism coverage (if any) and other property loss coverage, the Hotel Unit directly absorbs the entire portion of the premium relating to FF&E, fine arts and business interruption, and the balance of the premium relative to the real property is allocated among all the Units on the basis of percentage of relative Common Interest.

(c)    With respect to commercial general liability, fidelity, employment practices liability, director and officers liability and other liability coverages (including umbrella coverage), the Hotel Unit directly absorbs 68.19% of the premium of the premium based on the relative percentages of the square footage of the Hotel Unit and Retail Unit (which Retail Unit is also currently owned by the Hotel Unit Owner) to the aggregate square footage of the Hotel Unit, the Retail Unit and the Common Elements.  The balance is allocated among all of the Units on the basis of percentage of relative Common Interest.  In the event the Retail Unit is no longer commonly-owned with the Hotel Unit and is therefore not covered by the Hotel's operator's liability insurance, the 69.19% figure shall be reduced to reflect that the Retail Unit would no longer be insured by the Hotel operator.

Coverage does not include claims for personal injury or property damage resulting from occurrences in the individual Suite Units or Club Units, nor does it include coverage of the furniture or other personal property within the Suite Units or Club Units, except to the extent liability coverage relates to the operation of the Hotel and/or provision of Hotel or Condominium services to or with respect to such Units.

7.    Management Fee to the Managing Agent:

This expense is allocated among the Hotel Unit, Suite Units, Club Units and the Retail Unit on the basis of percentage of relative Common Interest.

8.    Legal and Audit Fees:

This expense is allocated among the Hotel Unit, the Suite Units, the Club Units and the Retail Unit on the basis of percentage of relative Common Interest.

9.    Reserve for Contingencies:

This expense is been allocated among the Hotel Unit, the Suite Units, the Club Units and the Retail Unit on the basis of percentage of relative Common Interest.

10.    Miscellaneous Administrative Expenses:

These expenses concern miscellaneous administrative expenses, including, without limitation, dues and subscriptions; administrative supplies; water fountain supplies; administrative supplies; phone service charges; and printing, postage and stationery.  Fifty percent (50%) of the postage and dues expenses incurred by the Hotel operator for the Hotel and Condominium under this expense category are absorbed directly by the Hotel Unit. Telecommunication costs for associated with the Building's maintenance department are allocated among the Hotel Unit, the Suites Units, the Club Units and the Retail Unit based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

Except as otherwise indicated to the contrary, expenses are allocated to the Hotel Unit, the Suite Units and the Club Units on a per-key basis.

11.    Service Contracts:

Service Contract Expenses for the following matters are allocated among the Hotel Unit, the Suite Units, the Club Units on the basis of percentage of relative Common Interest:  glass cleaning services – chandeliers/crystal; contract cleaning – overnight services; HVAC maintenance; extermination/water care; waste removal; metal cleaning; flowers, and indoor plant maintenance.

Service Contract Expenses for fire alarm testing and inspection and smoke detectors are allocated as follows:  That portion of the expense incurred by the Hotel operator for the Hotel and Condominium but attributable to excess service for the Hotel's food and beverage areas is absorbed directly by the Hotel Unit.  The balance is allocated among all Units based on the basis of percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of service provided with respect to the Retail Unit.

Service Contract Expenses relative to the Building's thirteen shared-use elevators are allocated based on estimated usage as follows:  $10/13^{ths}$ of the total expense (reflecting shared use of ten elevators by the Hotel Unit, the Suite Units and the Club Units) is allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis; $2/13^{ths}$ of the total expense (reflecting the Hotel Unit's exclusive use of one elevator and primary use of a second elevator) is allocated solely to the Hotel Unit; and $1/13^{th}$ of the total expense (reflecting the Hotel Unit's

and Retail Unit's shared use of one elevator) is allocated equally to the Hotel Unit and the Retail Unit.

Service Contract Expenses for cable TV is allocated among the Hotel Unit, the Suite Units and the Club Units on a per-key basis.

12.   <u>Reimbursement to Hotel Owner related to the Hotel Unit's Fitness Center</u>:

This expense reflects that the Suite Units and Club Units are allocated a share of expenses associated with the operation, maintenance, repair, upgrade and replacement of the Hotel Unit's fitness center.  Such allocation may include reasonable reserves for replacement of equipment and refurbishment of the fitness center.  The Fitness Center expense is allocated among the Hotel Unit, the Suite Units and the Club Units on the basis of percentage of relative Common Interest.  Because the Hotel Unit absorbs its share of the allocated cost directly and assesses the Condominium for only the Suite Units and Club Units share of the expense, the resultant Common Expenses apply only to the Suite Units and Club Units.  There is no resultant impact to the overall distribution of expenses among the various categories of Units as a result of the Hotel Unit's direct absorption of expense relating to the Fitness Center.

## EXHIBIT C

## RULES AND REGULATIONS

### OF

### FIFTH AND FIFTY-FIFTH CONDOMINIUM

Welcome to Condominium living at its very best. The following Rules and Regulations have been established for the benefit of all Owners. These Rules and Regulations supplement the Declaration and Bylaws (together, the "**Condominium Documents**") for the Fifth and Fifty-Fifth Condominium ("**Condominium**"). Compliance with these Rules and Regulations will permit the Condominium to run smoothly and efficiently. All capitalized terms not defined in these Rules and Regulations shall have the meanings given them in the Condominium Documents. For purposes of these Rules and Regulations, "**Premises**" shall mean the interior portion of any Suite Unit, Club Unit, Hotel guest room, or Retail Premises (other than a retail store operated by the Hotel). The Term "**Occupant**" means any person (other than an employee, agent or representative of Hotel Unit Owner, Hotel Operator, Managing Agent, Suite Sponsor or Club Sponsor) occupying or visiting any Suite Unit, Club Unit, Hotel guest room or Retail Premises (other than a retail store operated by the Hotel), including, without limitation, any Suite Unit Owner, Club Unit Owner, Club Interest Owner, Hotel transient guest, retail store operator (other than retail stores operated by the Hotel) and their respective guests, invitees, employees contractors, agents and representatives. St. Regis New York Operating LLC, the entity currently operating the Hotel, has been engaged by the Condominium Board as managing agent ("**Managing Agent**") with respect to the day-to-day operation of the Condominium and is authorized, on behalf of the Condominium Board, to implement and enforce these Rules and Regulations. These Rules and Regulations are in addition to, and shall not be construed to modify or amend, in whole or in part, the terms, covenants, agreements and conditions of any of the Condominium Documents. In the event of any conflict between these Rules and Regulations and the Terms and Provisions Condominium Documents, the Terms and Provisions Condominium Documents shall govern.

Additions, Alterations, and Renovations. No Occupant shall make any additions, alterations, or renovations to any part of the Condominium or Hotel property. No public hall or public elevator vestibule of the Building shall be decorated or furnished by any Unit Owner in any manner, except as otherwise expressly provided in the Condominium Documents.

Advertising. The Condominium Board shall have the right to prohibit any advertising by any Occupant mentioning the Hotel, which, in the Managing Agent's or the Hotel Operator's reasonable opinion, tends to impair the reputation of the Hotel. Upon written notice from the Managing Agent or Hotel Operator such party shall refrain from or discontinue such advertising. (See also, "St. Regis Trade Names and Trademarks".)

