SEVENTEENTH AMENDMENT

FRACTIONAL OFFERING PLAN

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB

TWO EAST 55TH STREET

NEW YORK, NEW YORK 10022

<u>Sponsor:</u>

**St. Regis Residence Club, New York Inc.**
**c/o Starwood Vacation Ownership, Inc.**
**9002 San Marco Court**
**Orlando, Florida  32819**
**(407) 903-4000**

**Dated:  July 18, 2012**

TABLE OF CONTENTS

<u>SECTION</u>                                                                                                        <u>PAGE</u>

INTRODUCTION ........................................................................................................................ 1

1.   STATUS OF CLOSING OF CLUB INTERESTS ........................................................... 1

2.   PURCHASE PRICE SCHEDULE ................................................................................... 1

3.   CLUB BOARD .................................................................................................................. 1

4.   CONDOMINIUM BOARD ............................................................................................... 2

5.   2012 CLUB BUDGET ....................................................................................................... 2

6.   2012 CONDOMINIUM BUDGET .................................................................................... 2

7.   2011 AND 2010 CLUB FINANCIAL STATEMENTS .................................................... 2

8.   2011 AND 2010 CONDOMINIUM FINANCIAL STATEMENTS .................................. 2

9.   AMENDMENT TO SVEC DISCLOSURE GUIDE ........................................................ 2

10.  DEFINITIONS .................................................................................................................. 3

11.  NO MATERIAL CHANGES ........................................................................................... 3

12.  INCORPORATION OF OFFERING PLAN .................................................................... 3

13.  EXTENSION OF OFFERING PLAN ............................................................................... 3

<u>EXHIBITS</u>

A   -   SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

B   -   2011 AND 2010 CLUB FINANCIAL STATEMENTS

C   -   2011 AND 2010 CONDOMINIUM FINANCIAL STATEMENTS

D   -   SVEC DISCLOSURE GUIDE

### SEVENTEENTH AMENDMENT

### TO

### FRACTIONAL OFFERING PLAN

### INTRODUCTION

This Seventeenth Amendment modifies and supplements the terms of the Fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club located at Two East 55th Street, New York, New York 10022 dated February 17, 2006 ("Offering Plan"), as amended, and should be read in conjunction with the Offering Plan, as previously amended.

The terms of this Seventeenth Amendment are as follows:

### 1.   STATUS OF CLOSING OF CLUB INTERESTS

As of June 30, 2012, Sponsor closed title on the sale of approximately 293 Club Interests out of a total of 494 Club Interests, leaving approximately 201 Club Interests available for sale.

### 2.   PURCHASE PRICE SCHEDULE

Annexed to this Amendment as Exhibit "A" is a revised "Schedule A – Purchase Prices and Related Information" which reflects the current prices for each of the Club Interests.

THE PURCHASE PRICES SET FORTH ON SCHEDULE A HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

### 3.   CLUB BOARD

The present officers and members of the Club Board are as follows:

| Name | Office | Affiliation |
| --- | --- | --- |
| Christine Georgopulo | President | Club Owner |
| Edward Diao | Vice-President | Club Owner |
| Clay Cockerell | Treasurer | Club Owner |
| Shawn Ericson | Secretary | Sponsor |

Sponsor relinquished control of the Club Board on June 16, 2011.

### 4. CONDOMINIUM BOARD

The present officers and members of the Condominium Board are as follows:

| Name | Office | Affiliation |
|------|--------|-------------|
| Bill Bailey | President | Hotel |
| Marvin Schein | Vice President | Suites |
| Paul Nash | Vice President | Hotel |
| Danny Corral | Treasurer | Hotel |
| Christine Georgopulo | Secretary | Club |
| Shawn Erickson | Manager | Hotel |
| Scott Zecher | Manager | Retail |

The Hotel and Retail Board Members will at all times control the Condominium Board through the designation of a majority of its members.

### 5. 2012 CLUB BUDGET

Annexed to the Sixteenth Amendment as Exhibits "B" and "C," respectively, is the Operating Budget for the Club Association for the period commencing January 1, 2012 and ending December 31, 2012 which was adopted by the Club Board and a Certification of Club Budget Expert.

### 6. 2012 CONDOMINIUM BUDGET

Annexed to the Sixteenth Amendment as Exhibits "D" and "E," respectively, is the Operating Budget for the Condominium for the period commencing January 1, 2012 and ending December 31, 2012 which was adopted by the Condominium Board and a Certification of Condominium Budget Expert.

### 7. 2011 AND 2010 CLUB FINANCIAL STATEMENTS

Annexed to this Amendment to the Plan as Exhibit "B" are the financial statements of the Club Association for the 2011 and 2010 calendar years certified by Myers, Brettholtz & Company, PA, certified public accountants.

### 8. 2011 AND 2010 CONDOMINIUM FINANCIAL STATEMENTS

Annexed to this Amendment to the Plan as Exhibit "C" are the financial statements of the Condominium for the 2011 and 2010 calendar years certified by Myers, Brettholtz & Company, PA, certified public accountants.

### 9. AMENDMENT TO SVEC DISCLOSURE GUIDE

Annexed to this Amendment as Exhibit "D" is a revised SVEC Disclosure Guide for Members of the Starwood Residence Network. It reflects changes resulting from the 2011 audit required under Florida law of the total number of members of, and Unit weeks in, the Starwood Vacation Exchange Club.

10. **DEFINITIONS**

Any term used in this Amendment not otherwise defined herein shall have the same meaning ascribed to it in the Offering Plan.

11. **NO MATERIAL CHANGES**

Except as set forth in this Amendment, there have been no material changes of facts or circumstances affecting the Property or the offering.

12. **INCORPORATION OF OFFERING PLAN**

The Offering Plan, as modified and supplemented by this Amendment, is incorporated herein by reference with the same effect as if set forth at length.

13. **EXTENSION OF OFFERING PLAN**

The Offering Plan, as modified and supplemented by this Amendment, may not be used after six (6) months following the Filing Date of this Amendment unless the Offering Plan is extended or amended.

SPONSOR:

ST. REGIS RESIDENCE CLUB, NEW YORK INC.

EXHIBIT "A"

---

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

---

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB**
**Two East 55th Street**
**New York, New York 10022**

| CLUB UNIT 1 | | | | | | PURCHASE PRICE 2 | PROJECTED ANNUAL CLUB CHARGES 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Number | Bedrooms | Bathrooms | "Condominium Declaration" Square Feet | "Usable" Square Feet | Facing | | Real Estate Taxes (a) | Other Club Expenses (b) | Total Club Charges (a)+(b) |
| 801 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 901 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 803 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 903 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1103 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 807 | One | One | 738 | 625 | 55th Street | $450,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 907 | One | One | 738 | 625 | 55th Street | $450,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 1007 | One | One | 738 | 625 | 55th Street | $500,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 808 | Studio | One | 523 | 445 | Interior | $387,000 | $1,924.42 | $11,036.12 | $12,960.53 |
| 908 | Studio | One | 523 | 445 | Interior | $387,000 | $1,924.42 | $11,036.12 | $12,960.53 |
| 809 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,924.42 | $11,036.12 | $12,960.53 |
| 909 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,924.42 | $11,036.12 | $12,960.53 |
| 815 | Two | Three | 1507 | 1290 | 55th Street | $750,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 915 | Two | Three | 1507 | 1290 | 55th Street | $750,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 818 | Two | Three | 1593 | 1395 | Interior | $750,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 918 | Two | Three | 1593 | 1395 | Interior | $750,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1018 | Two | Three | 1539 | 1349 | Interior | $750,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 821 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 921 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1021 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1121 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 822 | One | Two | 1070 | 852 | Interior | $522,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 922 | One | Two | 1070 | 852 | Interior | $522,000 | $3,571.44 | $14,926.82 | $18,498.26 |
| 835 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 935 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 836 | Two | Three | 1455 | 1260 | Interior | $700,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 936 | Two | Three | 1455 | 1260 | Interior | $700,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1035 | Two | Three | 1458 | 1262 | 55th Street | $800,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1135 | Two | Three | 1458 | 1262 | Interior | $800,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1036 | Two | Three | 1455 | 1259 | 55th Street | $700,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| 1136 | Two | Three | 1438 | 1245 | Interior | $700,000 | $5,506.50 | $19,497.95 | $25,004.45 |
| TOTALS | | | | | | $248,904,000 | $1,713,933 | $6,463,095 | $8,177,028 |

**See Notes to Schedule A**

Notes to Schedule A

1.   The Club Units on Floors 8, 9, 10 and 11 contain studios; one-bedrooms; and two-bedroom duplexes. The Club Interest in each Club Unit is equal to a fraction, the numerator of which is four (4) and the denominator of which is fifty-two (52).

Purchasers should refer to the Floor Plans set forth in Part II of the Offering plan for an approximation of the dimensions and layouts of the Club Units. The "Condominium Declaration" square footage represents the square foot area of the Club Unit measured horizontally on each floor from the interior side of the glazing or the exterior walls at the Building line and/or the Property line to the midpoint of the interior walls and partitions separating one Club Unit from another Unit, or the public side of the interior walls separating a Club Unit from public corridors, stairs, elevators and other mechanical equipment spaces or any Common Elements. Column and mechanical pipes (whether along the perimeter or with the Club Unit) are not deducted from the square foot area of the Club Unit. The "useable" square foot area of a Club Unit represents that portion of the Club Unit to which the Club Owner has access (i.e., interior painted surfaced to interior painted surface, including kitchen counters, bathtubs, etc.). The square foot area and dimensions of the Club Units are approximate and may vary due to field conditions. No such variation will affect a Purchaser's obligations under the Purchase Agreement or the Offering Plan unless the square foot area of the Club Unit is diminished by more than five percent (5%) (excluding interior partitions), therefore affording Purchaser a fifteen (15) day right to rescind.

