**TWENTY-FOURTH AMENDMENT**

**FRACTIONAL OFFERING PLAN**

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB**

**TWO EAST 55TH STREET**

**NEW YORK, NEW YORK 10022**

<u>Sponsor:</u>

**St. Regis Residence Club, New York Inc.**
**c/o Starwood Vacation Ownership, Inc.**
**9002 San Marco Court**
**Orlando, Florida  32819**
**(407) 903-4000**

**Dated: September 16, 2015**

{v.5}

TABLE OF CONTENTS

SECTION                                                                                          PAGE

INTRODUCTION ........................................................................................................1

1.   STATUS OF CLOSING OF CLUB INTERESTS ...............................................1

2.   PURCHASE PRICE SCHEDULE .........................................................................1

3.   CLUB BOARD ........................................................................................................1

4.   CONDOMINIUM BOARD .....................................................................................2

5.   2015 CLUB BUDGET .............................................................................................2

6.   2015 CONDOMINIUM BUDGET ..........................................................................2

7.   CLUB FINANCIAL STATEMENTS ......................................................................2

8.   CONDOMINIUM FINANCIAL STATEMENTS.....................................................2

9.   PURCHASE AND SALE AGREEMENT ...............................................................3

10.  SPECIAL RISK FACTORS ....................................................................................3

11.  PROCEDURE TO PURCHASE SECTION ............................................................3

12.  AMENDMENT TO SVEC DISCLOSURE GUIDE ...............................................4

13.  DEFINITIONS ........................................................................................................4

14.  NO MATERIAL CHANGES ..................................................................................4

15.  INCORPORATION OF OFFERING PLAN ...........................................................5


EXHIBIT

A   -   SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

B   -   2014 CLUB FINANCIAL STATEMENTS

C   -   2014 CONDOMINIUM FINANCIAL STATEMENTS

D-  -   PURCHASE AND SALE AGREEMENT

E   -   SVEC DISCLOSURE GUIDE FOR MEMBERS OF THE STARWOOD RESIDENCE
        NETWORK

# TWENTY-FOURTH AMENDMENT

## TO

# FRACTIONAL OFFERING PLAN

## INTRODUCTION

This Twenty-Fourth Amendment modifies and supplements the terms of the Fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club located at Two East 55th Street, New York, New York 10022 dated February 17, 2006 ("Offering Plan"), as amended, and should be read in conjunction with the Offering Plan, as previously amended.

The terms of this Twenty-Third Amendment are as follows:

### 1.   STATUS OF CLOSING OF CLUB INTERESTS

As of June 8, 2015, Sponsor closed title on the sale of approximately 294 Club Interests out of a total of 494 Club Interests, leaving approximately 200 Club Interests available for sale.

### 2.   PURCHASE PRICE SCHEDULE

Annexed hereto as Exhibit "A" is a "Schedule A – Purchase Prices and Related Information" which reflects the current prices for each of the Club Interests.

THE PURCHASE PRICES SET FORTH ON SCHEDULE A HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

### 3.   CLUB BOARD

The present officers and members of the Club Board are as follows:

| Name | Office | Affiliation |
|------|--------|-------------|
| Christine Georgopulo | President | Club Owner |
| Skip Kotkins | Vice-President | Club Owner |
| Clay Cockerell | Treasurer | Club Owner |
| Paulette Carter | Secretary | Sponsor |

Sponsor does not control of the Club Board.

4. **CONDOMINIUM BOARD**

The present officers and members of the Condominium Board are as follows:

| Name | Office | Affiliation |
|------|--------|-------------|
| Bill Bailey | President | Hotel |
| Marvin Schein | Vice President | Suites |
| Hermann Elger | Vice President | Hotel |
| Nicole Stutz | Treasurer | Hotel |
| Paulette Carter | Secretary | Hotel |
| Christine Georgopulo | Manager | Club |
| David Greenbaum | Manager | Retail |

The Hotel and Retail Board Members will at all times control the Condominium Board through the designation of a majority of its members.

5. **2015 CLUB BUDGET**

Annexed to the Twenty-Third Amendment as Exhibit "B", is the Operating Budget for the Club Association for the period commencing January 1, 2015 and ending December 31, 2015 which was adopted by the Club Board.

Annexed to the Twenty-Third Amendment as Exhibit "C" is a Certification of Club Budget Expert.

6. **2015 CONDOMINIUM BUDGET**

Annexed to the Twenty-Third Amendment as Exhibit "D" is the Operating Budget for the Condominium for the period commencing January 1, 2015 and ending December 31, 2015 which was adopted by the Condominium Board

Annexed to the Twenty-Third Amendment as Exhibit "E" is a Certification of Condominium Budget Expert.

7. **CLUB FINANCIAL STATEMENTS**

Annexed hereto as Exhibit "B" are the financial statements of the Club Association for the 2014 calendar year prepared by Myers, Brettholtz & Company, PA, certified public accountants.

8. **CONDOMINIUM FINANCIAL STATEMENTS**

Annexed hereto as Exhibit "C" are the financial statements of the Condominium for the 2014 calendar year certified by Myers, Brettholtz & Company, PA, certified public accountants.

### 9.     PURCHASE AND SALE AGREEMENT

The following text is being added to Section 34 of the Purchase and Sales Agreement as follows:

"Any dispute, controversy or claim between Purchaser and Seller, whether preexisting, present or future, arising from or relating to the Purchase Agreement or the Club Interest shall, at the election of either party, be arbitrated on an individual basis before JAMS, a private alternative dispute resolution provider."

Annexed hereto as Exhibit "D" is revised Purchase and Sale Agreement, which was modified to add language pertaining to Arbitration.

### 10.     SPECIAL RISK FACTORS

The following information is being added to Special Risk Factors:

The Purchase Agreement contains an arbitration provision requiring that, at the election of either party, any dispute, controversy or claim (collectively defined in the Purchase Agreement as "Claim") between Purchaser and Sponsor arising or related to the Purchase Agreement be submitted to arbitration before JAMS (www.jamsadr.org) pursuant to the "Streamlined Rules". If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction shall select the arbitrator. Purchaser may be required to bear a portion of the costs of any arbitration, including compensation of the arbitrators. (See the Section of the Plan entitled "Procedure to Purchase" and the form of Purchase Agreement set forth in Part II of the Plan for further details)

### 11.     PROCEDURE TO PURCHASE SECTION

The following information is being added to the Procedure to Purchase Section:
The Purchase Agreement contains an arbitration provision requiring that, at the election of either party, any dispute, controversy or claim (collectively defined in the Purchase Agreement as "Claim") between Purchaser and Sponsor arising or related to the Purchase Agreement be submitted to arbitration before JAMS (www.jamsadr.org) pursuant to the "Streamlined Rules". A single neutral arbitrator will be appointed and The Federal Arbitration Act ("FAA"), 9.U.S.C. § 1, et seq., shall govern the interpretation and enforcement of the arbitration. If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction shall select the arbitrator. Purchaser may be required to bear a portion of the costs of any arbitration, including compensation of the arbitrator. The prevailing party will be entitled to recover and shall be awarded all costs and reasonable attorneys' fees from the non-prevailing party and such amounts will be included in any judgment or award obtained. The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims or privilege, and issue a written decision which will be final and binding on all parties, except for any review under the FAA. The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court). Any in-person hearing will be held in the County of New York, unless otherwise agreed in writing.

The type of Claim which will be subject to arbitration shall be broadly construed to include, among other things, disputes concerning breach, termination, cancellation or default under the Purchase Agreement, including the disposition of escrowed funds. In the event a final arbitration award is rendered allowing the disposition of escrowed funds (including deposits or advance received by Sponsor), such funds shall not be released from escrow for 90 days from the issuance of the final arbitration award.

Purchaser is advised that the parties to the Purchase Agreement are giving up the right to bring a suit in court, including the right to trial by jury, concerning disputes over any Claim that is subject to the arbitration provision. The rules of some arbitration forums may impose time limits for filing a claim in arbitration and the ability of the parties to obtain documents, witness statements and other discovery may be more limited in arbitration than in court proceedings. In general, arbitration awards are final and binding and the ability to have a court reverse of modify an arbitration award is very limited. Similarly, an arbitrator is not necessarily required to explain the reasoning for their award. In addition, unlike in litigation, New York law does not authorize the filing of a notice of pendency based on ongoing arbitration proceedings.

Purchaser may reject the arbitration provision by sending Sponsor a written notice which gives Purchaser's name and Purchase Agreement number and states that Purchaser rejects the arbitration provision. The rejection notice must be sent by certified mail, return receipt requested, to St. Regis Residence Club, New York Inc. at 9002 San Marco Court, Orlando, Florida 32819; Attention Legal Department. A rejection notice must be signed by Purchaser and received by Sponsor within 30 days after the date of the Purchase Agreement. (See the form of Purchase Agreement set forth in Part II of the Plan for further details)

## 12.    AMENDMENT TO SVEC DISCLOSURE GUIDE

Annexed hereto as Exhibit "E' is a revised SVEC Disclosure Guide for Members of the Starwood Residence Network. It reflects changes resulting from the 2014 audit required under Florida law of the total number of members of, and Unit Weeks in, the Starwood Vacation Exchange Club.

## 13.    DEFINITIONS

Any term used in this Amendment not otherwise defined herein shall have the same meaning ascribed to it in the Offering Plan.

## 14.    NO MATERIAL CHANGES

Except as set forth in this Amendment, there have been no material changes of facts or circumstances affecting the Property or the offering.

15.     **INCORPORATION OF OFFERING PLAN**

The Offering Plan, as modified and supplemented by this Amendment, is incorporated herein by reference with the same effect as if set forth at length.

**SPONSOR:**

**ST. REGIS RESIDENCE CLUB, NEW YORK INC.**

EXHIBIT "A"

---

**SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION**

---

## SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

### FIFTH AND FIFTY-FIFTH RESIDENCE CLUB
Two East 55th Street
New York, New York 10022

| CLUB UNIT 1 | | | | | | PURCHASE PRICE 2 | PROJECTED ANNUAL CLUB CHARGES 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Number | Bedrooms | Bathrooms | "Condominium Declaration" Square Feet | "Usable" Square Feet | Facing | | Real Estate Taxes (a) | Other Club Expenses (b) | Total Club Charges (a)+(b) |
| 801 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 901 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 803 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 903 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1103 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 807 | One | One | 738 | 625 | 55th Street | $450,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 907 | One | One | 738 | 625 | 55th Street | $450,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 1007 | One | One | 738 | 625 | 55th Street | $500,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 808 | Studio | One | 523 | 445 | Interior | $387,000 | $1,361.59 | $11,212.92 | $12,574.50 |
| 908 | Studio | One | 523 | 445 | Interior | $387,000 | $1,361.59 | $11,212.92 | $12,574.50 |
| 809 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,361.59 | $11,212.92 | $12,574.50 |
| 909 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,361.59 | $11,212.92 | $12,574.50 |
| 815 | Two | Three | 1507 | 1290 | 55th Street | $750,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 915 | Two | Three | 1507 | 1290 | 55th Street | $750,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 818 | Two | Three | 1593 | 1395 | Interior | $750,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 918 | Two | Three | 1593 | 1395 | Interior | $750,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1018 | Two | Three | 1539 | 1349 | Interior | $750,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 821 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 921 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1021 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1121 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 822 | One | Two | 1070 | 852 | Interior | $522,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 922 | One | Two | 1070 | 852 | Interior | $522,000 | $2,526.91 | $15,218.73 | $17,745.64 |
| 835 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 935 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $3,896.03 | $19,925.12 | $23,821.14 |

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

## FIFTH AND FIFTY-FIFTH RESIDENCE CLUB
Two East 55th Street
New York, New York 10022

| CLUB UNIT 1 | | | | | | PURCHASE PRICE 2 | PROJECTED ANNUAL CLUB CHARGES 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Number | Bedrooms | Bathrooms | "Condominium Declaration" Square Feet | "Usable" Square Feet | Facing | | Real Estate Taxes (a) | Other Club Expenses (b) | Total Club Charges (a)+(b) |
| 836 | Two | Three | 1455 | 1260 | Interior | $700,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 936 | Two | Three | 1455 | 1260 | Interior | $700,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1035 | Two | Three | 1458 | 1262 | 55th Street | $800,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1135 | Two | Three | 1458 | 1262 | Interior | $800,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1036 | Two | Three | 1455 | 1259 | 55th Street | $700,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| 1136 | Two | Three | 1438 | 1245 | Interior | $700,000 | $3,896.03 | $19,925.12 | $23,821.14 |
| TOTALS | | | | | | $248,904,000 | $1,212,663 | $6,598,621 | $7,811,285 |

See Notes to Schedule A

Notes to Schedule A

1.    The Club Units on Floors 8, 9, 10 and 11 contain studios; one-bedrooms; and two-bedroom duplexes. The Club Interest in each Club Unit is equal to a fraction, the numerator of which is four (4) and the denominator of which is fifty-two (52).

Purchasers should refer to the Floor Plans set forth in Part II of the Offering plan for an approximation of the dimensions and layouts of the Club Units. The "Condominium Declaration" square footage represents the square foot area of the Club Unit measured horizontally on each floor from the interior side of the glazing or the exterior walls at the Building line and/or the Property line to the midpoint of the interior walls and partitions separating one Club Unit from another Unit, or the public side of the interior walls separating a Club Unit from public corridors, stairs, elevators and other mechanical equipment spaces or any Common Elements. Column and mechanical pipes (whether along the perimeter or with the Club Unit) are not deducted from the square foot area of the Club Unit. The "useable" square foot area of a Club Unit represents that portion of the Club Unit to which the Club Owner has access (i.e., interior painted surfaced to interior painted surface, including kitchen counters, bathtubs, etc.). The square foot area and dimensions of the Club Units are approximate and may vary due to field conditions. No such variation will affect a Purchaser's obligations under the Purchase Agreement or the Offering Plan unless the square foot area of the Club Unit is diminished by more than five percent (5%) (excluding interior partitions), therefore affording Purchaser a fifteen (15) day right to rescind.

The number of rooms in each Club Unit has been computed by Sponsor in accordance with industry standard as follows:

| Type of Club Unit | Total Rooms | Type of Rooms |
|---|---|---|
| Studio | 2 | 1 bedroom, 1 bathroom |
| One bedroom | 3 or 4 | 1 or 2 bedrooms, 1 bathroom, 1 living room |
| Two bedroom | 5 | 2 bedrooms, 2 bathrooms, 1 living room |
| Two bedroom duplex | 5 or 6 | 2 bedrooms, 2 or 3 bathrooms, 1 living room |

2.    THE PURCHASE PRICES AND OTHER TERMS OF SALE OF CLUB INTERESTS MAY BE NEGOTIATED BY SPONSOR AND, THEREFORE, MAY BE CHANGED. ACCORDINGLY, PURCHASERS MAY PAY DIFFERENT PURCHASE PRICES FOR SIMILAR CLUB INTERESTS. The effect of this, as well as the right of Sponsor to change purchase prices, is more particularly discussed in the Section of the Offering Plan entitled "Changes in Prices and Facilities." In addition to the payment of the purchase price, each Purchaser will be responsible for the payment of certain closing costs and expenses at the time of Closing, as explained in the Section of the Offering Plan entitled "Closing Costs". If Purchaser obtains a mortgage loan from Sponsor or other lender, Purchaser will be responsible for the payment of additional closing costs and expenses relating to such loan. There may be an apportionment of certain charges relating to the

Club Interest at the time of the Closing of Title.  THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

3.  The estimated Club Charges contained in this column are for the period from January 1, 2015 to December 31, 2015 based on the "Schedule B – Club Budget" prepared by Sponsor in consultation with the Club Budget Expert. Club Charges include Real Estate Taxes assessed against the Club Units and other Club Expenses. The Club Association reserves the right to bill Club Members for Club Charges more often than once a year.

The estimated annual Real Estate Taxes of $1,212,663 for the 2015 budget calendar year for the Club Units are based upon tax assessments published by the City of New York, that: (a) the approximate allocated assessed taxable value of the Club Units during the second half of the 2014/2015 tax year is $11,515,181 in the aggregate and during the first half of the 2015/2016 tax year is estimated to be $11,284,877 in the aggregate for a total 2014 assessed value of $25,589,298 (rounded); and (b) the effective tax rate in effect for the 2014/2015 tax year is $10.684 per $100 of assessed valuation and the tax rate in effect for the 2015/2016 tax year is estimated to be $10.897 per $100 of assessed valuation with respect to the Club Units.  While the legal responsibility for Real Estate Taxes lies with each Club Member, the Club Association will collect Real Estate Taxes from each Club Member (which are included in the Club Charges) and remit the same on behalf of each Club Member to the taxing authorities.  In addition to these estimated Club Charges, each Owner will be responsible for mortgage payments under a loan, if any, obtained to finance the purchase of the Club Interest.

EXHIBIT "B"

## 2014 CLUB FINANCIAL STATEMENTS

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.**
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEAR ENDED DECEMBER 31, 2014
(WITH COMPARATIVE TOTALS FOR THE YEAR
ENDED DECEMBER 31, 2013)



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS
OFFICES IN FORT MYERS AND NAPLES
12671 Whitehall Drive, Fort Myers, Florida 33907-3626        999 Vanderbilt Beach Road, Suite 200, Naples, Florida 34108
239.939.5775 · Fax: 239.939.3032 · mbcopa@mbcopa.com        239.919.5086 · Fax: 239.790.1701 · mbcopa@mbcopa.com
THE EXCEPTION TO THE RULE

# TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ................................................................................................... 2-3

FINANCIAL STATEMENTS

    Balance Sheet ............................................................................................................................4

    Statement of Revenues, Expenses and Changes in Fund Balances ...........................................5

    Statement of Cash Flows ........................................................................................................ 6-7

    Notes to Financial Statements ............................................................................................... 8-12

SUPPLEMENTARY INFORMATION

    Supplementary Information on Future Major Repairs and Replacements .................................14

    Schedule of Operating Fund Revenues and Expenses - Budget to Actual ........................... 15-16



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

## INDEPENDENT AUDITOR'S REPORT

To the Board of Managers of
Fifth and Fifty-Fifth Residence Club Association, Inc.