Antennas and Electrical Devices. No Occupant may install any antenna of any type outside of its Premises. No Occupant may install or operate any electrical or other

equipment at the Building which interferes with television signal reception. No Occupant may attach to or hang from the exterior of the Building or on the Building's roof, terraces or façade any radio, television or other aerial, satellite dish, disk or similar device (including without limitation loud speakers, sound amplifiers, solar devices, or similar devices). All radio, television or other electrical or electronic equipment of any kind installed or used in any Unit shall comply with all rules, regulations, requirements and recommendations of the New York Board of Fire Underwriters and governmental or public authorities having jurisdiction, and the Unit Owner alone shall be liable for any damage or injury caused by any radio, television or other electrical or electronic equipment in such Unit Owner's Unit.

Barbecue Grills. No Occupant shall keep or use any barbecue grills at the Building.

Bicycles. No Occupant may bring or permit bicycles or other vehicles inside or on the sidewalks outside the Hotel except in areas designated from time to time by the Hotel Operator for such purposes, if any. No mopeds, motorcycles, bicycles, scooters or similar vehicles shall be taken into or from the Building through the main Building entrance or be allowed in the lobby or in the guest elevators, and no baby carriages (except in connection with front desk check-in) or any of the above mentioned vehicles shall be allowed to stand in the public halls, vestibules, corridors or other public areas of the Building. The service entrance is the only means by which bicycles should be transported in and out of the Building.

Children. Occupants are responsible for the conduct of their children or children in their care. Children are not permitted to play in the entrances, passages, public halls, lobbies, elevators, vestibules, corridors, or fire landings of the Building. Children under thirteen (13) years of age must be accompanied by an adult. Unit Owners will be held financially responsible for disturbance or damage caused by their minor children or children under their care. Failure to pay for damages caused by such behavior may affect the Unit Owner's use privileges.

Cleanliness. Each Occupant shall keep his or her Unit (and any Limited Common Element appurtenant thereto) in a good state of preservation and cleanliness, and shall not sweep or throw or permit to be swept or thrown therefrom, or from the doors or windows thereof, any dirt or other substance.

Consent. Any consent or approval given under these Rules and Regulations may be granted, effused, added to, amended or repealed at any time, in the sole discretion of the Condominium Board, Managing Agent or Hotel Operator, as the case may be. Further, any such consent or approval may, in the discretion of the Condominium Board, Managing Agent or Hotel Operator, as the case may be, be conditional in nature.

Common Elements. The Common Elements of the Condominium shall be used only for the purposes for which they are intended in the furnishing of services and facilities for the enjoyment of and use by the Unit Owners and others as permitted by the Declaration.

Complaints. Complaints regarding Building services shall be made in writing to the Condominium Board or to the Managing Agent.

Cooking. No cooking shall be done or permitted by any Occupant, except in areas that use microwave ovens and Underwriters' Laboratory approved equipment for cooking, or for brewing coffee, tea, hot chocolate and similar beverages, provided that such use is in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations.

Conduct. Occupants shall not conduct themselves in any manner inconsistent with the character of the Building and the Hotel.

Damage. No Occupant shall deface, mar, or otherwise damage any part of the Condominium or Hotel property. In the event of such damage, the Unit Owner responsible for such Occupant shall be liable for the cost of repair.

Delivery Persons. No outside delivery persons are permitted to make deliveries to Suite Units or Club Units; all such deliveries must be handled in the manner established by the Managing Agent for delivery to the Suite Units and Club Units using Building staff. Building staff may enter the Units in order to complete such delivery. Any out-of-pocket costs associated with deliveries requiring use of porterage labor (as opposed to page staff) shall be charged to the applicable Unit Owner. This paragraph does not apply to moving companies or similar deliveries as determined by the Managing Agent. (See also, "Freight Deliveries and Heavy Objects".)

Emergencies and Fire Safety. In the event of an emergency, contact the Managing Agent by dialing "O," or contact the appropriate authority by dialing "9" for an outside line, then dialing "911." After dialing "911," contact the Managing Agent so that emergency responders can be directed appropriately. Posted in conspicuous places throughout the Building are fire regulations that must be adhered to by Occupants during their stay at the Building.

Enforcement of Rules. The Condominium Board expects all Occupants to adhere to the requirements set forth in the Condominium Documents and these Rules and Regulations. To assist the Condominium Board in the enforcement of the provisions of these documents, the Condominium Board has delegated enforcement authority to the Managing Agent. Any Occupant who has been advised by the Managing Agent or Hotel Operator that they are in violation of any of these documents will immediately cease and desist that activity. If any Occupant, after being notified by the Managing Agent that he or she is in violation, fails to comply with the Managing Agent's direction, the matter may, among other things, be referred to the Condominium Board for consideration of the assessment of penalties by reason of such person's non-compliance. Such remedy is in addition to all other rights and remedies available to the Condominium Board, Managing Agent, Hotel Unit Owner, Hotel Operator and Sponsors as provided in the Condominium Documents or under applicable law or equity. The responsible Unit Owner against whom such action is proposed to be taken has the right to appear before the Condominium Board at its next regularly scheduled meeting to contest such action, all as provided in the Condominium Documents. To the extent the Hotel Operator has approvable consent or other rights under these Rules and Regulations or the Condominium Documents, it too shall have the right to enforce each rule by any lawful means, including right of injunction,

and the Managing Agent and Condominium Board shall reasonably cooperate in enforcement of such rights.

Eviction. No act or thing done or omitted to be done by the Condominium Board, the Managing Agent, the Hotel Unit Owner (or its designee), in connection with the enforcement of these Rules and Regulations shall constitute an act of eviction by such party.

Floor Covering. Unless expressly authorized by the Condominium Board in each case, at least 80% of the floor area of each Suite Unit, Club Unit or Hotel guest room that is directly above another such Unit or guest room (excepting only kitchens, pantries, bathrooms, closets and foyers) must be covered with rugs, carpeting or equally effective noise-reducing material.

Freight Deliveries and Heavy Objects. Elevators designated for freight by the Managing Agent shall be available for use during the hours and pursuant to such procedures as the Managing Agent may determine from time to time. Any moving company serving a Suite Unit or Club Unit must be a locally recognized professional mover, whose primary business is the performing of relocation services, and must be fully insured. A certificate or other verification of such insurance must be received and approved by the Hotel engineering office prior to the start of any moving operations. Any such moving company's insurance must be sufficient in the Managing Agent's sole opinion, to cover all personal liability, theft or damage to the premises, including, but not limited to, floor coverings, doors, walls, elevators, stairs, foliage and landscaping. Special care must be taken to prevent damage to foliage and landscaping and to mitigate affects of adverse weather. All moving operations shall be conducted at such times and in such a manner as the Managing Agent shall direct, and all moving shall take place during non-business hours unless the Managing Agent agrees in writing otherwise. The Managing Agent shall have the right to reasonably prescribe the weight, size and position of all vaults, safes and other similar heavy objects brought into the Building. Heavy objects shall, if considered necessary by the Managing Agent, stand on wood strips of such thickness as is necessary to properly distribute the weight. Trunks and heavy baggage other than normal guest-type baggage shall be taken in or out of the Building by Building staff by the freight or service elevators and through the service entrance only. Special charge may apply for particularly heavy or bulky materials as reasonably determined by the Managing Agent. The Condominium Board and Managing Agent shall not be responsible for loss of or damage to any such property from any cause, and all damage done to the Building by moving or maintaining such property shall be repaired at the expense of the applicable Unit Owner. The Managing Agent reserves the right to inspect all such property to be brought into the Building and to exclude from the Building all such property which violates any of these Rules and Regulations. Supplies, goods, materials, packages, furniture and all other items of every kind delivered to or taken from the Premises shall be delivered or removed through the entrance and route designated by the Managing Agent. The Condominium Board and Managing Agent shall not be responsible for the loss or damage of any such property unless such loss or damage results from the gross negligence or willful acts of the Condominium Board or Managing Agent.