The number of rooms in each Club Unit has been computed by Sponsor in accordance with industry standard as follows:

| Type of Club Unit | Total Rooms | Type of Rooms |
|---|---|---|
| Studio | 2 | 1 bedroom, 1 bathroom |
| One bedroom | 3 or 4 | 1 or 2 bedrooms, 1 bathroom, 1 living room |
| Two bedroom | 5 | 2 bedrooms, 2 bathrooms, 1 living room |
| Two bedroom duplex room | 5 or 6 | 2 bedrooms, 2 or 3 bathrooms, 1 living room |

2.   THE PURCHASE PRICES AND OTHER TERMS OF SALE OF CLUB INTERESTS MAY BE NEGOTIATED BY SPONSOR AND, THEREFORE, MAY BE CHANGED. ACCORDINGLY, PURCHASERS MAY PAY DIFFERENT PURCHASE PRICES FOR SIMILAR CLUB INTERESTS. The effect of this, as well as the right of Sponsor to change purchase prices, is more particularly discussed in the Section of the Offering Plan entitled "Changes in Prices and Facilities." In addition to the payment of the purchase price, each Purchaser will be responsible for the payment of certain closing costs and expenses at the time of Closing, as explained in the Section of the Offering Plan entitled "Closing Costs". If Purchaser obtains a mortgage loan from Sponsor or other lender, Purchaser will be responsible for the payment of additional closing costs and expenses

relating to such loan. There may be an apportionment of certain charges relating to the Club Interest at the time of the Closing of Title. THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

3.   The estimated Club Charges contained in this column are for the period from January 1, 2012 to December 31, 2012 based on the "Schedule B – Club Budget" prepared by Sponsor in consultation with the Club Budget Expert. Club Charges include Real Estate Taxes assessed against the Club Units and other Club Expenses. The Club Association reserves the right to bill Club Members for Club Charges more often than once a year.

The estimated annual Real Estate Taxes of $1,713,933 for the 2012 calendar year for the Club Units are based upon recent tax assessments published by the City of New York, that: (a) the approximate allocated assessed value of the Club Units during the second half of the 2011/2012 tax year is $15,678,026 in the aggregate and during the first half of the 2012/2013 tax year is estimated to be $16,969,561 in the aggregate for a total 2012 assessed value of $32,647,600 (rounded); and (b) the effective tax rate in effect for the 2011/2012 tax year is $10.312 per $100 of assessed valuation and the tax rate in effect for the 2012/2013 tax year is estimated to be $10.673 per $100 of assessed valuation with respect to the Club Units. While the legal responsibility for Real Estate Taxes lies with each Club Member, the Club Association will collect Real Estate Taxes from each Club Member (which are included in the Club Charges) and remit the same on behalf of each Club Member to the taxing authorities. In addition to these estimated Club Charges, each Owner will be responsible for mortgage payments under a loan, if any, obtained to finance the purchase of the Club Interest.

EXHIBIT "B"

---

2011 AND 2010 CLUB FINANCIAL STATEMENTS

---

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.**
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEAR ENDED DECEMBER 31, 2011
(WITH COMPARATIVE TOTALS FOR THE YEAR
ENDED DECEMBER 31, 2010)



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 · 800.749.8270 · Fax: 239.939.3032 · e-mail: mbcopa@mbcopa.com

THE EXCEPTION TO THE RULE

# TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ...................................................................................................... 2

FINANCIAL STATEMENTS

      Balance Sheet ................................................................................................................................ 3

      Statement of Revenues, Expenses and Changes in Fund Balances ............................................. 4

      Statement of Cash Flows ............................................................................................................... 5

      Notes to Financial Statements ................................................................................................. 6-10

SUPPLEMENTARY INFORMATION

      Supplementary Information on Future Major Repairs and Replacements ................................. 12

      Schedule of Operating Fund Revenues and Expenses - Budget to Actual ............................... 13



**Myers, Brettholz & Company, PA**
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

## INDEPENDENT AUDITOR'S REPORT

The Board of Managers
Fifth and Fifty-Fifth Residence Club Association, Inc.
New York, New York

We have audited the accompanying balance sheet of Fifth and Fifty-Fifth Residence Club Association, Inc. as of December 31, 2011, and the related statements of revenues, expenses and changes in fund balances and cash flows for the year then ended. These financial statements are the responsibility of the Association's management. Our responsibility is to express an opinion on these financial statements based on our audit. The prior year summarized comparative information has been derived from the Association's 2010 financial statements and, in our report dated February 21, 2011, we expressed an unqualified opinion on those financial statements.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Residence Club Association, Inc. as of December 31, 2011, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

Accounting principles generally accepted in the United States of America require that the supplementary information on future major repairs and replacements on page 12 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance. The schedule of operating fund revenues and expenses - budget to actual is presented for the purpose of additional analysis and is not a required part of the basic financial statements. Such information, except for the portion marked "unaudited", on which we express no opinion, has been subjected to the auditing procedures applied during the audit of the basic financial statements and, in our opinion, the information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Myers, Brettholz & Company, PA*

MYERS, BRETTHOLZ & COMPANY, PA
Fort Myers, Florida
February 22, 2012

12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 • 800.749.8270 • Fax: 239.939.3032 • e-mail: mbcopa@mbcopa.com

THE EXCEPTION TO THE RULE

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
BALANCE SHEET
DECEMBER 31, 2011
(With comparative totals for December 31, 2010)

| | FUNDS | | | |
| | Operating | Replacement | 2011 Total | 2010 Total |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and cash equivalents | $ 931,175 | $ 593,791 | $ 1,524,966 | $ 622,536 |
| Certificates of deposit | - | 1,384,000 | 1,384,000 | 1,384,000 |
| Accounts receivable - members, net | 47,625 | - | 47,625 | 5,000 |
| Interest receivable | - | 7,291 | 7,291 | 7,331 |
| Due from Manager | 50,460 | - | 50,460 | 28,422 |
| Prepaid expenses | 715,582 | - | 715,582 | 800,079 |
| Due from funds | - | 2 | 2 | - |
| Total assets | $ 1,744,842 | $ 1,985,084 | $ 3,729,926 | $ 2,847,368 |
| | | | | |
| LIABILITIES AND FUND BALANCES | | | | |
| | | | | |
| LIABILITIES | | | | |
| Accounts payable | $ 5 | $ - | $ 5 | $ - |
| Accrued expenses | 167,017 | - | 167,017 | 184,294 |
| Income taxes payable | 25 | - | 25 | 25 |
| Due to Condominium | 28,830 | - | 28,830 | - |
| Assessments received in advance | 255,594 | - | 255,594 | 76,085 |
| Due to funds | 2 | - | 2 | - |
| Total liabilities | 451,473 | - | 451,473 | 260,404 |
| | | | | |
| FUND BALANCES | | | | |
| Undesignated | 293,369 | 1,985,084 | 2,278,453 | 2,586,964 |
| Board designated | 1,000,000 | - | 1,000,000 | - |
| Total fund balances | 1,293,369 | 1,985,084 | 3,278,453 | 2,586,964 |
| Total liabilities and fund balances | $ 1,744,842 | $ 1,985,084 | $ 3,729,926 | $ 2,847,368 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
3

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF REVENUES, EXPENSES AND CHANGES IN FUND BALANCES
FOR THE YEAR ENDED DECEMBER 31, 2011
(With comparative totals for the year ended December 31, 2010)

| | FUNDS | | | |
| | Operating | Replacement | 2011 Total | 2010 Total |
|---|---|---|---|---|
| REVENUES | | | | |
| Maintenance fees | $ 7,808,733 | $ 368,423 | $ 8,177,156 | $ 8,266,818 |
| Interest and dividends | 887 | 23,879 | 24,766 | 25,120 |
| Late fees and interest | 44,021 | - | 44,021 | 32,598 |
| Refund of maintenance fees | (994,182) | - | (994,182) | - |
| Total revenues | 6,859,459 | 392,302 | 7,251,761 | 8,324,536 |
| EXPENSES | | | | |
| Operation department | 1,236,852 | - | 1,236,852 | 1,419,034 |
| Homeowners association direct | 964,714 | - | 964,714 | 977,634 |
| Real property taxes | 1,394,635 | - | 1,394,635 | 1,558,890 |
| Condominium fees | 2,964,071 | - | 2,964,071 | 2,903,625 |
| Total expenses | 6,560,272 | - | 6,560,272 | 6,859,183 |
| Excess of revenues over expenses | 299,187 | 392,302 | 691,489 | 1,465,353 |
| FUND BALANCES - January 1, 2011 and 2010 | 994,182 | 1,592,782 | 2,586,964 | 1,121,611 |
| FUND BALANCES - December 31, 2011 and 2010 | $ 1,293,369 | $ 1,985,084 | $ 3,278,453 | $ 2,586,964 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.

4

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2011
(With comparative totals for the year ended December 31, 2010)

| | FUNDS | | 2011 | 2010 |
| | Operating | Replacement | Total | Total |
|---|---|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | | | |
| Excess of revenues over expenses | $ 299,187 | $ 392,302 | $ 691,489 | $ 1,465,353 |
| Provision for uncollectible accounts | 205,985 | - | 205,985 | 134,778 |
| Changes in: | | | | |
| Accounts receivable - members | (248,610) | - | (248,610) | (139,778) |
| Accounts receivable - other | - | - | - | 36,800 |
| Interest receivable | - | 40 | 40 | (7,331) |
| Due from Manager | (22,038) | - | (22,038) | 23,716 |
| Prepaid expenses | 84,497 | - | 84,497 | (56,299) |
| Accounts payable | 5 | - | 5 | - |
| Accrued expenses | (17,277) | - | (17,277) | 65,306 |
| Income taxes payable | - | - | - | (275) |
| Due to Condominium | 28,830 | - | 28,830 | (398) |
| Assessments received in advance | 179,509 | - | 179,509 | (2,381,538) |
| | | | | |
| Net cash provided (used) by operating activities | 510,088 | 392,342 | 902,430 | (859,666) |
| | | | | |
| CASH FLOWS FROM INVESTING ACTIVITIES | | | | |
| Purchases of certificates of deposit | - | - | - | (1,384,000) |
| | | | | |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Interfund reimbursement | 2 | (2) | - | - |
| | | | | |
| Net increase (decrease) in cash | 510,090 | 392,340 | 902,430 | (2,243,666) |
| | | | | |
| CASH AND CASH EQUIVALENTS- January 1, 2011 and 2010 | 421,085 | 201,451 | 622,536 | 2,866,202 |
| | | | | |
| CASH AND CASH EQUIVALENTS- December 31, 2011 and 2010 | $ 931,175 | $ 593,791 | $ 1,524,966 | $ 622,536 |
| | | | | |
| | | | | |
| SUPPLEMENTAL INFORMATION | | | | |
| Income taxes paid | $ 25 | $ - | $ 25 | $ 25 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
5

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 1 - THE ASSOCIATION

Fifth and Fifty-Fifth Residence Club Association, Inc. (the "Association"), was formed on June 26, 2006 to promote and advance the health and welfare of the fractional interest owners of Fifth and Fifty-Fifth Residence Club (the "Club"). As of December 31, 2011 and 2010, the Club consisted of 372 and 456 fractional interests, respectively, located on the 8th, 9th, 10th and 11th floors of a mixed-use project which includes lodging and commercial enterprise within the control of the commercial unit owners. The owners of all fractional interests in the Club are the only members.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to a 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Project (the "Developer"). Until all fractional interests have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the fractional interests owned by the Developer.