We have audited the accompanying financial statements of Fifth and Fifty-Fifth Residence Club Association, Inc., which comprise the balance sheet as of December 31, 2014, and the related statements of revenues, expenses and changes in fund balances and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Residence Club Association, Inc. as of December 31, 2014, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

To the Board of Managers of
Fifth and Fifty-Fifth Residence Club Association, Inc.

**Report on Summarized Comparative Information**

We have previously audited the Fifth and Fifty-Fifth Residence Club Association, Inc.'s 2013 financial statements, and we expressed an unmodified opinion on those financial statements in our report dated March 25, 2014. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2013, is consistent, in all material respects, with the audited financial statements from which it has been derived.

**Disclaimer of Opinion on Required Supplementary Information**

Accounting principles generally accepted in the United States of America require that the supplementary information on future major repairs and replacements on page 14 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

**Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The schedule of operating fund revenues and expenses - budget to actual, which is the responsibility of the Association's management, is presented for purposes of additional analysis and is not a required part of the financial statements. Such information, except for the portion marked "unaudited," was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. That information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole. The information marked "unaudited" has not been subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

*Myers, Brettholz & Company, PA*

MYERS, BRETTHOLTZ & COMPANY, PA
Fort Myers, Florida
April 25, 2015

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
BALANCE SHEET
DECEMBER 31, 2014
(With comparative totals for December 31, 2013)

| | FUNDS | | 2014 | 2013 |
| | Operating | Replacement | Total | Total |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ 4,232,247 | $ 867,620 | $ 5,099,867 | $ 8,915,192 |
| Certificates of deposit | - | 1,509,000 | 1,509,000 | 491,000 |
| Accounts receivable - members, net | 33,524 | - | 33,524 | 81,780 |
| Interest receivable | - | 2,910 | 2,910 | 2,816 |
| Accounts receivable - other | 163,881 | - | 163,881 | - |
| Due from Manager | 150,900 | - | 150,900 | - |
| Prepaid expenses | 652,916 | - | 652,916 | 622,146 |
| Due from funds | - | 3 | 3 | - |
| Total assets | $ 5,233,468 | $ 2,379,533 | $ 7,613,001 | $10,112,934 |
| **LIABILITIES AND FUND BALANCES** | | | | |
| **LIABILITIES** | | | | |
| Accrued expenses | $ 227,603 | $ - | $ 227,603 | $ 515,124 |
| Income taxes payable | 25 | - | 25 | 25 |
| Due to Manager | - | - | - | 18,941 |
| Due to Condominium | - | - | - | 612,814 |
| Assessments received in advance | 1,726,137 | - | 1,726,137 | 2,750,186 |
| Deferred refurbishment fees | 399,857 | - | 399,857 | 2,729,619 |
| Due to funds | 3 | - | 3 | - |
| Total liabilities | 2,353,625 | - | 2,353,625 | 6,626,709 |
| **FUND BALANCES** | | | | |
| Undesignated | 1,879,843 | 2,379,533 | 4,259,376 | 2,486,225 |
| Board designated | 1,000,000 | - | 1,000,000 | 1,000,000 |
| Total fund balances | 2,879,843 | 2,379,533 | 5,259,376 | 3,486,225 |
| Total liabilities and fund balances | $ 5,233,468 | $ 2,379,533 | $ 7,613,001 | $10,112,934 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
4

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF REVENUES, EXPENSES AND CHANGES IN FUND BALANCES
FOR THE YEAR ENDED DECEMBER 31, 2014
(With comparative totals for the year ended December 31, 2013)

| | FUNDS | | 2014 | 2013 |
| | Operating | Replacement | Total | Total |
| | | | | *(Reclassified)* |
|---|---|---|---|---|
| **REVENUES** | | | | |
| Maintenance fees | $ 7,196,292 | $ 740,424 | $ 7,936,716 | $ 7,949,147 |
| Refurbishment fees | 2,329,762 | - | 2,329,762 | 6,966,720 |
| Interest and dividends | 16,698 | 9,230 | 25,928 | 17,997 |
| Late fees and interest | 18,052 | - | 18,052 | 30,582 |
| Other | 151,447 | - | 151,447 | - |
| Total revenues | 9,712,251 | 749,654 | 10,461,905 | 14,964,446 |
| **EXPENSES** | | | | |
| Housekeeping and rooms | 1,318,764 | - | 1,318,764 | 1,259,617 |
| Administrative and general | 546,335 | - | 546,335 | 934,561 |
| Management fees | 519,225 | - | 519,225 | 520,032 |
| Property operations and maintenance | 12,710 | - | 12,710 | 13,866 |
| Real estate taxes | 1,212,046 | - | 1,212,046 | 1,355,330 |
| Income taxes | 25 | - | 25 | 25 |
| Insurance | 21,151 | - | 21,151 | 15,475 |
| Condominium fees | 2,911,248 | - | 2,911,248 | 2,771,580 |
| Refurbishment project | 2,329,762 | - | 2,329,762 | 6,966,720 |
| Replacement | - | - | - | 2,668,409 |
| Total expenses | 8,871,266 | - | 8,871,266 | 16,505,615 |
| Excess (deficiency) of revenues over expenses | 840,985 | 749,654 | 1,590,639 | (1,541,169) |
| FUND BALANCES - January 1, | 2,656,346 | 829,879 | 3,486,225 | 5,027,394 |
| INTERFUND TRANSFER | (800,000) | 800,000 | - | - |
| SURPLUS DISTRIBUTION | 182,512 | - | 182,512 | - |
| FUND BALANCES - December 31, | $ 2,879,843 | $ 2,379,533 | $ 5,259,376 | $ 3,486,225 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2014
(With comparative totals for the year ended December 31, 2013)

| | FUNDS | | 2014 | 2013 |
|---|---|---|---|---|
| | Operating | Replacement | Total | Total |
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | | | |
| Excess (deficiency) of revenues over expenses | $ 840,985 | $ 749,654 | $ 1,590,639 | $ (1,541,169) |
| Provision for uncollectible accounts | - | - | - | 6,290 |
| Recovery of bad debt | (182,777) | - | (182,777) | - |
| Changes in: | | | | |
| Accounts receivable - members | 231,033 | - | 231,033 | 185,873 |
| Interest receivable | - | (94) | (94) | 3,331 |
| Accounts receivable - other | (163,881) | - | (163,881) | - |
| Due from Manager | (150,900) | - | (150,900) | 15,123 |
| Due from Condominium | - | - | - | 163,173 |
| Prepaid expenses | (30,770) | - | (30,770) | 129,775 |
| Accrued expenses | (287,521) | - | (287,521) | 429,742 |
| Due to Manager | (18,941) | - | (18,941) | 18,941 |
| Due to Condominium | (612,814) | - | (612,814) | 612,814 |
| Assessments received in advance | (1,024,049) | - | (1,024,049) | 316,549 |
| Deferred refurbishment fees | (2,329,762) | - | (2,329,762) | (706,765) |
| Net cash (used) provided by operating activities | (3,729,397) | 749,560 | (2,979,837) | (366,323) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | | | |
| Purchases of certificates of deposit | (1,743,000) | (1,509,000) | (3,252,000) | - |
| Proceeds from redemption of certificates of deposit | 1,743,000 | 491,000 | 2,234,000 | 883,000 |
| Net cash (used) provided by investing activities | - | (1,018,000) | (1,018,000) | 883,000 |

|  | FUNDS | | 2014 | 2013 |
| --- | --- | --- | --- | --- |
|  | Operating | Replacement | Total | Total |
| CASH FLOWS FROM FINANCING ACTIVITIES | | | | |
| Interfund reimbursement | 3 | (3) | - | - |
| Interfund transfer | (800,000) | 800,000 | - | - |
| Surplus distribution | 182,512 | - | 182,512 | - |
| Net cash (used) provided by financing activities | (617,485) | 799,997 | 182,512 | - |
| Net (decrease) increase in cash | (4,346,882) | 531,557 | (3,815,325) | 516,677 |
| CASH AND CASH EQUIVALENTS- January 1, | 8,579,129 | 336,063 | 8,915,192 | 8,398,515 |
| CASH AND CASH EQUIVALENTS- December 31, | $ 4,232,247 | $ 867,620 | $ 5,099,867 | $ 8,915,192 |
| SUPPLEMENTAL INFORMATION | | | | |
| Income taxes paid | $ 25 | $ - | $ 25 | $ 25 |
| Interest paid | $ - | $ - | $ - | $ - |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

## NOTE 1 - THE ASSOCIATION

Fifth and Fifty-Fifth Residence Club Association, Inc. (the "Association"), was formed on June 26, 2006 to promote and advance the health and welfare of the fractional interest owners of Fifth and Fifty-Fifth Residence Club (the "Club"). The Club consists of 372 fractional interests located on the 8th, 9th, 10th and 11th floors of a mixed-use project which includes lodging and commercial enterprise within the control of the commercial unit owners. The owners of all fractional interests in the Club are the only members.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to a 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Project (the "Developer"). Until all fractional interests have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the fractional interests owned by the Developer.

## NOTE 2 - DATE OF MANAGEMENT'S REVIEW

In preparing the financial statements, the Association has evaluated events and transactions for potential recognition or disclosure through April 25, 2015, the date that the financial statements were available to be issued.

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Fund Accounting

The Association prepares its financial statements on the accrual basis and presents them as separate funds based on its different funding policies for operations and major repairs and replacements.

The operating fund reflects the operating portion of the annual assessments billed to the fractional interest owners to meet the various day-to-day expenditures incurred in the administration and operation of the Club. The Board of Managers (the "Board") designated a portion of the operating fund balance to provide for the real estate tax payment.

The replacement fund is composed of the portion of the annual assessments designated in the budget to fund future major repairs and replacements, as further described in Note 9.

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when they are 11 days past due. The Association accounts for potential losses in accounts receivable utilizing the allowance method. The Association maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. Provision for uncollectible accounts expense for the years ended December 31, 2014 and 2013, was $190,691 and $589,354, respectively, and is included in administrative and general expenses.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Common Property

The Association is responsible to preserve and maintain the common property of the Club. Ownership of the commonly owned assets is vested directly or indirectly in the fractional interest owners, those assets are not titled in the Association's name and disposition of those assets by the Board is restricted. As a result, commonly owned assets are not presented in the Association's financial statements. Common property not capitalized consists of unit furnishings.

Income Taxes

Management has analyzed its various federal, state and city filing positions and believes that the Association's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The Association's federal and state income tax returns remain subject to examination by the Internal Revenue Service and the State of New York, respectively, for three years from the date of filing.

The Association files its income tax return as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Association is not taxed on uniform assessments to members and other income received from Association members solely as a function of their membership in the Association. The Association is taxed at a rate of 32% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the nonexempt function income; therefore, no deferred tax provision has been recorded. The Association incurred an income tax liability of $25 for the years ended December 31, 2014 and 2013.

Fair Value of Financial Instruments

Substantially all of the Association's assets and liabilities, excluding prepaid expenses, assessments received in advance and deferred refurbishment fees, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument.

Revenue Recognition

Maintenance fees revenue is recognized monthly in the amount of the membership assessment allocation specified for the current period operations, based on the annual budget adopted by the Board. Each fractional interest owner is an Association member, and a proportionate share of the maintenance fees is assessed for each fractional interest, based on unit type.

Late fees and interest revenue is recognized when collected.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Cash Flows

      For purposes of the statement of cash flows, the Association considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents, excluding certificates of deposit.

      The Association made cash payments for income taxes of $25, during the years ended December 31, 2014 and 2013. The Association made no cash payments for interest during the years ended December 31, 2014 or 2013.

Estimates

      The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

Reclassification

      Certain accounts have been reclassified in the 2013 statement of revenues, expenses and changes in fund balances for comparative purposes to conform with the presentation in the current-year financial statements. The result of the reclassification had no effect on fund balances.

**NOTE 4 - CONCENTRATION OF CREDIT RISK**

      The Association maintains cash balances and certificates of deposit at several financial institutions. Accounts and certificates of deposit at each institution are insured by the Federal Deposit Insurance Corporation ("FDIC"). As of December 31, 2014 and 2013, the uninsured balances were $299,612 and $1,135,631, respectively, based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $4,407,810 and $7,270,817, as of December 31, 2014 and 2013, respectively, are not insured by the FDIC.

      As of December 31, 2014 and 2013, the Developer owned 92 fractional interests, or approximately 25% of the available interests.

**NOTE 5 - ACCOUNTS RECEIVABLE - MEMBERS**

      Accounts receivable - members consisted of the following as of December 31,:

| | 2014 | 2013 |
|---|---|---|
| Maintenance fee assessments | $ 540,578 | $ 667,405 |
| Refurbishment fee assessments | 164,944 | 269,151 |
| Less: allowance for uncollectible accounts | (671,998) | (854,776) |
| | $ 33,524 | $ 81,780 |

Read Independent Auditor's Report.
10

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 6 - RELATED PARTY TRANSACTIONS**

During the years ended December 31, 2014 and 2013, the Developer paid maintenance fees as any other fractional interest owner. The amount of maintenance fees assessed to the Developer during the years ended December 31, 2014 and 2013, were $1,811,471 and $1,633,941, respectively. During the year ended December 31, 2013, the Developer paid refurbishment fees of $1,445,974.

St. Regis New York Management, Inc. (the "Manager") is an affiliate of the Developer. A Board member is also an employee of the Manager or its affiliates. Substantially all operating expenses have been allocated to the Association from the Manager. As of December 31, 2014, due from Manager consisted of reimbursements due to the Association. As of December 31, 2013, due to Manager consisted of operating expenses of the Association paid by the Manager.

The Association is part of the high-rise estate project consisting of mixed-use components known as the Fifth and Fifty-Fifth Condominium (the "Condominium"). The Condominium allocates and assesses charges to the Association for the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the common elements, the provision of services to the mixed-use components and the business affairs of the Condominium. For the years ended December 31, 2014 and 2013, the condominium fees were $2,911,248 and $2,771,580, respectively. The charges are considered to be a common expense of the Association. During the year ended December 31, 2013, the Association was assessed $612,814 by the Condominium for a refurbishment project. As of December 31, 2013, $612,814 was due to the Condominium for refurbishment fees.

**NOTE 7 - ASSESSMENTS RECEIVED IN ADVANCE**

Assessments received in advance in the amount of $1,726,137 and $2,750,186, consisted of 2015 and 2014 maintenance and refurbishment fees received by the Association prior to January 1, 2015 and 2014, respectively.

**NOTE 8 - DEFERRED REFURBISHMENT FEES**

The Association billed owners for refurbishment fees totaling $9,696,498. The refurbishment fees are recognized as the related expenses are incurred. Unexpended amounts are recorded as deferred revenue on the balance sheet until they are either expended for the purpose of the original assessment, returned to owners or used for another purpose determined and approved by the Board. During the years ended December 31, 2014 and 2013, there were expenditures of $2,329,762 and $6,996,720, respectively, related to the refurbishment project.

**NOTE 9 - REPLACEMENT FUND**

New York statutes require reasonable sums to be periodically set aside for the funding of reserves. Reserves are funded per the Board approved budget. If additional funds are needed, the Association has the right, subject to the Board's approval, to increase regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 9 - REPLACEMENT FUND (Continued)**

The Association's replacement fund is utilized to accumulate funds for future major repairs and replacements, based on the budgeted portion of the maintenance fee assessment charged to each fractional interest owner, and specifically designated for the fund in the annual budget. Deductions from the fund are recorded as costs, as incurred, which are determined by the Board to meet the objective for which the fund was established.

For the years ended December 31, 2014 and 2013, additions to the fund include $9,230 and $11,478 of interest and dividends, respectively. The Association's policy is to retain the investment income earned on such funds in the replacement fund. During the year ended December 31, 2014, a transfer of $800,000 was made from the operating fund to the replacement fund, based on Board approval. During the year ended December 31, 2013, $2,668,409 of replacement reserves was used for the refurbishment project, based on Board approval.

During 2014 and 2013, the Association funded for major repairs and replacements over the estimated useful lives of the components, based on management's estimates of current replacement costs.

The 2015 proposed budgeted funding is $1,019,421, as shown in the unaudited supplementary information. The components' actual replacement costs, useful lives, and investment income may vary from the estimated amounts and the variation may be material.

**NOTE 10 - COMMITMENTS**

The Association has a three-year management agreement ending August 28, 2017, with the Manager. The Manager provides on-site management and maintenance services, and off-site administrative and accounting services. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term. The management agreement provides that the Manager may subcontract its rights, duties and obligations.

The Association has a banking agreement ending April 24, 2015 with the Manager and SVO Management, Inc. ("SVOM"), who has guaranteed or indemnified the Association's liability for overdrafts with banks or other entities providing financial services to the Association. The agreement give SVOM the right to reimburse itself for the amount of any overdrafts, if any, incurred on the Association's behalf. The agreement automatically renews for successive three-year periods unless terminated according to the terms of the agreement.

**NOTE 11 - ECONOMIC DEPENDENCY**

The Association derived approximately 23% and 22% of its revenue from the Developer for the years ended December 31, 2014 and 2013, respectively.