Guests. A Suite Unit Owner, Club Unit Owner or Club Interest Owner may permit another person to occupy their Unit subject to the following restrictions: Guests must

- 4 -

observe the check-in and check-out procedures established by the Hotel Operator.  If you intend for a person other than yourself to use your Suite Unit or Club Unit, you must furnish the Hotel Operator, not less than five business days prior to commencement of the occupancy period, written notice setting forth (a) the name and address and phone number of such person(s), (b) the expected times of arrival and departure, and (c) whether the guest is to receive daily housekeeping service.  The guest must present a credit card upon registration for the payment for optional services.  Suite Unit Owners and Club Unit Owners are responsible for all personal charges and/or damages resulting from occupancy by their guests.  Persons under twenty-one (21) years of age must be accompanied by a Suite Unit Owner, Club Unit Owner, or a legal guardian twenty-one (21) years of age or older.

Hazardous Materials.  No Occupant shall at any time bring into or keep in the Premises or the Building any kerosene, gasoline or inflammable or combustible or explosive fluid or material or chemical substance except as may be approved by Managing Agent for contractors in the ordinary performance of their duties.  Without the Condominium Board's prior written approval, no Occupant shall use any method of heating or air conditioning other than that supplied as a Building service.  No Occupant shall use or keep or permit to be used any foul or noxious gas or substance in its Premises, or permit or suffer its Premises to be occupied or used in a manner offensive or objectionable to the Condominium Board, other Occupants or the Hotel Operator by reason of noise, odors or vibrations, or unreasonably interfere in any way with other Occupants or the operation of the Hotel.  No Occupant may bring any fire arm into the Building

Housekeeping.  The time between check-out time and check-in time is reserved exclusively for the cleaning, inventory, repair and maintenance of the Suite Units, Club Units and Hotel guest rooms by the housekeeping and maintenance personnel.  Housekeeping services are available by contacting the Managing Agent.  Charges for housekeeping services to Suite Units will be made and must be paid prior to departure.  Daily Housekeeping services are mandatory for Club Units.  Housekeeping charges to the Club Units shall be billed by the Hotel Operator to the Club Association and be a common charge of the Club Association.

HVAC.  No heat, ventilator or air conditioning device shall be installed in any Suite Unit or Club Unit without the prior written approval of the Hotel Operator; and no "window" air-conditioners of any kind shall be permitted.

Ingress and Egress; Service Personnel.  The sidewalks, halls, passages, exits, entrances, elevators, and stairways of the Property shall not be obstructed by any Occupant or used by any of them for any purpose other than for ingress to and egress from their respective Premises.  The halls, passages, exits, entrances, elevators, escalators and stairways are not for the general public, and the Managing Agent and Hotel Operator, as the case may be, shall in all cases retain the right to control and prevent access to such halls, passages, exits, entrances, elevators and stairways by all persons whose presence, in the judgment of such party, would be prejudicial to the safety, character, reputation and interests of the Hotel and/or Unit Owners and their guests and tenants, provided that nothing contained in these Rules and Regulations shall be construed to prevent such access to persons with whom any Unit Owner normally deals in the ordinary course of its business, unless such persons are engaged in illegal activities.  Service personnel, messengers and trades people visiting any Suite Unit or Club Unit may be required to

use the service elevators for ingress and egress, and shall not use the guest elevators for any purpose, except that nurses in the employ of Suite Unit Owners, Club Unit Owners, Club Interest Owners or their guests or tenants may use the guest elevators. Corridor doors shall be kept closed at all times except when in actual use for ingress or egress to and from public corridors. Occupants shall comply with applicable law with respect to notices of emergency assess and egress.

Insurance. Nothing shall be done or kept in any Suite Units or Club Unit which would increase the rate of insurance of the Building or contents thereof, without the prior written consent of the Managing Agent. No Unit Owner shall permit anything to be done or kept in his or her Unit which will result in the cancellation of insurance on the Building or which would be in violation of any law. No waste shall be committed in the Common Elements. Any Insurance Certificates required with respect to any Suite Unit, Club Unit or Club Interests shall name the following parties as additional insureds: Fifth and Fifty-Fifth Condominium, St. Regis New York Operating LLC; SLT Realty Limited Partnership; Fifth Avenue Hotel Suites, LLC; St. Regis Residence Club, New York, Inc.; their respective affiliates and their respective officers, director, trustees, employees agents and representatives.

Labor Disruptions. No Occupant shall interfere with, or cause any labor unrest, disturbances or stoppages in, the work of Condominium employees or hotel employees.

Lawful Use. No immoral, improper, offensive or unlawful use shall be made at the Building, and all laws, zoning ordinances and regulations of all governmental bodies having jurisdiction shall be observed.

Leasing. The Rules and Regulations applicable to "Guests", as described above, also apply to any tenants of any Suite Unit Owner, Club Unit Owner or Club Interest Owner. In addition, in the case of a rental of a Suite Unit or Club Unit (but not a rental of a Club Unit or Club Interest arranged by the Club Association Manager), the renting Unit Owner must deliver to the Hotel Operator, at least five business days prior to lease commencement, a copy of the Condominium's then Standard Lease Addendum executed by such Unit Owner and its tenant.

Locks. The use of "deadbolt" door locks or double locks are prohibited except as arranged at the Unit Owner's expense through the Building's security office.

Name Change. The Condominium Board shall have the right, subject to the consent of the Hotel Unit Owner, exercisable upon written notice and without liability to any Unit Owner or tenant of any Unit, to change the name and street address of the Building.

Noise. No Occupant shall make or permit any disturbing or objectionable noises, odors or activity in the Building, or do or permit anything to be done therein, which will interfere with the rights, comforts or conveniences of other Unit Owners or their tenants or occupants or the Hotel Operation. No Occupant shall play upon or suffer to be played upon any musical instrument, or operate or permit to be operated a phonograph, stereo system, or radio or television set or other loudspeaker in its Premises between midnight and the following 7:00 A.M., if the same shall disturb or annoy other occupants of the Building, and in no event shall

practice or suffer to be practiced either vocal or instrumental music between the hours of 10:00 P.M. and the following 9:00 A.M.

Nuisances. No nuisance shall be allowed at the Building, nor any use or practice that is the source of annoyance to Unit Owners or which interferes with the peaceful possession and proper use of the Building by the Unit Owners and their guests. All parts of the Common Elements and Units shall be kept in a clean and sanitary condition, and no rubbish, refuse or garbage shall be allowed to accumulate (except in areas designated and used for same by Managing Agent) nor any fire hazard allowed to exist. All Common Elements shall be kept free for their intended use, and shall in no event be used as storage areas, either on a temporary or permanent basis (except areas designated for same and as used by the Managing Agent). No clothing, towels, bedding, or other similar items may be dried or aired in any outdoor area or hung over or on terraces. No Occupant shall project any strobe, light or other illumination from its Premises.