## NOTE 2 - DATE OF MANAGEMENT'S REVIEW

In preparing the financial statements, the Association has evaluated events and transactions for potential recognition or disclosure through February 22, 2012, the date that the financial statements were available to be issued.

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Fund Accounting

The Association prepares its financial statements on the accrual basis and presents them as separate funds based on its different funding policies for operations and major repairs and replacements.

The operating fund reflects the operating portion of the annual assessments billed to the fractional interest owners to meet the various day-to-day expenditures incurred in the administration and operation of the Club. The Board of Managers (the "Board") designated a portion of the operating fund balance to provide for the upcoming real estate tax payment.

The replacement fund is composed of the portion of the annual assessments designated in the budget to fund future major repairs and replacements, as further described in Note 8.

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when they are 31 days past due. The Association accounts for potential losses in accounts receivable utilizing the allowance method. The Association maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. The provision for uncollectible accounts for the years ended December 31, 2011 and 2010, was $205,985 and $134,778, respectively, and is included in homeowners association direct expenses.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Common Property

The Association is responsible to preserve and maintain the common property of the Club. Ownership of the commonly owned assets is vested directly or indirectly in the fractional interest owners, those assets are not titled in the Association's name and disposition of those assets by the Board is restricted. As a result, commonly owned assets are not presented in the Association's financial statements. Common property not capitalized consists of unit furnishings.

Income Taxes

Management has analyzed its various federal, state and city filing positions and believes that the Association's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The years 2008 through 2011 remain open to examination under federal and state statutes and applicable city statute limitations.

The Association files its income tax return as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Association is not taxed on uniform assessments to members and other income received from Association members solely as a function of their membership in the Association. The Association is taxed at a rate of 32% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the nonexempt function income; therefore, no deferred tax provision has been recorded. The Association incurred an income tax liability of $25 for the years ended December 31, 2011 and 2010.

Fair Value of Financial Instruments

Substantially all of the Association's assets and liabilities, excluding prepaid expenses and assessments received in advance, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument.

Revenue Recognition

Maintenance fees revenue is recognized monthly in the amount of the membership assessment allocation specified for the current period operations, based on the annual budget adopted by the Board. Each fractional interest owner is an Association member, and a proportionate share of the maintenance fees is assessed for each fractional interest.

Late fees and interest revenue is recognized when collected.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Cash Flows

For purposes of the statement of cash flows, the Association considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents, excluding certificates of deposit.

The Association made cash payments for income taxes of $25, during the years ended December 31, 2011 and 2010. The Association made no cash payments for interest during the years ended December 31, 2011 or 2010.

Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

## NOTE 4 - CONCENTRATION OF CREDIT RISK

The Association maintains cash balances and certificates of deposit at several financial institutions. Accounts and certificates of deposit at each institution are insured by the Federal Deposit Insurance Corporation ("FDIC"). These balances were fully insured as of December 31, 2011 and 2010, based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $1,233,745 and $550,989, as of December 31, 2011 and 2010, respectively, are not insured by the FDIC.

As of December 31, 2011 and 2010, the Developer owned 81 and 163 fractional interests, respectively.

## NOTE 5 - ACCOUNTS RECEIVABLE - MEMBERS

Accounts receivable - members consisted of the following as of December 31,:

|  | 2011 | 2010 |
|---|---|---|
| Maintenance fee assessments | $ 469,490 | $ 345,088 |
| Less: allowance for uncollectible accounts | (421,865) | (340,088) |
|  | $ 47,625 | $ 5,000 |

## NOTE 6 - RELATED PARTY TRANSACTIONS

During the years ended December 31, 2011 and 2010, the Developer paid maintenance fees as any fractional interest owner. The amount of maintenance fees assessed to the Developer during the years ended December 31, 2011 and 2010, were $1,619,804 and $2,714,193, respectively.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

**NOTE 6 - RELATED PARTY TRANSACTIONS (Continued)**

St. Regis New York Management, Inc. (the "Manager"), an affiliate of the Developer, provides on-site management and maintenance services, and off-site administrative and accounting services. The management agreement provides that the Manager may subcontract its rights, duties and obligations. A Board member is also an officer of the management company and its affiliates. Substantially all operating expenses have been allocated to the Association from the Manager. As of December 31, 2011 and 2010, due from Manager consisted of reimbursements due to the Association.

The Association is part of the high-rise estate project consisting of mixed-use components known as the Fifth and Fifty-Fifth Condominium (the "Condominium"). The Condominium allocates and assesses charges to the Association for the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the Common Elements, the provision of services to the mixed-use components and the business affairs of the Condominium. For the years ended December 31, 2011 and 2010, the Condominium fees were $2,964,071 and $2,903,625, respectively. The charges are considered to be a common expense of the Association. As of December 31, 2011 and 2010, $28,830 and $0, respectively, was due to the Condominium.

**NOTE 7 - ASSESSMENTS RECEIVED IN ADVANCE**

Assessments received in advance in the amounts of $255,594 and $76,085, consisted of 2012 and 2011 maintenance fees received by the Association prior to January 1, 2012 and 2011, respectively.

**NOTE 8 - REPLACEMENT FUND**

New York statutes require reasonable sums to be periodically set aside for the funding of reserves. Reserves are funded per the Board approved budget. If additional funds are needed, the Association has the right, subject to the Board's approval, to increase regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

The Association's replacement fund is utilized to accumulate funds for future major repairs and replacements, based on the budgeted portion of the maintenance fee assessment charged to each fractional interest owner, and specifically designated for the fund in the annual budget. Deductions from the fund are recorded as costs, as incurred, which are determined by the Board to meet the objective for which the fund was established.

For the years ended December 31, 2011 and 2010, additions to the fund include $23,879 and $19,708 of investment income, respectively.

During 2011 and 2010, the Association funded for major repairs and replacements over the estimated useful lives of the components, based on estimates of current replacement costs.

The 2012 proposed budgeted funding is $740,421, as shown in the unaudited supplementary information. The components' actual replacement costs, useful lives, and investment income may vary from the estimated amounts and the variation may be material.

Read Independent Auditor's Report.
9

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

**NOTE 9 - COMMITMENTS**

The Association currently has a three-year management agreement ending in August 28, 2014, with the Manager. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term.

**NOTE 10 - ECONOMIC DEPENDENCY**

The Association derived approximately 22% and 33% of its revenue from the Developer for the years ended December 31, 2011 and 2010, respectively.

**SUPPLEMENTARY INFORMATION**

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SUPPLEMENTARY INFORMATION ON
FUTURE MAJOR REPAIRS AND REPLACEMENTS
DECEMBER 31, 2011
*(Unaudited)*

The following table represents a study by management, which is based on estimates provided by the Manager during 2011, based on consultation with various experts regarding the estimated remaining lives of the components and their current replacement costs. The following table is based on the study and presents significant information about the components of the common property. Amounts are based on normal operations and without the effect of potential catastrophic occurrences.

| Components | Estimated Useful Lives | Estimated Remaining Useful Lives | Estimated Current Replacement Costs | 2012 Proposed Budgeted Funding |
|---|---|---|---|---|
| Unit furnishings, equipment, and other capital expenditures | 1-24 years | 0-21 years | $ 7,382,489 | $ 740,421 |

Estimated current replacement costs are based on the assumption of a variable interest rate earned on investments that exceeds an assumed rate of inflation of 3.8%.

Read Independent Auditor's Report.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SCHEDULE OF OPERATING FUND REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2011

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REVENUES** | | | |
| Maintenance fees | $ 7,808,734 | $ 7,808,733 | $ (1) |
| Interest and dividends | 4,056 | 887 | (3,169) |
| Late fees and interest | 31,828 | 44,021 | 12,193 |
| Refund of maintenance fees | - | (994,182) | (994,182) |
| Total operating fund revenues | 7,844,618 | 6,859,459 | (985,159) |
| | | | |
| **EXPENSES** | | | |
| | | | |
| **OPERATION DEPARTMENT** | | | |
| Housekeeping - variable | 591,920 | 568,441 | 23,479 |
| Cleaning supplies | 189,694 | 187,677 | 2,017 |
| Laundry | 263,381 | 261,256 | 2,125 |
| Owner reservations | 195,622 | 195,625 | (3) |
| Facilities management | 10,002 | 9,998 | 4 |
| Engineering other | 13,885 | 13,855 | 30 |
| Total operation department | 1,264,504 | 1,236,852 | 27,652 |
| | | | |
| **HOMEOWNERS ASSOCIATION DIRECT** | | | |
| Provision for uncollectible accounts | 1,053,624 | 205,985 | 847,639 |
| SVO management | 6,937 | 6,936 | 1 |
| Association management | 38,548 | 38,543 | 5 |
| Postage and printing | 1,157 | 2,248 | (1,091) |
| Audit | 8,910 | 16,910 | (8,000) |
| Legal and professional | 191,638 | 48,291 | 143,347 |
| Annual meeting | 5,250 | 8,557 | (3,307) |
| Bank fees | 1,115 | 1,972 | (857) |
| Credit card fees | 96,264 | 80,087 | 16,177 |
| Management service contract | 534,954 | 534,959 | (5) |
| Telephone and broadband | 4,615 | 2,955 | 1,660 |
| Technology services | - | 800 | (800) |
| Income taxes | 2,274 | 25 | 2,249 |
| Insurance | 15,773 | 16,446 | (673) |
| Total homeowners association direct | 1,961,059 | 964,714 | 996,345 |
| | | | |
| **REAL PROPERTY TAXES** | 1,504,989 | 1,394,635 | 110,354 |
| | | | |
| **CONDOMINIUM FEES** | 2,964,066 | 2,964,071 | (5) |
| | | | |
| **CONTINGENCY** | 150,000 | - | 150,000 |
| | | | |
| Total operating fund expenses | 7,844,618 | 6,560,272 | 1,284,346 |
| | | | |
| Excess of revenues over expenses | $ - | $ 299,187 | $ 299,187 |

Read Independent Auditor's Report.