SUPPLEMENTARY INFORMATION

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SUPPLEMENTARY INFORMATION ON
FUTURE MAJOR REPAIRS AND REPLACEMENTS
DECEMBER 31, 2014
*(Unaudited)*

The following table represents a study by management, which is based on estimates provided by the Manager during 2014, based on consultation with various experts regarding the estimated remaining lives of the components and their current replacement costs. The following table is based on the study and presents significant information about the components of the common property. Amounts are based on normal operations and without the effect of potential catastrophic occurrences.

| Components | Estimated Useful Lives | Estimated Remaining Useful Lives | Estimated Current Replacement Costs | 2015 Proposed Budgeted Funding |
|---|---|---|---|---|
| Building paint | 1 year | 1 year | $ 41,000 | $ - |
| Unit furnishings, equipment, and other capital expenditures | 2-32 years | 2-22 years | 16,448,349 | 1,019,421 |
| | | | $ 16,489,349 | $ 1,019,421 |

Estimated current replacement costs are based on the assumption of a variable interest rate earned on investments that exceeds an assumed rate of inflation of 2.4%.

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SCHEDULE OF OPERATING FUND REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2014

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REVENUES** | | | |
| Maintenance fees | $ 7,196,297 | $ 7,196,292 | $ (5) |
| Refurbishment fees | - | 2,329,762 | 2,329,762 |
| Interest and dividends | 4,002 | 16,698 | 12,696 |
| Late fees and interest | 25,737 | 18,052 | (7,685) |
| Other | - | 151,447 | 151,447 |
| Total operating fund revenues | 7,226,036 | 9,712,251 | 2,486,215 |
| **EXPENSES** | | | |
| **HOUSEKEEPING AND ROOMS** | | | |
| Housekeeping-variable | 715,785 | 667,288 | 48,497 |
| Cleaning supplies | 472,920 | 440,812 | 32,108 |
| Owner reservations | 210,664 | 210,664 | - |
| Total housekeeping and rooms | 1,399,369 | 1,318,764 | 80,605 |
| **ADMINISTRATIVE AND GENERAL** | | | |
| Administrative wages | 120,354 | 103,054 | 17,300 |
| Administrative other | 50,000 | 52,953 | (2,953) |
| SVO management | 6,660 | 6,660 | - |
| Association management | 59,652 | 59,652 | - |
| Provision for uncollectible accounts | 226,734 | 190,690 | 36,044 |
| Audit | 7,500 | 7,500 | - |
| Legal and professional | 260,833 | 11,087 | 249,746 |
| Annual meeting | 9,000 | 11,578 | (2,578) |
| Bank fees | 1,544 | 2,434 | (890) |
| Credit card fees | 82,022 | 83,292 | (1,270) |
| Postage and printing | 1,901 | 1,842 | 59 |
| Facilities management | 15,593 | 15,593 | - |
| Total administrative and general | 841,793 | 546,335 | 295,458 |
| **MANAGEMENT FEES** | 519,225 | 519,225 | - |
| **PROPERTY OPERATIONS AND MAINTENANCE** | 13,885 | 12,710 | 1,175 |
| **REAL ESTATE TAXES** | 1,373,628 | 1,212,046 | 161,582 |
| **INCOME TAXES** | 300 | 25 | 275 |
| **INSURANCE** | 16,593 | 21,151 | (4,558) |

| | Budget | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| | *(Unaudited)* | | |
| CONDOMINIUM FEES | 2,911,243 | 2,911,248 | (5) |
| REFURBISHMENT PROJECT | - | 2,329,762 | (2,329,762) |
| CONTINGENCY | 150,000 | - | 150,000 |
| Total operating fund expenses | 7,226,036 | 8,871,266 | (1,645,230) |
| Excess of revenues over expenses | $          - | $    840,985 | $    840,985 |

EXHIBIT "C"

2014 CONDOMINIUM FINANCIAL STATEMENTS

**FIFTH AND FIFTY-FIFTH CONDOMINIUM**
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2014 AND 2013



Myers, Brettholtz & Company, PA

CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS
OFFICES IN FORT MYERS AND NAPLES
12671 Whitehall Drive, Fort Myers, Florida 33907-3626       999 Vanderbilt Beach Road, Suite 200, Naples, Florida 34108
239.939.5775 · Fax: 239.939.3032 · mbcopa@mbcopa.com       239.919.5086 · Fax: 239.790.1701 · mbcopa@mbcopa.com
THE EXCEPTION TO THE RULE

# TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ................................................................................................................ 2-3

FINANCIAL STATEMENTS

      Balance Sheets ................................................................................................................................4

      Statements of Revenues, Expenses and Changes in Fund Balance ...........................................................5

      Statements of Cash Flows ............................................................................................................6

      Notes to Financial Statements ................................................................................................ 7-11

SUPPLEMENTARY INFORMATION

      Schedule of Revenues and Expenses - Budget to Actual ................................................................. 13-15



Myers, Brettholtz & Company, PA
CERTIFIED PUBLIC ACCOUNTANTS & BUSINESS CONSULTANTS

## INDEPENDENT AUDITOR'S REPORT

To the Board of Managers of
Fifth and Fifty-Fifth Condominium

We have audited the accompanying financial statements of Fifth and Fifty-Fifth Condominium, which comprise the balance sheets as of December 31, 2014 and 2013, and the related statements of revenues, expenses and changes in fund balance and cash flows for the years then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Condominium as of December 31, 2014 and 2013, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

OFFICES IN FORT MYERS AND NAPLES
12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 · Fax: 239.939.3032 · mbcopa@mbcopa.com
**THE EXCEPTION TO THE RULE**

999 Vanderbilt Beach Road, Suite 200, Naples, Florida 34108
239.919.5086 · Fax: 239.790.1701 · mbcopa@mbcopa.com

To the Board of Managers of
Fifth and Fifty-Fifth Condominium

**Other Matter**

The supplementary information on future major repairs and replacements that accounting principles generally accepted in the United States of America require to be presented to supplement the basic financial statements is not presented because a replacement fund has not been established, as further described in Note 8. The supplementary information, although not a part of the basic financial statements, is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. Our opinion on the basic financial statements is not affected by the supplementary information on future major repairs and replacements that has not been presented.

**Report on Supplementary Information**

Our audit was conducted for the purpose of forming an opinion on the financial statements as a whole. The schedule of revenues and expenses - budget to actual, which is the responsibility of the Association's management, is presented for purposes of additional analysis and is not a required part of the financial statements. Such information, except for the portion marked "unaudited," was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. That information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, the information is fairly stated in all material respects in relation to the financial statements as a whole. The information marked "unaudited" has not been subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

*Myers, Brettholz & Company, PA*

MYERS, BRETTHOLTZ & COMPANY, PA
Fort Myers, Florida
April 22, 2015

OFFICES IN FORT MYERS AND NAPLES
12671 Whitehall Drive, Fort Myers, Florida 33907-3626
239.939.5775 · Fax: 239.939.3032 · mbcopa@mbcopa.com
THE EXCEPTION TO THE RULE

999 Vanderbilt Beach Road, Suite 200, Naples, Florida 34108
239.919.5086 · Fax: 239.790.1701 · mbcopa@mbcopa.com

FIFTH AND FIFTY-FIFTH CONDOMINIUM
BALANCE SHEETS
DECEMBER 31,

|  | | 2014 | | 2013 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 1,467,573 | $ | 3,130,838 |
| Accounts receivable - members, net | | - | | 13,453 |
| Accounts receivable - other | | 24,050 | | - |
| Due from Manager | | - | | 249,579 |
| Due from Club | | - | | 612,814 |
| Prepaid expenses | | 10,593 | | 5,879 |
| Total assets | $ | 1,502,216 | $ | 4,012,563 |
| **LIABILITIES AND FUND BALANCE** | | | | |
| **LIABILITIES** | | | | |
| Accounts payable and accrued expenses | $ | 166,827 | $ | 17,982 |
| Income taxes payable | | 25 | | 25 |
| Due to Manager | | 380,105 | | - |
| Deferred refurbishment fees | | 273,221 | | 829,246 |
| Total liabilities | | 820,178 | | 847,253 |
| **FUND BALANCE** | | 682,038 | | 3,165,310 |
| Total liabilities and fund balance | $ | 1,502,216 | $ | 4,012,563 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
4

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN FUND BALANCE
FOR THE YEARS ENDED DECEMBER 31,

|  | 2014 | 2013 |
|---|---|---|
| REVENUES |  |  |
| Common charges | $  21,262,976 | $  20,287,139 |
| Refurbishment fees | 558,044 | - |
| Interest | 3,218 | 1,185 |
| Late fees and interest | 189 | 557 |
| Other | 21,712 | - |
| Total revenues | 21,846,139 | 20,288,881 |
| EXPENSES |  |  |
| Operations | 11,617,068 | 9,590,547 |
| Administrative and general | 2,434,782 | 2,119,404 |
| Repairs and maintenance | 4,642,633 | 3,673,220 |
| Energy department | 3,075,533 | 2,699,463 |
| Guest laundry department | 583,085 | 566,697 |
| Administration | 5,416 | - |
| Board and membership meetings | 3,014 | 5,420 |
| Provision for uncollectible accounts | 28,635 | 50,435 |
| Legal and audit | 12,392 | 13,314 |
| Income taxes | 25 | 25 |
| Insurance | 578,264 | 570,444 |
| Management fees | 123,804 | 120,955 |
| Total expenses | 23,104,651 | 19,409,924 |
| (Deficiency) excess of revenues over expenses | (1,258,512) | 878,957 |
| FUND BALANCE - January 1, | 3,165,310 | 2,286,353 |
| SURPLUS DISTRIBUTION | (1,224,760) | - |
| FUND BALANCE - December 31, | $        682,038 | $    3,165,310 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.

5

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31,

|  | 2014 | 2013 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES |  |  |
| (Deficiency) excess of revenues over expenses | $ (1,258,512) | $ 878,957 |
| Provision for uncollectible accounts | 28,635 | 50,435 |
| Changes in: |  |  |
| Accounts receivable - members | (15,182) | (42,108) |
| Accounts receivable - other | (24,050) | - |
| Due from Manager | 249,579 | (249,579) |
| Due from Club | 612,814 | (612,814) |
| Prepaid expenses | (4,714) | 384 |
| Accounts payable and accrued expenses | 148,845 | (29,672) |
| Due to Manager | 380,105 | (736,028) |
| Due to Club | - | (163,173) |
| Deferred refurbishment fees | (556,025) | 829,246 |
| Net cash used by operating activities | (438,505) | (74,352) |
| CASH FLOWS FROM FINANCING ACTIVITIES |  |  |
| Surplus distribution | (1,224,760) | - |
| Net decrease in cash | (1,663,265) | (74,352) |
| CASH AND CASH EQUIVALENTS - January 1, | 3,130,838 | 3,205,190 |
| CASH AND CASH EQUIVALENTS - December 31, | $ 1,467,573 | $ 3,130,838 |

| SUPPLEMENTAL INFORMATION |  |  |
|---|---|---|
| Income taxes paid | $ 25 | $ 25 |
| Interest paid | $ - | $ - |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.

6

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

## NOTE 1 - THE CONDOMINIUM

Fifth and Fifty-Fifth Condominium (the "Condominium"), was formed on June 13, 2006, to be responsible for the management of a high-rise estate project (the "Project") consisting of distinct mixed-use components located in New York, New York.

The Project consists of: (1) 15 suite units, located on the 10th and 11th floors of the building, (2) 31 club units, located on the 8th, 9th, 10th and 11th floors of the building, and (3) two commercial units, one of which (the "Hotel unit") is located on portions of each floor (other than the 8th, 9th, 10th, and 11th floors) of the building and the "Retail unit" which is located on portions of the 1st and mezzanine floors of the building. The owners of all units in the Condominium are the only members.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to a 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Project (the "Developer"). Until all units have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the units owned by the Developer.

## NOTE 2 - DATE OF MANAGEMENT'S REVIEW

In preparing the financial statements, the Condominium has evaluated events and transactions for potential recognition or disclosure through April 22, 2015, the date that the financial statements were available to be issued.

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

General Accounting

The Condominium prepares its financial statements on the accrual basis of accounting, in accordance with generally accepted accounting principles. Under the accrual basis of accounting, revenues are recognized when earned and expenses are recognized when incurred.

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when they are 11 days past due. The Condominium accounts for potential losses in accounts receivable utilizing the allowance method. The Condominium maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. Provision for uncollectible accounts for the years ended December 31, 2014 and 2013 was $28,635 and $50,435, respectively.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Common Property

The Condominium is responsible to preserve and maintain the common property of the Project. Ownership of the commonly owned assets is vested directly or indirectly in the unit owners, those assets are not titled in the Condominium's name and disposition of those assets by the Board of Managers (the "Board") is restricted. As a result, commonly owned assets are not presented in the Condominium's financial statements.

The common elements of the Condominium (the "Common Elements") consist of the entire property including the land and all parts of the building and improvements thereon other than the units. The Common Elements are classified as General Common Elements and Hotel Limited Common Elements. The Common Elements do not include any of the Development Rights, all of which are assigned and reserved to and shall inure to the benefit of the Hotel Unit and the Hotel Unit Owner.

The Hotel Unit Owner shall, at least annually, prepare a budget in connection with the operation, care, upkeep and maintenance of the Hotel Limited Common Elements and shall periodically invoice the Condominium for such expenses incurred or to be incurred. Each unit owner shall pay to the Condominium its allocated share of the allocable hotel expenses. Such amounts payable to the Condominium shall be deemed to be included in General Common Charges, shall be collected by the Condominium and the Condominium shall have, any and all rights and remedies for the collection of such charges.

The declaration grants various easements to the Hotel Unit Owner for such items as alteration and reconfiguring of the lobby, entrance, and other public areas of the building; the right to maintain and operate a platform and other facilities for the purpose of operating communication equipment; and the right to apply for and/or grant with respect to the façade of the property a further historic preservation easement or similar right. In addition, the hotel unit owner grants to the members of the Condominium that for as long as any portion of the space specified as health club is made available to hotel guests as a fitness facility, the members of the Condominium shall have a right to access and use the health club; and agrees to provide on the same basis that such services are provided and made available to hotel guests: hotel concierge service, lobby bellmen and doormen; room service, and housekeeping service at a daily charge.

Income Taxes

Management has analyzed its various federal and state filing positions and believes that the Condominium's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The Association's federal and state income tax returns remain subject to examination by the Internal Revenue Service and the State of New York, respectively, for three years from the date of filing.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Income Taxes (Continued)

The Condominium has elected to be taxed as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Condominium is not taxed on uniform assessments to members and other income received from Condominium members solely as a function of their membership in the Condominium. The Condominium is taxed at a rate of 30% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the non-exempt function income; therefore, no deferred tax provision has been recorded. The Condominium incurred an income tax liability of $25 for the years ended December 31, 2014 and 2013.

Fair Value of Financial Instruments

Substantially all of the Condominium's assets and liabilities, excluding prepaid expenses and deferred refurbishment fees, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument.

Revenue Recognition

Common charges revenue is recorded monthly in the amount of the membership assessment allocation specified for current period operations, and is based on the annual budget adopted by the Board. Each unit owner is a Project member, and a proportionate undivided interest in fee simple absolute (expressed as a percentage) in the Common Elements is assessed for each unit, based on square footage.

Late fees and interest revenue is recognized when collected.

Cash Flows

For purposes of the statement of cash flows, the Condominium considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

The Condominium made cash payments for income taxes of $25 during the years ended December 31, 2014 and 2013. The Condominium made no cash payments for interest during the years ended December 31, 2014 or 2013.

Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

## NOTE 4 - CONCENTRATION OF CREDIT RISK

The Condominium maintains cash balances at one financial institution. Accounts at the institution are insured by the Federal Deposit Insurance Corporation ("FDIC"). As of December 31, 2014 and 2013, the cash balances were fully insured based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $1,399,972 and $3,088,243, as of December 31, 2014 and 2013, respectively, are not insured by the FDIC.

As of December 31, 2014 the Developer owned the hotel unit and seven suite units. As of December 31, 2013 the Developer owned the hotel unit and six suite units.

## NOTE 5 - ACCOUNTS RECEIVABLE - MEMBERS

Accounts receivable - members consisted of the following as of December 31,:

|  | 2014 | 2013 |
|---|---|---|
| Maintenance fee assessments | $ - | $ 222,233 |
| Less: allowance for uncollectible accounts | - | (208,780) |
|  | $ - | $ 13,453 |

## NOTE 6 - DEFERRED REFURBISHMENT FEES

During the year ended December 31, 2013, the Condominium billed owners for refurbishment fees. The refurbishment fees are recognized as the related expenses are incurred. Unexpended amounts are recorded as deferred revenue on the balance sheet until they are either expended for the purpose of the original assessment, returned to owners or used for another purpose as determined and approved by the Board. As of December 31, 2014, $558,044 has been expended against the project.

## NOTE 7 - RELATED PARTY TRANSACTIONS

St. Regis New York Operating LLC (the "Manager") is an affiliate of the Developer. As of December 31, 2014, due to Manager consisted of operating expenses paid by the Manager. As of December 31, 2013, due from Manager consisted of reimbursements due to the Association. Certain Board members are also employees of the Manager or its affiliates. Substantially all operating expenses have been allocated to the Condominium from the Manager.

During the year ended December 31, 2014, the Developer paid common charges of $17,589,108. During the year ended December 31, 2013, the Developer paid common charges of $16,893,744. During the year ended December 31, 2013, the Developer paid refurbishment fees of $116,777. As of December 31, 2014 and 2013, there were no amounts due from the Developer.