Outside Labor. No Occupant shall engage or pay any employees on the Premises, except those actually working for such Occupant at the Premises. No Occupant shall advertise for laborers giving an address at the Building. Nothing in this paragraph shall prohibit the Hotel Operator or any operator of the Retail Unit or their commercial tenants from advertising for employees to work at the Building.

Pass Key. The Managing Agent shall retain a pass-key to each Unit. If any lock is altered or a new lock is installed, the Managing Agent shall be provided with a key thereto immediately upon such alteration or installation. If the Unit Owner is not personally present to open and permit an entry to his or her Unit at any time when an entry therein is necessary or permissible under these Rules and Regulations or under the Condominium Documents, and the Unit Owner has not furnished a key to the Managing Agent, then the Managing Agent or their agents (but, except in an emergency, only when specifically authorized by an officer of the Condominium Board or the Managing Agent) may forcibly enter such Unit without liability for damages or trespass by reason thereof (provided that during such entry reasonable care is given to the Unit Owner's property). If any key or keys are given or lent by a Unit Owner or by any member of his or her family or by his or her agent, servant, employee, licensee or visitor to an employee of the Condominium or the Managing Agent, whether for such Unit Owner's Unit, automobile, trunk or other item of personal property, the use of the key shall be at the sole risk of such Unit Owner, and neither the Condominium Board nor the Managing Agent shall be liable for injury, loss or damage of any nature whatsoever, directly or indirectly resulting there from or connected therewith, except to the extent resulting from such party's gross negligence or willful misconduct (and then only to the extent not covered by the Unit Owner's insurance).

Personal Charges. All personal charges, including, but not limited to, charges for extra services or damages, for guests are considered the responsibility of the Suite Unit Owner, Club Unit Owner or Club Interest Owner who requested access for such guest, and shall be paid in full at the time of check out by a valid credit card or cash. If for any reason a valid charge remains unpaid after check out, the amount due shall bear interest at the maximum rate specified in the Condominium Documents.

Personal Use Restriction.  Each Suite Unit and Club Unit shall be occupied only as a non-primary residence in accordance with the Condominium Documents.  Use of all Suite Units and Club Units are limited solely to the personal use of Suite Unit Owners, Club Unit Owners, Club Interest Owners and their guests, invitees, and lessees.  Use by Occupants of Suite Units, Club Units or the public areas of the Building for commercial purposes or any purposes other than the personal use described in the Condominium Documents is expressly prohibited.  "Commercial purposes" includes a pattern of rental activity or other occupancy by a Suite Unit Owner, Club Unit Owner or Club Interest Owner that the Condominium Board or Managing Agent, in its reasonable discretion, could conclude constitutes a commercial enterprise or practice.  This prohibition includes, without limitation, any home office that entails clients or customer visits to the Building or that advertises or represents to consumers as having a place of business at the Building (e.g., such as a real estate brokerage office).  This paragraph shall not apply to Suite Units or Club Units owned by the Sponsor or to any use by the Hotel Operator.

Pest Control.  The Condominium Board or the Managing Agent, and any contractor or worker authorized by the Condominium Board or the Managing Agent and accompanied by an agent of the Condominium Board or the Managing Agent, may enter any room or Unit at any reasonable hour of the day, on at least one day's prior notice to the Unit Owner, for the purpose of inspecting such Unit for the presence of any vermin, insects or other pests and for the purpose of taking such measures as may be necessary to control or exterminate any such vermin, insects or other pests; however, such entry inspection and extermination shall be done in a reasonable manner so as not to unreasonably interfere with the use of such Unit for its permitted purpose.

Pets.  No pets are allowed at the Building without the consent of the Hotel Operator, which consent may be withheld or conditioned in its sole discretion.  Notwithstanding the foregoing, visually-impaired individuals are permitted to have a domesticated seeing eye dog as required pursuant to the Americans With Disabilities Act.  Any pet approved by the Hotel Operator but constituting a nuisance shall be permanently removed from the Building upon notice from the Managing Agent.  In no event shall any bird, reptile, or animal approved by the Hotel Operator (other than seeing-eye dogs) be permitted in any elevator, other than the elevators designated by the Managing Agent for that purpose, or in any of the public portions of the Building, unless carried or on a leash.  Any Occupant in the public portions of the Building with an animal that is unleashed and not carried shall be fined $500.  No pigeons or other birds or animals shall be fed from the window sills or other public portions of the Building or on the sidewalk or street adjacent to the Building.  Each Unit Owner who keeps (or permits to be kept) with the consent of the Hotel Operator any type of pet in such Unit Owner's Unit may be required to enter into an agreement with the Condominium Board, which agreement may set forth such other requirements as the Condominium Board shall deem suitable and require the Unit Owner to indemnify, defend and hold harmless the Condominium Board, all Unit Owners, the Managing Agent and the Hotel Operator from all claims and expenses resulting from the acts or presence of such pet.

Private Business.  No Occupant shall send any employee of the Building or the Managing Agent out of the Building on any private business.  All special requests that would

- 8 -

require such activity must be presented to the concierge desk, and, if approved, would be at such rates as the Hotel Operator may determine from time-to-time.

Public Areas. The entrances, passages, public halls, elevators, vestibules, corridors and stairways of or appurtenant to the Building and the sidewalks adjoining the Building shall not be obstructed or used for any purpose by Occupants other than for the respective purposes for which they were intended. No article (including, but not limited to, garbage cans, bottles or mats) shall be placed in any of the passages, public halls, vestibules, corridors, stairways or fire landings of the Building nor shall any fire exit thereof be obstructed in any manner. No Occupant shall hang or shake anything from any doors, windows or roofs or place anything upon the window sills or terraces of the Building.

Recycling. All Occupants shall comply with applicable law with respect to recycling of waste and refuse, and all requirements of Hotel Operator relating thereto, including, without limitation, the separation of trash into "recyclable" and "non-recyclable" materials and/or categories of each of same. The Condominium Board may designate from time to time the types of materials which must be separated for recycling, the types of containers to be used by Occupants for the disposal of designated recyclable materials and the locations where designated recyclable materials shall be stored or deposited within Premises. If applicable, Managing Agent will arrange for the periodic collection of recyclables from the Suite Units and Clubs Units and shall be entitled to enter such Units for such purpose without additional notice to the Owners or Occupants thereof.

Rest Room Facilities. Rest rooms, toilets, urinals, wash bowls and other plumbing fixtures shall not be used for any purposes other than those for which they were constructed, and no paint, sweepings, rubbish, rags, or other foreign substances shall be thrown in such plumbing fixtures. All damages resulting from any misuse of the fixtures shall be borne by the party who, or whose servants, employees, agents, visitors or licensees, caused the same.

Roof and Terraces. Except as otherwise expressly provided in the Condominium Documents or these Rules and Regulations, Occupants shall not at any time or for any reason whatsoever enter upon or attempt to enter upon the roof or terraces of the Building or any other portions of the Building (outside of the applicable Premises) which is not similarly intended for access by Hotel Guests.