EXHIBIT "C"

2011 AND 2010 CONDOMINIUM FINANCIAL STATEMENTS

**FIFTH AND FIFTY-FIFTH CONDOMINIUM**
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2011 AND 2010



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 · 800.749.8270 · Fax: 239.939.3032 · e-mail: mbcopa@mbcopa.com

THE EXCEPTION TO THE RULE

# TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ...............................................................................................................2

FINANCIAL STATEMENTS

     Balance Sheets....................................................................................................................................3

     Statements of Revenues, Expenses and Changes in Fund (Deficit) Balance ...............................................4

     Statements of Cash Flows ................................................................................................................5

     Notes to Financial Statements .................................................................................................... 6-11

SUPPLEMENTARY INFORMATION

     Schedule of Revenues and Expenses - Budget to Actual ................................................................... 13-15



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

## INDEPENDENT AUDITOR'S REPORT

The Board of Managers
Fifth and Fifty-Fifth Condominium
New York, New York

We have audited the accompanying balance sheets of Fifth and Fifty-Fifth Condominium as of December 31, 2011 and 2010, and the related statements of revenues, expenses and changes in fund (deficit) balance and cash flows for the years then ended. These financial statements are the responsibility of the Condominium's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Condominium as of December 31, 2011 and 2010, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. Management has omitted the supplementary information on future major repairs and replacements that accounting principles generally accepted in the United States of America require to supplement, the basic financial statements. Such missing information, although not a part of the basic financial statements, is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. Our opinion on the basic financial statements is not affected by the missing information. The schedule of revenues and expenses - budget to actual is presented for the purpose of additional analysis and is not a required part of the basic financial statements. Such information, except for the portion marked "unaudited," on which we express no opinion, has been subjected to the auditing procedures applied during the audit of the basic financial statements and, in our opinion, the information is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

*Myers, Brettholtz & Company, PA*

MYERS, BRETTHOLTZ & COMPANY, PA
Fort Myers, Florida
February 22, 2012

12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 · 800.749.8270 · Fax: 239.939.3032 · e-mail: mbcopa@mbcopa.com

THE EXCEPTION TO THE RULE

FIFTH AND FIFTY-FIFTH CONDOMINIUM
BALANCE SHEETS
DECEMBER 31,

|  | | 2011 | | 2010 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 1,124,468 | $ | 87,918 |
| Accounts receivable - members (net of allowance for | | | | |
|   uncollectible accounts of $113,729 in 2011 and $70,232 in 2010) | | - | | - |
| Due from affiliate | | 28,830 | | - |
| Prepaid expenses | | 6,260 | | 3,415 |
| Total assets | $ | 1,159,558 | $ | 91,333 |
| | | | | |
| **LIABILITIES AND FUND (DEFICIT) BALANCE** | | | | |
| | | | | |
| **LIABILITIES** | | | | |
| Accrued expenses | $ | 59,832 | $ | 37,138 |
| Income taxes payable | | 25 | | - |
| Due to Manager | | 23,926 | | 1,041,760 |
| Assessments received in advance | | 2,119 | | 28,334 |
| Total liabilities | | 85,902 | | 1,107,232 |
| FUND (DEFICIT) BALANCE | | 1,073,656 | | (1,015,899) |
| Total liabilities and fund balance | $ | 1,159,558 | $ | 91,333 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
3

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN FUND (DEFICIT) BALANCE
FOR THE YEARS ENDED DECEMBER 31,

|  | 2011 | 2010 |
|---|---|---|
| **REVENUES** | | |
| Common charges - members | $  3,488,961 | $  3,395,504 |
| Common charges - Developer | 17,844,147 | 14,243,976 |
| Interest and dividends | 292 | 207 |
| Late fees and interest | 126 | 419 |
| Total revenues | 21,333,526 | 17,640,106 |
| **EXPENSES** | | |
| Operations | 9,398,108 | 9,151,644 |
| Administrative and general | 2,275,960 | 2,053,165 |
| Repairs and maintenance | 3,464,128 | 3,394,266 |
| Energy department | 2,900,974 | 2,874,678 |
| Guest laundry department | 520,763 | 481,028 |
| Board and membership meetings | 2,254 | 1,616 |
| Provision for uncollectible accounts | 43,497 | 40,284 |
| Legal and audit | 26,761 | 25,875 |
| Income taxes | 25 | (538) |
| Insurance | 495,867 | 485,204 |
| Management fees | 115,634 | 115,700 |
| Total expenses | 19,243,971 | 18,622,922 |
| Excess (deficiency) of revenues over expenses | 2,089,555 | (982,816) |
| FUND (DEFICIT) BALANCE - January 1, | (1,015,899) | (33,083) |
| FUND (DEFICIT) BALANCE - December 31, | $  1,073,656 | $  (1,015,899) |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
4

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31,

|  | 2011 | 2010 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Excess (deficiency) of revenues over expenses | $ 2,089,555 | $ (982,816) |
| Provision for uncollectible accounts | 43,497 | 40,284 |
| Changes in: | | |
| Accounts receivable - members | (43,497) | (32,519) |
| Due from affiliate | (28,830) | 398 |
| Prepaid expenses | (2,845) | 5,863 |
| Prepaid income taxes | - | 1,632 |
| Accrued expenses | 22,694 | 4,100 |
| Income taxes payable | 25 | - |
| Due to Manager | (1,017,834) | 751,714 |
| Assessments received in advance | (26,215) | 18,023 |
| Net cash provided (used) by operating activities | 1,036,550 | (193,321) |
| Net increase (decrease) in cash | 1,036,550 | (193,321) |
| CASH AND CASH EQUIVALENTS - January 1, | 87,918 | 281,239 |
| CASH AND CASH EQUIVALENTS - December 31, | $ 1,124,468 | $ 87,918 |

| SUPPLEMENTAL INFORMATION | | |
|---|---|---|
| Income taxes paid | $ - | $ - |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
5

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 1 - THE CONDOMINIUM

Fifth and Fifty-Fifth Condominium (the "Condominium"), was formed on June 13, 2006, to be responsible for the management of a high-rise estate project (the "Project") consisting of distinct mixed-use components located in New York, New York. The owners of all units in the Condominium are the only members.

For the years ended December 31, 2011 and 2010, the Project consisted of: (1) 15 and 8 suite units, respectively, located on the 10th and 11th floors of the building, (2) 31 and 38 club units, respectively, located on the 8th, 9th, 10th and 11th floors of the building, and (3) two commercial units, one of which (the "Hotel unit") is located on portions of each floor (other than the 8th, 9th, 10th, and 11th floors) of the building and the "Retail unit" which is located on portions of the 1st and mezzanine floors of the building.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to a 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Project (the "Developer"). Until all units have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the units owned by the Developer.

## NOTE 2 - DATE OF MANAGEMENT'S REVIEW

In preparing the financial statements, the Condominium has evaluated events and transactions for potential recognition or disclosure through February 22, 2012, the date that the financial statements were available to be issued.

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General Accounting

The Condominium prepares its financial statements on the accrual basis of accounting, in accordance with generally accepted accounting principles. Under the accrual basis of accounting, revenues are recognized when earned and expenses are recognized when incurred.

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when they are 10 days past due. The Condominium accounts for potential losses in accounts receivable utilizing the allowance method. The Condominium maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. Provision for uncollectible accounts expense for the years ended December 31, 2011 and 2010 was $43,497 and $40,284, respectively.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

### Common Property

The Condominium is responsible to preserve and maintain the common property of the Project. Ownership of the commonly owned assets is vested directly or indirectly in the unit owners, those assets are not titled in the Condominium's name and disposition of those assets by the Board of Managers (the "Board") is restricted. As a result, commonly owned assets are not presented in the Condominium's financial statements.

The Common Elements of the Condominium (the "Common Elements") consist of the entire Property including the Land and all parts of the Building and improvements thereon other than the Units. The Common Elements are classified as General Common Elements and Hotel Limited Common Elements. The Common Elements do not include any of the Development Rights, all of which are assigned and reserved to and shall inure to the benefit of the Hotel Unit and the Hotel Unit Owner in all respects as set forth in Section 1.2 of the Declaration of Condominium. The Common Elements will remain undivided and no Unit Owner or other Person will bring or will have the right to bring any action for partition or division thereof except as may be specifically provided for herein and in the Condominium By-Laws.

The General Common Elements consist generally of the Land and all parts of the Building and the other improvements thereon other than the Units and the Hotel Limited Common Elements, and include generally, without limitation, those rooms, areas, corridors, spaces and other parts of the Building and all facilities located or contained therein for the common use of the Units and the Unit Owners (in each case, except as may otherwise be provided herein or on the Floor Plans) or which are necessary or convenient for the existence, maintenance, operation or safety of the Property (in each case, except as may otherwise be provided herein or on the Floor Plans), together with any other portions and/or facilities of the Property that are designated on the Floor Plans as General Common Elements.

The Hotel Limited Common Elements consist generally of those portions of the Common Elements which exclusively serve or exclusively benefit the Hotel Unit whether or not designated as Hotel Limited Common Elements (or designated at all) on the Floor Plans (but excluding any items therein or in the Building which are not part of the Property, including, without limitation, any equipment, wiring and devices owned by telecom providers or any area or item designated herein or in the Floor Plans as part of the General Common Elements or any Unit), together with any other portions and/or facilities of the Property identified herein or designated on the Floor Plans as Hotel Limited Common Elements.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Common Property (Continued)

The Hotel Unit Owner shall, at least annually, prepare a budget in connection with the operation, care, upkeep and maintenance of, and the making of Alterations to, and Repairs of and insuring, the Hotel Limited Common Elements, and/or, to the extent the same are also accessible to or used by the Suite Unit Occupants and Club Unit Occupants at no per-use charge, the Hotel Unit, as well as other expenses of the Hotel Unit Owner in providing services (for which there is no per-use charge) on a Building-wide basis or throughout or for the benefit of the guest-room portions of the Hotel Unit as well as the Suite Units and Club Units (and the Occupants thereof) in connection with the operation of a hotel in the Building and/or in order to maintain the Hotel Flag Standards (such costs and expenses being referred to in the Condominium Documents as "Allocable Hotel Expenses"); and shall periodically invoice the Condominium Board for such expenses incurred or to be incurred with respect thereto. Each Unit Owner shall pay to the Condominium Board its allocated share of the Allocable Hotel Expenses which allocation shall be made by the Condominium Board in accordance with the Cost Allocation Schedule. Such amounts payable to the Condominium Board shall be deemed to be included in General Common Charges, shall be collected by the Condominium Board and the Condominium Board shall have, and shall diligently and promptly as agent for the owner of the Hotel Unit or its designee exercise, any and all rights and remedies for the collection of such charges as are provided herein for the collection of General Common Charges. In addition, the owner of the Hotel Unit shall have the right of offset against the Condominium Board in respect of any amounts payable to it in respect of the costs and expenses, of such shared areas and services which are not collected by the Condominium Board and paid the owner of the Hotel Unit or its designee. Any dispute regarding the Allocable Hotel Expense shall be resolved by Arbitration as set forth in Article 11 of these Condominium By-Laws; provided, however, that allocations of Allocable Hotel Expenses which are based on "key" count, proportionate Common Interest and/or metering/sub metering shall not be subject to challenge in Arbitration.