During the year ended December 31, 2013, the Condominium billed Fifth and Fifty-Fifth Residence Club Association, Inc. (the "Club") fees for a refurbishment project. As of December 31, 2013, $612,814 was due from the Club related to refurbishment fees.

Read Independent Auditor's Report.

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2014 AND 2013

**NOTE 8 - REPLACEMENT FUND**

A replacement fund has not been established; therefore, no reserve assessments have been levied. If funds are needed, the Condominium has the right, subject to the Board's approval, to charge regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

**NOTE 9 - COMMITMENTS**

The Condominium has an agreement ending May 31, 2016, with the Manager. The Manager provides on-site management and maintenance services, and off-site administrative and accounting services. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term. The management agreement provides that the Manager may subcontract its rights, duties and obligations under the management agreement.

The Condominium has a banking agreement ending April 25, 2015 with the Manager, SVO Residential Management, Inc. and SVO Management, Inc. ("SVOM"), who has guaranteed or indemnified the Condominium's liability for overdrafts with banks or other entities providing financial services to the Condominium. The agreement gives SVOM the right to reimburse itself for the amount of any overdrafts, if any, incurred on the Condominium's behalf. The agreement automatically renews for successive three-year periods unless terminated according to the terms of the agreement.

**NOTE 10 - ECONOMIC DEPENDENCY**

The Condominium derived approximately 81% and 83% of its revenue from the Developer during the years ended December 31, 2014 and 2013, respectively.

SUPPLEMENTARY INFORMATION

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2014

| | Budget | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| | *(Unaudited)* | | |
| **REVENUES** | | | |
| Common charges | $ 21,262,973 | $ 21,262,976 | $ 3 |
| Refurbishment fees | - | 558,044 | 558,044 |
| Interest | 711 | 3,218 | 2,507 |
| Late fees and interest | 504 | 189 | (315) |
| Other | - | 21,712 | 21,712 |
| Total revenues | 21,264,188 | 21,846,139 | 581,951 |
| **EXPENSES** | | | |
| **OPERATIONS** | | | |
| Managers | 821,775 | 944,944 | (123,169) |
| Bellman | 451,230 | 526,930 | (75,700) |
| Concierge | 289,647 | 347,808 | (58,161) |
| Doorman | 228,227 | 221,292 | 6,935 |
| Page | 225,292 | 257,358 | (32,066) |
| Houseperson | 775,333 | 845,224 | (69,891) |
| Public area attendant | 168,493 | 179,749 | (11,256) |
| Front office | 416,171 | 519,771 | (103,600) |
| Trainee | 4,715 | 7,563 | (2,848) |
| Butler | 2,181,094 | 2,322,272 | (141,178) |
| Benefits | 4,008,625 | 4,502,181 | (493,556) |
| Contract services | 153,160 | 203,482 | (50,322) |
| Decorations | 141,888 | 142,901 | (1,013) |
| Uniforms | 69,552 | 75,882 | (6,330) |
| Cleaning supplies | 25,028 | 23,215 | 1,813 |
| Silverware | - | 44 | (44) |
| China | 12,880 | 2,512 | 10,368 |
| Operating supplies | 147,971 | 310,913 | (162,942) |
| Cable television | 142,968 | 162,019 | (19,051) |
| Telecommunications | 23,184 | 21,008 | 2,176 |
| Total operations | 10,287,233 | 11,617,068 | (1,329,835) |
| **ADMINISTRATIVE AND GENERAL** | | | |
| Management | 615,928 | 602,713 | 13,215 |
| Accounting office | 76,736 | 66,555 | 10,181 |
| Human resources | 75,219 | 76,568 | (1,349) |
| Administration | 51,048 | 58,677 | (7,629) |
| Management information system | - | 18,495 | (18,495) |
| Security salaries and wages | 439,933 | 493,555 | (53,622) |
| Bonus wages | 20,723 | 22,187 | (1,464) |
| Benefits | 705,457 | 832,533 | (127,076) |
| Operating supplies | 16,273 | 26,628 | (10,355) |
| Payroll service | 58,954 | 55,748 | 3,206 |

Read Independent Auditor's Report.

13

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2014

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **ADMINISTRATIVE AND GENERAL (Continued)** | | | |
| Personnel relocation | 36,923 | 34,568 | 2,355 |
| Personnel recognition | 42,154 | 52,803 | (10,649) |
| Personnel training | 28,927 | 33,681 | (4,754) |
| Telecommunications | 17,002 | 18,317 | (1,315) |
| Uniforms | 1,159 | 1,158 | 1 |
| Postage | 3,429 | 3,662 | (233) |
| Print and stationery | 10,949 | 15,482 | (4,533) |
| Professional fees and dues | 1,011 | 6,103 | (5,092) |
| Security | - | 9,407 | (9,407) |
| Bank fees | 1,484 | 2,198 | (714) |
| Six sigma distribution | - | 3,744 | (3,744) |
| Total administrative and general | 2,203,309 | 2,434,782 | (231,473) |
| | | | |
| **REPAIRS AND MAINTENANCE** | | | |
| Salaries and wages | 1,501,529 | 1,489,161 | 12,368 |
| Benefits | 975,529 | 925,318 | 50,211 |
| Alarm maintenance | 9,303 | 6,087 | 3,216 |
| Building | 140,846 | 184,259 | (43,413) |
| Computer system maintenance | 254,855 | 296,295 | (41,440) |
| Contract services purchasing | 10,120 | 36,964 | (26,844) |
| Curtain and drapes | - | 2,362 | (2,362) |
| Electrical and mechanical equipment | 15,457 | 21,538 | (6,081) |
| Electric bulbs | 21,163 | 64,467 | (43,304) |
| Elevators | 371,476 | 414,929 | (43,453) |
| Floor coverings | 5,220 | 16,438 | (11,218) |
| Furniture and equipment | - | 632 | (632) |
| Grounds / landscaping | 67,222 | 104,429 | (37,207) |
| Refurbishment | - | 558,044 | (558,044) |
| HVAC | 62,976 | 84,979 | (22,003) |
| Keys and locks | 11,308 | 16,325 | (5,017) |
| Laundry equipment | 11,022 | 7,379 | 3,643 |
| Maintenance contract | 126,733 | 134,315 | (7,582) |
| Miscellaneous | 289 | 3,520 | (3,231) |
| Operating supplies | 1,429 | 4,542 | (3,113) |
| Painting and decorating | 3,573 | 9,736 | (6,163) |
| Pest control | 57,170 | 37,309 | 19,861 |
| Plumbing | 35,714 | 89,807 | (54,093) |
| Telecommunications | 6,789 | 8,603 | (1,814) |
| Television and radio | - | 21,061 | (21,061) |
| Tools | - | 7,811 | (7,811) |
| Uniforms | 4,806 | 4,258 | 548 |
| Waste removal | 78,323 | 92,065 | (13,742) |
| Total repairs and maintenance | 3,772,852 | 4,642,633 | (869,781) |

Read Independent Auditor's Report.
14

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2014

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **ENERGY DEPARTMENT** | | | |
| Electric current | 1,590,573 | 1,732,505 | (141,932) |
| Steam | 960,278 | 832,696 | 127,582 |
| Sewer | 357,175 | 322,262 | 34,913 |
| Water | 199,236 | 188,070 | 11,166 |
| Total energy department | 3,107,262 | 3,075,533 | 31,729 |
| | | | |
| **GUEST LAUNDRY DEPARTMENT** | | | |
| Salaries and wages | 323,690 | 326,993 | (3,303) |
| Benefits | 246,763 | 246,063 | 700 |
| Laundry supplies | 291 | - | 291 |
| Print and stationery | 996 | 2 | 994 |
| Uniforms | 1,435 | 1,364 | 71 |
| Miscellaneous | 495 | 64 | 431 |
| Operating supplies | 10,873 | 8,599 | 2,274 |
| Total guest laundry department | 584,543 | 583,085 | 1,458 |
| | | | |
| **ADMINISTRATION** | | | |
| Administration | 2,045 | 2,045 | - |
| Administration other | 3,810 | 3,371 | 439 |
| Total administration | 5,855 | 5,416 | 439 |
| | | | |
| **BOARD AND MEMBERSHIP MEETINGS** | 6,000 | 3,014 | 2,986 |
| | | | |
| **PROVISION FOR UNCOLLECTIBLE ACCOUNTS** | 45,000 | 28,635 | 16,365 |
| | | | |
| **LEGAL AND AUDIT** | | | |
| Audit | 7,500 | 7,500 | - |
| Legal | 5,158 | 4,892 | 266 |
| Total legal and audit | 12,658 | 12,392 | 266 |
| | | | |
| **INCOME TAXES** | 300 | 25 | 275 |
| | | | |
| **INSURANCE** | 615,372 | 578,264 | 37,108 |
| | | | |
| **MANAGEMENT FEES** | 123,804 | 123,804 | - |
| | | | |
| **CONTINGENCY** | 500,000 | - | 500,000 |
| | | | |
| Total expenses | 21,264,188 | 23,104,651 | (1,840,463) |
| | | | |
| Deficiency of revenues over expenses | $          - | $   (1,258,512) | $   (1,258,512) |

# EXHIBIT "D"

---

## PURCHASE AND SALE AGREEMENT

---

|  | Date: |  |
|---|---|---|
|  | Account #: |  |
|  | Purchase Price: |  |

**PURCHASE AND SALE AGREEMENT
FIFTH AND FIFTY-FIFTH RESIDENCE CLUB**

This Purchase and Sale Agreement ("**Purchase Agreement**") is made on the date stated below between St. Regis Residence Club, New York Inc., ("**Seller**") whose address is 9002 San Marco Court, Orlando, FL 32819, and the undersigned purchaser(s) ("**Purchaser**"). Terms not otherwise defined in this Purchase Agreement have the meanings stated in the Declaration and Plan of Club Ownership for the Fifth and Fifty-Fifth Residence Club (as amended and supplemented from time to time, the "**Club Declaration**") for the Fifth and Fifty-Fifth Residence Club ("**Club**").

**PURCHASER 1:**

Name in full

Street Address

City, State & Zip

Business Phone          Home Phone

E-Mail Address

**PURCHASER 2:**

Name in full

Street Address

City, State & Zip

Business Phone          Home Phone

E-Mail Address

**PURCHASER 3:**

Name in full

Street Address

City, State & Zip

Business Phone          Home Phone

E-Mail Address

**PURCHASER 4:**

Name in full

Street Address

City, State & Zip

Business Phone          Home Phone

E-Mail Address

1. **The Offering Plan.** Purchaser acknowledges having received and read a copy of the Offering Plan and all amendments thereto, if any, filed with the Department of Law of the State of New York by Seller as sponsor (collectively, "**Offering Plan**"). The Offering Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Purchase Agreement (including Riders to this Purchase Agreement executed by Purchaser and Seller which are not materially and adversely inconsistent with the Offering Plan) and the Offering Plan, the provisions of the Offering Plan will govern and be binding.

2. **Definitions.** Terms used herein which are also used in the Offering Plan shall have the same meanings herein as therein unless the context otherwise requires.

3. **Primary Owner:** Purchasers appoint Purchaser Number 1 to be the Primary Owner. Each Purchaser agrees that the Primary Owner will receive all official notices and mailings regarding the Club Interest(s) that are the subject of this Purchase Agreement and only the Primary Owner will receive notices required under this Purchase Agreement, under the Club Declaration, and under the Fifth and Fifty-Fifth Residence Club Reservation Policies and Procedures ("**Reservation Procedures**"). This provision will survive Closing.

4. **Primary Designee.** If the Purchaser is not a natural person (e.g Trust, corporation, etc), _____ shall be the Primary Designee, holding all benefits and obligations of ownership. Purchaser agrees that the Primary Designee will receive all official notices and mailings regarding the Club Interest(s) that are the subject of this Agreement and only the Primary Designee will receive notices required under this Agreement, under the Declaration, and under the Fifth and Fifty-Fifth Reservation Policies and Procedures. This provision will survive Closing.

5. **Agreement to Sell and Purchase.** In consideration of the terms, covenants and conditions set forth in this Purchase Agreement, which include an Arbitration Provision, Purchaser agrees to purchase, and Seller agrees to sell, the following real property ("**Club Interest**") as described in the attached Exhibit "A".

6. **Purchase Price and Title.**

   (a) The total "**Purchase Price,**" as adjusted by prorations and closing costs, will be paid in immediately available U.S. funds by Purchaser as follows:

   |  |  |  |
   |---|---|---|
   | Purchase Price: | $ |  |
   | Deposit (Due at Signing): | $ |  |
   | Additional Deposit (Due _____): | $ |  |
   | Additional Deposit (Due _____): | $ |  |
   | Purchase Price Balance Due: | $ |  |

   (b) All checks and credit card transactions shall represent United States currency. The Deposit, Additional Deposit(s) and the balance of the Purchase Price shall be made payable to the direct order of Escrow Agent. If any Agent is returned for insufficient funds or any credit card transaction is not credited to the Master Escrow Account or any other reason, such return shall be deemed to be a default by Purchaser under this Purchase Agreement and shall entitle Seller to exercise any of the remedies set forth in this Purchase Agreement.

(c)   Purchaser shall pay the balance of the Purchase Price as adjusted by prorations and closing costs, at or before closing. EXCEPT AS OTHERWISE AGREED IN WRITING, THIS PURCHASE AGREEMENT IS NOT CONTINGENT ON PURCHASER OBTAINING FINANCING.

(d)   Purchaser shall pay all closing costs which are Purchaser's responsibility as more particularly set forth in the Section of the Offering Plan entitled "Closing Costs."

(e)   If Purchaser consists of more than one person or entity, Purchaser shall take title as (check one):

[ ] Joint Tenants

[ ] Tenants in Common

[ ] Other: (specify): _____.

Title shall be conveyed to all Purchasers as joint tenants with rights of survivorship unless specifically otherwise noted above.

**7.**   **Deposits To Be Held In Trust.**  All Deposits received from Purchaser will be held in accordance with the provisions of the Section of the Offering Plan entitled "Escrow and Trust Fund Requirements". By signing this Purchase Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposits to the parties entitled to them in the event the Closing of Title is consummated between Seller and Purchaser. If Purchaser shall default on Purchaser's obligations under this Purchase Agreement, then the Deposit not exceeding the sum of ten percent (10%) of the Purchase Price shall be released to Seller as liquidated damages, and the balance, if any, and the Closing Documents returned to Purchaser within thirty (30) days of such release, and thereafter, neither party shall have any further rights or obligations against or to each other.  In the event Seller cannot convey title to the Club Interest to Purchaser by reason other than Purchaser's default, the Deposits and the Closing Documents shall be returned to Purchaser, within thirty (30) business days of Seller's notification to Purchaser that it cannot convey title.

**8.**   **Closing Of Title.**

8.1   The Club Unit is Complete. Therefore, Seller intends to close this transaction within ninety (90) days of the date of this Purchase Agreement, but, the last date on which Closing may occur is the date which is two (2) years from the date hereof, unless extended (the **"Outside Date"**).  Seller's obligation shall be to hold the Closing on or before the Outside Date, unless extended by conditions or events legally recognized in the State of New York as frustrating or rendering impossible the performance of contracts.  The date, time and place of Closing shall be determined by Seller and Seller shall give notice of the date of Closing to Purchaser at least fifteen (15) days in advance of the scheduled Closing Date.  Closing will be effected by mail and Purchaser need not be present.  On or before Closing, Purchaser and Seller shall execute, obtain acknowledgements and deliver such documents, affidavits and instruments and take such action as may be necessary to carry out their respective obligations under this Purchase Agreement. Seller shall provide, or cause the Club Association to provide, to Purchaser at Closing a written statement of Club Charges.  Purchaser will be mailed a bill for current Club Charges within ninety (90) days of the date of Closing. This Purchase Agreement and any Closing Document may be executed in two or more counterparts, all of which taken together shall constitute one and the same document.

8.2   On the date of this Purchase Agreement, Purchaser shall execute and acknowledge all Closing Documents (including Loan Documents, if applicable) requested by Seller to consummate the transaction contemplated in this Purchase Agreement, as more fully set forth in the Offering Plan.

8.3   The Closing of Title shall occur only after or concurrently with the compliance with the Closing Conditions set forth in the Section of the Offering Plan entitled "Closing of Title".

8.4   The term "Closing Date" or "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Club Interest is released for recording to Purchaser or Purchaser's title company.

8.5   Purchaser authorizes Seller, Selling Agent, the Title Company and Escrow Agent to complete all blank information and/or substitute pages containing completed information in all Closing Documents including, but not limited to, the Closing Date, recording data and other required information and to change the Closing Documents as a result of amendments to the Offering Plan and as needed in order to consummate the closing of the Club Units and/or to recopy some of the Closing Documents. No change in the Closing Documents will be made which would materially and adversely affect a Purchaser unless the change is first disclosed in an amendment to the Offering Plan. Purchaser also authorizes the release of the Closing Documents and the Deposits to the parties entitled to them upon the Closing of Title to the Ownership Interest or a default hereunder.

8.6   All Deposits will be held in escrow by Escrow Agent and released in accordance with the terms of the Offering Plan.  All Closing Documents will be held as more fully set forth in the Section of the Offering Plan entitled "Procedure to Purchase" and released in accordance with the terms of the Offering Plan.

**9.**   **Delivery Of The Closing Documents.**

9.1   On the Closing Date, all Closing Documents which require recording will be delivered to the representative of the title company insuring Purchaser's title (or, if no such representative is present, then to a title company designated by Escrow Agent) for recording in the Register's Office.

9.2   On the Closing Date, those remaining Closing Documents which do not require recording shall be delivered to the parties entitled to them.