Signs. Except as otherwise provided in the Condominium Documents, no sign, placard, picture, name, advertisement or notice on or visible the exterior of the Premises shall be inscribed, painted, affixed or otherwise displayed by any Occupant without the prior written consent of the Hotel Operator. All approved items shall be printed, painted, affixed or inscribed at the expense of applicable Unit Owner by a person approved by the Hotel Operator.

Safety and Security. The Condominium Board, Managing Agent and/or Hotel Operator may from time to time adopt appropriate systems and procedures for the security or safety of Occupants and the Hotel operation. Any persons occupying, using or entering the Building shall comply with the reasonable requirements relative to such systems and procedures.

No Occupant shall use or permit the use of the Premises in any manner which involves the unusual risk of injury to any person.

      Smoking. As per New York City Code, no smoking is permitted in the public areas of the Building. No smoking is permitted inside any Club Unit. Smoking of cigarettes, but not cigars or pipes, is permitted in Suite Unites. Persons who smoke in any Suite Unit or Club Unit are subject to additional cleaning charges as determined by the Hotel Operator.

      Solicitation. No Occupant may conduct any solicitation of any kind, whether commercial, religious, educational or otherwise, anywhere within the Building or the adjoining sidewalks unless specifically authorized in advance and in writing by the Hotel Operator. Canvassing, peddling, soliciting, and distribution of handbills or any other written materials by Occupants is prohibited, and each Unit Owner shall cooperate to prevent the same.

      St. Regis® Trade Names and Trademarks. No Occupant has any rights in the St. Regis® trade name or trademarks, including any St. Regis logos. No Occupant shall attempt to use or claim rights in the same or permit any Person to do so on its behalf. Notwithstanding the foregoing, Suite Unit Owners, Club Unit Owners, and Club Interest Owners are authorized by the Hotel Operator, for so long as the Hotel is operated as a St. Regis Hotel, to use the words "St. Regis®" for non-commercial purposes in their address using ordinary Times New Roman or Arial font. Such text must be no larger or more prominent than surrounding text such that in no way shall the "St. Regis" name receive special emphasis. No use of the St. Regis trademarks or logos is permitted, nor shall any alternate or mock trademark or logo be associated with the "St. Regis" name.

      Telephone. Each Club Unit is furnished with a house telephone. The Hotel Operator will maintain a record of all calls made through the Hotel's telephone switchboard. Any calls made during a Suite Unit Owner's, Club Unit Owner's or Club Interest Owner's reservation period will be charged by the Hotel Operator to such Occupant at check-out. The Hotel Operator may impose charges for long-distance telephone calls, whether or not such calls are collect, billed to a credit card, or billed to an Occupant's home phone or business number.

      Terraces. Occupants shall not at any time or for any reason whatsoever enter upon or attempt to enter upon or place items in or upon the terraces of the Building.

      Tours. No Occupant shall conduct any group tour, exhibition or open house of any Unit or its contents or any auction sale in any Unit, without the prior consent of the Hotel Operator.

      Trash and Waste. All trash and waste removal, including removal of furniture other large or heavy items, shall be conducted by Building personnel in accordance with procedures established from time to time by the Managing Agent. In no event shall any Occupant attempt to remove trash or waste from, or place trash outside its Premises. Trash and waste removal from the Premises shall be effected by Building personnel. In such regard, Building personnel, whether employees of Managing Agent or Hotel Operator, are authorized to enter any Unit without prior notice to the Unit Owners or Occupants thereof for the purpose of

trash removal. Any special costs associated with heavy or bulky items shall be the responsibility of the applicable Unit Owner. No trash or waste may be disposed of or placed by Occupants in any of the Common Elements.

Unit Owner. Notwithstanding any references in these Rules and Regulations to "Unit Owner", "Commercial Unit Owner", "Suite Unit Owner", "Club Unit Owner" or "Club Interest Owner", the Rules and Regulations shall be binding upon all tenants, guests and other occupants of such Persons. Unit Owners shall be responsible for enforcing compliance with, and liable for any violation of, the Rules and Regulations by members of their families, guests, invitees, tenants, employees, agents, visitors, contractors and any other occupants of their Units.

Waiver. The Condominium Board or its Managing Agent and/or the Hotel Operator, as applicable, reserves the right to rescind, alter, waive or add, as to one or more or all Occupants, any Rule or Regulation enforceable by such party at any time when, in its judgment, it deems it necessary or desirable for the reputation, safety, character, security, care, appearance or interests of the Condominium, the Building, the Hotel or the preservation of good order therein, or the operation or maintenance of the Condominium, the Building, the Hotel or the comfort of Unit Owners, Occupants or others in the Building. No rescission, alteration, waiver or addition of any rule or regulation in respect of one Unit Owner or Occupant shall operate as a rescission, alteration, waiver or addition in respect of any other Unit Owner or Occupant.

Windows. No window guards or other window decorations shall be used in or about any Unit, unless otherwise required by applicable law and as approved by the Condominium Board or Managing Agent. However, each Suite Unit Owner, Club Unit Owner or Club Interest Owner shall notify the Managing Agent in writing when a child or children under the age of eleven years lives or resides (even temporarily) in the Unit. If required by law, each such Unit Owner (or the Club Association, in the case of Club Interest Owner) shall install, at its expense, the required window guards in all windows of the applicable Suite Unit or Club Unit. The Suite Unit, Club Unit Owner or Club Association shall maintain all window guards installed in the Unit and shall not remove the same until permitted by law and in any event, without written notice to the Managing Agent. No window of any Suite Unit or Club Unit may be covered or painted over or altered in any way by any Occupant. All window curtains, drapes or other window treatments visible from Suite Units and Club Units to the exterior of the Building must be approved by the Hotel Manager so as to have the same backing, color, texture and shape as the curtains, drapes or window treatments used in the Hotel's guest rooms.

## RULES AND REGULATIONS

### OF

### FIFTH AND FIFTY-FIFTH CONDOMINIUM

### (PART 2)

### CONSTRUCTION

The following rules and regulations apply to construction work performed by or on behalf of any Occupant of the Building, except as may be otherwise approved by the Hotel Operator.

No construction personnel shall be allowed on any guest-occupied floors or Suite Unit or Club Unit floors unless engaged in scheduled activities.

Construction personnel are to eat, take breaks, change clothes, use restrooms, etc. within the Premises or portion of the Hotel in which the work is being performed, however, not in employee or hotel guest designated areas.

Construction personnel are restricted from using guest elevators. Any use of any guest elevators by construction personnel shall be grounds for immediate dismissal.

At the Hotel Operator's request, weekly construction/hotel management meetings shall be held to review upcoming activities, coordination, etc. In all cases, the Hotel Operator must receive at least two business days advance notice prior to arrival of construction personnel that work is to take place. All work documents (i.e., plans, insurance certificates, permits, etc.) must be delivered to the Building engineer and approved prior to work commencing.

Any necessary activities to be performed by or on behalf of any Occupant during other than normal working hours must be identified in writing to the Building engineering office or Hotel General Manager, a minimum of 24 hours in advance, and approved in writing.

Activities to be performed during normal working hours which may affect guest comfort (i.e., service shutdown, chopping type demolition, etc.) must be identified as above, and approved by the Building engineer.

Except for work as may be contracted with the Hotel Operator, there will be no use of Hotel personnel or their tools, equipment, facilities during performance of work.