The declaration grants various easements to the hotel unit owner for such items as alteration and reconfiguring of the lobby, entrance, and other public areas of the building; the right to erect, use, lease, license, maintain, repair, replace and operate a platform and other facilities for the purpose of operating antennae, satellite dishes and other communication equipment; and the right to apply for and/or grant with respect to the façade of the property a further historic preservation easement or similar right. In addition, the hotel unit owner grants to the members of the Condominium that for as long as any portion of the space specified as health club on the floor plans and all improvements thereto is made available to hotel guests as a fitness facility, the members of the Condominium shall have a right to access and use the health club for the same purposes and on the same basis which hotel guest are permitted to access and use the health club; and agrees to provide on the same basis that such services are provided and made available to hotel guests: hotel concierge service, lobby bellmen and doormen; room service, and housekeeping service at a daily charge.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Income Taxes

Management has analyzed its various federal and state filing positions and believes that the Condominium's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The years 2008 through 2011 remain open to examination under federal and state statute limitations.

The Condominium has elected to be taxed as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Condominium is not taxed on uniform assessments to members and other income received from Condominium members solely as a function of their membership in the Condominium. The Condominium is taxed at a rate of 30% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the non-exempt function income; therefore, no deferred tax provision has been recorded. The Condominium incurred an income tax liability of $25 for the year ended December 31, 2011. The Condominium incurred an income tax liability of $25, less an overpayment applied of $25, for the year ended December 31, 2010.

Fair Value of Financial Instruments

Substantially all of the Condominium's assets and liabilities, excluding prepaid expenses and assessments received in advance, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument.

Revenue Recognition

Common charges revenue is recorded monthly in the amount of the membership assessment allocation specified for current period operations, and is based on the annual budget adopted by the Board. Each unit owner is a Project member, and a proportionate undivided interest in fee simple absolute (expressed as a percentage) in the common elements is assessed for each unit.

Late fees and interest revenue is recognized when collected.

Determination of General Common Expenses and Fixing of General Common Charges

Common Expenses shall mean all costs and expenses to be incurred generally by the Unit Owners pursuant to the Condominium Declaration and/or the Condominium By-Laws in connection with: (i) the repair, maintenance, replacement, restoration and operation of, and any alteration, addition, or improvement to, the Common Elements; (ii) the establishment and/or maintenance of a general operating reserve, or a reserve fund for working capital, for replacements with respect to the Common Elements, or to make up any deficit in the Common Charges for any prior year(s); and (iii) generally, the conduct of the affairs of the Condominium.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Determination of General Common Expenses and Fixing of General Common Charges (Continued)

The Condominium Board shall, from time to time, but at least annually, prepare or cause to be prepared a budget setting forth its Projections of the costs and expenses associated with the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the Common Elements, the provision of services to Unit Owners and the business and affairs of the Condominium (the "General Common Expenses") for the next fiscal year and will allocate and assess charges (such charges, together with all such other amounts denominated or payable as General Common Charges in or under the Condominium Documents, being collectively, the "General Common Charges") among: (a) the Suite Units; (b) the Club Units; (c) the Hotel Unit; and (d) the Retail Unit. Each such Unit Owner or group of Unit Owners (as set forth in the preceding sentence), as the case may be, will be assessed General Common Charges to meet its/their allocated share of General Common Expenses, with the General Common Charges allocated to the Suite Units and the Club Units (as a group) being further allocated, among each Unit within such separate group generally in proportion to the applicable Unit Owner's Unit's proportionate Common Interest among all Suite Units or Club Units, as the case may be. Each Commercial Unit Owner will be assessed General Common Charges to meet the share of only those General Common Expenses allocated to such Commercial Unit by the Condominium Board.

Cash Flows

For purposes of the statement of cash flows, the Condominium considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

For the years ended December 31, 2011 and 2010, the Condominium made no cash payments for income taxes or interest.

Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

## NOTE 4 - CONCENTRATION OF CREDIT RISK

The Condominium maintains cash balances at one financial institution. Accounts at the institution are insured by the Federal Deposit Insurance Corporation ("FDIC"). As of December 31, 2011 and 2010, the cash balances were fully insured based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $1,100,148 and $37,906, as of December 31, 2011 and 2010, respectively, are not insured by the FDIC.

As of December 31, 2011 and 2010 the Developer owned the hotel unit and eight and one suite units, respectively.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2011 AND 2010

## NOTE 5 - RELATED PARTY TRANSACTIONS

St. Regis New York Operating LLC (the "Manager"), an affiliate of the Developer, provides on-site management and maintenance services, and off-site administrative and accounting services. As of December 31, 2011 and 2010 due to Manager consisted of operating expenses of the Condominium paid by the Manager. Board members are also officers of the Manager and its affiliates. Substantially all operating expenses have been allocated to the Condominium from the Manager.

For the year ended December 31, 2011, the Developer paid common charges on the suite units of $671,751, and on the hotel unit of $17,172,396. For the year ended December 31, 2010, the Developer paid common charges on the suite units of $36,516, and on the hotel unit of $14,207,460. As of December 31, 2011 and 2010, the amounts due for common charges had been paid in full.

As of December 31, 2011 and 2010, due from affiliate consisted of $28,830 and $0, respectively, due from Fifth and Fifty-Fifth Residence Club Association, Inc. (the "Club") related to the Club units portion of the common charges.

## NOTE 6 - REPLACEMENT FUND

A replacement fund has not been established; therefore, no reserve assessments have been levied. If funds are needed, the Condominium has the right, subject to the Board's approval, to charge regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

## NOTE 7 - COMMITMENTS

The Condominium currently has a management agreement ending May 31, 2013, with the Manager. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term. The management agreement provides that the Manager may subcontract its rights, duties and obligations under the management agreement.

## NOTE 8 - ECONOMIC DEPENDENCY

The Condominium derived approximately 84% and 81% of its revenue from the Developer during the years ended December 31, 2011 and 2010, respectively.

SUPPLEMENTARY INFORMATION

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2011

| | Budget | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| | *(Unaudited)* | | |
| **REVENUES** | | | |
| Common charges - members | $  21,333,082 | $    3,488,961 | $ (17,844,121) |
| Common charges - Developer | - | 17,844,147 | 17,844,147 |
| Interest and dividends | 421 | 292 | (129) |
| Late fees and interest | 436 | 126 | (310) |
| Total revenues | 21,333,939 | 21,333,526 | (413) |
| | | | |
| **EXPENSES** | | | |
| | | | |
| **OPERATIONS** | | | |
| Managers | 1,574,970 | 1,343,465 | 231,505 |
| Bellman | 667,354 | 639,294 | 28,060 |
| Concierge | 492,162 | 442,008 | 50,154 |
| Doorman | 323,958 | 303,053 | 20,905 |
| Page | 416,127 | 377,202 | 38,925 |
| Housekeeping supervisor | 243,702 | 185,063 | 58,639 |
| Houseperson | 1,106,334 | 1,227,999 | (121,665) |
| Public area attendant | 244,961 | 233,551 | 11,410 |
| Front office | 624,105 | 619,302 | 4,803 |
| Trainee | - | 38,036 | (38,036) |
| Butler | 2,990,558 | 3,260,798 | (270,240) |
| Contract services | 202,693 | 134,505 | 68,188 |
| Decorations | 134,360 | 162,714 | (28,354) |
| Uniforms | 112,318 | 69,797 | 42,521 |
| Cleaning supplies | 25,557 | 23,262 | 2,295 |
| Operating supplies | 211,789 | 176,366 | 35,423 |
| Cable television | 122,191 | 131,248 | (9,057) |
| China | - | 4,387 | (4,387) |
| Telecommunications | 38,210 | 26,058 | 12,152 |
| Total operations | 9,531,349 | 9,398,108 | 133,241 |
| | | | |
| **ADMINISTRATIVE AND GENERAL** | | | |
| Management | 950,622 | 976,776 | (26,154) |
| Accounting office | 101,114 | 99,425 | 1,689 |
| Human resources | 109,231 | 162,757 | (53,526) |
| Administration | 63,187 | 87,595 | (24,408) |
| Management information system | 47,231 | 55,570 | (8,339) |
| Security salaries and wages | 569,402 | 647,236 | (77,834) |
| Bonus wages | 49,473 | 35,954 | 13,519 |
| Operating supplies | 16,462 | 34,626 | (18,164) |
| Payroll service | 65,974 | 63,507 | 2,467 |
| Personnel recognition | 38,154 | 55,059 | (16,905) |
| Personnel training | 43,077 | 11,947 | 31,130 |
| Telecommunications | 21,538 | 15,151 | 6,387 |
| Uniforms | 4,637 | 3,859 | 778 |