**10.**   **Status Of Title.**  At the Closing of Title, Seller shall convey to Purchaser good and insurable title in fee simple to the Club Interest, free and clear of all encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule "A" annexed hereto and made a part hereof.  Any encumbrance to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Closing of Title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Purchaser's title company, is or would be willing, in a fee policy issued by it to the Purchaser, to insure Purchaser that it will not be collected out of the Ownership Interest if is a lien, or will not be enforced against the Club Interest if it is not a lien.

**11.**   **Closing Disclosure:**  Purchaser has the right to inspect the Closing Disclosure prior to Closing.  The completed Closing Disclosure will be provided by Title Company or other Closing agent to Purchaser for Purchaser's inspection prior to Closing.

**12.**   **Occupancy.**  Assuming Closing has occurred, Purchaser's first occupancy will begin no sooner than the current Use Year.

SRN:012 (Rev. 08-24-15)

13. **Purchaser's Acknowledgment.** Purchaser's signature on this Purchase Agreement constitutes Purchaser's acknowledgment that Purchaser has received, has read and understands, and, where applicable, has signed the documents listed below. Further, Purchaser understands and agrees that Seller may provide copies of this Purchase Agreement or certain information contained in this Purchase Agreement, as well as other documents executed by Purchaser at the time of purchase, to the Club Association, Management Company or Starwood Vacation Ownership Portfolio Services, Inc. (if sale is financed) for the purpose of enabling each of those entities to perform their job functions as stated in the Club Documents or the Offering Plan.

   (a)   The Club Declaration, the Club Articles, Club Bylaws, the Club Reservation Procedures and the Club Rules and Regulations ("**Club Documents**");

   (b)   The Schedule B – Club Budget;

   (c)   Starwood Residence Network Disclosure Guide and Rules and Regulations; and

   (d)   The Condominium Declaration and Condominium Bylaws for the Condominium ("**Condominium Documents**").

   (e)   Purchaser hereby accepts and approves the Offering Plan (including the Condominium Documents and Club Documents contained or referred to therein) and agrees to abide and be bound by the terms and conditions thereof. The sale of the Club Interest is subject and subordinate to the provisions of the Condominium Documents and the Club Documents.

14. **Furnishings.** Each Club Unit will be fully furnished with furniture, appliances, equipment and accent materials ("**Furnishings**") substantially similar in quality to those shown in the models, renderings and advertising materials; provided that Seller at all times retains the right to make changes and substitutions with respect to the Furnishings and construction of the Club Unit so long as the changes or substitutions do not materially impair the quality of the Furnishings or the Club Unit and are of equal or better quality. Purchaser may not rely on any specific representation made in any model, renderings or advertising materials. Purchaser acknowledges that square footage calculations may be made in a variety of manners and so long as the Club Unit is demised substantially in accordance with the models, renderings or materials reviewed by Purchaser, Purchaser shall neither have any right to rescind this Purchase Agreement nor to claim any breach hereof on account of alleged discrepancies in square footage calculations. Replacement and repair of the Furnishings are the responsibility of the Club Association. Purchaser understands and acknowledges that, upon occupancy, the Furnishings may not be modified in anyway or removed from the Club Unit by Club Members or Club Unit Occupants.

15. **Agreement Subject To Mortgage.** No encumbrance shall arise against the Club Unit as a result of this Purchase Agreement or any monies deposited hereunder. In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Purchase Agreement are and shall be subject and subordinate to the lien of any mortgage, including, but not limited to, any construction or building loan mortgage, heretofore or hereafter made any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser. This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Seller shall, at its option, either satisfy such mortgages or obtain a release of each Ownership Interest from the lien of such mortgages on or prior to the Closing Date, unless Purchaser voluntarily assumes such mortgage or consents to the continuation of the lien thereof. The existence of any mortgage or mortgages encumbering the Club Unit, or portions thereof, other than the Club Interest shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of its other obligations hereunder or be the basis of any claim against, or liability of, Seller, provided that any such mortgage(s) is subordinated to the Condominium Declaration and the Club Declaration.

16. **Representations, Acknowledgments, Warranties and Covenants.** Purchaser makes the following representations, warranties and covenants to Seller:

   **(a)**   **Purchaser is purchasing the Club Interest and the rights and privileges associated with it for Purchaser's own personal use and account and not for any other purpose and Purchaser does not anticipate or expect to make a profit from the ownership or rental of the Club Interest. Purchaser understands that the purchase of a Club Interest should be based solely upon its value as a vacation experience or for spending leisure time and not for its potential liquidity or as an appreciating investment, including potential for rental income or for resale at a profit. Purchaser acknowledges that Seller and its representatives have made no representations to Purchaser regarding the Club Interest's potential for future profit, rental potential, tax advantages, depreciation, or investment potential.**

   (b)   Purchaser shall be required to pay the Assessments set forth in the Club Declaration whether or not the Club Interest is used, and shall be responsible for the other fees and charges associated with the Club Interest or the use thereof, all as more fully set forth in the Club Documents. Purchaser's first payment of Assessments will be due after the Closing Date as set forth in the Use Notification. Purchaser acknowledges that unpaid Assessments, fees and charges shall become a lien on Purchaser's Club Interest. As of the Closing Date there will be no unpaid Assessments, including real property taxes, outstanding against the Club Interest.

   (c)   Purchaser understands and acknowledges that no salesperson, broker or other person has any authority whatsoever to make any representation, agreement or warranty, express or implied, for Seller, except those expressly set forth in writing in this Purchase Agreement and the Club Documents.

   (d)   Purchaser acknowledges that all of the information called for in the blank spaces of this Purchase Agreement was filled in and read and understood by Purchaser prior to the time of execution of this Purchase Agreement.

   (e)   Purchaser acknowledges that errors or omissions sometimes occur in Closing documents and that Purchaser intends for all documentation for this transaction to be accurate. Accordingly, Purchaser agrees to cooperate in initialing, re-executing and redelivering any Closing documents where such corrective action is deemed necessary or desirable in Seller's reasonable discretion in this transaction.

   (f)   Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building, the Common Elements, the Common Areas or the size or the dimensions of the Club Units or any other physical characteristics thereof, the services to be provided to Club Members, the estimated Club Charges allocable to Club Members, the estimated Real Estate Taxes, the right to any income tax deductions or any other data, except as herein or in the Offering Plan specifically represented. No Person has been authorized to make any representations on behalf of Seller except as herein or in the Offering Plan specifically set forth. No oral representations or statements shall be considered a part of this Purchase Agreement. Seller makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Club Units, the Common Areas or any other part of the Property other than as set forth in the Purchase Agreement or in the Offering Plan.

   (g)   Purchaser represents to Seller that Selling Agent is the only broker or sales agent with whom Purchaser has dealt in connection with this transaction, and Seller agrees to pay the commission earned by Selling Agent said broker pursuant to a separate agreement. Purchaser agrees that should any claim be made against Seller for commissions by any broker, other than Selling Agent, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Seller free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees.

                 SRN012 (Rev. 08-24-15)

(h)   The covenants, acknowledgments, representations and warranties set forth in this Paragraph will survive the delivery and recordation of the deed.

**17.   Binding Effect; Entire Agreement; Amendment; Recordation.**   This Purchase Agreement is binding on and enforceable against the parties and their heirs, legal representatives, successors, and permitted assigns.   This Purchase Agreement is the only agreement between Seller and Purchaser and all prior and contemporaneous negotiations are superseded and all prior agreements, arrangements, representations and understandings are not legally binding on Seller or Purchaser and are replaced by this Purchase Agreement.   The only representations, agreements and warranties made by Seller are those specified in this Purchase Agreement and in the Club Documents.   This Purchase Agreement may only be amended in writing, signed by both parties.   Purchaser may not record this Purchase Agreement or any memorandum of this Purchase Agreement and any such recording by Purchaser will constitute a breach and Seller may terminate this Purchase Agreement at Seller's option and retain the Deposit.

**18.   Default; Termination.**

(a)   Time is of the essence.   If the date for performance of any obligation under this Purchase Agreement falls on a Saturday or Sunday or on any holiday recognized by the States of New York or Florida, the date of performance shall be extended to the next regular business week day.

(b)   If Purchaser fails to pay all sums due under this Purchase Agreement when required as herein provided or fails to perform any of Purchaser's other obligations hereunder, Seller shall give notice to Purchaser of such default.   If such default shall not be cured within seven (7) business days thereafter, Seller may, at its option, cancel this Purchase Agreement by notice of cancellation to Purchaser.   If Seller elects to cancel this Purchase Agreement, (a) Seller may retain all sums deposited by Purchaser hereunder not to exceed ten percent (10%) of the Purchase Price, as liquidated damages (Seller's actual damages being difficult or impossible to ascertain) and, upon retaining such sum, this Purchase Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Purchase Agreement or the Offering Plan, except for Seller's obligation to return to Purchaser within thirty (30) days of such termination the unretained portion of the Deposits, if any, and the Closing Documents and (b) Seller may sell the Club Interest to any third party as though this Purchase Agreement had never been made (without any obligation to account to Purchaser for any part of the proceeds of such sale).

(c)   If Seller breaches this Agreement, Purchaser shall give Seller written notice of such default and, if within thirty (30) days from receipt of such notice, Seller fails to commence action that would cure the default within a reasonable period of time, all monies deposited by Purchaser with Seller under this Agreement, together with interest shall, at the option of Purchaser, be paid by Seller to Purchaser and this Agreement shall terminate and thereafter neither party shall have any further rights or obligations in connection with this Agreement.

(d)   Upon any termination of this Purchase Agreement, the parties shall be relieved of any further obligation to each other.

**19.   Seller's Inability To Convey The Club Interest.**   If Seller is unable to deliver insurable title to the Club Interest to Purchaser in accordance with the provisions of the Offering Plan, Seller shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in order to cure such inability and, in such case, If Seller notifies Purchaser of its refusal to cure such inability, Purchaser's sole remedy shall be to either (a) cancel this Purchase Agreement or (b) take title to the Club Interest subject to such inability (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Seller for damages or otherwise).   If Purchaser elects to terminate this Purchase Agreement, the Purchase Agreement and the other Closing Documents shall be null and void as of the date of Purchaser's cancellation notice and neither Seller nor Purchaser shall have any further rights, obligations or liabilities with respect to the other under this Purchase Agreement or the Offering Plan, except for Seller's obligation to return to Purchaser within thirty (30) days after receipt of Purchaser's cancellation notice, all Deposits made by Purchaser.   The foregoing remedy must be exercised by notice of Purchaser in writing to Seller within ten (10) days after the Presentation Date of Seller's notice of refusal to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to terminate this Purchase Agreement).

**20.   Fixtures, Appliances And Personal Property.**   None of the fixtures, appliances and items of personal property which are described in the "Description of Property and Building Condition" (which is set forth in the Offering Plan, as the same may be amended from time to time) as being part of the Club Unit or the Club Project are included in the sale of the Club Interest pursuant to the provisions of this Purchase Agreement.   Such fixtures, appliances and items of personal property shall belong to the Club Association for the benefit of all Club Members.

**21.   Acceptance Of Condition Of Property.**   The signing of this Purchase Agreement by Purchaser signifies Purchaser's acceptance of the condition of the Property and the Club (as represented by Seller in the Offering Plan), as the same may be amended from time to time, including the Building, the Common Elements, the Club Units, the Common Areas and the Facilities in their respective existing conditions, subject to ordinary wear and tear between the date Purchaser signs this Purchase Agreement and delivery of the deed to Purchaser.   Purchaser understands that Seller has no obligation to make any repairs, improvements or decorations in or to the Property, the Building, Common Elements, the Club Units, the Common Areas, or the Facilities, except as may otherwise be set forth in the Offering Plan.

**22.   Risk of Loss.**   The risk of loss to the Club Unit shall be on Seller until the Club Declaration is recorded and then the risk of loss shall be on the Club Association.

**23.   Lead-Based Paint And/Or Lead-Based Paint Hazards.**   The Environmental Protection Agency and the Department of Housing and Urban Development promulgated Federal regulations under 24 CFR Part 35 and 40 CFR Part 745 ("Regulations") regarding the disclosure of lead-based paint and/or lead-based paint hazards to prospective purchaser's of Ownership Interests.   In accordance with the provisions of the Regulations, annexed to this Purchase Agreement as Schedule "B" is a "Lead Warning Statement" and "Disclosure of Information on Lead-Based Paint And/Or Lead-Based Paint Hazards" to be signed by Seller and Purchaser.   In the event Purchaser exercises Purchasers' right to conduct a risk assessment or inspection ("Inspection") for the presence of lead-based paint and/or lead-based paint hazards, such inspection shall be performed within ten (10) calendar days following the date of this Purchase Agreement under the following terms and conditions:

(a)   Purchaser and Purchaser's consultant ("Consultant") will be given reasonable access to the Club Units and the public areas of the Property.

(b)   The Inspection shall be held at a mutually convenient time and date on a business day between 9 a.m. and 5 p.m.

(c)   The Inspection shall be performed in a reasonable manner so as not to disturb or interfere with the use, operation, security or occupancy of the Club Units or the Building.

(d)   Purchaser shall be liable for any damages to the Club Units or the Building, injuries, and all claims and lawsuits caused by Purchaser or the Consultant during the Inspection.

(e)   Purchaser or the Consultant will not probe, penetrate or disturb any painted or covered surface during the Inspection without Seller's prior approval.

**24.   Notice.**   Except for the Arbitration Provision, all notices required to be sent under this Purchase Agreement must be in writing and either delivered personally or deposited in the U.S. Mail, first class postage prepaid, or via overnight courier, addressed to

- 4 -

Purchaser and Seller at the addresses listed on the first page of this Purchase Agreement. Notice will be deemed given when delivered personally, on the third business day after deposit in the U.S. Mail in the form stated above, or on the next business day when deposited with a reputable overnight courier for next-day delivery. The addressees and addresses for purposes of this Purchase Agreement may be changed by giving written notice of such change as provided in this paragraph. Unless written notice is provided to the contrary, the last addressee and address provided under this Purchase Agreement will continue to be in effect.

25. **Performance By And Liability Of Seller.** Purchaser's acceptance of the deed for the Club Interest shall be deemed to be a full performance and discharge of each and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Purchase Agreement, the Offering Plan, 13 NYCRR, Part 24 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Offering Plan) and General Business Law, Section 352-e, except those (if any) herein or therein expressly stated to survive delivery of such deed.

26. **Further Assurances.** Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Purchase Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

27. **Entire Agreement.** This Purchase Agreement supersedes any and all understandings and agreements between the parties with respect to the subject matter hereof.

28. **Limited Warranty/Disclaimer.**

    (a) _Restrictions on Warranties._ Seller did not construct the building containing the Club Units (**"Building"**). Rather, it was constructed in 1904 by an unrelated party. Seller therefore cannot and does not warrant the Building and disclaims any warranty except for the Limited Warranty (defined below). The statute of limitations for bringing claims against the party that constructed the Building have expired, however, Purchaser makes no representations regarding same. EXCEPT AS STATED IN THIS PARAGRAPH BELOW, PURCHASER IS ACCEPTING THE CLUB UNIT IN ITS "AS IS" CONDITION, AND SELLER MAKES NO WARRANTY OR REPRESENTATION OF ANY NATURE, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THOSE OF WORKMANLIKE CONSTRUCTION, HABITABILITY, DESIGN, CONDITION, OR QUALITY AS TO THE PROPERTY UNDERLYING THE CONDOMINIUM, THE CLUB UNIT, OR, THE OTHER IMPROVEMENTS CONSTITUTING THE CONDOMINIUM, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES. SELLER SPECIFICALLY DISCLAIMS, AND PURCHASER SPECIFICALLY RELEASES SELLER FROM, ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES TO ANY PERSON OR THE CLUB UNIT OR ANY OTHER REAL OR PERSONAL PROPERTY RESULTING FROM A DEFECT. WITH REGARD TO THE APPLIANCES AND ANY OTHER ITEMS OF TANGIBLE PERSONAL PROPERTY, SELLER DISCLAIMS ALL WARRANTIES INCLUDING, BUT NOT LIMITED TO, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. IN ADDITION, SELLER MAKES NO REPRESENTATION OR WARRANTY AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY CONCERNING ANY GEOLOGICAL OR ENVIRONMENTAL MATTERS.

    (b) _Limited Warranty._ Seller has engaged a general contractor to renovate the Club Units. For a period of one-year from Closing, Seller warrants to Purchaser that materials and equipment furnished in connection with such contractor's work and incorporated into the Club Units will be of good quality and new, unless otherwise required under the contractor's construction contract, that the contractor's work will be free from defects in workmanship and quality not inherent in the quality required under the contractor's construction contract for a period of one year from the date of issuance of a certificate of completion for the Club Unit. Seller shall cause the correction, by repair or replacement, of any defective or non-conforming work which result from faulty material or workmanship claimed within one year of the date of issuance of a certificate of completion for the Club Unit, at no cost to Purchaser, provided that Purchaser gives Seller written notice of any such defect within ten (10) days after Purchaser's discovery of the defect (**"Limited Warranty"**). This Limited Warranty excludes any remedy for defect, non-conforming work, or damage caused by modifications not performed by Seller or Seller's contractor, or due to normal wear and normal usage occurring after the Closing. Purchaser's sole remedy (in lieu of all remedies implied by law or otherwise) against Seller in connection with such defects shall be to require Seller to cause the defects in material or workmanship to be corrected. Purchaser shall have no right to assert claims against Seller or its general contractor for any other monetary damages arising out of any defect in workmanship or materials. The Limited Warranty does not extend or relate to any items of tangible personal property in the Club Unit (regardless of whether such property is attached to or installed in the Club Unit).