Trash must be removed on a daily basis without use of hotel compactor.

Stair towers must be kept clean at all times.

All barriers, and temporary barriers must be placed in a safe workmanlike manner pursuant to industry practices. Any such work must take place after proper identification.

Construction personnel must provide temporary signage and lighting as required where public space is affected, with prior approval of the Hotel Operator.

A list of project personnel including home telephone numbers must be provided to the Hotel's engineering office for emergency use.

Day to day communications with Hotel operating staff shall be through the Building engineering office.

Life safety systems must be maintained in an operating condition at all times unless specific shutdowns are scheduled in advance and approved by the Hotel Operator.

All contractor employees must wear suitable identification (i.e. badge) while at the Building, and must access and egress the project through security controlled check points unless otherwise identified.

Hours allotted for performance of work shall be 9:00 A.M. to 5:00 P.M. on weekdays (excluding holidays) and 10:00 A.M. to 5:00 P.M. on Saturdays, unless (a) otherwise approved by the Hotel engineering office, (b) such work is necessitated by an emergency, or (c) such work is being performed by or on behalf of the Hotel Operator, the Condominium Board, the owner of any Unsold Units, by Sponsor or its designee, or by the Retail Unit Owner (after obtaining the consent of Hotel Operator or the Managing Agent if applicable)..

The contractor shall protect and secure his/her material against loss or theft or otherwise. Neither the Condominium Board, the Managing Agent, Sponsor, the Hotel Operator, nor any Unit Owner will be liable for any loss with respect thereto.

Individual contractor and/or subcontractor signs are not permitted without the written approval of the Hotel Operator.

The contractor shall be responsible for providing fire extinguishers and fire watch for periods during which his personnel may be engaged in activities constituting a fire hazard, or as otherwise required by law. Prior to engaging in such activities, the contractor will remove all flammable materials from the immediate area.

Access and egress of the contractor's personnel to and from the project site shall be through the employee entrance only, unless otherwise stipulated.

Contractor shall stage work from designated areas only. All lock boxes shall be stored in this designated area. Under no circumstances shall lock boxes be placed on the guest floors.

The contractor shall continuously maintain adequate protection of all work from damage due to any cause, including inclement weather, and shall protect all property of the Unit Owners, the Managing Agent, the Hotel Operator, and Condominium from damage or loss.

Any work to be performed in public areas shall occur after normal business hours. Any work performed on occupied guest floors shall be done during restricted business hours. Any work that will be done in these areas will require strict supervision to assure that absolutely no guest interference will occur.  Failure to comply with this policy will result in immediate removal of the offender from the property.

No smoking, alcoholic beverages or drugs shall be allowed on the job site. Failure to comply with this policy will result in immediate removal of the offender from the property.



**CONDOMINIUM POWER OF ATTORNEY**

## CONDOMINIUM POWER OF ATTORNEY

Terms used in this Condominium Power of Attorney which are used (a) in the declaration ("Condominium Declaration") establishing a plan for condominium ownership of the premises known as the Fifth and Fifty-Fifth Condominium and by the street number Two East 55th Street, New York, New York under Article 9-B of the Real Property Law of the State of New York, dated _____, and recorded in the New York County Office of the Register of the City of New York on _____ in CRFN # _____, as the same may be amended from time to time, or (b) in the By-Laws of the Fifth and Fifty-Fifth Condominium ("Condominium By-Laws") attached to, and recorded together with, the Condominium Declaration, shall have the same meanings in this Condominium Power of Attorney as in the Condominium Declaration or the Condominium By-Laws.

The Undersigned, _____, having an address c/o the Fifth and Fifty-Fifth Residence Club, Two East 55th Street, New York, New York 10022, the owner of an undivided 4/52 club interest ("Club Interest") as tenant-in-common with other owners in Club Unit __ ("Club Unit") in the Fifth and Fifty-Fifth Condominium which is designated and described as Club Unit _____ in the Condominium Declaration and also designated as Tax Lot ____ in Block 1290 of Section 5 of the Borough of Manhattan on the Tax Map of the Real Property Assessment Department of the City of New York and on the Floor Plans, do(es) hereby nominate, constitute and appoint the persons who may from time to time constitute the board of managers ("Condominium Board") of the Fifth and Fifty-Fifth Condominium ("Condominium"), true and lawful attorneys-in-fact for the undersigned, coupled with an interest, with power of substitution, in their own names, as members of the Condominium Board or in the name of their designee (corporate or otherwise), on behalf of all Club Owners, in accordance with such Club Owners' respective interests in the Common Elements, subject to the provisions of the Condominium By-Laws then in effect, (1) to acquire any Club Unit, together with its Appurtenant Interests, which becomes the subject of a foreclosure or other similar sale, all on such terms and at such price or rental, as the case may be, as said attorneys-in-fact shall deem proper, in the name of the Condominium Board or its designee, corporate or otherwise, on behalf of all Club Owners, and, after any such acquisition, (2) to convey, sell, lease, mortgage or otherwise deal with (but not vote the Common Interest appurtenant thereto) any Club Unit so acquired by them, without the necessity of on such terms as said attorneys-in-fact may determine, granting to said attorneys-in-fact the power to do all things with the Club Interest which the Undersigned could do if the undersigned were personally present, and (3) to execute, acknowledge and deliver (a) any declaration or other instrument affecting the Property that the Condominium Board deems necessary or appropriate to comply with any law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public or quasi-public authority, applicable to the maintenance, demolition, construction, alteration, repair or restoration of the Property or (b) any consent, covenant, restriction, easement or declaration, or any amendment thereto, affecting the Property or the Common Elements which the Condominium Board deems necessary or appropriate.

The acts of a majority of such persons constituting the Condominium Board shall constitute the acts of said attorneys-in-fact.

The Undersigned (does) (do) hereby irrevocably nominate, constitute and appoint St. Regis Residence Club, New York Inc. ("Sponsor"), as attorney-in-fact for the Undersigned, coupled with an interest, with power of substitution, to amend from time to time the Condominium Declaration, Condominium By-Laws and the Condominium Rules and Regulations or any of such documents, when such amendment (1) shall be required to reflect any changes in Unsold Club Units and/or the reapportionment of the Common Interests of the affected Unsold Club Units resulting therefrom made by

CD0398.DOC

Sponsor in accordance with the Condominium Declaration or (2) shall be required by (a) a Permitted Mortgagee designated by Sponsor to make a mortgage loan secured by a mortgage on any Club Unit, (b) any governmental agency having regulatory jurisdiction over the Condominium, or (c) any title insurance company selected by Sponsor to insure title to any Club Unit provided, however, that any amendment made pursuant to the terms of subdivision (1) or (2) of this paragraph shall not (i) change the Common Interest of the Club Unit in which the Undersigned has an Club Interest, (ii) require a material, physical modification to the Club Unit in which the Undersigned has a Club Interest, or (iii) adversely affect the priority or validity of the lien of any mortgage held by a Permitted Mortgagee covering the Undersigned's Club Interest unless the Undersigned (in the event described in subdivision (i) or (ii) of this paragraph) or the holder of such Permitted Mortgage (in the event described in subdivision (iii) of this paragraph) shall consent thereto by joining in the execution of such amendment.  The terms, covenants and conditions contained in, and the powers granted pursuant to, this paragraph shall remain in full force and effect until such time as Sponsor shall cease to own any Club Unit in the Condominium.