Read Independent Auditor's Report.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2011

| | Budget _(Unaudited)_ | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **ADMINISTRATIVE AND GENERAL (Continued)** | | | |
| Postage | 6,137 | 5,063 | 1,074 |
| Print and stationery | 16,582 | 9,521 | 7,061 |
| Professional fees and dues | 1,612 | 3,824 | (2,212) |
| Security | - | 6,980 | (6,980) |
| Bank fees | 1,179 | 1,110 | 69 |
| Total administrative and general | 2,105,612 | 2,275,960 | (170,348) |
| | | | |
| **REPAIRS AND MAINTENANCE** | | | |
| Salaries and wages | 2,067,936 | 2,189,329 | (121,393) |
| Alarm maintenance | 6,584 | 8,596 | (2,012) |
| Building | 184,445 | 167,239 | 17,206 |
| Computer system maintenance | 249,218 | 201,062 | 48,156 |
| Contract services purchasing | 13,128 | 10,509 | 2,619 |
| Curtain and drapes | 6,402 | 2,776 | 3,626 |
| Electrical and mechanical equipment | 19,994 | 12,233 | 7,761 |
| Electric bulbs | 13,295 | 15,248 | (1,953) |
| Elevators | 367,828 | 368,293 | (465) |
| Engineering supplies | 1,335 | 675 | 660 |
| Floor coverings | 5,482 | 5,449 | 33 |
| Furniture and equipment | 4,166 | 153 | 4,013 |
| Grounds / landscaping | 68,412 | 35,435 | 32,977 |
| HVAC | 75,007 | 69,746 | 5,261 |
| Keys and locks | 8,417 | 6,945 | 1,472 |
| Laundry equipment | 5,196 | 7,529 | (2,333) |
| Maintenance contract | 120,793 | 142,809 | (22,016) |
| Miscellaneous | 310 | 1,275 | (965) |
| Operating supplies | 1,165 | 4,626 | (3,461) |
| Painting and decorating | 4,662 | 4,705 | (43) |
| Pest control | 77,180 | 58,308 | 18,872 |
| Plumbing | 25,000 | 68,553 | (43,553) |
| Signs | - | 3,238 | (3,238) |
| Telecommunications | 3,916 | 1,417 | 2,499 |
| Television and radio | 9,583 | 3,264 | 6,319 |
| Tools | 714 | 40 | 674 |
| Uniforms | 5,717 | 5,658 | 59 |
| Waste removal | 65,746 | 69,018 | (3,272) |
| Total repairs and maintenance | 3,411,631 | 3,464,128 | (52,497) |
| | | | |
| **ENERGY DEPARTMENT** | | | |
| Electric current | 2,005,737 | 1,652,217 | 353,520 |
| Steam | 991,058 | 833,844 | 157,214 |
| Sewer | 215,953 | 261,064 | (45,111) |
| Water | 129,360 | 153,849 | (24,489) |
| Total energy department | 3,342,108 | 2,900,974 | 441,134 |

Read Independent Auditor's Report.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2011

| | Budget | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| | *(Unaudited)* | | |
| **GUEST LAUNDRY DEPARTMENT** | | | |
| Salaries and wages | 503,305 | 508,179 | (4,874) |
| Laundry supplies | 585 | 285 | 300 |
| Miscellaneous | 838 | 523 | 315 |
| Print and stationery | 279 | 320 | (41) |
| Uniforms | 1,116 | 991 | 125 |
| Operating supplies | 10,374 | 10,465 | (91) |
| Total guest laundry department | 516,497 | 520,763 | (4,266) |
| BOARD AND MEMBERSHIP MEETINGS | 6,000 | 2,254 | 3,746 |
| PROVISION FOR UNCOLLECTIBLE ACCOUNTS | 50,000 | 43,497 | 6,503 |
| LEGAL AND AUDIT | 21,720 | 26,761 | (5,041) |
| INCOME TAXES | 300 | 25 | 275 |
| INSURANCE | 470,574 | 495,867 | (25,293) |
| MANAGEMENT FEES | 115,636 | 115,634 | 2 |
| CONTINGENCY | 746,658 | - | 746,658 |
| Total expenses | 20,318,085 | 19,243,971 | 1,074,114 |
| Excess of revenues over expenses | $ 1,015,854 | $ 2,089,555 | $ 1,073,701 |

Read Independent Auditor's Report.

15

EXHIBIT "D"

SVEC DISCLOSURE GUIDE

Starwood Vacation Exchange Company Disclosure Guide

For Members of the Starwood Residence Network

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION REGARDING THE EXCHANGE PROGRAM OWNED AND OPERATED BY STARWOOD VACATION EXCHANGE COMPANY IN ACCORDANCE WITH APPLICABLE LAW.**

**This does not constitute an offer to sell or a solicitation of an offer to buy securities or any interest in real estate. For further information, please contact:**

**STARWOOD VACATION EXCHANGE COMPANY**
**9002 San Marco Court**
**Orlando, Florida 32819**

## I.  Definitions

The capitalized terms used in this Disclosure Guide shall have the same meaning as the identical terms defined in the Starwood Residence Network ("SRN") Rules and Regulations attached as Exhibit "A" unless the context otherwise requires.

## II.  Information about SRN Operator

SRN Operator, Starwood Vacation Exchange Company, is a Delaware corporation with principal offices located at 9002 San Marco Court, Orlando, Florida 32819.  The sole shareholder of SRN Operator is Starwood Hotels & Resorts Worldwide, Inc., a Maryland corporation ("Parent").  The officers and directors of SRN Operator are as listed on the attached Exhibit "B."  SRN Operator has no legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in SRN.  However, one or more of the developers, sellers, or managing entities for SRN Resorts may also be subsidiaries or affiliates of the Parent.  None of the officers and directors of SRN Operator have any legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in SRN, although one or more of them may also be an officer or director of such entities and/or a stockholder of the Parent.  SRN Operator and its shareholder, officers, and directors reserve the right to act as developers or sellers of fractional and/or vacation ownership plans and multisite vacation ownership plans for future resorts which plans may or may not be affiliated with SRN.

## III.  Membership in SRN

Each purchaser of a Club Interest in an SRN Resort is eligible for enrollment as an SRN Member either at the time the purchaser acquires such Club Interest or sometime thereafter.  To use and enjoy benefits of membership in SRN, such purchaser must execute an Owner Use Agreement, which is separate and distinct from such purchaser's purchase contract with purchaser's seller.  The terms and conditions of such membership are set forth in the SRN Documents and also may be set forth in the Resort Documents for that SRN Resort.  An SRN Member's decision to use SRN by requesting an Interchange at an SRN Resort is strictly voluntary.  However, SRN Members must affirmatively make an Interchange Request in order to make an Interchange.  All SRN Resorts are affiliated with SRN by means of an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator.  SRN Operator may charge the homeowners association an affiliation fee for operating SRN.  Membership in SRN automatically terminates if the SRN Member voluntarily or involuntarily transfers the SRN Member's Club Interest and owns no other Club Interest; if the SRN Member's Home Resort ceases to be an SRN Resort; or if SRN is cancelled by SRN Operator.  Although SRN Membership is not transferable, resale purchasers may be eligible to enroll in SRN.

## IV.  SRN Procedures and Obligations

The terms and conditions of the procedures for using SRN program are set forth in the SRN Rules attached to this Disclosure Guide as Exhibit "A."

**The terms and conditions of this Disclosure Guide and the SRN Rules, including fees, benefits, and reservation procedures, are subject to change by SRN Operator without advance notice.**

**THE TERMS AND CONDITIONS OF MEMBERSHIP IN SRN WILL BE GOVERNED EXCLUSIVELY BY THE LAWS OF THE STATE OF FLORIDA.  ANY ACTION AT LAW OR IN EQUITY BY AN SRN MEMBER TO CHALLENGE OR ENFORCE THE TERMS AND CONDITIONS OF MEMBERSHIP IN SRN MUST BE SUBMITTED EXCLUSIVELY TO THE JURISDICTION OF THE COURTS OF ORANGE COUNTY, FLORIDA, AND BY MAINTAINING MEMBERSHIP WITH SRN, EACH SRN MEMBER CONSENTS TO THE PERSONAL JURISDICTION OF THOSE COURTS.  IF AN ACTION AT LAW OR IN EQUITY IS INITIATED BY EITHER AN SRN MEMBER OR**

**SRN OPERATOR, THE LOSING PARTY SHALL PAY ALL COSTS INCURRED BY THE PREVAILING PARTY IN DEFENDING OR PURSUING SUCH ACTION, INCLUDING REASONABLE ATTORNEYS' FEES AND LEGAL COSTS.**

Each SRN Member recognizes and acknowledges that:

1. SRN Operator does not sell, lease, or otherwise convey any interest in real property;

2. Because not all owners of Club Interests in all SRN Resorts will participate in SRN, only a limited number of Club Weeks at such SRN Resorts, if any, will be available from time to time for reservation by SRN Members. Consequently, purchasers should not rely on the status of a particular resort as an SRN Resort in determining whether to purchase a Club Interest in an SRN Resort;

3. SRN Resort accommodations and facilities vary by location and resort. In addition, SRN Resort accommodations that have been reserved may differ in unit size, design, furnishing, or amenities from the Club Interest accommodations a particular SRN Member owns due to variations between resorts. SRN Operator will assign an Interchange Value to each Club Week and each Club Unit at all SRN Resorts;

4. Fees, if any, incurred by an SRN Member for the use of amenities at a host SRN Resort are determined and collected by the host SRN Resort;

5. An SRN Member is responsible for payment of any personal expenses incurred while occupying a Club Unit received through a reservation confirmation, as well as for any damage, theft, or loss caused by the SRN Member or the SRN Member's guests;

6. If the Interchange Selection becomes unavailable due to natural disaster, act of God, war, insurrection, or any other reason beyond SRN Operator's control, the SRN Member waives any and all claims against SRN Operator; and

7. SRN Operator is not liable for any claim or loss incurred in connection with participation in SRN or with respect to ownership of a Club Interest.

V. Fees

Pursuant to an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator, an SRN Affiliation Fee will be assessed to each SRN Resort's homeowners association so that Owners at that SRN Resort may be eligible to participate in SRN. The SRN Affiliation Fees to be charged per Club Interest participating in SRN is disclosed in the SRN Affiliation Fees Chart attached to this Disclosure Guide as Exhibit "C." SRN Members themselves have no contractual obligation to SRN Operator for the payment of any fees for membership in SRN. **Currently, there are no transaction fees charged by SRN Operator. However, SRN Operator reserves the right to amend the SRN Rules and charge transaction fees in its sole discretion.** Use of SRN may be restricted by SRN Operator if the SRN Member is not current in the payment of the SRN Member's Home Resort maintenance fees and taxes, and Club Interest mortgage or purchase money payments. Furthermore, use of SRN may be restricted by SRN Operator if the SRN Member's homeowners association is not current in the payment of the SRN Affiliation Fee. SRN Operator also will require advance payment of estimated maintenance fees and taxes to the SRN Member's Home Resort Managing Entity before permitting use of Interchange privileges.