    (c) _Magnuson-Moss Warranty Act Compliance._ This Limited Warranty has been prepared to comply with the disclosure requirements of the federal Magnuson-Moss Warranty-Federal Trade Improvement Act (15 U.S.C. § 2301, as amended). With respect to any Appliances finally determined by a court to be within this Limited Warranty described above, all implied warranties are limited in duration to the period of the Limited Warranty. This includes, without limitation, the implied warranties of merchantability and fitness for a particular purpose if created or recognized in New York. Some states do not allow limitations on how long an implied warranty lasts or the exclusion or limitation of incidental or consequential damages so the above limitation may not apply to Purchaser. This Limited Warranty gives specific legal rights, and Purchaser may also have other rights which vary from state to state.

    (d) _No Other Representations._ PURCHASER REPRESENTS THAT PURCHASER HAS READ THIS PURCHASE AGREEMENT AND THE PROVISIONS REFERRED TO ABOVE AND, NO OTHER AGREEMENT, PROMISES, REPRESENTATIONS OR WARRANTIES, EXCEPT THOSE EXPRESSLY SET FORTH IN THIS PURCHASE AGREEMENT IN WRITING, HAVE BEEN MADE BY SELLER OR ITS SALESMEN, AGENTS OR EMPLOYEES TO PURCHASER. PURCHASER ACKNOWLEDGES THAT HE/SHE IS NOT RELYING UPON ANY STATEMENT, REPRESENTATION, OR WARRANTY NOT SET FORTH IN WRITING IN THIS PURCHASE AGREEMENT. FURTHER, SELLER MAKES NO REPRESENTATIONS AS TO THE EXISTENCE, PRESERVATION OR PERMANENCE OF ANY VIEW OR VISTA FROM THE CLUB UNIT. PURCHASER ACKNOWLEDGES THAT NO SALES COUNSELOR, EMPLOYEE, AGENT OF SELLER OR BROKER HAS AUTHORITY TO MODIFY THE TERMS HEREOF OR TO MAKE ANY AGREEMENTS, REPRESENTATIONS, WARRANTIES OR PROMISES REGARDING THE CLUB UNIT, THE CONDOMINIUM, THE SURROUNDING PROPERTIES, OR ANY OTHER ITEM RELATING TO THIS PURCHASE AGREEMENT, UNLESS THE SAME ARE EXPRESSLY SET FORTH IN THIS PURCHASE AGREEMENT.

    (e) _Acknowledgment; Survival of Covenants._ Purchaser hereby acknowledges and accepts the foregoing disclaimers and agrees to waive any and all rights Purchaser may have by virtue of the representations and warranties disclaimed. Except as otherwise provided in the Limited Warranty, Purchaser assumes the risk of damage occurring in the Club Unit after the Closing regardless of the cause. The provisions of this Paragraph 28 shall survive Closing.

29. **Attorneys' Fees and Costs.** In the event of any litigation, arbitration, or other legal proceeding between Purchaser and Seller to enforce this Purchase Agreement or related documents, the prevailing party will be entitled to recover and shall be awarded all costs and reasonable attorneys' fees from the non-prevailing party and such amounts will be included in any judgment or award obtained.

SRN1012 (Rev. 08-24-15)

30. **Severability.**  Except as set forth in the Arbitration Provision, if any non-material provision of this Purchase Agreement is determined to be invalid or unenforceable under applicable law, it will be stricken from this Purchase Agreement and will in no way affect the other provisions of this Purchase Agreement.  This Purchase Agreement will remain in full force and effect and will be construed in all respects as if the invalid or unenforceable non-material provision was intentionally omitted. If any material provision of this Purchase Agreement is declared invalid or unenforceable, Seller shall have the right to terminate this Purchase Agreement in its sole and absolute discretion.

31. **Termination of Agreement with Blocked Persons.**  Pursuant to United States Presidential Executive Order 13224 (the "**Executive Order**"), Seller is required to ensure that Seller does not transact business with persons or entities determined to have committed, or to pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the "**List**"), generated by the Office of Foreign Assets Control of the U.S. Department of the Treasury. The names or aliases of these persons or entities ("**Blocked Persons**") are updated from time to time.  In the event Seller learns that Purchaser's name (or Purchaser's assigned party's name) appears on the List, Seller reserves the right to delay the Closing pending Seller's investigation into the matter.  If Seller is advised and/or determines that Purchaser (or Purchaser's assigned party) is a Blocked Person, Seller reserves the right to terminate this Purchase Agreement and/or to take all other actions necessary to comply with the requirements of the Executive Order.  The provisions of this paragraph will survive Closing and/or termination of this Purchase Agreement.

32. **Assignment.**  This Purchase Agreement is personal to Purchaser and **may not be assigned by Purchaser to any unrelated third party prior to Closing.** This Purchase Agreement may be assigned by Purchaser to a related party only with Seller's written approval, prior to the assignment, which approval shall not be unreasonably withheld. Seller shall not unreasonably withhold its consent if the proposed assignment is to a person related to Purchaser or to an entity in which Purchaser has a significant economic interest, provided Purchaser shall not be released by such assignment.  In any event, however, Seller reserves the right to withhold approval of an assignment to any person or entity whose name appears on the List as defined in Paragraph 31 of this Purchase Agreement in Seller's sole and absolute discretion.

33. **Governing Law.**  This Purchase Agreement will be governed by, construed and enforced in accordance with, the laws of New York.  Jurisdiction and venue will be proper only in the County of New York.

34. **Arbitration Provision ("Provision").**  Any dispute, controversy or claim ("Claim") between Purchaser and Seller, whether preexisting, present or future, arising from or relating to the Purchase Agreement or the Club Interest shall, at the election of either party, be arbitrated on an individual basis before JAMS (www.jamsadr.com, 1-800-352-5267) pursuant to its Streamlined Rules. If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction will select the arbitrator. The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., shall govern the interpretation and enforcement of this Provision. A single neutral arbitrator shall be appointed.  The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and issue a written reasoned decision which will be final and binding except for any review under the FAA. The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court).  The rules of some arbitration forums may impose time limits for filing a claim in arbitration and the ability of the parties to obtain documents, witness statements and other discovery may be more limited in arbitration than in court proceedings. In general, arbitration awards are final and binding and the ability to have a court reverse or modify an arbitration award is very limited.  An arbitrator is not necessarily required to explain the reasons for the award.  In addition, unlike in litigation, New York law does not authorize the filing of a notice of pendency based on ongoing arbitration proceedings.  Any in-person hearing will be held in the County of New York unless otherwise agreed in writing.  If Purchaser initiates an individual arbitration, Seller will pay all administrative and arbitrator fees exceeding $250.  Solely for purposes of this Provision, "Seller" also means Seller's parent companies, subsidiaries and affiliates; Seller's and their employees, officers and directors; and any other person or entity named as a defendant or respondent in a Claim by Purchaser against Seller.  "Purchaser" also means Purchaser's heirs, successors and assigns.

"**Claim**" shall be broadly construed and includes, without limitation, disputes concerning: purchase, financing, ownership or occupancy; breach, termination, cancellation or default; condition of the property; the Starwood Vacation Network or other exchange programs; reservations, points or rewards programs; applications and personal information; marketing or sales solicitations, representations, advertisements, promotions or disclosures; and collection of delinquent amounts and the manner of collection.  "Claim" includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity.  "Claim" does not include: (i) disputes about the validity, enforceability, coverage or scope of this Provision or any part thereof, which are for a court to decide.  But disputes about the validity or enforceability of the Purchase Agreement as a whole are for the arbitrator to decide; (ii) any individual action by Purchaser in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court; or (iii) Seller's use of judicial or non-judicial relief to enforce a security agreement, mortgage or deed of trust relating to the collateral secured in a transaction underlying the Purchase Agreement, including, without limitation, foreclosure on the collateral.  The institution and maintenance of any such action shall not waive any party's right to compel arbitration of any other Claim subject to arbitration, including, without limitation, the filing of a counterclaim in a suit brought by Seller.  In any such action commenced by Seller, Purchaser may assert any cognizable defense permitted by applicable law which does not seek any form of affirmative relief from Seller, including, without limitation, damages.

**Class Action Waiver.**  If a Claim is arbitrated, neither Purchaser nor Seller will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member, (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity.  The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding or to issue any relief that applies to any person or entity except Purchaser and Seller individually.

An arbitration award may be enforced in any court with jurisdiction.  In the event a final arbitration award is rendered allowing the disposition of escrowed funds (including deposits or advance received by Seller), such funds shall not be released from escrow for 90 days from the issuance of the final arbitration award.  This Provision shall survive the breach, cancellation, termination or rescission of the Purchase Agreement, and any bankruptcy to the extent permitted by law.  This Provision governs if it conflicts with the Purchase Agreement or the arbitration rules.  If any part of this Provision other than the Class Action Waiver is declared unenforceable, the remainder shall be enforceable.  If the Class Action Waiver is declared unenforceable in a proceeding between Purchaser and Seller, without impairing the right to appeal such decision, this entire Provision (except for this sentence) shall be null and void in such proceeding.  Seller will not amend this Provision in a manner that adversely affects Purchaser's rights unless Seller gives Purchaser a right to reject the amendment.

**Right to Reject Arbitration Provision:**  Purchaser may reject this Provision by sending Seller a written notice which gives Purchaser's name and Purchase Agreement number and states that Purchaser rejects the Arbitration Provision.  The rejection notice must be sent by certified mail, return receipt requested, to St. Regis Residence Club, New York Inc. at 9002 San Marco Court, Orlando, Florida 32819; Attention: Legal Department.  A rejection notice must be signed by Purchaser and received by Seller within thirty (30) days after the date of this Purchase Agreement.  Rejection of arbitration will not affect any other term of this Purchase Agreement.

**Each Purchaser has read, understands and voluntarily agrees to this Arbitration Provision and acknowledges that if a Claim is arbitrated, there will be no right to have a court or jury trial or participate in a class action.**

SRNI012 (Rev. 08-24-15)

35. **Seller's Right of First Refusal before Resale.** For three (3) years from the Closing Date, Purchaser is required to offer Purchaser's Club Interest(s) to Seller upon the same terms and conditions (including financing) as offered by or to a bona fide third party before Purchaser may resell, transfer or assign the Purchaser's Club Interest to a bona fide third party. This restriction shall not apply to transfers, assignments or sales to members of Purchaser's immediate family or other entities related to Purchaser, such as affiliates or subsidiaries. Further, this restriction shall not apply to the mortgage, collateral grant, pledge, hypothecation, collateral assignment of the Club Interest for the purpose of securing purchase money financing nor to any subsequent transfer by foreclosure, by similar proceeding or by deed in lieu of same. Purchaser must notify Seller in writing no less than thirty (30) days in advance of any proposed Closing date, of Purchaser's intention to sell the Club Interest and must include a copy of the fully executed contract for sale. Seller shall notify Purchaser within ten (10) days of receipt of such notice and written contract whether Seller wishes to exercise its right of first refusal. If Seller elects to exercise its right of first refusal, the Seller's purchase of Purchaser's Club Interest shall be closed no later than thirty (30) days of the date that Seller's response is mailed to Purchaser, unless both parties agree to an extended date. If the sale of the Club Interest fails to close, through no fault of the Seller, this restriction shall continue and be binding on Purchaser, pursuant to this Purchase Agreement. If Seller fails to timely notify Purchaser of its election to exercise its right to purchase, Purchaser may consummate its sale with the bona fide third party. This provision shall survive Closing and shall bind any of Purchaser's immediate family or related entities to whom title is transferred.

36. **The St. Regis Name and License.** The Club Manager has a licensing arrangement with The Sheraton LLC, a Delaware limited liability company ("Licensor") to use the name "St. Regis" ("Club Licensing Arrangement"). As a consequence, the Plan of Club Ownership and the Club Property will be designated with the St. Regis name during the term of the Club Licensing Arrangement and the Plan of Club Ownership and the Club Property will be operated, managed and maintained according to the standards established by Licensor to protect its service mark and trademark ("St. Regis Standards"). The fees, costs, and expenses incurred by the Club Manager to maintain the affiliation with Licensor under the Club Licensing Arrangement are part of the Club Expenses. The Club Licensing Agreement may be terminated, resulting in the removal of the St. Regis designation from the plan of Club Ownership and the Club Property (with or without the St. Regis designation remaining in connection with operation of the hotel within the Condominium), if: (a) the Club Manager's management contract is terminated for any reason; (b) the plan of Club Ownership or the Club Property is not managed, operated, and maintained in a manner consistent with the St. Regis Standards (which could occur, among other reasons, if budget constraints imposed by the Club Association prevent Club Manager from so managing); (c) licensing fees are not paid as required by the Club Licensing Arrangement; (d) the Club Licensing Arrangement is terminated; (e) the Club Licensing Arrangement expires by its own terms and is not renewed; or (f) if customary business defaults occur. Upon certain breaches or termination events under the Club Licensing Arrangement, liquidated damages may be incurred as an expense of the Club Association. The license to use the name "St. Regis" is not part of the Plan of Club Ownership, the Club Property or the Condominium Property. The Club Association and the Club Members do not have any right, title, or interest in the name "St. Regis" or in any licensing arrangement. Purchaser may use the condominium name for the resale or rental of a Club Interest, but it is strictly prohibited from using the St. Regis name or marks in connection with the resale or rental of a Club Interest through any entity other than Seller, Club Manager or their affiliates. In addition to the Club Licensing Arrangement, a similar licensing arrangement between St. Regis and Seller with respect to the operation of certain property, which has not been declared to the Club Property or the Condominium Property, may exist.

37. **Damage Before Closing.** If prior to Closing, the Club Unit shall be destroyed or damaged by fire or other casualty, Seller shall repair the damage to the Club Unit or may terminate this Purchase Agreement and refund all monies paid by Purchaser. This Purchase Agreement shall remain in full force and effect, and the Closing shall be delayed as necessary to allow the completion of such repair.

38. **Seller Changes to Club Documents.** Seller reserves the right to modify and amend the Club Documents at any time and from time to time prior to Closing as Seller may deem necessary or advisable, including without limitation for the following reasons:  to make any necessary corrections to comply with the laws of any jurisdiction or to meet the requirements of any governmental agency (whether federal, state, local or foreign), to meet the requirements of any lending institutions or marketing programs; provided that, in each event, such modifications or amendments do not materially adversely affect the value of the Club Interest. Purchaser acknowledges that Seller has reserved rights, at any time after Closing, to amend the Club Documents in the exercise of Seller's Special Rights set forth in the Club Declaration or to amend the Club Documents to comply with the real estate laws of any jurisdiction or the requirements of any governmental agency (whether federal, state, local or foreign).

39. **Starwood Residence Network Exchange Program.** The Club Association has endorsed through an affiliation agreement, the Starwood Residence Network or SRN as the Club's exchange program. The Club will not recognize or honor any exchanges from any entity, other than SRN. SRN will permit Club Members to exchange or "interchange" Club Weeks associated with their Club Interest with Club Members at other Starwood Residence Club locations, provided such location is also affiliated with SRN. Club Members should review the SRN Disclosure Guide for a current listing of affiliated Starwood Residence Club locations. SRN Interchanges will be made strictly on a voluntary, first come, first served basis for available Club Weeks that are placed for interchange by other Club Members. An affiliation fee will be assessed against the Club Association for the SRN Affiliation; however, each member's participation in SRN is voluntary. Each Club Member should carefully review the SRN Disclosure Guide and Rules and Regulations for complete details of the SRN exchange program, including each Club Member's allocated portion of the current SRN fees.

40. **Additions and Addenda.** This Purchase Agreement includes the following additional provisions and all addenda attached hereto specifically listed below, if any, all of which are incorporated herein by this reference.

## REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

SRN012 (Rev. 08-24-15)

Purchaser has read this Purchase Agreement, acknowledges receipt of a copy of it, and agrees to all the terms, conditions and provisions herein. Purchaser and Seller executed this Purchase Agreement as of the _____ day of _____.

SELLER:

ST. REGIS RESIDENCE CLUB, NEW YORK INC.,
a Florida corporation

By: _____
Authorized Agent

Acceptance Date: _____

PURCHASER MAY CANCEL THIS PURCHASE AGREEMENT AT WILL AND WITHOUT EXPLANATION WITHIN SEVEN (7) BUSINESS DAYS AFTER PURCHASER SIGNS THE PURCHASE AGREEMENT, IN WHICH EVENT PURCHASER WILL RECEIVE A FULL REFUND. SEE PAGE 1 OF THE OFFERING PLAN.

PURCHASER(S):

_____
Date

_____
Date

_____
Date

_____
Date

SRN/012 (Rev. 08-24-15)

EXHIBIT "A"

Club Unit No: _____

Accomodation Type: _____

Club Week: _____ ("Fixed Time")

Assigned Priority Designation: _____

SCHEDULE "A"

PERMITTED ENCUMBRANCES

1.    Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.    Any state of facts shown on a survey of the Property, provided such state of facts would not prevent the use of the Club Unit for its permitted purposes.

3.    Any state of facts which an accurate survey of the Club Unit would show, provided such state of facts would not prevent the use of the Club Unit for its permitted purposes.

4.    The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Condominium Documents, the Condominium Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

5.    The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Club Documents and the Club Power of Attorney from Purchaser to the Club Board, as the same may be amended from time to time.

6.    Consents by Seller or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

7.    Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

8.    Revocability of licenses for vault space, if any, under the sidewalks and streets.

9.    Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

10.   Leases and service, maintenance, employment, concessionaire and license agreements, if any, of the Club Unit, or other Club Units or portions of the Common Elements or Common Areas.