This Condominium Power of Attorney shall be irrevocable.

IN WITNESS WHEREOF, the undersigned has/have executed this Condominium Power of Attorney as of the _____ day of _____.

_____

_____

(ACKNOWLEDGEMENTS)

STATE OF NEW YORK

COUNTY OF _____ } SS.:

On the _____ day of _____ in the year _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that (he) (she) (they) executed the same in (his) (her) (their) capacity(ies), and that by(his) (her) (their) signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK

COUNTY OF _____ } SS.:

On the _____ day of _____ in the year _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that (he) (she) (they) executed the same in (his) (her) (their) capacity(ies), and that by(his) (her) (their) signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

---

**CERTIFICATION OF SPONSOR AND PRINCIPALS**

---

## PART 24:  CERTIFICATION OF SPONSOR AND PRINCIPALS

New York State Department of Law
Investment Protection Bureau
120 Broadway, 23rd Floor
New York, New York  10271

       Re:   Timeshare Offering Plan
            Fifth and Fifty-Fifth Residence Club
            New York, New York

We are the sponsor and the principals of sponsor of the timeshare offering plan for the timeshare captioned property.

We understand that we have primary responsibility for compliance with the provisions of Article 23-A of the General Business Law, the regulations promulgated by the Department of Law in Part 24 and such other laws and regulations as may be applicable.

We have read the entire offering plan.  We have investigated the facts set forth in the offering plan and the underlying facts.  We have exercised due diligence to form a basis for this certification.  We jointly and severally certify that the offering plan does, and that documents submitted hereafter by us which amend or supplement the offering plan will:

      (i)      set forth the detailed terms of the transaction and be complete, current and accurate;

      (ii)     afford potential investors, purchasers and participants an adequate basis upon which to found their judgment;

      (iii)    not omit any material fact;

      (iv)    not contain any untrue statement of a material fact;

      (v)     not contain any fraud, deception, concealment, suppression, false pretense or fictitious or pretended purchase or sale;

      (vi)    not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

      (vii)   not contain any representation or statement which is false, where we:

           (a)   knew the truth;

734

    (b)      with reasonable effort could have known the truth;

    (c)      made no reasonable effort to ascertain the truth; or

    (d)      did not have knowledge concerning the representation or statement made.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

SPONSOR:

ST. REGIS RESIDENCE CLUB, NEW YORK INC.,
a Florida Corporation

By:

Name: Sergio D. Rivera
Title:  President

PRINCIPAL(S) OF SPONSOR:

Sergio D. Rivera

Raymond L. Gellein, Jr

Severally sworn to before me
this 25th day of January, 2006.

Notary Public

JEAN M. DEETZ
MY COMMISSION # DD 418167
EXPIRES: August 13, 2009
Bonded Thru Notary Public Underwriters

- 2 -

---

**CERTIFICATION OF ARCHITECT**

---

**BRENNAN BEER GORMAN/ARCHITECTS, L.L.P**
**515 MADISON AVENUE**
**NEW YORK, NEW YORK 10022**

CERTIFICATION OF SPONSOR'S ARCHITECT
PURSUANT TO SECTION 24.4 (C)(3) OF THE REGULATIONS ISSUED
PURSUANT TO GENERAL BUSINESS LAW, ARTICLE 23-A, AS AMENDED

New York State Department of Law
Investment Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271

   Re: Fifth and Fifty-Fifth Residence Club
     Two East 55th Street
     New York, New York 10022

   The undersigned, a licensed architect in the State of New York, hereby certifies as follows:

   The sponsor of the fractional offering plan for the captioned fractional property retained our firm to prepare a report describing the property when constructed ("Report"). We examined the building plans and specifications that were prepared by us dated as of November 29, 2005, that were submitted to the Department of Buildings on December 28, 2005, and prepared the Report dated as of February 3, 2006, a copy of which is intended to be incorporated in the fractional offering plan so that prospective purchasers may rely on the Report.

   We understand that we are responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Department of Law in Part 24 insofar as they are applicable to this Report.

   We have read the entire Report and investigated the facts set forth in the Report and the facts underlying it and conducted the visual inspection referred to above with due diligence in order to form a basis for this certification. We certify that the Report and all documents prepared by us disclose all the material facts which were then discernible from a visual inspection of the fractional property. This certification is made for the benefit of all persons to whom this offer is made.

   We certify that the Report based on our visual inspection:

   (i) sets forth in narrative form the physical condition of the entire fractional property and is current and accurate as of the date of inspection;

BS5627.DOC

(ii)    in our professional opinion affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the physical condition of the fractional property;

(iii)   does not omit any material fact;

(iv)   does not contain any untrue statement of a material fact;

(v)   does not contain any fraud, deception, concealment or suppression;

(vi)   does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)   does not contain any representation or statement which is false, where we:

    (a)    knew the truth;
    (b)    with reasonable effort could have known the truth;
    (c)    made no reasonable effort to ascertain the truth; or
    (d)    did not have knowledge concerning the representations or statement made.

(viii)   it is to be understood that all aspects of the physical condition of the fractional property cannot be determined by a visual inspection and that all statements contained in this certification are premised on and limited to such visual inspection.

We further certify that we are not owned or controlled by and have no beneficial interest in the sponsor and that our compensation for preparing this Report is not contingent on the success of the fractional offering plan or on the profitability or price of the offering. This statement is not intended as a guarantee or warranty of the physical condition of the fractional property.

BRENNAN BEER GORMAN/ARCHITECTS, L.L.P

By: _____
Name: Marc Gross
Title: Partner

Sworn to before me this
_15th_ day of February, 2006

_Maureen Abano_
Notary Public



MAUREEN ABANO
Notary Public, State Of New York
No. 01AB4641174
Qualified In Kings County
Commission Expires May 31, 2006

CERT. OF ARCHITECT (BS5627-4)2.DOC

---

**CERTIFICATION OF CLUB BUDGET EXPERT**

---

# St. Regis New York Management, Inc.

P.O. Box 22051, Lake Buena Vista, Florida 32830-2051

## PART 24: CERTIFICATION BY EXPERT AS TO ADEQUACY OF TIMESHARE BUDGET

New York State Department of Law
Investment Protection Bureau
120 Broadway, 23rd Floor
New York, New York 10271

> Re: Timeshare Offering Plan
> Fifth and Fifty-Fifth Residence Club
> New York, New York

The sponsor of the timeshare offering plan for the captioned timeshare property retained me to prepare Schedule B containing projections of income and expenses for the first year of timeshare operation. My experience in this field includes:

I am currently Senior Vice President, Associations and Legislative Affairs of St. Regis New York Management, Inc. ("St. Regis New York Management") in Orlando, Florida. In addition, I am an officer in other affiliated entities who, along with St. Regis New York Management, serve as the manager of timeshare and fractional resorts in various states. Today, St. Regis New York Management and its affiliates manage a combined total of over 2,800 units and 140,000 weeks.

In my role as an officer of St. Regis New York Management and its related affiliates I oversee the financial and administrative affairs of all timeshare or fractional associations created by Starwood Vacation Ownership, Inc., or its affiliates (including the Fifth and Fifty-Fifth Residence Club Association Inc.).