VI.  SRN Resorts

SRN Members may request reservations in accordance with the SRN Documents and Resort Documents for any SRN Resort that is affiliated with SRN from time to time by SRN Operator. The names and addresses of all SRN Resorts currently participating in SRN are as follows:

Resorts with 1-20 Units

| Name and Address | Number of Club Units | SRN Members |
|---|---|---|
| Camelback Residence Club Condominium<br>4515 North Phoenicia Place<br>Scottsdale, AZ 85251 | 7 | 68 |

Resorts with 21-50 units

| Name and Address | Number of Club Units | SRN Members |
|---|---|---|
| Fifth and Fifty-Fifth Residence Club<br>Two East 55th Street<br>New York, New York 10022 | 31 | 576 |
| Aspen Residence Club and Hotel Condominium<br>315 East Dean Street<br>Aspen, Colorado | 25 | 514 |

As of December 31, 2011, there were 1,158 SRN Members enrolled in SRN. If required by applicable law, an independent audit of SRN operations will be performed and reported through the period ending December 31st each year. The SRN Operator calculates the number of SRN Members based on the number of Club Interests enrolled in SRN at each SRN Resort.

For the calendar year ending December 31, 2011, the percentage of confirmed exchanges (which is the number of reservations confirmed by SRN Operator divided by the number of reservation requests properly applied for) was 100%.

All Interchanges are based on availability and SRN does not guarantee that SRN Members will receive a specific Interchange Request. The Interchange program is based on an SRN Member trading one of SRN Member's reserved Club Weeks in exchange for an available Club Week. In order to make an Interchange Request, an SRN Member must: (a) pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interests; (b) not have placed the Club Week with another exchange company or program; and (c) obtain a confirmed reservation at SRN Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day.

SRN Operator may receive improperly submitted Interchange Requests in the normal course of business. These requests cannot be honored if the SRN Member does not follow SRN's procedures by either improperly completing an Interchange Request or failing to submit an Interchange Request within the minimum time required.

**The percentage of confirmed reservations contained in any annual audit report will be only a summary of the reservation requests entered in the year reported, and such percentage should not be relied on as an indication of the probability of an SRN Member being confirmed to any specific choice or range of choices.**

Exhibit "A"

Starwood Residence Network Rules and Regulations

These SRN Rules are binding on all SRN Members, their guests, invitees, lessees, licensees, and designees.

## I. Definitions

The following capitalized terms have the meaning set forth below unless the context requires a different meaning:

Alternate Use means Interchange, conversion to use through the Starwood Preferred Guest Program (if available at a given SRN Resort), or rental.

Biennial Club Interest means a Club Interest in which the SRN Member's Use Year occurs every other year. Currently, the only Biennial Club Interests are in the Aspen SRN Resort, which Biennial Club Interests also are known as Lifestyle Interests.

Check-in Day means the first day of use of a given seven day Club Week. Each SRN Resort has established Check-in Days.

Club Interest means a fractional ownership interest in an SRN Resort. Unless the context dictates otherwise, the term will include Biennial Club Interests.

Club Unit means an accommodation of an SRN Resort that is subject to exclusive occupancy by one or more persons pursuant to the Resort Documents and available for reservation by SRN Members pursuant to the SRN Documents.

Club Week means seven consecutive days, or a one-week increment of time, that must begin on a Check-in Day, as described in the Resort Documents, and pursuant to which an SRN Member is entitled to the use and occupancy of a Club Unit.

Confirmation Notice means a written or electronic acknowledgment from Reservation Services that an Interchange Request has been fulfilled.

Disclosure Guide means the Starwood Vacation Exchange Company Disclosure Guide for SRN promulgated by SRN Operator from time to time.

External Exchange Company means any company that provides services to SRN or to SRN Members under an External Exchange Program. Currently there are no External Exchange Companies affiliated with SRN.

External Exchange Program means the contractual arrangement, if any, pursuant to which an SRN Member may exchange the use of a Club Week, under certain conditions, for the use of accommodations in resorts other than SRN Resorts.

Home Resort means, as to a particular Club Interest, the SRN Resort in which an SRN Member's Club Interest is located.

Interchange means the exchange of an SRN Member's Club Week for another Club Week through SRN Operator.

Interchange Request means a Club Week requested by an SRN Member for an Interchange.

Interchange Selection means a Club Week requested by an SRN Member for an Interchange and for which a reservation is confirmed.

4

Interchange Value means the value assigned by SRN Operator to each Club Week and Club Unit at each SRN Resort.

Managing Entity means the condominium or homeowners association, management company, or other entity responsible for operating and maintaining a given SRN Resort.

Owner means the owner of a Club Interest.  During any period of time in which a purchaser has entered into a valid contract for the purchase of a Club Interest with a developer of an SRN Resort, has passed any applicable rescission period, and has not defaulted, such purchaser shall be considered an Owner.

Owner Use Agreement means an agreement executed by an Owner and SRN Operator, pursuant to which agreement the Owner may enroll and participate in SRN on a voluntary basis in accordance with the terms of such agreement and the other SRN Documents.

Primary Owner means the individual designated by the multiple Owners of a single Club Interest as having the exclusive right to make decisions regarding the use of SRN with respect to the Club Interest.

Reservation Services means the division of SRN Operator that handles and processes Interchange requests and other SRN Member services from time to time.

Resort Documents means all of the documents, other than SRN Documents, that create and govern the rights of Owners in, and the use and operation of, a given SRN Resort.

Starwood means Starwood Hotels & Resorts Worldwide, Inc., a Maryland corporation.

Starwood Preferred Guest® Program means the vacation and travel benefits program created by Starwood, as more particularly set forth in the Terms & Conditions for the Starwood Preferred Guest Program.  The Starwood Preferred Guest Program is a separate program and is not part of SRN.  Eligible SRN Members may access the Starwood Preferred Guest Program as set forth in the applicable Resort Documents.

SRN means the Starwood Residence Network, the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed by SRN Operator for SRN Resorts.  SRN is an exchange program offered by SRN Operator, an exchange company.  SRN Members may reserve the use of Club Weeks through SRN, which may or may not include access to an External Exchange Program, as set forth in the applicable SRN Documents.  SRN is not a legal entity or association of any kind.

SRN Affiliation Agreement means an agreement setting forth the terms and conditions that SRN Operator establishes from time to time, to make membership in SRN available to owners in SRN Resorts.

SRN Affiliation Fee means the amount assessed by SRN Operator to each SRN Resort's homeowners association each calendar year.

SRN Documents means those instruments governing the use and operation of SRN, including each SRN Affiliation Agreement, Owner Use Agreement, if applicable, the Disclosure Guide, and the SRN Rules, as promulgated, executed, or amended by SRN Operator from time to time.

SRN Member means an Owner who meets all of the terms and conditions for membership in SRN as determined by SRN Operator from time to time.

SRN Operator means Starwood Vacation Exchange Company, a Delaware corporation, its successors and permitted assigns.

SRN Resort means all or such portion of a resort that is affiliated with SRN.

SRN Rules means the Starwood Residence Network Rules and Regulations governing the reservation and use of Club Units and SRN Resort facilities, as promulgated, adopted, or amended from time to time by SRN Operator pursuant to the SRN Documents.

Use Year has the meaning given in the Resort Documents. SRN Members owning a Biennial Club Interest will have a Use Year that occurs every other year.

## II. SRN Operation

2.1     Membership.  Pursuant to an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator, a purchaser of a Club Interest is eligible to enroll in SRN to enjoy the benefits of membership in SRN.  To enroll in SRN, purchasers of Club Interests will be required to execute an Owner Use Agreement.  Membership in SRN automatically terminates if the SRN Member voluntarily or involuntarily transfers the SRN Member's Club Interest and owns no other Club Interest, or if the SRN Member's Home Resort ceases to be an SRN Resort.  SRN Membership is not transferable.

2.2     Management.  SRN is operated and managed by SRN Operator pursuant to the SRN Documents. SRN Operator expressly is authorized to take such actions as it deems necessary or appropriate for the operation of SRN, including the implementation of all exchange program and reservation duties as outlined in the SRN Rules.

2.3     Primary Owner.  The Owners of each Club Interest which is owned by more than one person or by a business entity must designate a Primary Owner from time to time by notifying Reservation Services of same through a writing executed by all individuals holding the membership or by an authorized representative of the business entity. Reservation Services may charge an administrative fee as SRN Operator may determine from time to time, each time it is requested to change a Primary Owner designation.

2.4     SRN Affiliation Fees.  Charges incurred by SRN Operator in connection with the operation of the Interchange program and the delivery of other SRN services and benefits at SRN Resorts will be charged as SRN Affiliation Fees to each SRN Resort's homeowners association, as more specifically provided in the applicable SRN Affiliation Agreement.

2.5     Transaction Fees.  In addition to SRN Affiliation Fees, SRN Operator has the right to charge such other transaction fees as it deems appropriate in its sole discretion from time to time.  Such fees may be charged for transactions including additional reservation request fees, Interchange fees, daily use fees, fees for additional housekeeping, and such other items as provided in the SRN Fees Chart as may be amended by SRN Operator from time to time in its sole discretion.

**Currently, there are no transaction fees charged by SRN Operator.**

2.6     Basis for Addition.  SRN Operator may decide to affiliate additional resorts with SRN from time to time.  The affiliation of additional SRN Resorts is not subject to the approval of the SRN Members.  SRN Operator will make any decision to associate resorts with SRN, including the terms and conditions under which such resorts are affiliated, in its sole discretion.

2.7     Availability of SRN Resorts.  Availability of Club Weeks in an SRN Resort, other than an SRN Member's Home Resort, is dependent on the number of Owners in such SRN Resort who become SRN Members and participate in the Interchange program, the continued affiliation of each SRN Resort with SRN, and the number of Club Weeks available for reservation in such SRN Resort during a given Use Year.

2.8     Assignment of Interchange Value.  For administrative convenience in the operation of SRN and in the determination of the respective rights of SRN Members to enjoy the benefits of membership in SRN, some or all Club Weeks and Club Units at every SRN Resort will be divided into categories on a resort specific basis.  Currently, there exist two categories: category "Platinum" and category "Platinum Plus." Depending on the SRN Resort and SRN Operator's sole discretion, some Club Weeks will be categorized by demand for use and seasonality regardless of Club Unit type, while other Club Weeks will be categorized based on Club Unit type.   The category assigned represents the Interchange power of a given Club Week within SRN.  Club Weeks assigned an Interchange Value of "Platinum" may exchange for other Club Weeks assigned an Interchange Value of "Platinum."  Club Weeks assigned an Interchange Value of "Platinum Plus" may exchange for other Club Weeks assigned an Interchange Value of "Platinum" or "Platinum Plus". **Accordingly, SRN Members whose Club Weeks are**

6

assigned an Interchange Value of "Platinum" will have less opportunities for Interchange than SRN Club Members whose Club Weeks are assigned an Interchange Value of "Platinum Plus."