11.   The lien of any unpaid Club Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the closing of title.

12.   The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board or the Club Board), except that Seller shall pay all such assessments due to the Club Board prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

13.   Any declaration or other instrument affecting the Property which Declarants deem necessary or appropriate to comply with any Law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

14.   Any encumbrance as to which Purchaser's title company (a New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Club Interest) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Club Unit or the Club Interest if it is a lien or (b) will not be enforced against the Club Unit or the Club Interest if it is not a lien.

15.   Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Club Unit for its permitted purposes.

16.   Any violations against the Property which is the obligation of the Condominium Board, Club Board or Unit Owners or Club Members to correct.

SRN1012 (Rev. 08-24-15)

<u>SCHEDULE "B"</u>

<u>DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS</u>

LEAD WARNING STATEMENT

**Every Purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide buyer with information on lead-based paint hazards from risk assessments or inspections in the Seller's possession and notify the buyer of any known lead-based hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended poor to purchase.**

SELLER'S DISCLOSURE

(a)     Presence of lead-based paint and/or lead-based paint hazards. (check (i) or (ii) below)

        (i) _____ Known lead-based paint and/or lead-based paint hazards are present in the housing (explain on attached sheet).
        (ii) __X__ Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)     Records and reports available to Seller (check (i) or (ii) below):

        (i) __X__ Seller has provided Purchaser with all available records and reports pertaining to lead-based paint anchor
              lead-based paint hazards in the housing (See the Lead-Based Paint Survey dated May 31, 2005 prepared by
              Atlantic Environmental Incorporated).
        (ii) _____ Seller has no records or reports pertaining to lead-based paint and/or lead-based paint hazards in the housing.

PURCHASER'S ACKNOWLEDGEMENT (initial)

(c) ____ Purchaser has received copies of all information listed above.
(d) _X_ Purchaser has received the pamphlet Protecting Your Family from Lead in Your Home.
(e) ____ Purchaser has (check (i) or (ii) below):
        (i) _____ Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the
              presence of lead-based paint and/or lead-based paint hazards; or
        (ii) _____ Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead
              based paint hazards.

SELLING AGENT'S ACKNOWLEDGMENT (initial)

(f) _N/A_ Selling Agent has informed Seller of Seller's obligation under 42 U.S.C. 4852d and is aware of Selling Agent's independent
        responsibility to ensure compliance.

CERTIFICATE OF ACCURACY

        The following parties have reviewed the information above and certify, to their best of their knowledge, that the information
they have provided is true and accurate.

SELLER:                                              PURCHASER(S):

ST. REGIS RESIDENCE CLUB, NEW YORK INC.,
a Florida corporation                                _____


By: _____               _____
          Authorized Agent

Date: _____                        _____


                                                     _____

                                                     Date: _____

EXHIBIT "E"

---

## SVEC DISCLOSURE GUIDE FOR MEMBERS OF
## THE STARWOOD RESIDENCE NETWORK

---

Starwood Vacation Exchange Company Disclosure Guide

For Members of the Starwood Residence Network

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION REGARDING THE EXCHANGE PROGRAM OWNED AND OPERATED BY STARWOOD VACATION EXCHANGE COMPANY IN ACCORDANCE WITH APPLICABLE LAW.**

**This does not constitute an offer to sell or a solicitation of an offer to buy securities or any interest in real estate.  For further information, please contact:**

**STARWOOD VACATION EXCHANGE COMPANY**
**9002 San Marco Court**
**Orlando, Florida 32819**

## I.  Definitions

The capitalized terms used in this Disclosure Guide shall have the same meaning as the identical terms defined in the Starwood Residence Network ("SRN") Rules and Regulations attached as Exhibit "A" unless the context otherwise requires.

## II.  Information about SRN Operator

SRN Operator, Starwood Vacation Exchange Company, is a Delaware corporation with principal offices located at 9002 San Marco Court, Orlando, Florida 32819.  The sole shareholder of SRN Operator is Starwood Hotels & Resorts Worldwide, Inc., a Maryland corporation ("Parent").  The officers and directors of SRN Operator are as listed on the attached Exhibit "B."  SRN Operator has no legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in SRN.  However, one or more of the developers, sellers, or managing entities for SRN Resorts may also be subsidiaries or affiliates of the Parent.  None of the officers and directors of SRN Operator have any legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in SRN, although one or more of them may also be an officer or director of such entities and/or a stockholder of the Parent.  SRN Operator and its shareholder, officers, and directors reserve the right to act as developers or sellers of fractional and/or vacation ownership plans and multisite vacation ownership plans for future resorts which plans may or may not be affiliated with SRN.

## III.  Membership in SRN

Each purchaser of a Club Interest in an SRN Resort is eligible for enrollment as an SRN Member either at the time the purchaser acquires such Club Interest or sometime thereafter.  To use and enjoy benefits of membership in SRN, such purchaser must execute an Owner Use Agreement, which is separate and distinct from such purchaser's purchase contract with purchaser's seller.  The terms and conditions of such membership are set forth in the SRN Documents and also may be set forth in the Resort Documents for that SRN Resort.  An SRN Member's decision to use SRN by requesting an Interchange at an SRN Resort is strictly voluntary.  However, SRN Members must affirmatively make an Interchange Request in order to make an Interchange.  All SRN Resorts are affiliated with SRN by means of an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator.  SRN Operator may charge the homeowners association an affiliation fee for operating SRN.  Membership in SRN automatically terminates if the SRN Member voluntarily or involuntarily transfers the SRN Member's Club Interest and owns no other Club Interest; if the SRN Member's Home Resort ceases to be an SRN Resort; or if SRN is cancelled by SRN Operator.  Although SRN Membership is not transferable, resale purchasers may be eligible to enroll in SRN.

## IV.  SRN Procedures and Obligations

The terms and conditions of the procedures for using SRN program are set forth in the SRN Rules attached to this Disclosure Guide as Exhibit "A."

**The terms and conditions of this Disclosure Guide and the SRN Rules, including fees, benefits, and reservation procedures, are subject to change by SRN Operator without advance notice.**

**Among the changes in these SRN Rules is the addition of an Arbitration Provision.**

**PLEASE READ THE ARBITRATION PROVISION CAREFULLY.  IT PROVIDES THAT EITHER PARTY CAN REQUIRE THAT CERTAIN DISPUTES BE RESOLVED BY BINDING ARBITRATION.   ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.  IN ARBITRATION, A DISPUTE IS**

**RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.**

**EXCEPT AS SET FORTH IN THE ARBITRATION PROVISION, THE TERMS AND CONDITIONS OF MEMBERSHIP IN SRN WILL BE GOVERNED EXCLUSIVELY BY THE LAWS OF THE STATE OF FLORIDA. ANY ACTION AT LAW OR IN EQUITY BY AN SRN MEMBER TO CHALLENGE OR ENFORCE THE TERMS AND CONDITIONS OF MEMBERSHIP IN SRN MUST BE SUBMITTED EXCLUSIVELY TO THE JURISDICTION OF THE COURTS OF ORANGE COUNTY, FLORIDA, AND BY MAINTAINING MEMBERSHIP WITH SRN, EACH SRN MEMBER CONSENTS TO THE PERSONAL JURISDICTION OF THOSE COURTS. IF AN ACTION AT LAW OR IN EQUITY IS INITIATED BY EITHER AN SRN MEMBER OR SRN OPERATOR, THE LOSING PARTY SHALL PAY ALL COSTS INCURRED BY THE PREVAILING PARTY IN DEFENDING OR PURSUING SUCH ACTION, INCLUDING REASONABLE ATTORNEYS' FEES AND LEGAL COSTS.**

Each SRN Member recognizes and acknowledges that:

1. SRN Operator does not sell, lease, or otherwise convey any interest in real property;

2. Because not all owners of Club Interests in all SRN Resorts will participate in SRN, only a limited number of Club Weeks at such SRN Resorts, if any, will be available from time to time for reservation by SRN Members. Consequently, purchasers should not rely on the status of a particular resort as an SRN Resort in determining whether to purchase a Club Interest in an SRN Resort;

3. SRN Resort accommodations and facilities vary by location and resort. In addition, SRN Resort accommodations that have been reserved may differ in unit size, design, furnishing, or amenities from the Club Interest accommodations a particular SRN Member owns due to variations between resorts. SRN Operator will assign an Interchange Value to each Club Week and each Club Unit at all SRN Resorts;

4. Fees, if any, incurred by an SRN Member for the use of amenities at a host SRN Resort are determined and collected by the host SRN Resort;

5. An SRN Member is responsible for payment of any personal expenses incurred while occupying a Club Unit received through a reservation confirmation, as well as for any damage, theft, or loss caused by the SRN Member or the SRN Member's guests;

6. If the Interchange Selection becomes unavailable due to natural disaster, act of God, war, insurrection, or any other reason beyond SRN Operator's control, the SRN Member waives any and all claims against SRN Operator; and

7. SRN Operator is not liable for any claim or loss incurred in connection with participation in SRN or with respect to ownership of a Club Interest.

<u>V. Fees</u>

Pursuant to an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator, an SRN Affiliation Fee will be assessed to each SRN Resort's homeowners association so that Owners at that SRN Resort may be eligible to participate in SRN. The SRN Affiliation Fees to be charged per Club Interest participating in SRN is disclosed in the SRN Affiliation Fees Chart attached to this Disclosure Guide as Exhibit "C." SRN Members themselves have no contractual obligation to SRN Operator for the payment of any fees for membership in SRN. **Currently, there are no transaction fees**

**charged by SRN Operator.  However, SRN Operator reserves the right to amend the SRN Rules and charge transaction fees in its sole discretion.** Use of SRN may be restricted by SRN Operator if the SRN Member is not current in the payment of the SRN Member's Home Resort maintenance fees and taxes, and Club Interest mortgage or purchase money payments.  Furthermore, use of SRN may be restricted by SRN Operator if the SRN Member's homeowners association is not current in the payment of the SRN Affiliation Fee.  SRN Operator also will require advance payment of estimated maintenance fees and taxes to the SRN Member's Home Resort Managing Entity before permitting use of Interchange privileges.

VI.  SRN Resorts

SRN Members may request reservations in accordance with the SRN Documents and Resort Documents for any SRN Resort that is affiliated with SRN from time to time by SRN Operator.  The names and addresses of all SRN Resorts currently participating in SRN are as follows:

Resorts with 1-20 Units

| Name and Address | Number of Club Units | SRN Members |
|---|---|---|
| Camelback Residence Club Condominium<br>4515 North Phoenicia Place<br>Scottsdale, AZ 85251 | 7 | 66 |

Resorts with 21-50 units

| Name and Address | Number of Club Units | SRN Members |
|---|---|---|
| Fifth and Fifty-Fifth Residence Club<br>Two East 55th Street<br>New York, New York 10022 | 38 | 566 |
| Aspen Residence Club and Hotel Condominium<br>315 East Dean Street<br>Aspen, Colorado | 25 | 508 |

As of December 31, 2014, there were 1,130 SRN Members enrolled in SRN.  If required by applicable law, an independent audit of SRN operations will be performed and reported through the period ending December 31st each year. The SRN Operator calculates the number of SRN Members based on the number of Club Interests enrolled in SRN at each SRN Resort.

For the calendar year ending December 31, 2015, the percentage of confirmed exchanges (which is the number of reservations confirmed by SRN Operator divided by the number of reservation requests properly applied for) was 100%.

All Interchanges are based on availability and SRN does not guarantee that SRN Members will receive a specific Interchange Request.  The SRN program is based on an SRN Member trading one of SRN Member's reserved Club Weeks in exchange for an available Club Week. In order to make an Interchange Request, an SRN Member must: (a) pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interests; (b) not have placed the Club Week with another exchange company or program; and (c) obtain a confirmed reservation at SRN Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day. SRN Operator may receive improperly submitted Interchange Requests in the normal course of business. Interchange Requests cannot be honored if the SRN Member does not follow SRN's procedures by either improperly completing an Interchange Request or failing to submit an Interchange Request within the minimum time required.

**The percentage of confirmed reservations contained in any annual audit report will be only a summary of the reservation requests entered in the year reported,**

and such percentage should not be relied on as an indication of the probability of an SRN Member being confirmed to any specific choice or range of choices.

4

Exhibit "A"

Starwood Residence Network Rules and Regulations

These SRN Rules are binding on all SRN Members, their guests, invitees, lessees, licensees, and designees.

## I.  Definitions

The following capitalized terms have the meaning set forth below unless the context requires a different meaning:

Alternate Use means Interchange, conversion to use through the Starwood Preferred Guest Program (if available at a given SRN Resort), or rental.

Biennial Club Interest means a Club Interest in which the SRN Member's Use Year occurs every other year. Currently, the only Biennial Club Interests are in the Aspen SRN Resort, which Biennial Club Interests also are known as Lifestyle Interests.

Check-in Day means the first day of use of a given seven day Club Week.  Each SRN Resort has established Check-in Days.

Club Interest means a fractional ownership interest in an SRN Resort.  Unless the context dictates otherwise, the term will include Biennial Club Interests.

Club Unit means an accommodation of an SRN Resort that is subject to exclusive occupancy by one or more persons pursuant to the Resort Documents and available for reservation by SRN Members pursuant to the SRN Documents.

Club Week means seven consecutive days, or a one-week increment of time, that must begin on a Check-in Day, as described in the Resort Documents, and pursuant to which an SRN Member is entitled to the use and occupancy of a Club Unit.

Confirmation Notice means a written or electronic acknowledgment from Reservation Services that an Interchange Request has been fulfilled.

Disclosure Guide means the Starwood Vacation Exchange Company Disclosure Guide for SRN promulgated by SRN Operator from time to time.

External Exchange Company means any company that provides services to SRN or to SRN Members under an External Exchange Program.  Currently there are no External Exchange Companies affiliated with SRN.

External Exchange Program means the contractual arrangement, if any, pursuant to which an SRN Member may exchange the use of a Club Week, under certain conditions, for the use of accommodations in resorts other than SRN Resorts.

Home Resort means, as to a particular Club Interest, the SRN Resort in which an SRN Member's Club Interest is located.

Interchange means the exchange of an SRN Member's Club Week for another Club Week through SRN Operator.

Interchange Request means a Club Week requested by an SRN Member for an Interchange.

Interchange Selection means a Club Week requested by an SRN Member for an Interchange and for which a reservation is confirmed.

5

<u>Interchange Value</u> means the value assigned by SRN Operator to each Club Week and Club Unit at each SRN Resort.

<u>Managing Entity</u> means the condominium or homeowners association, management company, or other entity responsible for operating and maintaining a given SRN Resort.

<u>Owner</u> means the owner of a Club Interest.  During any period of time in which a purchaser has entered into a valid contract for the purchase of a Club Interest with a developer of an SRN Resort, has passed any applicable rescission period, and has not defaulted, such purchaser shall be considered an Owner.

<u>Owner Use Agreement</u> means an agreement executed by an Owner and SRN Operator, pursuant to which agreement the Owner may enroll and participate in SRN on a voluntary basis in accordance with the terms of such agreement and the other SRN Documents.

<u>Primary Owner</u> means the individual designated by the multiple Owners of a single Club Interest as having the exclusive right to make decisions regarding the use of SRN with respect to the Club Interest.

<u>Reservation Services</u> means the division of SRN Operator that handles and processes Interchange requests and other SRN Member services from time to time.

<u>Resort Documents</u> means all of the documents, other than SRN Documents, that create and govern the rights of Owners in, and the use and operation of, a given SRN Resort.

<u>Starwood</u> means Starwood Hotels & Resorts Worldwide, Inc., a Maryland corporation.

<u>Starwood Preferred Guest® Program</u> means the vacation and travel benefits program created by Starwood, as more particularly set forth in the Terms & Conditions for the Starwood Preferred Guest Program.  The Starwood Preferred Guest Program is a separate program and is not part of SRN.  Eligible SRN Members may access the Starwood Preferred Guest Program as set forth in the applicable Resort Documents.

<u>SRN</u> means the Starwood Residence Network, the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed by SRN Operator for SRN Resorts.  SRN is an exchange program offered by SRN Operator, an exchange company.  SRN Members may reserve the use of Club Weeks through SRN, which may or may not include access to an External Exchange Program, as set forth in the applicable SRN Documents.  SRN is not a legal entity or association of any kind.

<u>SRN Affiliation Agreement</u> means an agreement setting forth the terms and conditions that SRN Operator establishes from time to time, to make membership in SRN available to owners in SRN Resorts.

<u>SRN Affiliation Fee</u> means the amount assessed by SRN Operator to each SRN Resort's homeowners association each calendar year.

<u>SRN Documents</u> means those instruments governing the use and operation of SRN, including each SRN Affiliation Agreement, Owner Use Agreement, if applicable, the Disclosure Guide, and the SRN Rules, as promulgated, executed, or amended by SRN Operator from time to time.

<u>SRN Member</u> means an Owner who meets all of the terms and conditions for membership in SRN as determined by SRN Operator from time to time.

<u>SRN Operator</u> means Starwood Vacation Exchange Company, a Delaware corporation, its successors and permitted assigns.

<u>SRN Resort</u> means all or such portion of a resort that is affiliated with SRN.

<u>SRN Rules</u> means the Starwood Residence Network Rules and Regulations governing the reservation and use of Club Units and SRN Resort facilities, as promulgated, adopted, or amended from time to time by SRN Operator pursuant to the SRN Documents.

6

Use Year has the meaning given in the Resort Documents.  SRN Members owning a Biennial Club Interest will have a Use Year that occurs every other year.

## II.  SRN Operation

2.1    Membership.  Pursuant to an SRN Affiliation Agreement between the SRN Resort's homeowners association and SRN Operator, a purchaser of a Club Interest is eligible to enroll in SRN to enjoy the benefits of membership in SRN.   To enroll in SRN, purchasers of Club Interests will be required to execute an Owner Use Agreement.  Membership in SRN automatically terminates if the SRN Member voluntarily or involuntarily transfers the SRN Member's Club Interest and owns no other Club Interest, or if the SRN Member's Home Resort ceases to be an SRN Resort.  SRN Membership is not transferable.