I also monitor and participate in national and state legislation and industry efforts on behalf of Starwood Vacation Ownership, Inc.

I understand that I am responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Attorney General in Part 24 insofar as they are applicable to Schedule B.

I have prepared Schedule B and investigated the facts set forth in Schedule B and the facts underlying it with due diligence in order to form a basis for this certification.

I certify that the projections in Schedule B appear reasonable and adequate based on present prices (adjusted to reflect continued inflation and present levels of consumption for comparable units similarly situated).

I certify that Schedule B:

> (i)     sets forth in detail the terms of the transaction as it relates to Schedule B and is complete, current and accurate;

(ii)    affords potential investors, purchasers and participants an adequate basis upon which to found their judgment;

(iii)    does not omit any material fact;

(iv)    does not contain any untrue statement of a material fact;

(v)    does not contain any fraud, deception, concealment or suppression;

(vi)    does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)    does not contain any representation or statement which is false, where I:

    (a)    knew the truth;

    (b)    with reasonable effort could have known the truth;

    (c)    made no reasonable effort to ascertain the truth; or

    (d)    did not have knowledge concerning the representation or statement made.

I further certify that I am are not owned or controlled by and have no beneficial interest in the sponsor and that my compensation for preparing this Certification is not contingent on the success of the offering. I/We understand that a copy of this Certification is intended to be incorporated into the timeshare offering plan so that prospective purchasers may rely on it.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. I understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

ST. REGIS NEW YORK MANAGEMENT, INC.,
a Florida corporation

By:_____
Name:  Thorp S. Thomas
Title:    Senior Vice President,
        Associations and Legislative Affairs

Sworn to before me this
30th day of January, 2006.

_____
Notary Public





**CERTIFICATION OF CONDOMINIUM BUDGET EXPERT**



CERTIFICATION OF SPONSOR'S EXPERT ON ADEQUACY OF CONDOMINIUM BUDGET

January 20, 2006

New York State Department of Law
Investment Protection Bureau
120 Broadway - 23rd Floor
New York, New York 10271
Attn: Investment Protection Bureau

      Re:     Condominium Offering Plan
              Fifth and Fifty-Fifth Condominium
              Two East 55th Street
              New York, New York

        The undersigned, Penmark Realty Corp., is a licensed real estate brokerage firm in the State of New York. Penmark Realty Corp. has been engaged in the management of over 40 condominium, cooperatives and residential rental property over the course of the past 40 years including at least 35 mixed use properties.

        The sponsor of the condominium offering plan for the captioned property retained our firm to review Schedule B (together with the notes thereto, the "Schedule") to the offering plan which includes projections of income and expenses for the first year of condominium operation.

        Our relevant experience in the filed includes: managing various cooperatives and condominiums with commercial and retail components.

        We understand that we are responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Department of Law in Part 20 insofar as they are applicable to Schedule.

        We have reviewed the Schedule and investigated the facts set forth in the Schedule and the facts underlying it with due diligence in order to form a basis for this certification. We also have relied on our experience in managing mixed use and residential buildings in Manhattan.

        We certify that the projections in the Schedule appear reasonable and adequate under existing circumstances, and the projected income appears to be sufficient to meet the anticipated operating expenses for the projected first year of condominium operation.

        We certify that the Schedule:

           (i)     sets forth in detail the projected income and expenses for the first year of condominium operation;

           (ii)    affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the first year of condominium operation;

(iii)     does not omit any material fact;

(iv)     does not contain any untrue statement of a material fact;

(v)      does not contain any fraud, deception, concealment or suppression;

(vi)     does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)    does not contain any representation or statement which is false, where we:

    (a)     knew the truth;

    (b)     with reasonable effort could have known the truth;

    (c)     made no reasonable effort to ascertain the truth; or managing various cooperatives and condominiums with commercial and retail components.

    (d)     did not have knowledge concerning the representation or statement made.

We further certify that we are not owned or controlled by the sponsor. We understand that a copy of this certification is intended to be incorporated into the offering plan. This statement is not intended as a guarantee or warranty of the income or expenses for the first year of condominium operation. This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made.

We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

PENMARK REALTY CORPORATION

By: _____

Name:  Bernard Friedman
Title:    President

Sworn to before me this
___ day of _____

_____
Notary Public

**CHRYSANTHIUS T. SPANN**
Notary Public, State of New York
No. 01SP6113501
Qualified in Kings County
Commission Expires 08/02/20__





CERTIFICATION BY SPONSOR'S EXPERT ON ADEQUACY OF
COMMON CHARGES PAYABLE BY THE COMMERCIAL UNIT OWNERS

January 20, 2006

New York State Department of Law
Investment Protection Bureau
120 Broadway
23rd Floor
New York, New York 10271

> Re:    Condominium Offering Plan
>         Fifth and Fifty-Fifth Condominium
>         Two East 55th Street
>         New York, New York

    The undersigned, Penmark Realty Corp., is a licensed real estate brokerage firm in the State of New York. Penmark Realty Corp. has been engaged in the management of over 40 condominium, cooperatives and residential rental property over the course of the past 40 years including at least 35 mixed use properties.

    The sponsor of the condominium offering plan for the captioned property retained our firm to review Schedule B (together with notes thereto, the "Schedule") to the offering plan which includes projections for common charges payable by the owners of the commercial units.

    Our relevant experience in the filed includes:  managing various cooperatives and condominiums with commercial and retail components.

    We understand that we are responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Department of Law in Part 20 insofar as they are applicable to the commercial units listed in the Schedule.

    We have reviewed the Schedule as it impacts upon the commercial units and investigated the facts underlying it with due diligence in order to form a basis for this certification.  We also have relied on our experience in managing mixed use commercial buildings in Manhattan.

    We certify that the projections in the Schedule for the common charges payable by the owners of the commercial units appear reasonable and adequate under existing circumstances to meet the anticipated operating expenses fairly attributable to such commercial units for the projected first year of condominium operation, and that the allocation of common charges attributable to the commercial units also reflects special or exclusive use or availability or exclusive control of particular common areas.

    We certify that the estimates in the Schedule for the common charges payable by the owners of the commercial units:

(i)      sets forth in detail the projected common charges for the commercial units for the first year of condominium operation;

(ii)      affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the common charges payable by the owners of the commercial units;

(iii)      does not omit any material fact;

(iv)      does not contain any untrue statement of a material fact;

(v)      does not contain any fraud, deception, concealment or suppression;

(vi)      does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)      does not contain any representation or statement which is false, where we:

         (a)      knew the truth;

         (b)      with reasonable effort could have known the truth;

         (c)      made no reasonable effort to ascertain the truth; or

         (d)      did not have knowledge concerning the representation or statement made.

We further certify that we are not owned or controlled by the sponsor. We understand that a copy of this certification is intended to be incorporated into the offering plan. This statement is not intended as a guarantee or warranty of the common charges attributable to the commercial units for the first year of condominium operation.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. We understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

                                  PENMARK REALTY CORPORATION

                               By: _____

                                  Name:    Bernard Friedman
                                  Title:      President

Sworn to before me this
23 day of January

_____
       Notary Public

CHRYSANTHIUS T. SPANN
Notary Public, State of New York
No. 01SP6113501
Qualified in Kings County
Commission Expires 08/02/20