The Interchange Value assigned represents the reservation power of a given Club Week within SRN. The assignment of a certain category with respect to SRN Resorts is based on such factors as relative SRN Member demand for use of certain Club Weeks and the SRN Resort, seasonality of the Club Week, Club Unit type, SRN Resort type, SRN Member use patterns, and availability of Club Weeks ("Assignment Factors"). SRN Operator reserves the right, in its sole discretion, to revise the Interchange Value assigned to any Club Weeks and required for reservations of any Club Weeks within SRN annually, each without SRN Member consent.

III. Reservations

3.1     Interchange Selection Process.

(a)     Requesting an Interchange. All Interchanges are subject to availability. Each SRN Member will be permitted up to two Interchange Selections per Use Year in accordance with the procedures set forth below. Pursuant to the Interchange restrictions set forth in Section 3.2, each SRN Member may only commit a maximum of two Club Weeks per Use Year to Alternate Use. All Interchanges must be made for increments of seven consecutive days, which is a full Club Week. Interchange Requests for particular Club Weeks will be taken on a first-come, first-served basis and SRN Manager does not guarantee that SRN Members will receive a specific Interchange Request.

(b)     Biennial Restrictions. Each SRN Member owning a Biennial Club Interest may request an Interchange and may be granted a Confirmation Notice for a Club Week occurring only during such SRN Member's Use Year, which occurs every other year.

(c)     Submitting an Interchange Request. The SRN Member must submit a valid Interchange Request to SRN Operator in writing, by telephone, facsimile, e-mail, or such other electronic means acceptable to SRN Operator from time to time. In order for an Interchange Request to be considered valid, an SRN Member must:

(i)     pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interests;

(ii)     not have subjected the Club Week to a different Alternate Use, placed the Club Week with another exchange company or program, or contributed to or used the Club Week in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the SRN Documents); and

(iii)     obtain a confirmed reservation at SRN Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day.

SRN Operator, on receipt of a valid Interchange Request, will assign the SRN Member the use of a designated Club Week if the Club Week requested is available. An SRN Member has no right to make a reservation unless the SRN Member has paid all Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments, pursuant to Article IV; furthermore, and as provided in Article IV, SRN Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due to the Managing Entity, as a condition to acceptance by SRN Operator of an Interchange Request. In addition, SRN Operator may restrict access to SRN if the SRN Member's homeowners association has failed to pay the SRN Affiliation Fee. An SRN Member may make a reservation in the name of a guest.

If the Club Week requested is available, SRN Operator will send the SRN Member a Confirmation Notice acknowledging that the SRN Member's Interchange Request has been fulfilled.  If the Club Week requested is unavailable, the SRN Member will keep the confirmed reservation at SRN Member's Home Resort.  As a consequence of this structure, SRN Operator will have no Club Weeks which are deposited with it by SRN Members which are not used by SRN Operator in effecting exchanges.

**Interchange Requests will be taken on a first-come, first-served basis, subject to availability.  Since availability will vary, SRN Operator cannot guarantee confirmation of an Interchange Request for any specific Club Week at any specific SRN Resort at any time.**

3.2     Interchange Options and Restrictions

(a)     On receiving a Confirmation Notice, an SRN Member may use the Interchange Selection for personal use or for use by a guest.  Unaccompanied guests must be registered with SRN Operator and must be at least 21 years of age.  SRN Members are solely responsible for the acts and omissions of any guests or individuals occupying the Club Unit, including any loss or damage to the Club Unit or SRN Resort.

(b)     SRN Operator reserves the right to restrict and/or prohibit Interchange Requests by each SRN Member for such SRN Member's Home Resort.

(c)     Interchanges are for seven consecutive days of occupancy, which is one full Club Week.

(d)     SRN Operator may prohibit certain club weeks in a given SRN Resort from participating in SRN.  **Currently, club weeks designated as Mid-Season Weeks at the St. Regis Residence Club, Aspen are not eligible for Interchange.**

(e)     A maximum of two Club Weeks per Use Year may be committed to Alternate Use.  By way of example, if an SRN Member converted two Club Weeks to use through the Starwood Preferred Guest Program for the current Use Year, the SRN Member is prohibited from committing any remaining Club Weeks to any other Alternate Use for that same Use Year.

(f)     Interchange Selections are not eligible for Alternate Use.

(g)     An SRN Member unable to use an Interchange Selection is not relieved of the obligation to pay all maintenance fee assessments, taxes, and mortgage or purchase money payments associated with ownership of a Club Interest.

(h)     The Interchange accommodation received may or may not be comparable in size, layout, furnishings, services, or amenities to those in the SRN Member's Home Resort.

(i)     Cancellation of a confirmed reservation is not permitted.  An SRN Member may request an exchange of the SRN Member's Interchange Selection one time, provided the SRN Member notifies SRN Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the Interchange Selection.

(j)     On acceptance of an Interchange Selection, the SRN Member relinquishes the right to use the Club Week which the SRN Member exchanged for the Use Year indicated on the Confirmation Notice.

3.3     Confirmations; Accommodation Preferences.  Confirmation Notices will be provided to each SRN Member or Primary Owner by Reservation Services to confirm all Interchanges.  Requests for Club Unit preferences, such as ground level Club Units, cannot be guaranteed, but will be noted as a preference in the Confirmation Notice.

3.4     Cancellations, Additional Reservation Requests, and No-Shows.

**Cancellation of a confirmed reservation is not permitted.  An SRN Member may request an exchange of the SRN Member's Interchange Selection, provided the**

**SRN Member notifies SRN Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the confirmed reservation.**

Interchange Selections are not eligible for Alternate Use.

SRN Members who fail to arrive on the Check-in Day of the Interchange Selection must notify SRN Operator that they will be arriving subsequent to such Check-in Day or risk losing the reservation.  In the event of a no-show, no refund of advance payment of estimated maintenance fees or taxes will be made.

IV.  Delinquency

SRN Operator reserves the right not to accept an Interchange Request from an SRN Member if the SRN Member is not current in the payment of all of the SRN Member's Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interest. An SRN Member who is delinquent in the payment of any maintenance fee assessment, tax assessment, or Club Interest mortgage or purchase money payment shall have no right to reserve a Club Week through SRN Operator or any External Exchange Company, and any previously confirmed Interchange Request may be cancelled, until the delinquency is satisfied in full.  SRN Operator may collect any delinquent maintenance fee assessments, tax assessments, or Club Interest mortgage or purchase money payments by credit card.  Furthermore, SRN Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due to the Managing Entity, as a condition to acceptance by SRN Operator of an Interchange Request, provided that any such prepaid maintenance fee and taxes for SRN Resorts are held in escrow if required by applicable law.

V.  Miscellaneous Provisions

5.1     Personal Use; Commercial Purposes.  Use of the Club Units and facilities associated with SRN is limited solely to the personal use of SRN Members, their guests, invitees, exchangers, and lessees, and for recreational use by corporations or other similar business entities owning Club Interests.  Purchase of a Club Interest or use of Club Units and facilities associated with SRN for commercial purposes, for contribution to or use in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the SRN Documents), or for any purpose other than the personal use described above is prohibited.

5.2     Rental of Club Weeks Reserved Through SRN.  Rental by an SRN Member of Club Weeks reserved through SRN is prohibited.

5.3     Amendment of the SRN Rules.  Except as provided in the Resort Documents, SRN Operator expressly reserves the right to amend the SRN Rules, with respect to SRN Resorts in all respects, in its sole discretion, from time to time, without the consent of SRN Members, for any purpose, including permitting banking of Club Weeks and creating SRN tiers.  SRN Operator shall deliver notice of any material amendment to each Primary Owner at the Primary Owner's last known address.  Notice of amendments may be made by newsletter, annual mailings, facsimile, owner website posting, or e-mail.

5.4     Special Exchange Programs.  SRN Operator reserves the right, from time to time, to enter into special exchange relationships with any entity other than an External Exchange Company pursuant to which SRN Members may have access to selected non-SRN resorts and non-SRN owners will have access to SRN accommodations.  Any special exchange programs will be governed by their own reservation rules and regulations.

5.5     Amendment of SRN Documents.  Each SRN Member's participation in SRN will be governed by the SRN Documents, as amended from time to time by SRN Operator.  SRN Operator shall have the right to amend any portions of the SRN Documents that SRN Operator in its sole discretion determines are necessary or desirable to amend from time to time, without the consent of SRN Members, except as provided in the Resort Documents.  SRN Operator shall deliver notice of any amendment in the same manner as described in Section 5.3.

9

5.6     Termination.  If the SRN Affiliation Agreement, Owner Use Agreement, or other instrument that affiliates an SRN Resort with SRN is terminated or expires in accordance with its own terms, the terminated SRN Resort will no longer be affiliated as a part of SRN.  However, on termination of such instrument, all confirmed reservations of SRN Members (from the terminating SRN Resort and from the non-terminating SRN Resorts) will be honored at both the terminating SRN Resort and at non-terminating SRN Resorts.

5.7     Severability and Conflict.  The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase, word, or other provision of the SRN Documents shall not affect the validity of the remaining portions.

5.8     Include.  The term "include" and similar terms (e.g., includes, including, included, comprises, comprising, such as, e.g., and for example), when used as part of a phrase including one or more specific items, are used by way of example and not of limitation.

SRN GUIDE R-8

Exhibit "B"

Officers and Directors of Starwood Vacation Exchange Company

Officers

| | |
|---|---|
| President, Chief Executive Officer | Sergio D. Rivera |
| Senior Vice President | Thorp S. Thomas |
| Senior Vice President, Assistant Secretary | Victoria H. Carter |
| Senior Vice President | Kerry Houghton |
| Vice President, Secretary | Angela K. Halladay |
| Vice President, Assistant Secretary | Robin L. Suarez |
| Vice President, Treasurer | Lisa Cassin |
| Vice President | Heather McGill |
| Assistant Treasurer | John Buckwalter |
| Assistant Secretary | Kristen Prohl |

Directors:

Sergio Rivera
Thorp S. Thomas
Victoria H. Carter

11

Exhibit "C"

## Chart for Starwood Residence Network Affiliation Fees

Note: This chart provides a summary of the fees that may be charged for the use of the Starwood Residence Network.  For additional information, please see the Starwood Residence Network Rules and Regulations.

### Affiliation Fees for Starwood Residence Network Members

SRN Yearly Affiliation Fee[1]                    US $149 per year per Club Interest

---

[1] For Owners of Biennial Club Interests,  the equivalent of half of the SRN Yearly Affiliation Fee shall be paid every year, not just in alternate years.