2.2    Management.  SRN is operated and managed by SRN Operator pursuant to the SRN Documents. SRN Operator expressly is authorized to take such actions as it deems necessary or appropriate for the operation of SRN, including the implementation of all exchange program and reservation duties as outlined in the SRN Rules.

2.3    Primary Owner.  The Owners of each Club Interest which is owned by more than one person or by a business entity must designate a Primary Owner from time to time by notifying Reservation Services of same through a writing executed by all individuals holding the membership or by an authorized representative of the business entity.  Reservation Services may charge an administrative fee as SRN Operator may determine from time to time, each time it is requested to change a Primary Owner designation.

2.4    SRN Affiliation Fees.  Charges incurred by SRN Operator in connection with the operation of the Interchange program and the delivery of other SRN services and benefits at SRN Resorts will be charged as SRN Affiliation Fees to each SRN Resort's homeowners association, as more specifically provided in the applicable SRN Affiliation Agreement.

2.5    Transaction Fees.  In addition to SRN Affiliation Fees, SRN Operator has the right to charge such other transaction fees as it deems appropriate in its sole discretion from time to time.  Such fees may be charged for transactions including additional reservation request fees, Interchange fees, daily use fees, fees for additional housekeeping, and such other items as provided in the SRN Fees Chart as may be amended by SRN Operator from time to time in its sole discretion.

## Currently, there are no transaction fees charged by SRN Operator.

2.6    Basis for Addition.  SRN Operator may decide to affiliate additional resorts with SRN from time to time.  The affiliation of additional SRN Resorts is not subject to the approval of the SRN Members.  SRN Operator will make any decision to associate resorts with SRN, including the terms and conditions under which such resorts are affiliated, in its sole discretion.

2.7    Availability of SRN Resorts.  Availability of Club Weeks in an SRN Resort, other than an SRN Member's Home Resort, is dependent on the number of Owners in such SRN Resort who become SRN Members and participate in the Interchange program, the continued affiliation of each SRN Resort with SRN, and the number of Club Weeks available for reservation in such SRN Resort during a given Use Year.

2.8    Assignment of Interchange Value.  For administrative convenience in the operation of SRN and in the determination of the respective rights of SRN Members to enjoy the benefits of membership in SRN, some or all Club Weeks and Club Units at every SRN Resort will be divided into categories on a resort specific basis.  Currently, there exist two categories: category "Platinum" and category "Platinum Plus." Depending on the SRN Resort and SRN Operator's sole discretion, some Club Weeks will be categorized by demand for use and seasonality regardless of Club Unit type, while other Club Weeks will be categorized based on Club Unit type.   The category assigned represents the Interchange power of a given Club Week within SRN.  Accordingly, Club Weeks assigned an Interchange Value of "Platinum" may exchange for other Club Weeks assigned an Interchange Value of "Platinum."  Club Weeks assigned an Interchange Value of "Platinum Plus" may exchange for other Club Weeks assigned an Interchange Value of "Platinum" or "Platinum Plus."

7

**Accordingly, SRN Members whose Club Weeks are assigned an Interchange Value of "Platinum" will have less opportunities for Interchange than SRN Club Members whose Club Weeks are assigned an Interchange Value of "Platinum Plus."**

**The Interchange Value assigned represents the reservation power of a given Club Week within SRN.  The assignment of a certain category with respect to SRN Resorts is based on such factors as relative SRN Member demand for use of certain Club Weeks and the SRN Resort, seasonality of the Club Week, Club Unit type, SRN Resort type, SRN Member use patterns, and availability of Club Weeks ("Assignment Factors").  SRN Operator reserves the right, in its sole discretion, to revise the Interchange Value assigned to any Club Weeks and required for reservations of any Club Weeks within SRN annually, each without SRN Member consent.**

<u>III.  Reservations</u>

3.1   <u>Interchange Selection Process</u>.

(a)   <u>Requesting an Interchange</u>.  All Interchanges are subject to availability.  Each SRN Member will be permitted up to two Interchange Selections per Use Year in accordance with the procedures set forth below.  Pursuant to the Interchange restrictions set forth in Section 3.2, each SRN Member may only commit a maximum of two Club Weeks per Use Year to Alternate Use.  All Interchanges must be made for increments of seven consecutive days, which is a full Club Week.  Interchange Requests for particular Club Weeks will be taken on a first-come, first-served basis and SRN Manager does not guarantee that SRN Members will receive a specific Interchange Request.

(b)   <u>Biennial Restrictions</u>.  Each SRN Member owning a Biennial Club Interest may request an Interchange and may be granted a Confirmation Notice for a Club Week occurring only during such SRN Member's Use Year, which occurs every other year.

(c)   <u>Submitting an Interchange Request</u>.  The SRN Member must submit a valid Interchange Request to SRN Operator in writing, by telephone, facsimile, e-mail, or such other electronic means acceptable to SRN Operator from time to time.  In order for an Interchange Request to be considered valid, an SRN Member must:

(i)   pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interests;

(ii)   not have subjected the Club Week to a different Alternate Use, placed the Club Week with another exchange company or program, or contributed to or used the Club Week in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the SRN Documents); and

(iii)   obtain a confirmed reservation at SRN Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day.

SRN Operator, on receipt of a valid Interchange Request, will assign the SRN Member the use of a designated Club Week if the Club Week requested is available.  An SRN Member has no right to make a reservation unless the SRN Member has paid all Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments, pursuant to Article IV; furthermore, and as provided in Article IV, SRN Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due to the Managing Entity, as a condition to acceptance by SRN Operator of an Interchange Request.  In addition, SRN Operator may restrict access to SRN if the SRN Member's homeowners association has failed to pay the SRN Affiliation Fee.  An SRN Member may make a reservation in the name of a guest.

8

If the Club Week requested is available, SRN Operator will send the SRN Member a Confirmation Notice acknowledging that the SRN Member's Interchange Request has been fulfilled. If the Club Week requested is unavailable, the SRN Member will keep the confirmed reservation at SRN Member's Home Resort. As a consequence of this structure, SRN Operator will have no Club Weeks which are deposited with it by SRN Members which are not used by SRN Operator in effecting exchanges.

**Interchange Requests will be taken on a first-come, first-served basis, subject to availability. Since availability will vary, SRN Operator cannot guarantee confirmation of an Interchange Request for any specific Club Week at any specific SRN Resort at any time.**

3.2    <u>Interchange Options and Restrictions</u>

(a)    On receiving a Confirmation Notice, an SRN Member may use the Interchange Selection for personal use or for use by a guest. Unaccompanied guests must be registered with SRN Operator and must be at least 21 years of age. SRN Members are solely responsible for the acts and omissions of any guests or individuals occupying the Club Unit, including any loss or damage to the Club Unit or SRN Resort.

(b)    SRN Operator reserves the right to restrict and/or prohibit Interchange Requests by each SRN Member for such SRN Member's Home Resort.

(c)    Interchanges are for seven consecutive days of occupancy, which is one full Club Week.

(d)    SRN Operator may prohibit certain club weeks in a given SRN Resort from participating in SRN. **Currently, club weeks designated as Mid-Season Weeks at the St. Regis Residence Club, Aspen are not eligible for Interchange.**

(e)    A maximum of two Club Weeks per Use Year may be committed to Alternate Use. By way of example, if an SRN Member converted two Club Weeks to use through the Starwood Preferred Guest Program for the current Use Year, the SRN Member is prohibited from committing any remaining Club Weeks to any other Alternate Use for that same Use Year.

(f)    Interchange Selections are not eligible for Alternate Use.

(g)    An SRN Member unable to use an Interchange Selection is not relieved of the obligation to pay all maintenance fee assessments, taxes, and mortgage or purchase money payments associated with ownership of a Club Interest.

(h)    The Interchange accommodation received may or may not be comparable in size, layout, furnishings, services, or amenities to those in the SRN Member's Home Resort.

(i)    Cancellation of a confirmed reservation is not permitted. An SRN Member may request an exchange of the SRN Member's Interchange Selection one time, provided the SRN Member notifies SRN Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the Interchange Selection.

(j)    On acceptance of an Interchange Selection, the SRN Member relinquishes the right to use the Club Week which the SRN Member exchanged for the Use Year indicated on the Confirmation Notice.

3.3    <u>Confirmations; Accommodation Preferences.</u> Confirmation Notices will be provided to each SRN Member or Primary Owner by Reservation Services to confirm all Interchanges. Requests for Club Unit preferences, such as ground level Club Units, cannot be guaranteed, but will be noted as a preference in the Confirmation Notice.

3.4    <u>Cancellations, Additional Reservation Requests, and No-Shows.</u>

9

**Cancellation of a confirmed reservation is not permitted.  An SRN Member may request an exchange of the SRN Member's Interchange Selection, provided the SRN Member notifies SRN Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the confirmed reservation.**

Interchange Selections are not eligible for Alternate Use.

SRN Members who fail to arrive on the Check-in Day of the Interchange Selection must notify SRN Operator that they will be arriving subsequent to such Check-in Day or risk losing the reservation.  In the event of a no-show, no refund of advance payment of estimated maintenance fees or taxes will be made.

IV.  Delinquency

SRN Operator reserves the right not to accept an Interchange Request from an SRN Member if the SRN Member is not current in the payment of all of the SRN Member's Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the SRN Member's Club Interest. An SRN Member who is delinquent in the payment of any maintenance fee assessment, tax assessment, or Club Interest mortgage or purchase money payment shall have no right to reserve a Club Week through SRN Operator or any External Exchange Company, and any previously confirmed Interchange Request may be cancelled, until the delinquency is satisfied in full.  SRN Operator may collect any delinquent maintenance fee assessments, tax assessments, or Club Interest mortgage or purchase money payments by credit card.  Furthermore, SRN Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due to the Managing Entity, as a condition to acceptance by SRN Operator of an Interchange Request, provided that any such prepaid maintenance fee and taxes for SRN Resorts are held in escrow if required by applicable law.

V.  Miscellaneous Provisions

5.1      Personal Use; Commercial Purposes.  Use of the Club Units and facilities associated with SRN is limited solely to the personal use of SRN Members, their guests, invitees, exchangers, and lessees, and for recreational use by corporations or other similar business entities owning Club Interests.  Purchase of a Club Interest or use of Club Units and facilities associated with SRN for commercial purposes, for contribution to or use in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the SRN Documents), or for any purpose other than the personal use described above is prohibited.

5.2      Rental of Club Weeks Reserved Through SRN.  Rental by an SRN Member of Club Weeks reserved through SRN is prohibited.

5.3      Amendment of the SRN Rules.  Except as provided in the Resort Documents, SRN Operator expressly reserves the right to amend the SRN Rules, with respect to SRN Resorts in all respects, in its sole discretion, from time to time, without the consent of SRN Members, for any purpose, including permitting banking of Club Weeks and creating SRN tiers.  SRN Operator shall deliver notice of any material amendment to each Primary Owner at the Primary Owner's last known address.  Notice of amendments may be made by newsletter, annual mailings, facsimile, owner website posting, or e-mail.

5.4      Special Exchange Programs.  SRN Operator reserves the right, from time to time, to enter into special exchange relationships with any entity other than an External Exchange Company pursuant to which SRN Members may have access to selected non-SRN resorts and non-SRN owners will have access to SRN accommodations.  Any special exchange programs will be governed by their own reservation rules and regulations.

5.5      Amendment of SRN Documents.  Each SRN Member's participation in SRN will be governed by the SRN Documents, as amended from time to time by SRN Operator.  SRN Operator shall have the right to amend any portions of the SRN Documents that SRN Operator in its sole discretion determines are necessary or desirable to amend from time to time, without the consent of SRN Members, except as

10

provided in the Resort Documents.  SRN Operator shall deliver notice of any amendment in the same manner as described in Section 5.3.

5.6     Termination.  If the SRN Affiliation Agreement, Owner Use Agreement, or other instrument that affiliates an SRN Resort with SRN is terminated or expires in accordance with its own terms, the terminated SRN Resort will no longer be affiliated as a part of SRN.  However, on termination of such instrument, all confirmed reservations of SRN Members (from the terminating SRN Resort and from the non-terminating SRN Resorts) will be honored at both the terminating SRN Resort and at non-terminating SRN Resorts.

5.7     Severability and Conflict.  The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase, word, or other provision of the SRN Documents shall not affect the validity of the remaining portions.

5.8     Include.  The term "include" and similar terms (e.g., includes, including, included, comprises, comprising, such as, e.g., and for example), when used as part of a phrase including one or more specific items, are used by way of example and not of limitation.

5.9     Arbitration.  Any dispute, controversy or claim ("Claim") between SRN Member and SRN Operator, whether preexisting, present or future, arising from or relating to the SRN Rules, Owner's VOI, the Resort or the Condominium shall, at the election of either party, be arbitrated on an individual basis before JAMS (www.jamsadr.org, 1-800-352-5267) pursuant to its Streamlined Rules.  If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction will select the arbitrator.  The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., shall govern the interpretation and enforcement of this Section.  A single neutral arbitrator shall be appointed.  The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and issue a written reasoned decision which will be final and binding except for any review under the FAA.  The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court).  Any in-person hearing will be held in Orange County, Florida unless otherwise agreed.  If SRN Member initiates an individual arbitration, SRN Operator will pay all administrative and arbitrator fees exceeding $250.  Solely for purposes of this Provision, "SRN Operator" also means SRN Operator's parent companies, subsidiaries and affiliates; SRN Operator's and their employees, officers and directors; and any other person or entity named as a defendant or respondent in a Claim by SRN Member against SRN Operator.  "SRN Member" also means SRN Member's heirs, successors and assigns and any other person or entity to which a VOI is subsequently resold or otherwise conveyed.

"**Claim**" shall be broadly construed and includes, without limitation, disputes concerning: purchase, financing, ownership or occupancy; breach, termination, cancellation or default; condition of the property; the Starwood Residence Network or other exchange programs; Owner's VOI, the Resort or the Condominium; reservations, points or rewards programs; applications and personal information; marketing or sales solicitations, representations, advertisements, promotions or disclosures; and collection of delinquent amounts and the manner of collection.  "Claim" includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity.  "Claim" does not include: (i) disputes about the validity, enforceability, coverage or scope of this Section or any part thereof, which are for a court to decide.  But disputes about the validity or enforceability of the SRN Rules as a whole are for the arbitrator to decide; or (ii) any individual action by SRN Member in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court.

**Class Action Waiver.**  If a Claim is arbitrated, neither SRN Member nor SRN Operator will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member, (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity.  The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding or to issue any relief that applies to any person or entity except SRN Member and SRN Operator individually.

An arbitration award may be enforced in any court with jurisdiction.  This Section shall survive the breach, cancellation, termination or rescission of the SRN Rules, and any bankruptcy to the extent permitted by

law.  This Section governs if it conflicts with the SRN Rules or the arbitration rules.  If any part of this Section other than the Class Action Waiver is declared unenforceable, the remainder shall be enforceable.  If the Class Action Waiver is declared unenforceable in a proceeding between SRN Member and SRN Operator, without impairing the right to appeal such decision, this entire Section (except for this sentence) shall be null and void in such proceeding.  SRN Operator will not amend this Section in a manner that adversely affects SRN Member's rights unless SRN Operator gives SRN Member a right to reject the amendment.

**Right to Reject Arbitration Provision**: SRN Member may reject this Section by sending SRN Operator a written notice which gives SRN Member's name and Agreement number and states that Owner rejects the Arbitration Provision.  The rejection notice must be sent by certified mail, return receipt requested, to Starwood Vacation Exchange Company, 9002 San Marco Ct., Orlando, Florida 32819, Attn: Legal Department - Arbitration Rejection Notice.  A rejection notice must be signed by SRN Member and received by SRN Operator within thirty (30) days after becoming a SRN Member or 30 days after these SVN Rules have been updated, whichever date is later.  Rejection of arbitration will not affect any other term of this Agreement.

**Each SRN Member has read, understands and voluntarily agrees to this Arbitration Provision and acknowledges that if a Claim is arbitrated, there will be no right to have a court or jury trial or participate in a class action.**

<u>Exhibit "B"</u>

<u>Officers and Directors of Starwood Vacation Exchange Company</u>

Officers

| | |
|---|---|
| President, Chief Executive Officer | Sergio D. Rivera |
| Senior Vice President, Chief Operating Officer | Stephen G. Williams |
| Senior Vice President | Thorp S. Thomas |
| Senior Vice President, Assistant Secretary | Victoria H. Carter |
| | |
| Vice President, Secretary | Angela K. Halladay |
| Vice President, Assistant Secretary | Robin L. Suarez |
| Vice President, Assistant Secretary | Barbara E. Overton |
| Vice President, Treasurer | Lisa Cassin |
| Vice President | Heather McGill |
| Assistant Treasurer | John Buckwalter |
| Assistant Secretary | Jason Cohen |

Directors:

Thorp S. Thomas
Stephen G. Williams
Barbara E. Overton

SRN GUIDE R-11

Exhibit "C"

## Chart for Starwood Residence Network Affiliation Fees

Note: This chart provides a summary of the fees that may be charged for the use of the Starwood Residence Network.  For additional information, please see the Starwood Residence Network Rules and Regulations.

## Affiliation Fees for Starwood Residence Network Members

SRN Yearly Affiliation Fee[1]                    US $149 per year per Club Interest

---

[1] For Owners of Biennial Club Interests,  the equivalent of half of the SRN Yearly Affiliation Fee shall be paid every year, not just in alternate years.

14