TWENTY-FIFTH AMENDMENT

FRACTIONAL OFFERING PLAN

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB

TWO EAST 55TH STREET

NEW YORK, NEW YORK 10022

Sponsor:

St. Regis Residence Club, New York Inc.
c/o Vistana Signature Experiences, Inc.
9002 San Marco Court
Orlando, Florida 32819
(407) 903-4000

Dated: November 15, 2016

CONFIDENTIAL

DEF00011032

TABLE OF CONTENTS

| SECTION | PAGE |
|---|---|
| INTRODUCTION | 1 |
| 1. STARWOOD TRANSACTION | 1 |
| 2. INTERVAL LEISURE GROUP | 1 |
| 3. NEW DEFINITIONS | 1 |
| 4. LICENSE AGREEMENT | 2 |
| 5. VISTANA SIGNATURE EXCHANGE COMPANY AND RESERVATION RULES | 4 |
| 6. STATUS OF CLOSING OF CLUB INTERESTS | 4 |
| 7. PURCHASE PRICE SCHEDULE | 4 |
| 8. CLUB BOARD | 4 |
| 9. CONDOMINIUM BOARD | 4 |
| 10. 2016 CLUB BUDGET | 5 |
| 11. 2016 CONDOMINIUM BUDGET | 5 |
| 12. CLUB FINANCIAL STATEMENTS | 5 |
| 13. CONDOMINIUM FINANCIAL STATEMENTS | 5 |
| 14. PURCHASE AND SALE AGREEMENT | 5 |
| 15. IDENTITY OF PARTIES | 5 |
| 16. DEFINITIONS | 6 |
| 17. NO MATERIAL CHANGES | 6 |
| 18. INCORPORATION OF OFFERING PLAN | 6 |
| 19. EXTENSION OF OFFERING PLAN | 6 |

**EXHIBIT**

| | | |
|---|---|---|
| A | - | SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION |
| B | - | 2016 CLUB BUDGET |
| C | - | CERTIFICATION OF CLUB BUDGET EXPERT |
| D | - | 2016 CONDOMINIUM BUDGET |
| E | - | CERTIFICATION OF CONDOMINIUM BUDGET EXPERT |
| F | - | 2015 CLUB FINANCIAL STATEMENTS |
| G | - | 2015 AND 2014 CONDOMINIUM FINANCIAL STATEMENTS |
| H | - | PURCHASE AND SALE AGREEMENT |
| I | - | RESIDENCE NETWORK GUIDE |

00047998.DOCX

i

CONFIDENTIAL

DEF00011033

**TWENTY-FIFTH AMENDMENT**

**TO**

**FRACTIONAL OFFERING PLAN**

## INTRODUCTION

This Twenty-Fifth Amendment modifies and supplements the terms of the Fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club located at Two East 55th Street, New York, New York 10022 dated February 17, 2006 ("Offering Plan"), as amended, and should be read in conjunction with the Offering Plan, as previously amended.

The terms of this amendment reflect changes as a result of the Starwood Transaction (described below). Sponsor and the Exchange Company are now independent of Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") and are owned by Interval Leisure Group ("ILG"). Terms not defined in this Amendment have the meaning given in the Timeshare Offering Plan.

1.   **STARWOOD TRANSACTION**

On May 12, 2016, Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") separated and sold its Starwood Vacation Ownership ("SVO") division to Interval Leisure Group, Inc. ("Starwood Transaction"). SVO is now known as Vistana Signature Experiences, Inc. ("Vistana"). Sponsor and the Exchange Company are now independent of Starwood and are owned by Interval Leisure Group ("ILG"). Sponsor is not a subsidiary of Starwood but rather a subsidiary of ILG.

2.   **INTERVAL LEISURE GROUP**

ILG is a leading provider of professionally delivered vacation experiences and the exclusive global licensee for the Westin®, and Sheraton® brands in vacation ownership. The company offers its owners, members, and guests access to an array of benefits and services, as well as world-class destinations through its international portfolio of resorts and clubs. ILG's subsidiary Vistana owns and manages the Westin Vacation Club and the Sheraton Vacation Club and, through Vistana's various subsidiary and affiliate entities such as Sponsor, offers Club Interests to the general public.

3.   **NEW DEFINITIONS**

Set forth below are changes that will appear in the Offering Plan as a result of the Starwood Transaction:

00047998.DOCX                                   1

**CONFIDENTIAL**                                                      **DEF00011034**

**Exchange Network** means the Vistana Residence Network, the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions imposed by the Exchange Company for resorts affiliated with the Exchange Network. Note that the Exchange Network was formerly known as Starwood Residence Network and by the acronym SRN and may be referred to by such former name and acronym in various documents and agreements.

**Exchange Company** means Vistana Signature Network, Inc., a Delaware corporation, its successors and permitted assigns. Note that Vistana Signature Network, Inc. was formerly known as Starwood Vacation Exchange Company, Inc. and may be referred to by such former name in various documents and agreements. ILG, a company independent of Starwood acquired Vistana and now controls all of the Vistana Companies.

**Sponsor** means the St. Regis Residence Club, New York Inc., a New York corporation.

**Vistana** means Vistana Signature Experiences, Inc., a Delaware corporation.

**Vistana Companies** means Vistana, its subsidiaries and affiliates, including VVO, Sponsor, the Exchange Company, and Association Manager.

**VVO** means Vistana Vacation Ownership, Inc., a Florida corporation. Note that Vistana Vacation Ownership, Inc. was formerly known as Starwood Vacation Ownership, Inc. and by the acronym SVO may be referred to by such former name and acronym in various documents and agreements. ILG, a company independent of Starwood acquired Vistana and now controls all of the Vistana companies.

4. **LICENSE AGREEMENT**

Vistana Signature Experiences, Inc. ("Vistana") has entered into a License Agreement with Starwood Hotels & Resorts Worldwide, Inc. ("Starwood") pursuant to which Vistana has been granted the limited right to use the "St. Regis" name and mark ("Brand") (including the limited right for Vistana to use Starwood's service marks and trademarks and logos associated therewith ("Marks")), in connection with Vistana's operation of the Club Property and Plan of Club Ownership and the marketing and sales of Club Interests in the Plan of Club Ownership (the "License Agreement").

Pursuant to such right and in accordance with and subject to the terms and conditions of the License Agreement and the Management Agreement, the Club Property and Plan of Club Ownership will be managed and operated in accordance with the "License Standards" (defined below) as a "St. Regis," or under such other similar names and marks as Vistana is permitted to use to identify the Club Property and Plan of Club Ownership as part of the club ownership system operated, managed, or owned by Vistana and its subsidiaries (including Management Company and Seller). Management Company may use the Brand and the Marks for such purposes, and for any other purpose it determines in its sole discretion, provided, in each case, such use is in accordance with the License Agreement. Seller also has certain limited rights to use the Brand and the Marks with respect to the development, sale, and marketing of Club Interests in the Plan of Club Ownership and the operation of certain property which has not been declared as part of the Club Property. As used in this Agreement, "License Standards" refers generally to any standards, policies, procedures, programs, instructions, management,

00047998.DOCX

2

requirements and guidance relating to the design, construction, development, maintenance, and operation of club properties which are owned or operated by Vistana, its successors, assigns, or any of its affiliates, subsidiaries or licensees and which are designated as a "St. Regis," or similar names or marks and including those standards, policies, procedures, programs, instructions, management, requirements and guidance specified under the License Agreement.

Owners acknowledge that Starwood may terminate the License Agreement if, among other reasons, the Club Property is not managed, operated, and maintained in a manner consistent with the License Standards (which could occur, among other reasons because of the failure of the Association or Owners to approve budgets sufficient to cover required maintenance expenses). Additionally, Owners acknowledge that Starwood may terminate the License Agreement in the event of the Association's bankruptcy or insolvency, the Association's liability for a large adverse court judgment, the Association's dissolution or liquidation, the failure by Vistana to pay the mandatory licensing fee owed to Starwood or for any other reason permitted under the License Agreement. Further, and as noted above, the availability and use of the Brand and Marks are subject to the terms, conditions, and requirements set forth in the Management Agreement and License Agreement. If the Management Agreement or License Agreement is terminated, the Club Property and Plan of Club Ownership will no longer be associated with the Brand or Marks. The costs and expenses incurred by Management Company to comply with the terms, conditions, and requirements of the License Agreement and Management Agreement may be part of the Club Expense Assessment.

**None of the Brand, the Marks, or the License Agreement are part of the Club Property or otherwise included in the Club Interest. All use of the Brand and the Marks in association with the Club Property inure exclusively to the benefit of Starwood or its affiliates. Neither the Association nor any Owner has any right, title, or interest in the Brand, the Marks, or the License Agreement. None of the Association, any Owner, and Purchaser shall have the right to license, advertise, market or otherwise use the Brand or Marks, and shall not use the Brand or Marks in association with any other business, service, or property. Purchaser acknowledges and agrees that Purchaser is not acquiring Purchaser's Club Interest with the expectation that the Brand or the Marks will continue to be associated with the Club Property or the Plan of Club Ownership during the Purchaser's entire period of ownership. The Club Interests, Residence Network, Club Property and Plan of Club Ownership are not owned, developed, maintained or sold by Starwood or any of its affiliates.**

In addition, and in accordance with the terms and conditions of the Residence Network Affiliation Agreement for the Club Property, the Association and Management Company have agreed to manage, operate, and maintain the Club Property and Plan of Club Ownership in a manner consistent with the standards of quality and customer service established, imposed or adopted by Residence Network Operator and published by Residence Network Operator for all Residence Network Resorts from time to time ("Network Standards"), which may incorporate or adopt all or a portion of the License Standards. The Residence Network Affiliation Agreement may be terminated by Residence Network Operator, resulting in the deletion of the Club Property and Plan of Club Ownership from the Residence Network, if, among other reasons, the Club Property and Plan of Club Ownership are not managed, operated, and maintained in a manner consistent with the Network Standards, (which could occur, among other reasons, because of the failure of the Association or Owners to approve budgets sufficient to cover

00047998.DOCX

3

**CONFIDENTIAL**                                                           DEF00011036

required maintenance or operating expenses).

5.    <u>VISTANA SIGNATURE EXCHANGE COMPANY AND RESERVATION RULES</u>

In order to increase the range of options available to Club Members, Sponsor has arranged with Vistana Signature Network, Inc., a Delaware corporation, whose address is 9002 San Marco Court, Orlando, Florida 32819 to provide the Vistana Residence Network Exchange Program ("Exchange Program") to Club Members. The Exchange Company and Sponsor are affiliates; however, neither the Exchange Company nor Sponsor are agents for the other party and no representations or promises made by the Exchange Company, Sponsor, or their agents, are binding on the other party. No joint venture, partnership, or contract of agency exists between the Exchange Company and Sponsor. The Exchange Company's responsibility for representations regarding the Exchange Program is limited to those representations made in written materials supplied by the Exchange Company. While it is anticipated that Sponsor and the Exchange Company will maintain an ongoing contractual relationship, there is no assurance that the arrangement between Sponsor and the Exchange Company will continue for any particular length of time.

6.    <u>STATUS OF CLOSING OF CLUB INTERESTS</u>

As of September 23, 2016, Sponsor closed title on the sale of approximately 301 Club Interests out of a total of 372 Club Interests, leaving approximately 71 Club Interests available for sale.

7.    <u>PURCHASE PRICE SCHEDULE</u>

Annexed hereto as Exhibit "A" is a "Schedule A – Purchase Prices and Related Information" which reflects the current prices for each of the Club Interests.

THE PURCHASE PRICES SET FORTH ON SCHEDULE A HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

8.    <u>CLUB BOARD</u>

The present officers and members of the Club Board are as follows:

| <u>Name</u> | <u>Office</u> | <u>Affiliation</u> |
|---|---|---|
| Skip Kotkins | President | Club Owner |
| Keith Balter | Vice President | Club Owner |
| Guy Collette | Treasurer | Club Owner |
| Paulette Carter | Secretary | Sponsor |

Sponsor does not control of the Club Board.

9.    <u>CONDOMINIUM BOARD</u>

The present officers and members of the Condominium Board are as follows:

00047998.DOCX      4

**CONFIDENTIAL**       **DEF00011037**

| Name | Office | Affiliation |
|------|--------|-------------|
| Cynthia Porter | President | Hotel |
| Marvin Schein | Vice President | Suites |
| Hermann Elger | Vice President | Hotel |
| Nicole Stutz | Treasurer | Hotel |
| Tobias Busse | Secretary | Hotel |
| Keith Balter | Manager | Club |
| David Greenbaum | Manager | Retail |

The Hotel and Retail Board Members will at all times control the Condominium Board through the designation of a majority of its members.

10.  **2016 CLUB BUDGET**

Annexed to this Amendment as Exhibit "B", is the Operating Budget for the Club Association for the period commencing January 1, 2016 and ending December 31, 2016 which was adopted by the Club Board.

Annexed to this Amendment as Exhibit "C" is a Certification of Club Budget Expert.

11.  **2016 CONDOMINIUM BUDGET**

Annexed to this Amendment as Exhibit "D" is the Operating Budget for the Condominium for the period commencing January 1, 2016 and ending December 31, 2016 which was adopted by the Condominium Board

Annexed to this Amendment as Exhibit "E" is a Certification of Condominium Budget Expert.

12.  **CLUB FINANCIAL STATEMENTS**

Annexed to this Amendment as Exhibit "F" are the financial statements of the Club Association for the 2015 calendar year prepared by Myers, Brettholtz & Company, PA, certified public accountants.

13.  **CONDOMINIUM FINANCIAL STATEMENTS**

Annexed hereto as Exhibit "G" are the financial statements of the Condominium for the 2015 calendar year certified by Myers, Brettholtz & Company, PA, certified public accountants.

14.  **PURCHASE AND SALE AGREEMENT**

Annexed hereto as Exhibit "H" is an updated Purchase and Sale Agreement which has been modified to update new terms.

15.  **IDENTITY OF PARTIES**

The principals of Sponsor are Robin L. Suarez and Steve Williams having an address c/o Sponsor.

00047998.DOCX

5

The principals of Sponsor have taken part in the following prior public offerings in New York which were initially offered during the past 5 years:

| Project | Filing Date | File Number |
|---|---|---|
| Coral Vista | July 17, 2014 | T13-0006 |
| St. Augustine Resort Condominium | May 30, 2008 | T08-0003 |
| Bay Vista Condominium | November 28, 2007 | T07-0010 |

The principals of Sponsor are current in their financial obligations with respect to these projects.

There have been no prior felony convictions of Sponsor or its principals and no prior convictions, injunctions and judgments against Sponsor or its principals that may be material to the Timeshare Plan or an offering of securities generally that occurred within 15 years prior to submission of this Amendment.

Sponsor and its principals have designated the Secretary of State as agent for service of process.

**16.   DEFINITIONS**

Any term used in this Amendment not otherwise defined herein shall have the same meaning ascribed to it in the Offering Plan.

**17.   NO MATERIAL CHANGES**

Except as set forth in this Amendment, there have been no material changes of facts or circumstances affecting the Property or the offering.

**18.   INCORPORATION OF OFFERING PLAN**

The Offering Plan, as modified and supplemented by this Amendment, is incorporated herein by reference with the same effect as if set forth at length.

**19.   EXTENSION OF OFFERING PLAN**

The Offering Plan, as modified and supplemented by this Amendment, may not be used after six (6) months following the Filing Date of this Amendment unless the Offering Plan is extended or amended.

SPONSOR:

ST. REGIS RESIDENCE CLUB, NEW YORK INC.

00047998.DOCX

6

CONFIDENTIAL   **DEF00011039**

EXHIBIT "A"

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

00047998.DOCX

CONFIDENTIAL

DEF00011040

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB
Two East 55th Street
New York, New York 10022

| CLUB UNIT 1 | | | | | | PURCHASE PRICE 2 | PROJECTED ANNUAL CLUB CHARGES 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Number | Bedrooms | Bathrooms | "Condominium Declaration" Square Feet | "Usable" Square Feet | Facing | | Real Estate Taxes (a) | Other Club Expenses (b) | Total Club Charges (a)+(b) |
| 801 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 901 | One | Two | 1061 | 935 | Interior & 5th Avenue | $700,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 803 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 903 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1103 | Two | Two | 1546 | 1383 | 5th Avenue & 55th St. | $1,000,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 807 | One | One | 738 | 625 | 55th Street | $480,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 907 | One | One | 738 | 625 | 55th Street | $480,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 1007 | One | One | 738 | 625 | 55th Street | $500,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 808 | Studio | One | 523 | 445 | Interior | $387,000 | $1,541.05 | $11,522.37 | $13,063.42 |
| 908 | Studio | One | 523 | 445 | Interior | $387,000 | $1,541.05 | $11,522.37 | $13,063.42 |
| 809 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,541.05 | $11,522.37 | $13,063.42 |
| 909 | Studio | One | 474 | 415 | 55th Street | $387,000 | $1,541.05 | $11,522.37 | $13,063.42 |
| 815 | Two | Three | 1507 | 1290 | 55th Street | $730,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 915 | Two | Three | 1507 | 1290 | 55th Street | $750,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 818 | Two | Three | 1593 | 1395 | Interior | $730,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 918 | Two | Three | 1593 | 1393 | Interior | $730,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1018 | Two | Three | 1539 | 1349 | Interior | $750,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 821 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 921 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1021 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1121 | Two | Two | 1129 | 957 | 55th Street | $650,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 822 | One | Two | 1070 | 852 | Interior | $522,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 922 | One | Two | 1070 | 852 | Interior | $522,000 | $2,859.97 | $15,632.91 | $18,492.88 |
| 855 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 955 | Two | Three | 1458 | 1263 | 55th Street | $800,000 | $4,409.55 | $20,462.32 | $24,871.87 |

CONFIDENTIAL

DEF00011041

SCHEDULE A – PURCHASE PRICES AND RELATED INFORMATION

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB
Two East 55th Street
New York, New York 10022

| CLUB UNIT 1 | | | | | | PURCHASE PRICE 2 | PROJECTED ANNUAL CLUB CHARGES 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Number | Bedrooms | Bathrooms | "Condominium Declaration" Square Feet | "Usable" Square Feet | Facing | | Real Estate Taxes (a) | Other Club Expenses (b) | Total Club Charges (a)+(b) |
| 836 | Two | Three | 1455 | 1260 | Interior | $700,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 936 | Two | Three | 1455 | 1260 | Interior | $700,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1035 | Two | Three | 1458 | 1262 | 55th Street | $800,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1135 | Two | Three | 1458 | 1262 | Interior | $800,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| 1036 | Two | Three | 1455 | 1259 | 55th Street | $700,000 | $4,409.55 | $20,462.33 | $24,871.27 |
| 1136 | Two | Three | 1438 | 1245 | Interior | $700,000 | $4,409.55 | $20,462.32 | $24,871.87 |
| TOTALS | | | | | | $243,964,000 | $1,372,499 | $6,777,196 | $8,149,695 |

See Notes to Schedule A

CONFIDENTIAL

DEF00011042

Notes to Schedule A

1.   The Club Units on Floors 8, 9, 10 and 11 contain studios; one-bedrooms; and two-bedroom duplexes. The Club Interest in each Club Unit is equal to a fraction, the numerator of which is four (4) and the denominator of which is fifty-two (52).

Purchasers should refer to the Floor Plans set forth in Part II of the Offering plan for an approximation of the dimensions and layouts of the Club Units. The "Condominium Declaration" square footage represents the square foot area of the Club Unit measured horizontally on each floor from the interior side of the glazing or the exterior walls at the Building line and/or the Property line to the midpoint of the interior walls and partitions separating one Club Unit from another Unit, or the public side of the interior walls separating a Club Unit from public corridors, stairs, elevators and other mechanical equipment spaces or any Common Elements.  Column and mechanical pipes (whether along the perimeter or with the Club Unit) are not deducted from the square foot area of the Club Unit.  The "useable" square foot area of a Club Unit represents that portion of the Club Unit to which the Club Owner has access (i.e., interior painted surfaced to interior painted surface, including kitchen counters, bathtubs, etc.). The square foot area and dimensions of the Club Units are approximate and may vary due to field conditions. No such variation will affect a Purchaser's obligations under the Purchase Agreement or the Offering Plan unless the square foot area of the Club Unit is diminished by more than five percent (5%) (excluding interior partitions), therefore affording Purchaser a fifteen (15) day right to rescind.

The number of rooms in each Club Unit has been computed by Sponsor in accordance with industry standard as follows:

| Type of Club Unit | Total Rooms | Type of Rooms |
|---|---|---|
| Studio | 2 | 1 bedroom, 1 bathroom |
| One bedroom | 3 or 4 | 1 or 2 bedrooms, 1 bathroom, 1 living room |
| Two bedroom | 5 | 2 bedrooms, 2 bathrooms, 1 living room |
| Two bedroom duplex room | 5 or 6 | 2 bedrooms, 2 or 3 bathrooms, 1 living room |

2.   THE PURCHASE PRICES AND OTHER TERMS OF SALE OF CLUB INTERESTS MAY BE NEGOTIATED BY SPONSOR AND, THEREFORE, MAY BE CHANGED. ACCORDINGLY, PURCHASERS MAY PAY DIFFERENT PURCHASE PRICES FOR SIMILAR CLUB INTERESTS.  The effect of this, as well as the right of Sponsor to change purchase prices, is more particularly discussed in the Section of the Offering Plan entitled "Changes in Prices and Facilities."  In addition to the payment of the purchase price, each Purchaser will be responsible for the payment of certain closing costs and expenses at the time of Closing, as explained in the Section of the Offering Plan entitled "Closing Costs".  If Purchaser obtains a mortgage loan from Sponsor or other lender, Purchaser will be responsible for the payment of additional closing costs and expenses relating to such loan. There may be an apportionment of certain charges relating to the

C:\Users\bcobarra\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\618MXRI6\SCHEDULE A NOTES (25th AMENDMENT) Draft.doc

CONFIDENTIAL                                                        DEF00011043

Club Interest at the time of the Closing of Title.  THESE PRICES HAVE BEEN SET BY SPONSOR AND ARE NOT SUBJECT TO REVIEW OR APPROVAL BY THE DEPARTMENT OF LAW OR ANY OTHER GOVERNMENT AGENCY.

3.     The estimated Club Charges contained in this column are for the period from January 1, 2016 to December 31, 2016 based on the "Schedule B – Club Budget" prepared by Sponsor in consultation with the Club Budget Expert. Club Charges include Real Estate Taxes assessed against the Club Units and other Club Expenses. The Club Association reserves the right to bill Club Members for Club Charges more often than once a year.

The estimated annual Real Estate Taxes of $1,372,499 for the 2016 budget calendar year for the Club Units are based upon tax assessments published by the City of New York, that: (a) the approximate allocated assessed taxable value of the Club Units during the second half of the 2015/2016 tax year is $12,321,283 in the aggregate and during the first half of the 2016/2017 tax year is estimated to be $12,564,364 in the aggregate for a total 2016 market value of $27,380,618 (rounded); and (b) the effective tax rate in effect for the 2015/2016 tax year is $10.656 per $100 of assessed valuation and the tax rate in effect for the 2016/2017 tax year is estimated to be $10.975 per $100 of assessed valuation with respect to the Club Units.  While the legal responsibility for Real Estate Taxes lies with each Club Member, the Club Association will collect Real Estate Taxes from each Club Member (which are included in the Club Charges) and remit the same on behalf of each Club Member to the taxing authorities.  In addition to these estimated Club Charges, each Owner will be responsible for mortgage payments under a loan, if any, obtained to finance the purchase of the Club Interest.

CONFIDENTIAL                                                               DEF00011044

EXHIBIT "B"

2016 CLUB BUDGET

00047998.DOCX

CONFIDENTIAL

DEF00011045

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION**
**APPROVED BUDGET OF OPERATING EXPENSES & REPLACEMENT RESERVES**
**JANUARY 1, 2016 through DECEMBER 31, 2016**

| | AR Units Annual | Fractional Ownership Interest | | |
| --- | --- | --- | --- | --- |
| | | Studio | 1 BR | 2 BR Deluxe |
| **Income** | | | | |
| Maintenance Charges (1) | $ 8,149,695 | $ 13,063.42 | $ 18,492.88 | $ 24,871.87 |
| Interest Income (2) | 7,495 | 20.15 | 20.15 | 20.15 |
| Total Income | $ 8,157,190 | $ 13,083.57 | $ 18,513.03 | $ 24,892.02 |
| | | | | |
| **Expenses** | | | | |
| Labor (3) | $ 1,060,638 | $ 1,190.22 | $ 2,208.87 | $ 3,405.68 |
| Operating Supplies (4) | 234,595 | 263.40 | 488.84 | 753.70 |
| Laundry Service (5) | 317,248 | 356.21 | 661.07 | 1,019.25 |
| Administrative (6) | 725,990 | 926.01 | 1,555.60 | 2,295.30 |
| Insurance (7) | 28,978 | 77.90 | 77.90 | 77.90 |
| Management Fee (8) | 533,158 | 863.44 | 1,213.22 | 1,624.17 |
| Legal & Audit (9) | 17,609 | 47.34 | 47.34 | 47.34 |
| Real Estate Taxes (10) | 1,372,499 | 1,541.05 | 2,859.97 | 4,409.55 |
| Condominium Fees (11) | 5,108,055 | 6,846.96 | 7,772.72 | 8,860.39 |
| Prior Year (Surplus) / Deficit Reduction (12) | - | - | - | - |
| Contingency (12) | - | - | - | - |
| Replacement Reserves (13) | 759,021 | 971.05 | 1,627.50 | 2,398.75 |
| Total Expenses | $ 8,157,190 | $ 13,083.57 | $ 18,513.03 | $ 24,892.02 |

CONFIDENTIAL

DEF00011046

**FOOTNOTES TO SCHEDULE B**
**Residence Club Operations**

Amounts are projected on the assumption that the year of association operation will be the year from January 1, 2016 to December 31, 2016.

The General Common Charges payable by Fractional Unit Owners equal the sum of their allocated shares of the General Common Expenses, including their allocated shares of the expenses associated with both the General Common Elements and the Hotel Limited Common Elements. The General Common Charges payable by the Hotel Unit Owner equals its allocated share of the expenses of the General Common Elements. The Hotel Unit Owner pays directly the expenses associated with the Hotel Limited Common Elements, subject to partial reimbursement by the Condominium Board on behalf of the Suite Unit Owners and the Fractional Unit Owners for their allocated shares of such expenses. The General Common Charges payable by the Retail Unit Owner equals its allocated share of the expenses of the General Common Elements. The Retail Unit does not use or share in the expenses of any of the Hotel Limited Common Elements. Certain General Common Charges are currently allocated in common to the Hotel Unit and the Retail Unit, which Units are currently under common ownership.

Potential purchasers are advised that the amounts set forth in Schedule B and these footnotes are only projections.

After operation of the Residence Club Association has commenced, it is anticipated that the methods of allocation of the General Common Expenses will be periodically adjusted as provided in Section 6.1.2 of the By-Laws, but not more frequently than once each year, to reflect the differing proportions fairly attributable to the then amount of usage by such category of Unit Owner of the services and the General Common Elements and Hotel Limited Common Elements in question, but in any event in conformity with Section 339-m of the New York State Real Property Law. If any category of Unit Owners contends that any method of allocation determined by the Board is inequitable, the dispute may be submitted to arbitration as provided in the By-Laws.

General Common Expenses include costs and expenses in connection with the repair, maintenance, replacement, restoration and operation of, and any alteration, addition or improvement to, the General Common Elements and Hotel Limited Common Elements, and with the provision of services to Unit Owners in general, such as service contracts applicable to the Building as a whole, employees who will provide services to the entire Condominium, fees of the managing agent for the Condominium, and insurance coverage for the General Common Elements and Hotel Limited Common Elements. The General Common Expenses are included in the Condominium Fees line item.

C:\Users\astarr\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\2T6S8M8D\2016 BUDGET FOOTNOTES.doc

**CONFIDENTIAL**                                        **DEF00011047**

1.  Maintenance charges billed to owners for operating expenses less other revenue: $8,149,695. The maintenance charge for the Studio is $13,063.42, One Bedroom $18,492.88, and Two Bedroom Deluxe units is $24,871.87 per fraction and there will be a total of 372 fractions.

2.  Interest earned on various Association accounts: $7,495

3.  Labor: $1,060,038

All payroll costs estimated in Schedule B, unless otherwise noted in these footnotes, assume prevailing salaries, wages and benefits for work of this nature, including applicable payroll taxes, as of the date of the Plan.  No warranty is made as to which unions, if any, will represent the Building employees or the actual wages, salaries, benefits and related payroll taxes and similar expenses which will be applicable and in effect during the first year of condominium operation.  However, the projected expenses for wages, salaries and benefits as well as the assumptions described herein, are believed to be reasonable and reflect the experience of the Sponsor's budget expert.

Payroll taxes and benefits for the Residence Club Association operation are estimated to be 66% of the wage and salary amounts.  The payroll taxes and benefits include FICA (projected at 9.87% of total wages), and allowances for union or other welfare and pension fund contributions, holidays and vacation pay.

4.  Operating Supplies: $234,595.  Cost to supply rooms with soap, shampoo, linens and other miscellaneous items, plus housekeeping supplies.

5.  Laundry Service: $317,248.  Cost of cleaning linen, towels and uniforms on a daily basis.

6.  Administrative: $725,990.  Expenses include allocations from Vistana Vacation Ownership for resort oversight, association management, owner reservations, and facilities management, plus annual meeting charges, bad debt, bank & credit card fees, income tax, licenses permits, postage and telephone.

7.  Insurance: $28,978.  This is for all Association Insurance including liability and Directors & Officers coverage.

8.  Management Fee:  $533,158.  The management fee represents 7% of the total maintenance charges per the management agreement between Fifth and Fifty-Fifth Residence Club Association and St. Regis New York Management Inc.

9.  Legal & Audit: $17,609.  Fees to be incurred in connection with the preparation of the audited financial statements for the Residence Club Association its federal, state and city income tax returns, based on a quote received from Myers, Brettholtz & Company, P.A. In addition, this includes the contingency fee related to legal representation for the

C:\Users\astari\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\2T6S8M8D\2016 BUDGET FOOTNOTES.doc

CONFIDENTIAL

DEF00011048

successful challenge of Real Estate Tax assessments. A fee is paid only if an assessment is reduced; in such cases, said fee is based on savings achieved.

10.  Real Estate Taxes:  $1,372,499.  Real estate taxes are based on recent tax assessments published by the City of New York. The taxes include floors 8 and 9 and selected units on floors 10 and 11, and is based on the current policy period covering January to June 30, 2016, plus an additional 7.5% increase for the second policy period covering July to December 31, 2016.

11.  Condominium Fees:  $3,108,055.  The General Common Expenses from the Condominium Association. Most of the services are provided for through the Condominium Association including salaries and wages for operating areas, insurance, repairs and maintenance, operating supplies, and utilities.

12.  Contingency:  $0.  This is intended to cover possible increases in expenses not now foreseen and for expenses not included in the budget, and for possible increases in one or more items of projected operating expenses.

13.  Replacement Reserves:  $759,021.  Cost to cover the periodic replacement of the Club Units furnishings, fixtures and equipment based on each item's anticipated useful life.

C:\Users\asten\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\2T6S8M8D\2016 BUDGET FOOTNOTES.doc

CONFIDENTIAL

DEF00011049

EXHIBIT "C"

CERTIFICATION OF CLUB BUDGET EXPERT

00047998.DOCX

CONFIDENTIAL                                    **DEF00011050**

<u>CERTIFICATION BY EXPERT AS TO ADEQUACY OF CLUB BUDGET</u>

New York State Department of Law
Investment Protection Bureau
120 Broadway - 23rd Floor
New York, New York 10271

        Re:    Fractional Offering Plan
              Fifth and Fifty-Fifth Residence Club
              Two East 55th Street
              <u>New York, New York 10022</u>

      The sponsor of the fractional offering plan for the captioned fractional property retained me to prepare projections of income and expenses ("Schedule") for the 2016 calendar year of club operation ("Budget"). My experience in this field includes:

      I am currently Senior Vice President of St. Regis New York Management, Inc. ("St. Regis New York Management") in Orlando, Florida. In addition, I am an officer in other affiliated entities who, along with St. Regis New York Management, serve as the manager of timeshare and fractional resorts in various states.

      In my role as an officer of St. Regis New York Management and its related affiliates I oversee the financial and administrative affairs of all timeshare or fractional associations created by Vistana Vacation Ownership, Inc., or its affiliates (including the Fifth and Fifty-Fifth Residence Club Association Inc.).

      I also monitor and participate in national and state legislation and industry efforts on behalf of Vistana Vacation Ownership, Inc.

      I understand that I am responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Attorney General in Part 24 insofar as they are applicable to the Budget.

      I have prepared the Budget and investigated the facts set forth in the Budget and the facts underlying it with due diligence in order to form a basis for this certification.

      I certify that the projections in the Budget appear reasonable and adequate based on present prices (adjusted to reflect continued inflation and present levels of consumption for comparable units similarly situated).

      I certify that the Budget:

        (i)    sets forth in detail the terms of the transaction as it relates to the Budget and is complete, current and accurate;

        (ii)   affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the Budget;

CONFIDENTIAL

DEF00011051

(iii)   does not omit any material fact;

(iv)   does not contain any untrue statement of a material fact;

(v)    does not contain any fraud, deception, concealment or suppression;

(vi)   does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii)  does not contain any representation or statement which is false, where I:

    (a)   knew the truth;

    (b)   with reasonable effort could have known the truth;

    (c)   made no reasonable effort to ascertain the truth; or

    (d)   did not have knowledge concerning the representation or statement made.

I further certify that in my capacity as Senior Vice President of St. Regis New York Management, Inc., I have an affiliation with Sponsor. I understand that a copy of this certification is intended to be incorporated into the offering plan so that prospective purchasers may rely on it.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. I understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

ST. REGIS NEW YORK MANAGEMENT, INC.,
a Florida corporation

By: _____

Name: Dale Curtin
Title:  Senior Vice President

Sworn to before me this
___ day of September  2016

_____
Notary Public

ROSEMARIE WALLACE
Notary Public, State of Florida
My comm. expires June 24, 2017
No. FF 15131
Bonded thru Ashton Agency, Inc. (250)451-4854

CONFIDENTIAL

DEF00011052

EXHIBIT "D"

2016 CONDOMINIUM BUDGET

00047998.DOCX

CONFIDENTIAL

DEF00011053

## SCHEDULE B

### Fifth and Fifty-Fifth Condominium
### Approved Budget of Operating Expenses
### For the Period January 1, 2016 to December 31, 2016

Approved Budget for the Period
January 1, 2016 to December 31, 2016

**Estimated Income**

| | |
|---|---|
| Common Charges - Suite Units | 1,159,811 |
| Common Charges - Club Units | 3,108,055 |
| Common Charges - Hotel Unit | 18,087,416 |
| Common Charges - Retail Unit | 117,446 |
| Total Estimated Income (Note 1) | 22,472,728 |

**Estimated Expenses**

| | Total | Suite Units | Club Units | Hotel Unit | Retail Unit |
|---|---|---|---|---|---|
| Payroll and Related Expenses (Note 2) | 15,670,256 | 831,508 | 2,271,082 | 12,536,241 | 31,424 |
| Electricity (Note 3) | 1,638,641 | 68,924 | 195,155 | 1,374,563 | - |
| Steam (Note 4) | 889,683 | 36,144 | 102,339 | 738,869 | 12,332 |
| Water Charges and Sewer Rent (Note 5) | 529,808 | 21,524 | 60,943 | 429,247 | 18,094 |
| Repairs, Supplies and Maintenance (Note 6) | 1,397,166 | 68,565 | 189,348 | 1,134,671 | 4,582 |
| Insurance (Note 7) | 577,653 | 23,467 | 66,446 | 468,010 | 19,728 |
| Management Fee (Note 8) | 123,804 | 5,030 | 14,241 | 100,306 | 4,228 |
| Legal and Audit Fees (Note 9) | 12,658 | 5,663 | 863 | 6,076 | 256 |
| Reserve for Contingencies (Note 10) | 225,000 | 9,141 | 25,881 | 182,294 | 7,684 |
| Miscellaneous Administrative Expenses (Note 11) | 121,434 | 30,085 | 16,948 | 73,972 | 410 |
| Service Contracts (Note 12) | 1,286,643 | 59,961 | 164,808 | 1,043,167 | 18,707 |
| Reimbursement to Hotel Unit for Fitness Center (Note 13) | - | - | - | - | - |
| (Surplus) / Deficit Assessment (Note 14) | - | - | - | - | - |
| Total Estimated Expenses (Note 15) | 22,472,728 | 1,159,811 | 3,108,055 | 18,087,416 | 117,446 |

1

CONFIDENTIAL

DEF00011054

### NOTES TO SCHEDULE B

1.  These amounts represent the total Common Charges to be levied against the Units and collected from the Unit Owners thereof for the operating year January 1, 2016 through December 31, 2016. The Common Charges will be utilized by the Condominium Board to defray the operational expenses of the Condominium. The method of allocation among the Units (or, in the case of the Suite Units and Club Units, categories of Units) of the various Common Expenses of the Condominium set forth in Schedule B are more particularly described in Notes 2 through 14 below. Except with respect to the Retail Unit which does not use or benefit from many of the Common Elements or services of the Condominium and therefore is allocated only its appropriate share of the expenses in connection therewith, the allocation of such Common Expenses is generally determined based upon either: (1) percentage of relative Common Interest; or (2) as appropriate, per usage, but in any event, in conformity with Section 339-m of the New York State Real Property Law.

    As described in these Notes, an allocation of expense to the Suite Units or Club Units refers to such expense being allocated to such <u>category</u> of Units as a whole.  Among the Suite Units or Club Units themselves, the Common Expenses allocated to the Suite Units as a whole or the Club Units as a whole are ultimately allocated among the various Suite Units or Club Units, as the case may be, based on the relative percentage of Common Interests of such Suite Units or Club Units.

    The methods of allocation of the Common Expenses may be periodically adjusted as provided in Section 6.1.2 of the By-Laws, but not more frequently than once each year, to reflect the differing proportions fairly attributable to the then amount of usage by such category of Unit Owner of the services and the General Common Elements and Hotel Limited Common Elements in question.  If any category of Unit Owners contends that any method of allocation determined by the Board is inequitable, the dispute may be submitted to arbitration as provided in, and subject to the terms and conditions of, the By-Laws.  The budgeted amounts presented are distributed among the various categories of Units based on a total of 15 Suite Units and 31 Club Units.  If there are greater or fewer Suite Units or Club Units, the distribution of the budgeted amounts between the affected categories of Units would be adjusted accordingly.

    The budget has been determined on the expectation that the operator of the Hotel will be the Managing Agent of the Condominium.  Accordingly, many of the expenses will be incurred pursuant to contracts, labor, purchase programs, etc. arranged by the Hotel operator, which will then allocate to the Condominium the appropriate share of expenses pursuant to the allocation methods described in this Schedule B.  Except as otherwise indicated, where a portion of an expense line item is said to be absorbed directly by the Hotel Unit, this refers to Hotel operator having incurred the expense for both the Hotel and Condominium, and allocating such portion directly to the Hotel Unit in order to determine the balance remaining to be allocated among the various categories of Units (including the Hotel Unit, as applicable) as a Common Expense.  Accordingly, the Common Expense totals for each category of Common Expense reflects only the Common Expense of the Condominium (i.e., after the Hotel operator's deduction of amounts directly absorbed by the Hotel Unit).

2.  Payroll, Benefits and Related Expenses: $15,670,256

    This estimate assumes that the Hotel operator would provide certain services on behalf of the Condominium using employees of the Hotel, and includes the wages, workers compensation, disability

2

**CONFIDENTIAL**                                                             **DEF00011055**

insurance, welfare and pension costs, payroll taxes and the cost of sick days, personal days, holidays and vacation pay, and other fringe benefit costs for such employees. Related expenses include, without limitation, any costs associated with training, employment checks, employee recognition programs and payroll services. The projected level of staffing for the Building complies with all applicable housing and labor laws. It is anticipated that most of the employees will be members of the New York Hotel-Motel Trades Council, AFL-CIO Union. The existing contract with such union is scheduled to expire June 30, 2018. The wages described below are, to the extent applicable, computed in accordance with the Industry-Wide Collective Bargaining Agreement between the Hotel Association of New York City, Inc. and the New York Hotel-Motel trades Council, AFL-CIO. For non-union personnel the wages described below are based on estimates provided by the current Hotel operator.

Fringe benefit costs are estimated as follows:  Rooms Dept. – 70%, Administrative Staff – 56%, Laundry Dept. – 72%, PBX Dept – 66% and Repairs and Maintenance Dept. – 66%.  Fringe benefits include statutorily required payments such as FICA, medicare and workers compensation.  Fringe benefits for the non-union Hotel executive staff includes 401K (75% company match on first 4% and 50% on next 3%, capped at 7% of salary or Federal limit, whichever is less); Long-Term Disability Plan; Basic Life Insurance Plan; Accidental Death and Dismemberment Insurance Plan; Basic Travel Accident Insurance Plan; Medical and Dental and Vision Plans; Employee Assistance Programs (e.g., counseling programs); an Employee Stock Purchase Plan (currently at 5% discount on Q-closing price); Severance Plan (amount varies with employee grade and employment classification); tuition reimbursement (capped at $1,500 per semester, $10,000 life time); adoption assistance (capped at $5,000 per adoption), vacation days (accruing as set forth below), and holiday/sick days (accrues at same rate as vacation days).  Fringe benefits for the union employees include Medical and Dental at 20.5% of wages for up to first 9 months of employment and 24.0% thereafter; Scholarship Fund at $1 per employee per month; pension at 9.5% of wages; FMLA for union employees on disability $276.99 per week per employee.  Legal Assistance Plan at 0.5% of wages; Training Fund at $1.50 per employee per month; Eight sick days; 3 personal days; 9 paid holidays; and vacation days as set forth below.

3

### Non-Union Vacation Day Accrual
*(Same formula applies for accruing holiday/sick days)*

| Service Length | Accrues | Cap |
|---|---|---|
| Up to 1 year of service | 0.0769 hours per hour worked | 160 hours |
| More than 1 year to up to 4 years | 0.0961 hours per hour worked | 200 hours |
| More than 4 years to up to 9 years | 0.1153 hours per hour worked | 240 hours |
| More than 9 years of service | 0.1346 hours per hour worked | 280 hours |

### Union Vacation Day Accrual

| Service Length | Vacation Time |
|---|---|
| Up to 1 year of service | 1 week |
| More than 1 year to up to 4 years | 2 weeks |
| More than 4 years up to 6 years | 12 days |
| More than 6 years up to 14 years | 3 weeks |
| More than 14 years up to 20 years | 4 weeks |
| Over 20 years of service | 5 weeks |

The Condominium's payroll service expenses are estimated at $56,093; employee recognition expenses are estimated at $54,462; and employee training costs are estimated at $47,906.

As with any building providing hotel-type services, staffing levels are higher than for a customary residential condominium building, reflecting the additional level and availability of services. Staffing levels will also vary from time to time based on variations in occupancy levels and seasonality, and may involve use of part-time and/or overtime labor services as well as contract labor.

The wage and salary estimates (which may include part-time and/or overtime projections in the weekly averages) are detailed as follows. Except as otherwise indicated to the contrary, the Payroll, Benefits and Related Expenses are allocated among the Hotel Unit, the Suite Units and the Club Units

4

| POSITION | No. of Full-time Equivalent Positions | WEEKLY WAGE *(prior to any reduction as stipulated in Footnotes)* |
|---|---|---|
| ***Rooms Department*** | | |
| Managers | 9.40 | $1,342 per week for a total yearly wage of $69,781 per person. |
| Bellman | 8.40 | $1,184 per week for a total yearly wage of $61,543 per person. |
| Concierge | 2.80 | $1,270 per week for a total yearly wage of $66,064 per person. |
| Doorman[a] | 5.60 | $1,102 per week for a total yearly wage of $57,303 per person. |
| Page | 4.20 | $1,237 per week for a total yearly wage of $64,312 per person. |
| Housekeeper/Supervisor[b] | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| Houseperson[b] | 14.00 | $1,319 per week for a total yearly wage of $68,573 per person. |
| Public Area Attendant[b] | 2.80 | $1,332 per week for a total yearly wage of $69,266 per person. |
| Front Office/Reservations | 7.00 | $1,174 per week for a total yearly wage of $61,024 per person. |
| Butler | 33.60 | $1,392 per week for a total yearly wage of $72,402 per person. |
| Trainee[a] | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| ***Administrative & General*** | | |
| Managers[c] | 4.50 | $2,953 per week for a total yearly wage of $153,577 per person. |
| Accounting Office[c] | 0.50 | $1,163 per week for a total yearly wage of $60,501 per person. |
| Human Resources[c] | 0.80 | $1,032 per week for a total yearly wage of $53,646 per person. |
| Administration[c] | 0.20 | $1,999 per week for a total yearly wage of $103,928 per person. |
| MIS[c] | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| Security[c] | 8.40 | $1,359 per week for a total yearly wage of $70,693 per person. |
| Trainee | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| ***Laundry*** | | |
| Laundry Persons[c] | 4.95 | $1,443 per week for a total yearly wage of $75,022 per person. |
| ***PBX*** | | |
| PBX Operators[c] | 4.20 | $1,408 per week for a total yearly wage of $73,203 per person. |
| ***Repairs & Maintenance*** | | |
| Managers[a] | 1.50 | $2,128 per week for a total yearly wage of $110,651 per person. |
| Administration[a] | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| Maintenance Engineers[a] | 12.60 | $1,650 per week for a total yearly wage of $85,800 per person. |
| Operating Salary[a] | 0.00 | $0 per week for a total yearly wage of $0 per person. |
| Trainee[b] | 0.00 | $0 per week for a total yearly wage of $0 per person. |

Footnotes to Wages Table
(a)   The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units.
       The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

(b)   Allocated based on percentage of relative Common Interest of the Hotel Unit, Suite Units and Club Units.

(c)   The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units.
       The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

5

CONFIDENTIAL

DEF00011058

(d) The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units. The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

(e) The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units. The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

(f) The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units. The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

(g) The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units. The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

(h) The 2016 wage expense is determined based on minimum fixed staffing needs to service the Suite and Club Units. The total is then allocated to the Suite Units, the Club Units and the Hotel Unit, on a per-key basis.

3.     Electricity: $1,638,643

Electricity is provided by Con Edison.  This estimate is based upon review of the actual electrical consumption in the Building based upon the approximate average of the consumption during the last twelve (12) months, exclusive of electrical consumption of the Retail Unit, which is separately metered. Based on the foregoing and projections for 2016 rates, it is estimated that electric consumption for the Building, exclusive of the Retail Unit, will be approximately 7,152,000 kw at an annual cost of $0.19 kw/hr.  Other than the Retail Unit, the Units are not separately metered.  Accordingly, the electricity expense charges for the entire Building, other than the Retail Unit, are allocated among the Hotel Unit, the Suite Units and the Club Units based on the percentage of relative Common Interest.

In view of the varying costs of energy, it is not possible to predict with certainty whether the estimated figures will reflect the actual cost to be incurred although it is believed that reasonable provisions for increased costs have been made.  The actual cost for electricity will vary depending upon various factors, including the amount of consumption, the severity of the weather, conservation measures, if any, adopted by the Condominium Board or individual Unit Owners or occupants, the rates of the utility company (which fluctuate periodically) and the possibility of changes in the methods of calculating charges by the utility company.

4.     Steam: $889,683

Steam service is provided by Con Edison, by single meter.  The steam is used for heating of the building, including the provision of heat for hot water service.  This estimate is based upon the approximate average of the consumption during the last twelve (12) months.  Based on the foregoing and projections for 2016 rate, it is estimated that steam consumption for the Building will be 31,798 Mlbs, at an anticipated cost of $27.98 Mlbs.  Steam expenses are allocated among all Units based on percentage of relative Common Interest.

In view of the varying costs of energy, it is not possible to predict with certainty whether the estimated figures will reflect the actual cost to be incurred, although it is believed that reasonable provisions for increased costs have been made.  The actual cost for steam will vary depending upon various factors, including the amount of consumption, the severity of the weather, conservation measures, if any,

6

CONFIDENTIAL                                                              DEF00011059

adopted by the Condominium Board or individual Unit Owners or occupants, the rates of the utility company (which fluctuate periodically) and the possibility of changes in the methods of calculating charges by the utility company.

5.     Water Charges and Sewer Rent:  $529,808

Water and sewer services are provided by the City of New York.  This estimate is based upon review of the actual water consumption during the last 12 months. Based on the foregoing and projections for 2016 rates, it is estimated that water consumption for the Building will be 41,472 cubic feet at an anticipated cost (water charges and sewer rents together) of $12.85 per cubic foot.  Water Charges and Sewer Rent expenses are allocated among all Units based on percentage of relative Common Interest.

6.     Repairs, Supplies and Maintenance:  $1,397,166

This estimate includes painting, maintenance and repair costs of the Common Elements.   Unit Owners are directly responsible for the cost of repairs, supplies and maintenance in the interiors of their Units. The Condominium Board may also determine to arrange from time to time for certain excess repair, supplies and maintenance services to be provided within the Units as a Condominium service, and assess the cost thereof as a Common Charge to the benefited categories of Unit Owners.  This estimate for the 2016 operating year contains an estimate for the provision of excess services such as minor repair (but not replacement) of building standard carpet, curtain and drapes; replacement of building standard light bulbs; repair and replacement of building standard faucets and shower heads; minor repair (but not replacement) of building standard furnishings; restocking of building standard china, glassware and silverware; repair and replacement of building standard guest phones; and certain other such maintenance services provided on equal availability to the Hotel Unit, the Suite Units and the Club Units (subject to the right to assess a particular Unit Owner, in appropriate circumstances, an additional charge to reflect any abuse of such service).  The Condominium Board may determine to discontinue any such excess services at any time, in which event the cost of the discontinued service will thereafter cease to be a Common Expense. The Retail Unit shares only in categories of Repairs, Supplies and Maintenance expenses that benefit the Retail Unit.

Certain Repairs, Supplies and Maintenance Expenses incurred by the Hotel operator on behalf of the Hotel and the Condominium are absorbed directly by the Hotel Unit, as follows, with all allocation percentages based on estimates provided by the Hotel Operator: 80.00% of floor covering expenses reflecting replacement, rather than minor repair of Hotel floor coverings; 79.00% of laundry equipment expenses; 20.00% of computer system maintenance support reflecting allocation to the hotel's reservations department; 74.71% of cleaning supplies associated with the Hotel's rooms department; 59.88% of decorations expenses associated with the Hotel's rooms department; and 63.40% of laundry supplies, printing and stationary, uniform expenses, and other miscellaneous expenses associated with the Hotel's laundry department.

Except as otherwise indicated, the Repairs, Supplies and Maintenance Expenses are allocated among the Hotel Unit, the Suite Units, the Club Units and, only where applicable, the Retail Unit, on the basis of percentage of relative Common Interest.  For the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit, except in cases where the Retail Unit is appropriately charged based on its full Common Interest (such as, by way of example and not limitation, with respect to any

7

DEF00011060

maintenance and/or repair of the Building's structure, foundations, facade, roof, heating system, adjoining sidewalks, etc.).

Subject to any costs directly absorbed by the Hotel Unit as described above, the following Repairs, Supplies and Maintenance Expenses are allocated among the Hotel Unit, the Suite Units and the Club Units: china, glassware and silverware supplies; uniforms relating to the Hotel's rooms, security and laundry departments; operating and cleaning supplies attributable to the Hotel's rooms department; operating supplies attributable to accounting and general administration; and laundry supplies, printing and stationary expenses, and other miscellaneous expenses associated with the Hotel's laundry department.

In application of the foregoing, the Condominium's share of expenses for Repairs, Supplies and Maintenance are summarized as follows:

| | |
|---|---:|
| china | 0 |
| cleaning supplies | 18,736 |
| glassware | 0 |
| operating supplies | 282,792 |
| silverware | 0 |
| uniforms | 186,739 |
| laundry supplies | 0 |
| miscellaneous | 0 |
| alarm maintenance supplies | 5,751 |
| building maintenance supplies | 241,433 |
| computer system maintenance | 268,446 |
| curtains and drapes | 0 |
| electrical/mechanical equipment | 16,628 |
| electric bulbs | 30,701 |
| engineering supplies | 4,283 |
| floor coverings | 8,557 |
| furniture and equipment | 3,573 |
| grounds and planters | 66,965 |
| HVAC supplies | 75,574 |
| keys and locks | 9,692 |
| laundry equipment | 4,934 |
| painting and decorations | 6,355 |
| plumbing | 39,429 |
| signage | 2,889 |
| television system | 5,894 |
| tools | 8,411 |

8

CONFIDENTIAL                                                                  DEF00011061

7.    Insurance: $577,653

The budget for the 2016 operating year is based on insurance coverage being provided by continued participation in Starwood's blanket insurance program available to hotels owned and managed by Starwood.  Premium allocations among the various properties participating in the program are made in accordance with the standard rating practices applicable to the program.  Such coverage would be provided by the Hotel Unit Owner or its designee on behalf of the Hotel and the Condominium.

Except as otherwise indicated, insurance premiums are allocated among all of the Units/or categories of Units on the basis of percentage of relative Common Interest.

| | Coverage & Perils | Limits of Liability |
|---|---|---|
| A. | Real and Personal Property | $1 billion, per occurrence |
| | "All Risk" coverage (including water damage insurance and boiler/machinery) | |
| | Replacement Cost Basis | Yes |
| | Co-Insurance | None |
| | Flood (Occurrence/Annual Aggregate) | $500 million |
| | Earthquake (Occurrence/Annual Aggregate) | $250 million |
| | Deductible (except for FL & CA) | $25,000 |
| | **Premium**[a] | **$390,905** |
| B. | Terrorism | $550 million per occurrence/annual aggregate, all locations |
| | Deductible | $1,000,000 |
| | **Premium**[b] | **$338,548** |
| C. | Employee Dishonesty/Crime (Fidelity) | $25 million each loss |
| | Deductible | $100,000 |
| | **Premium**[c] | **$24,521** |
| D. | Employment Practices Liability | $2 million each event |
| | Deductible | $2,500 loss/event |
| | **Premium**[c] | **Included in Item C above.** |
| E. | Director's and Officers Liability | $3 Million |
| | **Premium**[d] | **$13,138** |
| F. | Commercial General Liability (including elevator collision) | $2 million per occurrence/ ($4 million annual aggregate) |
| | **Premium**[e] | **$190,257** |

9

CONFIDENTIAL                                        DEF00011062

G.  Umbrella Liability [Note: detail components - each     $25 million per occurrence/annual
    occurrence water damage liability auto liability         aggregate
    employee benefits fire damage]
    **Premium**[c]                                           **$42,365**

Notes:
(a)  The Hotel Unit directly absorbs the entire portion of the premium relating to FF&E, fine arts and business interruption (estimated at $89,583 and the balance of the premium relative to the real property (estimated at $301,322) is allocated among all the Units on the basis of percentage of relative Common Interest.
(b)  The Hotel Unit directly absorbs the entire portion of the premium relating to FF&E, fine art and business interruption, and the balance of the premium relative to the real property is allocated among all the Units on the basis of percentage of relative Common Interest.  The result is a direct absorption of $77,585 of the premium by the Hotel Unit, and the balance of $260,963 being allocated among all Units on the basis of percentage of relative Common Interest.
(c)  The Hotel Unit directly absorbs the entire portion of the premium relative to the Hotel's Gross Operating Revenue (estimated at $257,143).
(d)  The entire premium is allocated among all of the Units on the basis of percentage of relative Common Interest.

This coverage does not include claims for personal injury or property damage resulting from occurrences in the individual Suite Units or Club Units, nor does it include coverage of the furniture or other personal property within the Suite Units or Club Units, except to the extent liability coverage relates to the operation of the Hotel and/or provision of Hotel or Condominium services to or with respect to such Units.

This expense reflects insurance premiums at current rates.  Because conditions in the insurance marketplace are so volatile, it is not possible to predict what the premiums will actually be for the entire 2016 operating year.  Purchasers should be aware of the possibility of significant rate increases.

8.    Management Fee:  $123,804

This expense provides for Property Management Services as further explained in Section 5 of the Management Agreement.  This expense has been allocated among the Hotel Unit, Suite Units, Club Units and the Retail Unit on the basis of percentage of relative Common Interest.

9.    Legal and Audit Fees:  $12,658

The amount budgeted for audit fees to be incurred in connection with the preparation of the audited financial statements for the Condominium and its Federal, state and city income tax returns and other financial reports, is $7,500.  The balance of the budgeted amount $5,158 has been estimated to provide for legal services to be rendered in connection with the operation of the Condominium and negotiation of agreements.  The Audit expense has been allocated among the Hotel Unit, the Suite Units, the Club Units and the Retail Unit on the basis of percentage of relative Common Interest.  The Legal expense is allocated to the Suite Units only.

10

**CONFIDENTIAL**                                    **DEF00011063**

10.    Reserve for Contingencies: $225,000

This amount is to be used at the discretion of the Board and is intended to cover possible increases in expenses not now foreseen and for expenses not included in the budget, and for possible increases in one or more items of operating expenses above the amounts projected.  This expense has been allocated among the Hotel Unit, the Suite Units, the Club Units and the Retail Unit on the basis of percentage of relative Common Interest.

11.    Miscellaneous Administrative Expenses: $121,414

These expenses concern miscellaneous administrative expenses, including, without limitation, dues and subscriptions; administrative supplies; water fountain supplies; phone service charges; and printing, postage and stationary.  Fifty percent (50%) of the postage and dues expenses incurred by the Hotel operator for the Hotel and Condominium under this expense category are absorbed directly by the Hotel Unit based on estimates provided by the Hotel operator relative to miscellaneous matters solely benefiting the Hotel.  Telecommunication costs associated with the Building's maintenance department are allocated among the Hotel Unit, the Suites Units, the Club Units and the Retail Unit based on percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of services provided with respect to the Retail Unit.

Except as otherwise indicated to the contrary, expenses are allocated to the Hotel Unit, the Suite Units and the Club Units.

12.    Service Contracts $1,286,643

Service Contracts include expenses such as cable TV, fire alarm testing and inspection, glass cleaning services for chandeliers and crystal, window cleaning services, HVAC maintenance, elevator maintenance, pest control, waste removal, metal cleaning, and flowers.

<u>Service Contracts – Additional Information</u>

(a) $200,927 of Cable TV is allocated among the Hotel Unit, the Suite Units and the Club Units.
(b) $91,118 of maintenance contract services is absorbed directly by the Hotel Unit with respect to excess service for the Hotel's food and beverage areas.  $137,055 of maintenance contract services is allocated among all Units based on the percentage of relative Common Interest; provided, that for the purposes of such allocation only, the Retail Unit's Common Interest shall be deemed to be reduced by 80% to reflect the lesser level of service provided with respect to the Retail Unit.  An additional $359,238 in contract services is allocated among the Hotel Unit, Suite Units, and Club Units based on the percentage of relative Common Interest.
(c) $191,127 of flower services is absorbed by the Hotel Unit with respect to guest units and the Hotel's food and beverage areas.  The remaining $128,065 is allocated based on the percentage of relative Common Interest of the Hotel Unit, Suite Units, and Club Units.
(d) $461,358 of elevator maintenance expenses relative to the Building's thirteen shared-use elevators are allocated based on estimated usage as follows:  10/13$^{ths}$ of the total expense  (reflecting shared use of ten elevators by the Hotel Unit, the Suite Units and the Club Units) is allocated among the Hotel Unit, the Suite Units and the Club Units; 2/13$^{ths}$ of the total expense  (reflecting the Hotel Unit's exclusive use of one elevator and primary use of a second elevator) is allocated solely to the Hotel Unit; and  1/13th of the total expense  (reflecting the Hotel Unit's and Retail Unit's shared use of one elevator) is allocated equally to the Hotel Unit and the Retail Unit.

11

13.     Reimbursement to Hotel Owner Related to the Hotel Unit's Fitness Center:  $0.

This expense reflects that the Suite Units and Club Units are allocated a share of expenses associated with the operation, maintenance, repair, upgrade and replacement of the Hotel Unit's fitness center.  No replacement of equipment is provided for in the 2016 operating budget.  Fitness Center expenses reflect the following: decorations ($0), linen ($0), operating supplies ($0), telecommunications ($0), uniforms ($0) and miscellaneous ($0).  At present there is no labor cost associated with the fitness center, as reception service is currently provided by an affiliate of the Hotel Unit Owner which is operating the spa and fitness center, and no portion of the reception salaries for the spa and fitness center is currently allocated to the fitness center.

14.     (Surplus) / Deficit Assessment:  $0

This represents the 2014 projected operating deficit of the Condominium.  This expense is allocated among the Hotel Unit, Suite Units, Club Units, and Retail Unit in the same proportion as the General Common Charges.

15.     Total estimated expenses:  $22,472,728

In the opinion of SVO Residential Management, Inc., Sponsor's Budget expert, the projected income for the Condominium is adequate to meet the estimated expenses for the 2016 operating year.  The budget, however, is not intended, and should not be taken, as a guarantee by anyone that the annual Common Charges of operation of the Condominium will be as set forth in the budget.  In fact, it is likely that the actual income and expenses for the 2016 operating year will vary from the amounts shown in the budget.

**CONFIDENTIAL**                                                                              **DEF00011065**

EXHIBIT "E"

CERTIFICATION OF CONDOMINIUM BUDGET EXPERT

00047998.DOCX

CONFIDENTIAL

DEF00011066

<u>CERTIFICATION OF SPONSOR'S EXPERT AS TO ADEQUACY OF CONDOMINIUM BUDGET</u>

New York State Department of Law
Investment Protection Bureau
120 Broadway - 23rd Floor
New York, New York 10271

       Re:    Condominium Offering Plan
             Fifth and Fifty-Fifth Condominium
             Two East 55th Street
             <u>New York, New York 10022</u>

       The sponsor of the condominium offering plan for the captioned property retained me to prepare projections of income and expenses for the 2016 calendar year of condominium operation ("Budget"). My experience in this field includes:

       I am currently Senior Vice President of St. Regis New York Management, Inc. ("St. Regis New York Management") in Orlando, Florida. In addition, I am an officer in other affiliated entities who, along with St. Regis New York Management, serve as the manager of timeshare and fractional resorts in various states.

       In my role as an officer of St. Regis New York Management and its related affiliates I oversee the financial and administrative affairs of all timeshare or fractional associations created by Vistana Vacation Ownership, Inc., or its affiliates (including the Fifth and Fifty-Fifth Condominium Association Inc.).

       I understand that I am responsible for complying with Article 23-A of the General Business Law and the regulations promulgated by the Attorney General in Part 20 insofar as they are applicable to the Budget.

       I have prepared the Budget and investigated the facts set forth in the Budget and the facts underlying it with due diligence in order to form a basis for this certification.

       I certify that the projections in the Budget appear reasonable and adequate under existing circumstances, and the projected income appears to be sufficient to meet anticipated operating expenses.

       I certify that the Budget:

           (i)     sets forth in detail the projected income and expenses for the Budget;

           (ii)    affords potential investors, purchasers and participants an adequate basis upon which to found their judgment concerning the Budget;

           (iii)   does not omit any material fact;

           (iv)   does not contain any untrue statement of a material fact;

CONFIDENTIAL

DEF00011067

(v)   does not contain any fraud, deception, concealment or suppression;

(vi)  does not contain any promise or representation as to the future which is beyond reasonable expectation or unwarranted by existing circumstances;

(vii) does not contain any representation or statement which is false, where I:

    (a)   knew the truth;

    (b)   with reasonable effort could have known the truth;

    (c)   made no reasonable effort to ascertain the truth; or

    (d)   did not have knowledge concerning the representation or statement made.

I further certify that I am not owned or controlled by and have no beneficial interest in the Sponsor and that my compensation for preparing this certification is not contingent on the success of the filing. I understand that a copy of this certification is intended to be incorporated into the offering plan so that prospective purchasers may rely on it.

This certification is made under penalty of perjury for the benefit of all persons to whom this offer is made. I understand that violations are subject to the civil and criminal penalties of the General Business Law and Penal Law.

                    ST. REGIS NEW YORK MANAGEMENT, INC., a Florida corporation

                    By:_____

                    Name: Dale Curtin
                    Title:  Senior Vice President

Sworn to before me this
19th day of September, 2016

_Rosemarie Wallace_
Notary Public

ROSEMARIE WALLACE
Notary Public, State of Florida
My comm. expires June 24, 2017
No. FF 18131
Bonded thru Ashton Agency, Inc. (800)451-4854

CONFIDENTIAL

DEF00011068

EXHIBIT "F"

2015 CLUB FINANCIAL STATEMENTS

CONFIDENTIAL

DEF00011069

**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.**
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEAR ENDED DECEMBER 31, 2015
(WITH COMPARATIVE TOTALS FOR THE YEAR
ENDED DECEMBER 31, 2014)



Myers
Brettholtz
& COMPANY, PA
CPAs and Consultants

OFFICES IN FORT MYERS AND NAPLES   12671 Whitehall Drive • Fort Myers, Florida 33907-3626 • 239.939.5775 • fax 239.939.3032
999 Vanderbilt Beach Road, Suite 200 • Naples, Florida 34108 • 239.919.5086 • fax 239.939.3032
THE EXCEPTION TO THE RULE   mbcopa@mbcopa.com

CONFIDENTIAL

TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ................................................................................................ 2-3

FINANCIAL STATEMENTS

    Balance Sheet .......................................................................................................................4

    Statement of Comprehensive Income (Loss) and Changes in Fund Balances ...........................5

    Statement of Cash Flows ....................................................................................................... 6-7

    Notes to Financial Statements ............................................................................................. 8-13

SUPPLEMENTARY INFORMATION

    Supplementary Information on Future Major Repairs and Replacements ...............................15

    Schedule of Operating Fund Revenues and Expenses - Budget to Actual ..........................16-17

CONFIDENTIAL                                                    **DEF00011071**



Myers
Brettholtz
& COMPANY, PA
CPAs and Consultants

**INDEPENDENT AUDITOR'S REPORT**

To the Board of Directors of
Fifth and Fifty-Fifth Residence Club Association, Inc.

We have audited the accompanying financial statements of Fifth and Fifty-Fifth Residence Club Association, Inc., which comprise the balance sheet as of December 31, 2015, and the related statements of comprehensive income (loss) and changes in fund balances and cash flows for the year then ended, and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Residence Club Association, Inc. as of December 31, 2015, and the results of its operations and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States of America.

OFFICES IN FORT MYERS AND NAPLES   12671 Whitehall Drive • Fort Myers, Florida 33907-3626 • 239.939.5775 · fax 239.939.3032
999 Vanderbilt Beach Road, Suite 200 • Naples, Florida 34108 • 239.919.5086 • fax 239.939.3032
THE EXCEPTION TO THE RULE   mbcpa@mbcpa.com

CONFIDENTIAL                                     DEF00011072

To the Board of Directors of
Fifth and Fifty-Fifth Residence Club Association, Inc.

**Report on Summarized Comparative Information**

We have previously audited the Fifth and Fifty-Fifth Residence Club Association, Inc.'s 2014 financial statements, and we expressed an unmodified opinion on those financial statements in our report dated April 25, 2015. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2014, is consistent, in all material respects, with the audited financial statements from which it has been derived.

**Disclaimer of Opinion on Required Supplementary Information**

Accounting principles generally accepted in the United States of America require that the supplementary information on future major repairs and replacements on page 15 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. We have applied certain limited procedures to the required supplementary information in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

**Report on Supplementary Information**

Our audit was performed for the purpose of forming an opinion on the financial statements as a whole. The schedule of operating fund revenues and expenses - budget to actual, which is the responsibility of the Association's management, is presented for purposes of additional analysis and is not a required part of the financial statements. Such information, except for the portion marked "unaudited," was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. That information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, that information is fairly stated in all material respects in relation to the financial statements as a whole. The information marked "unaudited" has not been subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

*Myers, Brettholtz & Company, CPA*

MYERS, BRETTHOLTZ & COMPANY, PA
Fort Myers, Florida
March 28, 2016

**CONFIDENTIAL**

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
BALANCE SHEET
DECEMBER 31, 2015
(With comparative totals for December 31, 2014)

| | FUNDS | | 2015 | 2014 |
|---|---|---|---|---|
| | Operating | Replacement | Total | Total |
| **ASSETS** | | | | |
| Cash and cash equivalents | $ 3,635,881 | $ 175,862 | $ 3,811,743 | $ 5,099,867 |
| Certificates of deposit | - | 915,000 | 915,000 | 1,509,000 |
| Investments | - | 2,259,575 | 2,259,575 | - |
| Accounts receivable - members, net | 10,747 | - | 10,747 | 33,524 |
| Interest receivable | - | 1,597 | 1,597 | 2,910 |
| Due from Manager | - | - | - | 150,900 |
| Accounts receivable - other | - | - | - | 163,881 |
| Prepaid expenses | 658,697 | - | 658,697 | 652,916 |
| Deferred tax asset | - | 7,142 | 7,142 | 3 |
| Due from funds | - | 6 | 6 | |
| Total assets | $ 4,305,325 | $ 3,359,182 | $ 7,664,507 | $ 7,613,001 |
| **LIABILITIES AND FUND BALANCES** | | | | |
| **LIABILITIES** | | | | |
| Accrued expenses | $ 9,303 | $ - | $ 9,303 | $ 227,603 |
| Income taxes payable | 14,553 | - | 14,553 | 25 |
| Due to Manager | 15,357 | - | 15,357 | - |
| Assessments received in advance | 1,374,724 | - | 1,374,724 | 1,726,137 |
| Deferred refurbishment fees | 160,976 | - | 160,976 | 399,857 |
| Due to funds | 6 | - | 6 | 3 |
| Total liabilities | 1,574,919 | - | 1,574,919 | 2,353,625 |
| **FUND BALANCES** | | | | |
| Accumulated excess of revenues over expenses | 1,730,406 | 3,374,358 | 5,104,764 | 4,259,376 |
| Board designated | 1,000,000 | - | 1,000,000 | 1,000,000 |
| Accumulated other comprehensive income (loss) | | | | |
| Net unrealized loss on investments | - | (15,176) | (15,176) | - |
| Total fund balances | 2,730,406 | 3,359,182 | 6,089,588 | 5,259,376 |
| Total liabilities and fund balances | $ 4,305,325 | $ 3,359,182 | $ 7,664,507 | $ 7,613,001 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
4

CONFIDENTIAL

DEF00011074

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF COMPREHENSIVE INCOME (LOSS) AND CHANGES IN FUND BALANCES
FOR THE YEAR ENDED DECEMBER 31, 2015
(With comparative totals for the year ended December 31, 2014)

| | FUNDS | | 2015 | 2014 |
|---|---|---|---|---|
| | Operating | Replacement | Total | Total |
| **REVENUES** | | | | |
| Maintenance fees | $ 6,791,862 | $ 1,019,424 | $ 7,811,286 | $ 7,936,716 |
| Refurbishment fees | 238,881 | - | 238,881 | 2,329,762 |
| Interest and dividends | 3,475 | 66,165 | 69,640 | 25,928 |
| Late fees and interest | 5,455 | - | 5,455 | 18,052 |
| Other | - | - | - | 151,447 |
| Loss on sale of investments | - | (82,359) | (82,359) | - |
| Total revenues | 7,039,673 | 1,003,230 | 8,042,903 | 10,461,905 |
| **EXPENSES** | | | | |
| Housekeeping and rooms | 1,598,206 | - | 1,598,206 | 1,318,764 |
| Administrative and general | 479,394 | - | 479,394 | 546,335 |
| Management fees | 511,019 | - | 511,019 | 519,225 |
| Property operations and maintenance | 15,021 | - | 15,021 | 12,710 |
| Real estate taxes | 1,300,370 | - | 1,300,370 | 1,212,046 |
| Income taxes | 14,553 | - | 14,553 | 25 |
| Insurance | 28,185 | - | 28,185 | 21,151 |
| Condominium fees | 3,003,481 | - | 3,003,481 | 2,911,248 |
| Refurbishment project | 238,881 | - | 238,881 | 2,329,762 |
| Replacement | - | 8,405 | 8,405 | - |
| Total expenses | 7,189,110 | 8,405 | 7,197,515 | 8,871,266 |
| (Deficiency) excess of revenues over expenses | (149,437) | 994,825 | 845,388 | 1,590,639 |
| **OTHER COMPREHENSIVE INCOME (LOSS), NET OF TAX** | | | | |
| Unrealized holding loss arising during period | - | (15,176) | (15,176) | - |
| Total comprehensive income (loss) | (149,437) | 979,649 | 830,212 | 1,590,639 |
| FUND BALANCES - January 1, | 2,879,843 | 2,379,533 | 5,259,376 | 3,486,225 |
| SURPLUS DISTRIBUTION | - | - | - | 182,512 |
| FUND BALANCES - December 31, | $ 2,730,406 | $ 3,359,182 | $ 6,089,588 | $ 5,259,376 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
5

**CONFIDENTIAL**                                    **DEF00011075**

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
STATEMENT OF CASH FLOWS
FOR THE YEAR ENDED DECEMBER 31, 2015
(With comparative totals for the year ended December 31, 2014)

|  | FUNDS | | 2015 | 2014 |
|---|---|---|---|---|
|  | Operating | Replacement | Total | Total |
| **CASH FLOWS FROM OPERATING ACTIVITIES** |  |  |  |  |
| (Deficiency) excess of revenues over expenses | $ (149,437) | $ 994,825 | $ 845,388 | $ 1,590,639 |
| Recovery of bad debt | (442,017) | - | (442,017) | (182,777) |
| Loss on sale of investments | - | 82,358 | 82,358 | - |
| Dividends reinvested | - | (54,702) | (54,702) | - |
| Changes in: |  |  |  |  |
| Accounts receivable - members | 464,794 | - | 464,794 | 231,033 |
| Interest receivable | - | 1,313 | 1,313 | (94) |
| Accounts receivable - other | 163,881 | - | 163,881 | (163,881) |
| Due from Manager | 150,900 | - | 150,900 | (150,900) |
| Prepaid expenses | (5,781) | - | (5,781) | (30,770) |
| Accrued expenses | (218,300) | - | (218,300) | (287,521) |
| Income taxes payable | 14,528 | - | 14,528 | - |
| Due to Manager | 15,357 | - | 15,357 | (18,941) |
| Due to Condominium | - | - | - | (612,814) |
| Assessments received in advance | (351,413) | - | (351,413) | (1,024,049) |
| Deferred refurbishment fees | (238,881) | - | (238,881) | (2,329,762) |
| Net cash (used) provided by operating activities | (596,369) | 1,023,794 | 427,425 | (2,979,837) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** |  |  |  |  |
| Purchases of certificates of deposit | - |  | - | (3,252,000) |
| Proceeds from redemption of certificates of deposit | - | 594,000 | 594,000 | 2,234,000 |
| Purchases of investments | - | (4,337,799) | (4,337,799) | - |
| Proceeds from sale of investments | - | 2,028,250 | 2,028,250 | - |
| Net cash used by investing activities | - | (1,715,549) | (1,715,549) | (1,018,000) |

6

DEF00011076

|  | FUNDS | | 2015 | 2014 |
|---|---|---|---|---|
|  | Operating | Replacement | Total | Total |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | | | |
| Interfund reimbursement | 3 | (3) | - | - |
| Surplus distribution | - | - | - | 182,512 |
| Net cash provided (used) by financing activities | 3 | (3) | - | 182,512 |
| Net decrease in cash | (596,366) | (691,758) | (1,288,124) | (3,815,325) |
| **CASH AND CASH EQUIVALENTS-** January 1, | 4,232,247 | 867,620 | 5,099,867 | 8,915,192 |
| **CASH AND CASH EQUIVALENTS-** December 31, | $ 3,635,881 | $ 175,862 | $ 3,811,743 | $ 5,099,867 |
| **SUPPLEMENTAL INFORMATION** Income taxes paid | $ 25 | $ - | $ 25 | $ 25 |
| Interest paid | $ - | $ - | $ - | $ - |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
7

**CONFIDENTIAL**

**DEF00011077**

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

## NOTE 1 - THE ASSOCIATION

Fifth and Fifty-Fifth Residence Club Association, Inc. (the "Association"), was formed on June 26, 2006 to promote and advance the health and welfare of the fractional interest owners of Fifth and Fifty-Fifth Residence Club (the "Club"). The Club consists of 372 fractional interests located on the 8th, 9th, 10th and 11th floors of a mixed-use project which includes lodging and commercial enterprise within the control of the commercial unit owners. The owners of all fractional interests in the Club are the only members.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to a 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Club (the "Developer"). Until all fractional interests have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the fractional interests owned by the Developer.

## NOTE 2 - DATE OF MANAGEMENT'S REVIEW

In preparing the financial statements, the Association has evaluated events and transactions for potential recognition or disclosure through March 28, 2016, the date that the financial statements were available to be issued.

## NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Fund Accounting

The Association prepares its financial statements on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America and presents them as separate funds based on its different funding policies for operations and major repairs and replacements.

The operating fund reflects the operating portion of the annual assessments billed to the members to meet the various day-to-day expenditures incurred in the administration and operation of the Club. The Board of Directors (the "Board") designated a portion of the operating fund balance to provide for the real estate tax payment.

The replacement fund is composed of the portion of the annual assessments designated in the budget to fund future major repairs and replacements, as further described in Note 10.

Investments

The Association classifies its marketable securities as available-for-sale. Available-for-sale securities are carried at fair market value, with the unrealized gains and losses, net of tax, included in the determination of other comprehensive income (loss) and reported as a separate component of fund balance.

The fair value of substantially all securities is determined by quoted market prices. Gains or losses on securities sold are based on the specific identification method.

Read Independent Auditor's Report.

8

CONFIDENTIAL                                                    DEF00011078

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

### NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when the payment is not received on or before the due date. The Association accounts for potential losses in accounts receivable utilizing the allowance method. The Association maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. Provision for uncollectible accounts expense for the years ended December 31, 2015 and 2014, was $101,738 and $190,691, respectively, and is included in administrative and general expenses.

Common Property

The Association is responsible to preserve and maintain the common property of the Club. Ownership of the commonly owned assets is vested directly or indirectly in the members, those assets are not titled in the Association's name and disposition of those assets by the Board is restricted. As a result, commonly owned assets are not presented in the Association's financial statements. Common property not capitalized consists of unit furnishings. Additions and improvements to common property are accounted for as major repair and replacement expenditures in the replacement fund.

Income Taxes

Management has analyzed its various federal, state and city filing positions and believes that the Association's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The Association's federal and state income tax returns remain subject to examination by the Internal Revenue Service and the State of New York, respectively, for three years from the date of filing.

The Association files its income tax return as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Association is not taxed on uniform assessments to members and other income received from Association members solely as a function of their membership in the Association. The Association is taxed at a rate of 32% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the nonexempt function income; therefore, no deferred tax provision has been recorded. The tax effect related to other comprehensive income (loss) is described in the statement of comprehensive income (loss) and changes in fund balances. The Association incurred an income tax liability of $14,553 and $25 for the years ended December 31, 2015 and 2014 respectively.

Fair Value of Financial Instruments

Substantially all of the Association's assets and liabilities, excluding prepaid expenses, assessments received in advance and deferred refurbishment fees, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument. Investments are valued based on the classification as further described in the investment policy above.

Read Independent Auditor's Report.
9

CONFIDENTIAL

DEF00011079

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Revenue Recognition

Maintenance fees revenue is recognized monthly in the amount of the membership assessment allocation specified for the current period operations, based on the annual budget adopted by the Board. A proportionate share of the maintenance fees is assessed for each fractional interest, based on unit type.

Late fees and interest revenue is recognized when collected.

Cash Flows

For purposes of the statement of cash flows, the Association considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents, excluding certificates of deposit.

The Association made cash payments for income taxes of $25, during the years ended December 31, 2015 and 2014. The Association made no cash payments for interest during the years ended December 31, 2015 or 2014.

Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

NOTE 4 - CONCENTRATION OF CREDIT RISK

The Association maintains cash balances and certificates of deposit at various financial institutions. Accounts and certificates of deposit at each institution are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000 per institution. As of December 31, 2015 and 2014, $565,823 and $299,612, respectively, was uninsured, based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $2,644,720 and $4,407,810, as of December 31, 2015 and 2014, respectively, are not insured by the FDIC.

As of December 31, 2015 and 2014, the Developer owned 98 and 92 fractional interests, or approximately 26% and 25% of the available interests, respectively.

CONFIDENTIAL                              DEF00011080

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

## NOTE 5 - INVESTMENTS

The Association invests idle cash balances in various securities. The amortized historical cost, aggregate fair value, and gross unrealized holding loss, summarized by major security type, as of December 31, 2015 consisted of:

| Replacement Fund | Amortized Historical Cost | Aggregate Fair Value | Gross Unrealized Holding Loss |
|---|---|---|---|
| Available-for-sale Mutual funds | $ 2,281,893 | $ 2,259,575 | $ (22,318) |

The following are the major categories of assets measured at fair value on a recurring basis during the year ended December 31, 2015, using quoted prices in active markets for identical assets (Level 1); significant other observable inputs (Level 2); and significant unobservable inputs (Level 3).

| Description | Level 1: Quoted Prices in Active Markets for Identical Assets | Level 2: Significant Other Observable Inputs | Level 3: Significant Unobservable Inputs | Total as of December 31, 2015 |
|---|---|---|---|---|
| Available-for-sale securities | $ 2,259,575 | $ - | $ - | $ 2,259,575 |

## NOTE 6 - ACCOUNTS RECEIVABLE - MEMBERS

Accounts receivable - members consisted of the following as of December 31,:

|  | 2015 | 2014 |
|---|---|---|
| Maintenance fee assessments | $ 189,471 | $ 540,578 |
| Refurbishment fee assessments | 51,257 | 164,944 |
| Less: allowance for uncollectible accounts | (229,982) | (671,998) |
|  | $ 10,746 | $ 33,524 |

## NOTE 7 - RELATED PARTY TRANSACTIONS

During the years ended December 31, 2015 and 2014, the amount of maintenance fees assessed to the Developer was $1,929,988 and $1,811,471, respectively. As of December 31, 2015 and 2014, there were no amounts due from the Developer.

St. Regis New York Management, Inc. (the "Manager") is an affiliate of the Developer. A Board member is also an employee of the Manager or its affiliates. Substantially all operating expenses have been allocated to the Association from the Manager. As of December 31, 2015, due to Manager consisted of operating expenses of the Association paid by the Manager. As of December 31, 2014, due from Manager consisted of reimbursements due to the Association.

Read Independent Auditor's Report.
11

CONFIDENTIAL

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

**NOTE 7 - RELATED PARTY TRANSACTIONS (Continued)**

The Association is part of the high-rise estate project consisting of mixed-use components known as the Fifth and Fifty-Fifth Condominium (the "Condominium"). Certain Board members are also members of the board of directors of the Condominium. The Condominium allocates and assesses charges to the Association for the repair, maintenance, replacement, restoration, care, upkeep and operation of, and any alteration, addition or improvement to, the common elements, the provision of services to the mixed-use components and the business affairs of the Condominium. The charges are considered to be a common expense of the Association. For the years ended December 31, 2015 and 2014, the condominium fees were $3,003,480 and $2,911,248, respectively. As of December 31, 2015 and 2014, there were no amounts due to the Condominium.

**NOTE 8 - ASSESSMENTS RECEIVED IN ADVANCE**

Assessments received in advance in the amounts of $1,374,724 and $1,726,137, consisted of 2016 and 2015 maintenance fees received by the Association prior to January 1, 2016 and 2015, respectively.

**NOTE 9 - DEFERRED REFURBISHMENT FEES**

The Association billed owners for refurbishment fees totaling $9,696,498. The refurbishment fees are recognized as the related expenses are incurred. Unexpended amounts are recorded as deferred revenue on the balance sheet until they are either expended for the purpose of the original assessment, returned to owners or used for another purpose determined and approved by the Board. During the years ended December 31, 2015 and 2014, there were expenditures of $238,881 and $2,329,762, respectively, related to the refurbishment project. As of December 31, 2015 and 2014, $160,976 and $399,857, respectively, of the original refurbishment fee is deferred.

**NOTE 10 - REPLACEMENT FUND**

New York statutes require reasonable sums to be periodically set aside for the funding of reserves. Reserves are funded per the Board approved budget. If additional funds are needed, the Association has the right, subject to the Board's approval, to increase regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

The Association's replacement fund is utilized to accumulate funds for future major repairs and replacements, based on the budgeted portion of the maintenance fee assessment charged to each member, and specifically designated for the fund in the annual budget. Deductions from the fund are recorded as costs, as incurred, which are determined by the Board to meet the objective for which the fund was established. The Association's policy is to retain the investment income earned on such funds in the replacement fund.

During 2015 and 2014, the Association funded for major repairs and replacements over the estimated useful lives of the components, based on the Manager's estimates of current replacement costs.

The 2016 proposed budgeted funding is $759,021 as shown in the unaudited supplementary information. The components' actual replacement costs, useful lives, and investment income may vary from the estimated amounts and the variation may be material.

Read Independent Auditor's Report.
12

CONFIDENTIAL          DEF00011082

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

### NOTE 11 - COMMITMENTS

The Association has a three-year management agreement ending August 28, 2017, with the Manager. The Manager provides on-site management and maintenance services, and off-site administrative and accounting services. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term. The management agreement provides that the Manager may subcontract its rights, duties and obligations.

The Association has a banking agreement ending April 24, 2018 with the Manager and SVO Management, Inc. ("SVOM"), who has guaranteed or indemnified the Association's liability for overdrafts with banks or other entities providing financial services to the Association. The agreement give SVOM the right to reimburse itself for the amount of any overdrafts, if any, incurred on the Association's behalf. The agreement automatically renews for successive three-year periods unless terminated according to the terms of the agreement.

### NOTE 12 - ECONOMIC DEPENDENCY

The Association derived approximately 25% and 23% of its revenue from the Developer for the years ended December 31, 2015 and 2014, respectively.

Read Independent Auditor's Report.
13

**CONFIDENTIAL**

**DEF00011083**

SUPPLEMENTARY INFORMATION

CONFIDENTIAL                                              DEF00011084

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SUPPLEMENTARY INFORMATION ON
FUTURE MAJOR REPAIRS AND REPLACEMENTS
DECEMBER 31, 2015
*(Unaudited)*

The following table represents a study by management, which is based on estimates provided by the Manager during 2015, based on consultation with various experts regarding the estimated remaining lives of the components and their current replacement costs. The following table is based on the study and presents significant information about the components of the common property. Amounts are based on normal operations and without the effect of potential catastrophic occurrences.

| | Estimated Useful Lives | Estimated Remaining Useful Lives | Estimated Current Replacement Costs | 2016 Proposed Budgeted Funding |
|---|---|---|---|---|
| Unit furnishings, equipment, and other capital expenditures | 1-32 years | 1-21 years | $ 16,508,629 | $   759,021 |

Estimated current replacement costs are based on the assumption of a variable interest rate earned on investments that exceeds an assumed rate of inflation of 2%.

Read Independent Auditor's Report.
15

CONFIDENTIAL                                                                 DEF00011085

FIFTH AND FIFTY-FIFTH RESIDENCE CLUB ASSOCIATION, INC.
SCHEDULE OF OPERATING FUND REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2015

| | Budget (Unaudited) | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REVENUES** | | | |
| Maintenance fees | $ 6,791,863 | $ 6,791,862 | $ (1) |
| Refurbishment fees | - | 238,881 | 238,881 |
| Interest and dividends | 2,307 | 3,475 | 1,168 |
| Late fees and interest | 17,775 | 5,455 | (12,320) |
| Total operating fund revenues | 6,811,945 | 7,039,673 | 227,728 |
| **EXPENSES** | | | |
| **HOUSEKEEPING AND ROOMS** | | | |
| Housekeeping fixed - other | 18,509 | 22,209 | (3,700) |
| Housekeeping-variable | 678,442 | 800,804 | (122,362) |
| Cleaning supplies | 443,917 | 526,467 | (82,550) |
| Owner reservations | 248,726 | 248,726 | - |
| Total housekeeping and rooms | 1,389,594 | 1,598,206 | (208,612) |
| **ADMINISTRATIVE AND GENERAL** | | | |
| Administrative wages | 103,104 | 109,798 | (6,694) |
| Administrative other | 50,000 | 64,270 | (14,270) |
| SVO management | 6,675 | 6,675 | - |
| Association management | 60,862 | 60,862 | - |
| Provision for uncollectible accounts | 149,976 | 101,738 | 48,238 |
| Audit | 7,500 | 7,500 | - |
| Printing and stationery | - | 126 | (126) |
| Legal and professional | 10,109 | 15,465 | (5,356) |
| Annual meeting | 9,000 | 7,385 | 1,615 |
| Bank fees | 2,608 | 1,563 | 1,045 |
| Credit card fees | 84,684 | 86,904 | (2,220) |
| Postage and printing | 1,925 | 1,311 | 614 |
| Facilities management | 15,797 | 15,797 | - |
| Total administrative and general | 502,240 | 479,394 | 22,846 |
| **MANAGEMENT FEES** | 511,019 | 511,019 | - |
| **PROPERTY OPERATIONS AND MAINTENANCE** | 13,885 | 15,021 | (1,136) |
| **REAL ESTATE TAXES** | 1,212,663 | 1,300,370 | (87,707) |
| **INCOME TAXES** | 300 | 14,553 | (14,253) |

16

**CONFIDENTIAL**                    **DEF00011086**

|  | Budget (Unaudited) | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| INSURANCE | 28,763 | 28,185 | 578 |
| CONDOMINIUM FEES | 3,003,481 | 3,003,481 | - |
| REFURBISHMENT PROJECT | - | 238,881 | (238,881) |
| ACCESS FEES | 150,000 | - | 150,000 |
| Total operating fund expenses | 6,811,945 | 7,189,110 | (377,165) |
| Deficiency of revenues over expenses | $ - | $ (149,437) | $ (149,437) |

Read Independent Auditor's Report.
17

CONFIDENTIAL

DEF00011087

EXHIBIT "G"

2015 AND 2014 CONDOMINIUM FINANCIAL STATEMENTS

00047998.DOCX

CONFIDENTIAL

DEF00011088

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NEW YORK, NEW YORK
FINANCIAL STATEMENTS
YEARS ENDED DECEMBER 31, 2015 AND 2014



Myers
Brettholz
& COMPANY, PA

CPAs and Consultants

OFFICES IN FORT MYERS AND NAPLES   12671 Whitehall Drive • Fort Myers, Florida 33907-3626 • 239.939.5775 • fax 239.939.3032
999 Vanderbilt Beach Road, Suite 200 • Naples, Florida 34108 • 239.919.5086 • fax 239.939.3032
THE EXCEPTION TO THE RULE   mbcopa@mbcopa.com

CONFIDENTIAL                                    DEF00011089

TABLE OF CONTENTS

INDEPENDENT AUDITOR'S REPORT ........................................................................................... 2-3

FINANCIAL STATEMENTS

    Balance Sheets ........................................................................................................ 4

    Statements of Revenues, Expenses and Changes in Fund Balance ............................. 5

    Statements of Cash Flows ....................................................................................... 6

    Notes to Financial Statements ............................................................................ 7-10

SUPPLEMENTARY INFORMATION

    Schedule of Revenues and Expenses – Budget to Actual ...................................... 12-15

**CONFIDENTIAL**                                                    **DEF00011090**

## INDEPENDENT AUDITOR'S REPORT

To the Board of Managers of
Fifth and Fifty-Fifth Condominium

We have audited the accompanying financial statements of Fifth and Fifty-Fifth Condominium, which comprise the balance sheets as of December 31, 2015 and 2014, and the related statements of revenues, expenses and changes in fund balance and cash flows for the years then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

### Opinion

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Fifth and Fifty-Fifth Condominium as of December 31, 2015 and 2014, and the results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

OFFICES IN FORT MYERS AND NAPLES 12671 Whitehall Drive • Fort Myers, Florida 33907-3626 • 239.939.5775 • fax 239.939.3032
999 Vanderbilt Beach Road, Suite 200 • Naples, Florida 34108 • 239.919.5086 • fax 239.939.3032
THE EXCEPTION TO THE RULE mbcopa@mbcopa.com

To the Board of Managers of
Fifth and Fifty-Fifth Condominium

**Other Matter**

The supplementary information on future major repairs and replacements that accounting principles generally accepted in the United States of America require to be presented to supplement the basic financial statements is not presented because a replacement fund has not been established, as further described in Note 8. The supplementary information, although not a part of the basic financial statements, is required by the Financial Accounting Standards Board, who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic, or historical context. Our opinion on the basic financial statements is not affected by the supplementary information on future major repairs and replacements that has not been presented.

**Report on Supplementary Information**

Our audit was performed for the purpose of forming an opinion on the financial statements as a whole. The schedule of revenues and expenses - budget to actual, which is the responsibility of the Condominium's management, is presented for purposes of additional analysis and is not a required part of the financial statements. Such information, except for the portion marked "unaudited," was derived from and relates directly to the underlying accounting and other records used to prepare the financial statements. That information has been subjected to the auditing procedures applied in the audit of the financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the financial statements or to the financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America. In our opinion, that information is fairly stated in all material respects in relation to the financial statements as a whole. The information marked "unaudited" has not been subjected to the auditing procedures applied in the audit of the financial statements and, accordingly, we do not express an opinion or provide any assurance on it.

*Myers, Brettholtz & Company, CPA*

MYERS, BRETTHOLTZ & COMPANY, PA
Fort Myers, Florida
March 15, 2016

OFFICES IN FORT MYERS AND NAPLES   12671 Whitehall Drive · Fort Myers, Florida 33907-3626 · 239.939.5775 · fax 239.939.3032
999 Vanderbilt Beach Road, Suite 200 · Naples, Florida 34108 · 239.919.5086 · fax 239.939.3032
THE EXCEPTION TO THE RULE   mbcopa@mbcopa.com

CONFIDENTIAL                                                     DEF00011092

FIFTH AND FIFTY-FIFTH CONDOMINIUM
BALANCE SHEETS
DECEMBER 31,

|  | | 2015 | | 2014 |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and cash equivalents | $ | 1,475,527 | $ | 1,467,573 |
| Accounts receivable - members, net | | 14,768 | | - |
| Accounts receivable - other | | - | | 24,050 |
| Due from Manager | | 74,557 | | - |
| Prepaid expenses | | 462 | | 10,593 |
| Total assets | $ | 1,565,314 | $ | 1,502,216 |
| LIABILITIES AND FUND BALANCE | | | | |
| LIABILITIES | | | | |
| Accounts payable and accrued expenses | $ | 29,375 | $ | 166,827 |
| Income taxes payable | | 25 | | 25 |
| Due to Manager | | - | | 380,105 |
| Deferred refurbishment fees | | 280,700 | | 273,221 |
| Total liabilities | | 310,100 | | 820,178 |
| FUND BALANCE | | 1,255,214 | | 682,038 |
| Total liabilities and fund balance | $ | 1,565,314 | $ | 1,502,216 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
4

CONFIDENTIAL

DEF00011093

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF REVENUES, EXPENSES AND CHANGES IN FUND BALANCE
FOR THE YEARS ENDED DECEMBER 31,

| | 2015 | 2014 |
|---|---|---|
| **REVENUES** | | |
| Common charges | $ 21,822,303 | $ 21,262,976 |
| Refurbishment fees | - | 558,044 |
| Interest | 423 | 3,218 |
| Late fees and interest | 1,529 | 189 |
| Other | - | 21,712 |
| Total revenues | 21,824,255 | 21,846,139 |
| **EXPENSES** | | |
| Operations | 10,763,664 | 11,617,068 |
| Administrative and general | 2,476,587 | 2,434,782 |
| Telecommunications | 300,359 | - |
| Repairs and maintenance | 3,647,089 | 4,642,633 |
| Energy department | 2,804,550 | 3,075,533 |
| Guest laundry department | 555,151 | 583,085 |
| Administration | 4,558 | 5,416 |
| Board and membership meetings | 2,090 | 3,014 |
| Provision for uncollectible accounts | 1,540 | 28,635 |
| Legal and audit | 15,047 | 12,392 |
| Income taxes | 25 | 25 |
| Insurance | 554,539 | 578,264 |
| Management fees | 125,880 | 123,804 |
| Total expenses | 21,251,079 | 23,104,651 |
| Excess (deficiency) of revenues over expenses | 573,176 | (1,258,512) |
| FUND BALANCE - January 1, | 682,038 | 3,165,310 |
| SURPLUS DISTRIBUTION | - | (1,224,760) |
| FUND BALANCE - December 31, | $   1,255,214 | $     682,038 |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
5

CONFIDENTIAL

DEF00011094

FIFTH AND FIFTY-FIFTH CONDOMINIUM
STATEMENTS OF CASH FLOWS
FOR THE YEARS ENDED DECEMBER 31,

|  | 2015 | 2014 |
|---|---|---|
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Excess (deficiency) of revenues over expenses | $ 573,176 | $ (1,258,512) |
| Provision for uncollectible accounts | 1,540 | 28,635 |
| Changes in: | | |
| Accounts receivable - members | (16,308) | (15,182) |
| Accounts receivable - other | 24,050 | (24,050) |
| Due from Manager | (74,557) | 249,579 |
| Due from Club | - | 612,814 |
| Prepaid expenses | 10,131 | (4,714) |
| Accounts payable and accrued expenses | (137,452) | 148,845 |
| Due to Manager | (380,105) | 380,105 |
| Deferred refurbishment fees | 7,479 | (556,025) |
| Net cash provided (used) by operating activities | 7,954 | (438,505) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Surplus distribution | - | (1,224,760) |
| Net increase (decrease) in cash | 7,954 | (1,663,265) |
| CASH AND CASH EQUIVALENTS - January 1, | 1,467,573 | 3,130,838 |
| CASH AND CASH EQUIVALENTS - December 31, | $ 1,475,527 | $ 1,467,573 |

| SUPPLEMENTAL INFORMATION | | |
|---|---|---|
| Income taxes paid | $ 25 | $ 25 |
| Interest paid | $ - | $ - |

Read Independent Auditor's Report.
The accompanying notes are an integral
part of the financial statements.
6

CONFIDENTIAL

DEF00011095

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

**NOTE 1 - THE CONDOMINIUM**

Fifth and Fifty-Fifth Condominium (the "Condominium"), was formed on June 13, 2006, to be responsible for the management of a high-rise estate project (the "Project") consisting of distinct mixed-use components located in New York, New York.

The Project consists of: (1) 15 suite units, located on the 10th and 11th floors of the building, (2) 31 club units, located on the 8th, 9th, 10th and 11th floors of the building, and (3) two commercial units, one of which (the "Hotel unit") is located on portions of each floor (other than the 8th, 9th, 10th, and 11th floors) of the building and the "Retail unit" which is located on portions of the 1st and mezzanine floors of the building. The owners of all units in the Condominium are the only members.

SLT Palm Desert, LLC, a Delaware limited liability company (as to 10.7567% tenant-in-common interest); SLT Realty Limited Partnership, a Delaware limited partnership (as to 63.5756% tenant-in-common interest); Prudential HEI Joint Venture, a Georgia general partnership (as to an 11.3826% tenant-in-common interest); and SLT St. Louis, LLC, a Delaware limited liability company (as to a 14.2851% tenant-in-common interest) are the developers of the Project (the "Developer"). Until all units have been sold, the Developer has the right to use and transact on the property, any business necessary to consummate sale, resale or rental of all the units owned by the Developer.

**NOTE 2 - DATE OF MANAGEMENT'S REVIEW**

In preparing the financial statements, the Condominium has evaluated events and transactions for potential recognition or disclosure through March 15, 2016, the date that the financial statements were available to be issued.

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

General Accounting

The Condominium prepares its financial statements on the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America. Under the accrual basis of accounting, revenues are recognized when earned and expenses are recognized when incurred.

Accounts Receivable and Allowance for Uncollectible Accounts

Accounts receivable are generally considered delinquent when the payment is not received on or before the due date. The Condominium accounts for potential losses in accounts receivable utilizing the allowance method. The Condominium maintains an allowance for uncollectible accounts at an amount that it believes is sufficient to provide adequate protection against future losses. Provisions for losses are determined principally on the basis of experiences in the preceding years, taking into account historical losses, industry standards and current economic conditions. All accounts or portions thereof deemed to be uncollectible are written off to the allowance for uncollectible accounts. Provision for uncollectible accounts expense for the years ended December 31, 2015 and 2014 was $1,540 and $28,635, respectively.

CONFIDENTIAL

DEF00011096

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

**NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Common Property

The Condominium is responsible to preserve and maintain the common property of the Project. Ownership of the commonly owned assets is vested directly or indirectly in the members, those assets are not titled in the Condominium's name and disposition of those assets by the Board of Managers (the "Board") is restricted. As a result, commonly owned assets are not presented in the Condominium's financial statements.

The general common elements and the hotel limited common elements are set forth in detail at Article 7 of the Second Amended and Restated Declaration of Fifth and Fifty-Fifth Condominium, as may be amended from time to time.

Income Taxes

Management has analyzed its various federal and state filing positions and believes that the Condominium's income tax filing positions and deductions are well documented, supported and contain no uncertain tax positions. Additionally, management believes that no accruals for tax liabilities, interest or penalties are required. Therefore, no reserves for uncertain income tax positions have been recorded. Further, no interest or penalties have been included since no reserves were recorded. When applicable, such interest and penalties will be reported as income tax expense. The Association's federal and state income tax returns remain subject to examination by the Internal Revenue Service and the State of New York, respectively, for three years from the date of filing.

The Condominium has elected to be taxed as a homeowners' association in accordance with Internal Revenue Code Section 528. Under that Section, the Condominium is not taxed on uniform assessments to members and other income received from Condominium members solely as a function of their membership in the Condominium. The Condominium is taxed at a rate of 30% on its investment income and other non-exempt function income, less allocable expenses. There are no temporary differences between the financial reporting and tax reporting with respect to the non-exempt function income; therefore, no deferred tax provision has been recorded. The Condominium incurred an income tax liability of $25 for the years ended December 31, 2015 and 2014.

Fair Value of Financial Instruments

Substantially all of the Condominium's assets and liabilities, excluding prepaid expenses and deferred refurbishment fees, are considered financial instruments. These assets and liabilities are reflected at fair value, or at carrying amounts that approximate fair value because of the short maturity of the instrument.

Revenue Recognition

Common charges revenue is recorded monthly in the amount of the membership assessment allocation specified for current period operations, and is based on the annual budget adopted by the Board. A proportionate undivided interest in fee simple absolute (expressed as a percentage) in the common elements is assessed for each unit, based on square footage.

Late fees and interest revenue is recognized when collected.

Read Independent Auditor's Report.
8

CONFIDENTIAL

DEF00011097

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

NOTE 3 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Cash Flows

For purposes of the statement of cash flows, the Condominium considers all highly liquid debt instruments purchased with an original maturity of three months or less to be cash equivalents.

The Condominium made cash payments for income taxes of $25 during the years ended December 31, 2015 and 2014. The Condominium made no cash payments for interest during the years ended December 31, 2015 or 2014.

Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amount of revenues and expenses during the reporting period. Actual results could differ from those estimates.

NOTE 4 - CONCENTRATION OF CREDIT RISK

The Condominium maintains cash balances at various financial institutions. Accounts at each institution are insured by the Federal Deposit Insurance Corporation ("FDIC") up to $250,000 per institution. As of December 31, 2015 and 2014, $929 and $0, respectively, was uninsured based on the bank statement balances, less the FDIC insurance. Cash balances at an investment services company and cash equivalents totaling $1,199,306 and $1,399,972, as of December 31, 2015 and 2014, respectively, are not insured by the FDIC.

As of December 31, 2015 and 2014, the Developer owned the hotel unit and seven suite units, or approximately 44% of the available units.

NOTE 5 - ACCOUNTS RECEIVABLE - MEMBERS

Accounts receivable - members consisted of the following as of December 31,:

|  | 2015 | 2014 |
|---|---|---|
| Common charges | $ 16,308 | $ - |
| Less: allowance for uncollectible accounts | (1,540) | - |
|  | $ 14,768 | $ - |

NOTE 6 - DEFERRED REFURBISHMENT FEES

During the year ended December 31, 2013, the Condominium billed members for refurbishment fees totaling $831,265 for lobby and reception area refurbishment. The refurbishment fees are recognized as the related expenses are incurred. Unexpended amounts are recorded as deferred revenue on the balance sheet until they are either expended for the purpose of the original assessment, returned to members or used for another purpose as determined and approved by the Board. As of December 31, 2015, $558,044 has been expended against the project.

Read Independent Auditor's Report.

9

CONFIDENTIAL

DEF00011098

FIFTH AND FIFTY-FIFTH CONDOMINIUM
NOTES TO FINANCIAL STATEMENTS
DECEMBER 31, 2015 AND 2014

**NOTE 7 - RELATED PARTY TRANSACTIONS**

During the years ended December 31, 2015 and 2014, the Developer paid common charges of $18,079,584 and $17,589,108, respectively. As of December 31, 2015 and 2014, there were no amounts due from the Developer.

St. Regis New York Operating LLC (the "Manager") is an affiliate of the Developer. Certain Board members are also employees of the Manager or its affiliates. Substantially all operating expenses have been allocated to the Condominium from the Manager. As of December 31, 2015, due from Manager consisted of reimbursements due to the Condominium. As of December 31, 2014, due to Manager consisted of operating expenses of the Condominium paid by the Manager.

**NOTE 8 - REPLACEMENT FUND**

A replacement fund has not been established; therefore, no reserve assessments have been levied. If funds are needed, the Condominium has the right, subject to the Board's approval, to charge regular assessments, pass special assessments, or delay major repairs and replacements until funds are available.

**NOTE 9 - COMMITMENTS**

The Condominium has an agreement ending May 31, 2016, with the Manager. The Manager provides on-site management and maintenance services, and off-site administrative and accounting services. The agreement automatically renews for successive three-year periods unless, at least 90 days prior to the expiration of the then-current term, either party gives written notice to the other of its election not to extend the term. The management agreement provides that the Manager may subcontract its rights, duties and obligations under the management agreement.

The Condominium has a banking agreement ending April 25, 2018 with the Manager, SVO Residential Management, Inc. and SVO Management, Inc. ("SVOM"), who has guaranteed or indemnified the Condominium's liability for overdrafts with banks or other entities providing financial services to the Condominium. The agreement gives SVOM the right to reimburse itself for the amount of any overdrafts, if any, incurred on the Condominium's behalf. The agreement automatically renews for successive three-year periods unless terminated according to the terms of the agreement.

**NOTE 10 - ECONOMIC DEPENDENCY**

The Condominium derived approximately 83% and 81% of its revenue from the Developer during the years ended December 31, 2015 and 2014, respectively.

Read Independent Auditor's Report.

10

CONFIDENTIAL

DEF00011099

SUPPLEMENTARY INFORMATION

CONFIDENTIAL                                          DEF00011100

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL
FOR THE YEAR ENDED DECEMBER 31, 2015

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REVENUES** | | | |
| Common charges | $ 21,822,302 | $ 21,822,303 | $          1 |
| Interest | 791 | 423 | (368) |
| Late fees and interest | 326 | 1,529 | 1,203 |
| Total revenues | 21,823,419 | 21,824,255 | 836 |
| **EXPENSES** | | | |
| **OPERATIONS** | | | |
| Managers | 656,981 | 656,981 | - |
| Bellman | 488,978 | 488,978 | - |
| Concierge | 155,482 | 155,482 | - |
| Doorman | 302,121 | 302,121 | - |
| Page | 255,210 | 255,210 | - |
| Houseperson | 899,459 | 899,459 | - |
| Public area attendant | 181,648 | 181,648 | - |
| Front office | 398,548 | 398,548 | - |
| Butler | 2,415,213 | 2,415,213 | - |
| Benefits | 4,080,616 | 4,080,613 | 3 |
| Contract services | 223,252 | 207,314 | 15,938 |
| Decorations | 114,877 | 118,593 | (3,716) |
| Uniforms | 175,804 | 136,103 | 39,701 |
| Cleaning supplies | 25,465 | 15,995 | 9,470 |
| Operating supplies | 276,678 | 280,355 | (3,677) |
| Cable television | 162,287 | 171,051 | (8,764) |
| Telecommunications | 23,184 | - | 23,184 |
| Total operations | 10,835,803 | 10,763,664 | 72,139 |
| **ADMINISTRATIVE AND GENERAL** | | | |
| Management | 743,513 | 743,513 | - |
| Accounting office | 28,868 | 28,868 | - |
| Human resources | 40,132 | 40,132 | - |
| Administration | 15,269 | 15,269 | - |
| Security salaries and wages | 557,494 | 557,494 | - |
| Bonus wages | 20,723 | 21,627 | (904) |
| Benefits | 765,174 | 764,437 | 737 |
| Operating supplies | 22,052 | 23,660 | (1,608) |
| Payroll service | 54,954 | 57,181 | (2,227) |

Read Independent Auditor's Report.
12

CONFIDENTIAL

DEF00011101

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2015

| | Budget (Unaudited) | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **ADMINISTRATIVE AND GENERAL** (Continued) | | | |
| Personnel relocation | 46,153 | 38,517 | 7,636 |
| Personnel recognition | 46,153 | 69,738 | (23,585) |
| Personnel training | 47,230 | 59,853 | (12,623) |
| Telecommunications | 17,002 | - | 17,002 |
| Uniforms | 17,746 | 15,436 | 2,310 |
| Postage | 4,047 | 2,374 | 1,673 |
| Print and stationery | 13,162 | 7,652 | 5,510 |
| Professional fees and dues | 1,011 | 4,969 | (3,958) |
| Security | - | 9,407 | (9,407) |
| Bank fees | 1,979 | 2,098 | (119) |
| Six sigma distribution | - | 14,362 | (14,362) |
| Total administrative and general | 2,442,662 | 2,476,587 | (33,925) |
| | | | |
| **TELECOMMUNICATIONS** | | | |
| Salaries and wages | 192,551 | 192,551 | - |
| Benefits | 107,806 | 107,808 | (2) |
| Total telecommunications | 300,357 | 300,359 | (2) |
| | | | |
| **REPAIRS AND MAINTENANCE** | | | |
| Salaries and wages | 1,231,347 | 1,231,347 | - |
| Benefits | 781,030 | 780,708 | 322 |
| Alarm maintenance | 5,751 | 6,007 | (256) |
| Building | 166,330 | 206,026 | (39,696) |
| Computer system maintenance | 273,323 | 284,392 | (11,069) |
| Contract services purchasing | 10,234 | 45,678 | (35,444) |
| Curtain and drapes | - | (75) | 75 |
| Electrical and mechanical equipment | 18,905 | 19,100 | (195) |
| Electric bulbs | 34,874 | 34,838 | 36 |
| Elevators | 403,183 | 461,222 | (58,039) |
| Engineering supplies | 3,324 | 1,885 | 1,439 |
| Floor coverings | 14,865 | 8,606 | 6,259 |
| Grounds / landscaping | 66,924 | 93,466 | (26,542) |
| HVAC | 73,646 | 87,268 | (13,622) |
| Keys and locks | 8,832 | 16,983 | (8,151) |
| Laundry equipment | 8,040 | 6,815 | 1,225 |
| Maintenance contract | 121,383 | 142,095 | (20,712) |
| Miscellaneous | - | 629 | (629) |
| Operating supplies | 1,664 | 2,322 | (658) |
| Painting and decorating | 5,175 | 9,466 | (4,291) |
| Pest control | 50,024 | 47,960 | 2,064 |
| Plumbing | 50,791 | 49,635 | 1,156 |
| Telecommunications | 6,789 | - | 6,789 |
| Television and radio | 2,510 | 7,981 | (5,471) |

Read Independent Auditor's Report.

13

CONFIDENTIAL

DEF00011102

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES - BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2015

| | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| **REPAIRS AND MAINTENANCE (Continued)** | | | |
| Signs | - | 2,972 | (2,972) |
| Tools | 12,141 | 5,123 | 7,018 |
| Uniforms | 3,692 | 6,481 | (2,789) |
| Waste removal | 89,330 | 88,159 | 1,171 |
| Total repairs and maintenance | 3,444,107 | 3,647,089 | (202,982) |
| | | | |
| **ENERGY DEPARTMENT** | | | |
| Electric current | 1,640,221 | 1,519,429 | 120,792 |
| Steam | 841,726 | 800,669 | 41,057 |
| Sewer | 336,115 | 306,209 | 29,906 |
| Water | 191,500 | 178,243 | 13,257 |
| Total energy department | 3,009,562 | 2,804,550 | 205,012 |
| | | | |
| **GUEST LAUNDRY DEPARTMENT** | | | |
| Salaries and wages | 325,551 | 325,551 | - |
| Benefits | 218,413 | 218,029 | 384 |
| Print and stationery | 797 | 580 | 217 |
| Uniforms | 1,654 | 944 | 710 |
| Miscellaneous | - | (22) | 22 |
| Operating supplies | 8,976 | 10,069 | (1,093) |
| Total guest laundry department | 555,391 | 555,151 | 240 |
| | | | |
| **ADMINISTRATION** | | | |
| Administration | 1,236 | 1,236 | - |
| Administration other | 3,060 | 3,322 | (262) |
| Total administration | 4,296 | 4,558 | (262) |
| | | | |
| **BOARD AND MEMBERSHIP MEETINGS** | 6,000 | 2,090 | 3,910 |
| | | | |
| **PROVISION FOR UNCOLLECTIBLE ACCOUNTS** | 45,000 | 1,540 | 43,460 |
| | | | |
| **LEGAL AND AUDIT** | | | |
| Audit | 7,500 | 7,500 | - |
| Legal | 5,158 | 7,547 | (2,389) |
| Total legal and audit | 12,658 | 15,047 | (2,389) |
| | | | |
| **INCOME TAXES** | 300 | 25 | 275 |
| | | | |
| **INSURANCE** | 591,398 | 554,539 | 36,859 |

Read Independent Auditor's Report.
14

CONFIDENTIAL

DEF00011103

FIFTH AND FIFTY-FIFTH CONDOMINIUM
SCHEDULE OF REVENUES AND EXPENSES – BUDGET TO ACTUAL (Continued)
FOR THE YEAR ENDED DECEMBER 31, 2015

|  | Budget *(Unaudited)* | Actual | Variance Favorable (Unfavorable) |
|---|---|---|---|
| MANAGEMENT FEES | 125,885 | 125,880 | 5 |
| CONTINGENCY | 450,000 | - | 450,000 |
| Total expenses | 21,823,419 | 21,251,079 | 572,340 |
| Excess of revenues over expenses | $      - | $    573,176 | $    573,176 |

Read Independent Auditor's Report.
15

CONFIDENTIAL

DEF00011104

EXHIBIT "H"

PURCHASE AND SALE AGREEMENT

00047998.DOCX

CONFIDENTIAL

DEF00011105

Date: _____
Account #: _____
Purchase Price: _____

**PURCHASE AND SALE AGREEMENT**
**FIFTH AND FIFTY-FIFTH RESIDENCE CLUB**

This Purchase and Sale Agreement ("Purchase Agreement") is made on the date stated below between St. Regis Residence Club, New York Inc., ("Seller") whose address is 9002 San Marco Court, Orlando, FL 32819, and the undersigned purchaser(s) ("Purchaser"). Terms not otherwise defined in this Purchase Agreement have the meanings stated in the Declaration and Plan of Club Ownership for the Fifth and Fifty-Fifth Residence Club (as amended and supplemented from time to time, the "Club Declaration") for the Fifth and Fifty-Fifth Residence Club ("Club").

| PURCHASER 1: | PURCHASER 2: |
|---|---|
| Name in full | Name in full |
| Street Address | Street Address |
| City, State & Zip | City, State & Zip |
| Business Phone    Home Phone | Business Phone    Home Phone |
| E-Mail Address | E-Mail Address |

| PURCHASER 3: | PURCHASER 4: |
|---|---|
| Name in full | Name in full |
| Street Address | Street Address |
| City, State & Zip | City, State & Zip |
| Business Phone    Home Phone | Business Phone    Home Phone |
| E-Mail Address | E-Mail Address |

1. **The Offering Plan.** Purchaser acknowledges having received and read a copy of the Offering Plan and all amendments thereto, if any, filed with the Department of Law of the State of New York by Seller as sponsor (collectively, "**Offering Plan**"). The Offering Plan is incorporated herein by reference and made a part hereof with the same force and effect as if set forth at length. In the event of any inconsistency between the provisions of this Purchase Agreement (including Riders to this Purchase Agreement executed by Purchaser and Seller, which are not materially and adversely inconsistent with the Offering Plan) and the Offering Plan, the provisions of the Offering Plan will govern and be binding.

2. **Definitions.** Terms used herein which are also used in the Offering Plan shall have the same meanings herein as therein unless the context otherwise requires.

3. **Primary Owner.** Purchasers appoint Purchaser Number 1 to be the Primary Owner. Each Purchaser agrees that the Primary Owner will receive all official notices and mailings regarding the Club Interest(s) that are the subject of this Purchase Agreement and only the Primary Owner will receive notices required under this Purchase Agreement, under the Club Declaration, and under the Fifth and Fifty-Fifth Residence Club Reservation Policies and Procedures ("Reservation Procedures"). This provision will survive Closing.

4. **Primary Designee.** If the Purchaser is not a natural person (e.g Trust, corporation, etc.), _____ shall be the Primary Designee, holding all benefits and obligations of ownership. Purchaser agrees that the Primary Designee will receive all official notices and mailings regarding the Club Interest(s) that are the subject of this Agreement and only the Primary Designee will receive notices required under this Agreement, under the Declaration, and under the Fifth and Fifty-Fifth Residence Club Reservation Policies and Procedures. This provision will survive Closing.

5. **Agreement to Sell and Purchase.** In consideration of the terms, covenants and conditions set forth in this Purchase Agreement, which include an Arbitration Provision, Purchaser agrees to purchase, and Seller agrees to sell, the following real property ("Club Interest") as described in the attached Exhibit "A".

6. **Purchase Price and Title.**

    (a)   The total "Purchase Price," as adjusted by prorations and closing costs, will be paid in immediately available U.S. funds by Purchaser as follows:

| | |
|---|---|
| Purchase Price: | $_____ |
| Deposit (Due at Signing): | $_____ |
| Additional Deposit (Due _____): | $_____ |
| Additional Deposit (Due _____): | $_____ |
| Purchase Price Balance Due: | $_____ |

    (b)   All checks and credit card transactions shall represent United States currency. The Deposit, Additional Deposit(s) and the balance of the Purchase Price shall be made payable to the direct order of Escrow Agent. If any check is returned for insufficient funds or any credit card transaction is not credited to the Master Escrow Account or any other reason, such return shall be deemed to be a default by Purchaser under this Purchase Agreement and shall entitle Seller to exercise any of the remedies set forth in this Purchase Agreement.

- 1 -

SRNY012 (Rev. 02-09-16)

**CONFIDENTIAL**

**DEF00011106**

(c)   Purchaser shall pay the balance of the Purchase Price as adjusted by prorations and closing costs, at or before closing. EXCEPT AS OTHERWISE AGREED IN WRITING, THIS PURCHASE AGREEMENT IS NOT CONTINGENT ON PURCHASER OBTAINING FINANCING.

(d)   Purchaser shall pay all closing costs which are Purchaser's responsibility as more particularly set forth in the Section of the Offering Plan entitled "Closing Costs."

(e)   If Purchaser consists of more than one person or entity, Purchaser shall take title as (check one):

[ ] Joint Tenants

[ ] Tenants in Common

[ ] Other: (specify): _____

Title shall be conveyed to all Purchasers as joint tenants with rights of survivorship unless specifically otherwise noted above.

7.   **Deposits To Be Held In Trust.**  All Deposits received from Purchaser will be held in accordance with the provisions of the Section of the Offering Plan entitled "Escrow and Trust Fund Requirements". By signing this Purchase Agreement, Purchaser will not object and will be deemed to have agreed, without the need for a further written agreement, to the release of the Deposits to the parties entitled to them in the event the Closing of Title is consummated between Seller and Purchaser. If Purchaser shall default on Purchaser's obligations under this Purchase Agreement, then the Deposit not exceeding the sum of ten percent (10%) of the Purchase Price shall be released to Seller as liquidated damages, and the balance, if any, and the Closing Documents returned to Purchaser within thirty (30) days of such release, and thereafter, neither party shall have any further rights or obligations against or to each other. In the event Seller cannot convey title to the Club Interest to Purchaser by reason other than Purchaser's default, the Deposits and the Closing Documents shall be returned to Purchaser, within thirty (30) business days of Seller's notification to Purchaser that it cannot convey title.

8.   **Closing Of Title.**

8.1   The Club Unit is Complete. Therefore, Seller intends to close this transaction within ninety (90) days of the date of this Purchase Agreement, but, the last date on which Closing may occur is the date which is two (2) years from the date hereof, unless extended (the "Outside Date"). Seller's obligation shall be to hold the Closing on or before the Outside Date, unless extended by conditions or events legally recognized in the State of New York as frustrating or rendering impossible the performance of contracts. The date, time and place of Closing shall be determined by Seller and Seller shall give notice of the date of Closing to Purchaser at least fifteen (15) days in advance of the scheduled Closing Date. Closing will be effected by mail and Purchaser need not be present. On or before Closing, Purchaser and Seller shall execute, obtain acknowledgements and deliver such documents, affidavits and instruments and take such action as may be necessary to carry out their respective obligations under this Purchase Agreement. Seller shall provide, or cause the Club Association to provide, to Purchaser at Closing a written statement of Club Charges. Purchaser will be mailed a bill for current Club Charges within ninety (90) days of the date of Closing. This Purchase Agreement and any Closing Document may be executed in two or more counterparts, all of which taken together shall constitute one and the same document.

8.2   On the date of this Purchase Agreement, Purchaser shall execute and acknowledge all Closing Documents (including Loan Documents, if applicable) requested by Seller to consummate the transaction contemplated in this Purchase Agreement, as more fully set forth in the Offering Plan.

8.3   The Closing of Title shall occur only after or concurrently with the compliance with the Closing Conditions set forth in the Section of the Offering Plan entitled "Closing of Title".

8.4   The term "Closing Date" or "Closing of Title" or words of similar import, whenever used herein, shall mean the date on which the deed to the Club Interest is released for recording to Purchaser or Purchaser's title company.

8.5   Purchaser authorizes Seller, Selling Agent, the Title Company and Escrow Agent to complete all blank information and/or substitute pages containing completed information in all Closing Documents including, but not limited to, the Closing Date, recording data and other required information and to change the Closing Documents as a result of amendments to the Offering Plan and as needed in order to consummate the closing of the Club Units and/or to recopy some of the Closing Documents. No change in the Closing Documents will be made which would materially and adversely affect a Purchaser unless the change is first disclosed in an amendment to the Offering Plan. Purchaser also authorizes the release of the Closing Documents and the Deposits to the parties entitled to them upon the Closing of Title to the Ownership Interest or a default hereunder.

8.6   All Deposits will be held in escrow by Escrow Agent and released in accordance with the terms of the Offering Plan. All Closing Documents will be held as more fully set forth in the Section of the Offering Plan entitled "Procedure to Purchase" and released in accordance with the terms of the Offering Plan.

9.   **Delivery Of The Closing Documents.**

9.1   On the Closing Date, all Closing Documents which require recording will be delivered to the representative of the title company insuring Purchaser's title (or, if no such representative is present, then to a title company designated by Escrow Agent) for recording in the Register's Office.

9.2   On the Closing Date, those remaining Closing Documents which do not require recording shall be delivered to the parties entitled to them.

10.   **Status Of Title.**  At the Closing of Title, Seller shall convey to Purchaser good and insurable title in fee simple to the Club Interest, free and clear of all encumbrances other than those expressly agreed to by Purchaser or set forth in Schedule "A" annexed hereto and made a part hereof. Any encumbrance to which title is not to be subject shall not be an objection to title if (a) the instrument required to remove it of record is delivered at or prior to the Closing of Title to the proper party or to Purchaser's title insurance company, together with the attendant recording or filing fee, if any, or (b) Purchaser's title company, is or would be willing, in a fee policy issued by it to the Purchaser, to insure Purchaser that it will not be collected out of the Ownership Interest if is a lien, or will not be enforced against the Club Interest if it is not a lien.

11.   **Closing Disclosure:**  Purchaser has the right to inspect the Closing Disclosure prior to Closing.  The completed Closing Disclosure will be provided by Title Company or other Closing agent to Purchaser for Purchaser's inspection prior to Closing.

12.   **Occupancy.**  Assuming Closing has occurred, Purchaser's first occupancy will begin no sooner than the current Use Year.

- 2 -

SRN/012 (Rev. 02-08-18)

**CONFIDENTIAL**                                                    **DEF00011107**

13. **Purchaser's Acknowledgment.** Purchaser's signature on this Purchase Agreement constitutes Purchaser's acknowledgment that Purchaser has received, has read and understands, and, where applicable, has signed the documents listed below. Further, Purchaser understands and agrees that Seller may provide copies of this Purchase Agreement or certain information contained in this Purchase Agreement, as well as other documents executed by Purchaser at the time of purchase, to the Club Association, Management Company or Vistana Portfolio Services, Inc. (if sale is financed) for the purpose of enabling each of those entities to perform their job functions as set forth in the Club Documents or the Offering Plan.

   (a)   The Club Declaration, the Club Articles, Club Bylaws, the Club Reservation Procedures and the Club Rules and Regulations ("Club Documents");

   (b)   The Schedule B – Club Budget;

   (c)   Vistana Residence Network Disclosure Guide and Rules and Regulations; and

   (d)   The Condominium Declaration and Condominium Bylaws for the Condominium ("Condominium Documents").

   (e)   Purchaser hereby accepts and approves the Offering Plan (including the Condominium Documents and Club Documents contained or referred to therein) and agrees to abide and be bound by the terms and conditions thereof. The sale of the Club Interest is subject and subordinate to the provisions of the Condominium Documents and the Club Documents.

14. **Furnishings.** Each Club Unit will be fully furnished with furniture, appliances, equipment and accent materials ("Furnishings") substantially similar in quality to those shown in the models, renderings and advertising materials; provided that Seller at all times retains the right to make changes and substitutions with respect to the Furnishings and construction of the Club Unit so long as the changes or substitutions do not materially impair the quality of the Furnishings or the Club Unit and are of equal or better quality.  Purchaser may not rely on any specific representation made in any model, renderings or advertising materials. Purchaser acknowledges that square footage calculations may be made in a variety of manners and so long as the Club Unit is demised substantially in accordance with the models, renderings or materials reviewed by Purchaser, Purchaser shall neither have any right to rescind this Purchase Agreement nor to claim any breach hereof on account of alleged discrepancies in square footage calculations.  Replacement and repair of the Furnishings are the responsibility of the Club Association. Purchaser understands and acknowledges that, upon occupancy, the Furnishings may not be modified in anyway or removed from the Club Unit by Club Members or Club Unit Occupants.

15. **Agreement Subject To Mortgage.** No encumbrance shall arise against the Club Unit as a result of this Purchase Agreement or any monies deposited hereunder.  In furtherance and not in limitation of the provisions of the preceding sentence, Purchaser agrees that the provisions of this Purchase Agreement are and shall be subject and subordinate to the lien of any mortgage, including, but not limited to, any construction or building loan mortgage, heretofore or hereafter made any advances heretofore or hereafter made thereon and any payments or expenses made or incurred or which hereafter may be made or incurred, pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent thereof, without the execution of any further legal documents by Purchaser.  This subordination shall apply in all cases, regardless of the timing of, or cause for, the making of advances of money or the incurring of expenses. Seller shall, at its option, either satisfy such mortgages or obtain a release of each Ownership Interest from the lien of such mortgages on or prior to the Closing Date, unless Purchaser voluntarily assumes such mortgage or consents to the continuation of the lien thereof.  The existence of any mortgage or mortgages encumbering the Club Unit, or portions thereof, other than the Club Interest shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of its other obligations hereunder or be the basis of any claim against, or liability of, Seller, provided that any such mortgage(s) is subordinated to the Condominium Declaration and the Club Declaration.

16. **Representations, Acknowledgments, Warranties and Covenants.** Purchaser makes the following representations, warranties and covenants to Seller:

   (a)   Purchaser is purchasing the Club Interest and the rights and privileges associated with it for Purchaser's own personal use and account and not for any other purpose and Purchaser does not anticipate or expect to make a profit from the ownership or rental of the Club Interest.  Purchaser understands that the purchase of a Club Interest should be based solely upon its value as a vacation experience or for spending leisure time and not for its potential liquidity or as an appreciating investment, including potential for rental income or for resale at a profit.  Purchaser acknowledges that Seller and its representatives have made no representations to Purchaser regarding the Club Interest's potential for future profit, rental potential, tax advantages, depreciation, or investment potential.

   (b)   Purchaser shall be required to pay the Assessments set forth in the Club Declaration whether or not the Club Interest is used, and shall be responsible for the other fees and charges associated with the Club Interest or the use thereof, all as more fully set forth in the Club Documents.  Purchaser's first payment of Assessments will be due after the Closing Date as set forth in the Use Notification.  Purchaser acknowledges that unpaid Assessments, fees and charges shall become a lien on Purchaser's Club Interest.  As of the Closing Date there will be no unpaid Assessments, including real property taxes, outstanding against the Club Interest.

   (c)   Purchaser understands and acknowledges that no salesperson, broker or other person has any authority whatsoever to make any representation, agreement or warranty, express or implied, for Seller, except those expressly set forth in writing in this Purchase Agreement and the Club Documents.

   (d)   Purchaser acknowledges that all of the information called for in the blank spaces of this Purchase Agreement was filled in and read and understood by Purchaser prior to the time of execution of this Purchase Agreement.

   (e)   Purchaser acknowledges that errors or omissions sometimes occur in Closing documents and that Purchaser intends for all documentation for this transaction to be accurate. Accordingly, Purchaser agrees to cooperate in initialing, re-executing and redelivering any Closing documents where such corrective action is deemed necessary or desirable in Seller's reasonable discretion in this transaction.

   (f)   Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Seller, or otherwise, including, but not limited to, any relating to the description or physical condition of the Property, the Building, the Common Elements, the Common Areas or the size or the dimensions of the Club Units or any other physical characteristics thereof, the services to be provided to Club Members, the estimated Club Charges allocable to Club Members, the estimated Real Estate Taxes, the right to any income tax deductions or any other data, except as herein or in the Offering Plan specifically represented.  No Person has been authorized to make any representations on behalf of Seller except as herein or in the Offering Plan specifically set forth.  No oral representations or statements shall be considered a part of this Purchase Agreement. Seller makes no representation or warranty as to the work, materials, appliances, equipment or fixtures in the Club Units, the Common Areas or any other part of the Property other than as set forth in the Purchase Agreement or in the Offering Plan.

   (g)   Purchaser represents to Seller that Selling Agent is the only broker or sales agent with whom Purchaser has dealt in connection with this transaction, and Seller agrees to pay the commission earned by Selling Agent said broker pursuant to a separate agreement.  Purchaser agrees that should any claim be made against Seller for commissions by any broker, other than Selling Agent, on account of any acts of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Seller free and harmless from and against any and all liabilities and expenses in connection therewith, including reasonable legal fees.

<div align="center">- 3 -</div>

SR86012 (Rev. 02-08-16)

(h)    The covenants, acknowledgments, representations and warranties set forth in this Paragraph will survive the delivery and recordation of the deed.

17.    **Binding Effect; Entire Agreement; Amendment; Recordation.**  This Purchase Agreement is binding on and enforceable against the parties and their heirs, legal representatives, successors, and permitted assigns.  This Purchase Agreement is the only agreement between Seller and Purchaser and all prior and contemporaneous negotiations are superseded and all prior agreements, arrangements, representations and understandings are not legally binding on Seller or Purchaser and are replaced by this Purchase Agreement.  The only representations, agreements and warranties made by Seller are those specified in this Purchase Agreement and in the Club Documents.  This Purchase Agreement may only be amended in writing, signed by both parties.  Purchaser may not record this Purchase Agreement or any memorandum of this Purchase Agreement and any such recording by Purchaser will constitute a breach and Seller may terminate this Purchase Agreement at Seller's option and retain the Deposit.

18.    **Default; Termination.**

    (a)    Time is of the essence.  If the date for performance of any obligation under the Purchase Agreement falls on a Saturday or Sunday or on any holiday recognized by the States of New York or Florida, the date of performance shall be extended to the next regular business week day.

    (b)    If Purchaser fails to pay sums due under this Purchase Agreement when required as herein provided or fails to perform any of Purchaser's other obligations hereunder, Seller shall give notice to Purchaser of such default.  If such default shall not be cured within seven (7) business days thereafter, Seller may, at its option, cancel this Purchase Agreement by notice of cancellation to Purchaser.  If Seller elects to cancel this Purchase Agreement, (a) Seller may retain all sums deposited by Purchaser hereunder not to exceed ten percent (10%) of the Purchase Price, as liquidated damages (Seller's actual damages being difficult or impossible to ascertain) and, upon retaining such sum, this Purchase Agreement shall be terminated and neither party hereto shall have any further rights, obligations or liability to or against the other under this Purchase Agreement or the Offering Plan, except for Seller's obligation to return to Purchaser within thirty (30) days of such termination the unretained portion of the Deposits, if any, and the Closing Documents and (b) Seller may sell the Club Interest to any third party as though this Purchase Agreement had never been made (without any obligation to account to Purchaser for any part of the proceeds of such sale).

    (c)    If Seller breaches this Agreement, Purchaser shall give Seller written notice of such default and, if within thirty (30) days from receipt of such notice, Seller fails to commence action that would cure the default within a reasonable period of time, all monies deposited by Purchaser with Seller under this Agreement, together with interest shall, at the option of Purchaser, be paid by Seller to Purchaser and this Agreement shall terminate and thereafter neither party shall have any further rights or obligations in connection with this Agreement.

    (d)    Upon any termination of this Purchase Agreement, the parties shall be relieved of any further obligation to each other.

19.    **Seller's Inability To Convey The Club Interest.**  If Seller is unable to deliver insurable title to the Club Interest to Purchaser in accordance with the provisions of the Offering Plan, Seller shall not be obligated to bring any action or proceeding or otherwise incur any cost or expense of any nature whatsoever in order to cure such inability, and, in such case, if Seller notifies Purchaser of its refusal to cure such inability, Purchaser's sole remedy shall be to either (a) cancel this Purchase Agreement or (b) take title to the Club Interest subject to such inability (without any abatement in, or credit against, the Purchase Price, or any claim or right of action against Seller for damages or otherwise).  If Purchaser elects to terminate this Purchase Agreement, the Purchase Agreement and the other Closing Documents shall be null and void as of the date of Purchaser's cancellation notice and neither Seller nor Purchaser shall have any further rights, obligations or liabilities with respect to the other under this Purchase Agreement or the Offering Plan, except for Seller's obligation to return to Purchaser within thirty (30) days after receipt of Purchaser's cancellation notice, all Deposits made by Purchaser.  The foregoing remedy must be exercised by notice of Purchaser in writing to Seller within ten (10) days after the Presentation Date of Seller's notice of refusal to cure such inability, failing which it shall be conclusively deemed that Purchaser elected the remedy described in clause (a) above (i.e., to terminate this Purchase Agreement).

20.    **Fixtures, Appliances And Personal Property.**  None of the fixtures, appliances and items of personal property which are described in the "Description of Property and Building Condition" (which is set forth in the Offering Plan, as the same may be amended from time to time) as being part of the Club Unit or the Club Project are included in the sale of the Club Interest pursuant to the provisions of this Purchase Agreement.  Such fixtures, appliances and items of personal property shall belong to the Club Association for the benefit of all Club Members.

21.    **Acceptance Of Condition Of Property.**  The signing of this Purchase Agreement by Purchaser signifies Purchaser's acceptance of the condition of the Property and the Club Unit (as represented by Seller in the Offering Plan), as the same may be amended from time to time, including the Building, the Common Elements, the Club Units, the Common Areas and the Facilities in their respective existing conditions, subject to ordinary wear and tear between the date Purchaser signs this Purchase Agreement and delivery of the deed to Purchaser.  Purchaser understands that Seller has no obligation to make any repairs, improvements or decorations in or to the Property, the Building, Common Elements, the Club Units, the Common Areas, or the Facilities, except as may otherwise be set forth in the Offering Plan.

22.    **Risk of Loss.**  The risk of loss to the Club Unit shall be on Seller until the Club Declaration is recorded and then the risk of loss shall be on the Club Association.

23.    **Lead-Based Paint And/Or Lead-Based Paint Hazards.**  The Environmental Protection Agency and the Department of Housing and Urban Development promulgated Federal regulations under 24CFR Part 35 and 40 CFR Part 745 ("Regulations") regarding the disclosure of lead-based paint and/or lead-based paint hazards to prospective purchaser's of Ownership Interests.  In accordance with the provisions of the Regulations, annexed to this Purchase Agreement as Schedule "B" is a "Lead Warning Statement" and "Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards" to be signed by Seller and Purchaser.  In the event Purchaser exercises Purchasers' right to conduct a risk assessment or inspection ("Inspection") for the presence of lead-based paint and/or lead-based paint hazards, such inspection shall be performed within ten (10) calendar days following the date of this Purchase Agreement on the following terms and conditions:

    (a)    Purchaser and Purchaser's consultant ("Consultant") will be given reasonable access to the Club Units and the public areas of the Property.

    (b)    The Inspection shall be held at a mutually convenient time and date on a business day between 9 a.m. and 5 p.m.

    (c)    The Inspection shall be performed in a reasonable manner so as not to disturb or interfere with the use, operation, security or occupancy of the Club Units or the Building.

    (d)    Purchaser shall be liable for any damages to the Club Units or the Building, injuries, and all claims and lawsuits caused by Purchaser or the Consultant during the Inspection.

    (e)    Purchaser or the Consultant will not probe, penetrate or disturb any painted or covered surface during the Inspection without Seller's prior approval.

24.    **Notice.**  Except for the Arbitration Provision, all notices required to be sent under this Purchase Agreement must be in writing and either delivered personally or deposited in the U.S. Mail, first class postage prepaid, or via overnight courier, addressed to

- 4 -

SRW012 (Rev. 02-03-16)

CONFIDENTIAL

DEF00011109

Purchaser and Seller at the addresses listed on the first page of this Purchase Agreement. Notice will be deemed given when delivered personally, on the third business day after deposit in the U.S. Mail in the form stated above, or on the next business day when deposited with a reputable overnight courier for next-day delivery. The addresses and addresses for purposes of this Purchase Agreement may be changed by giving written notice of such change as provided in this paragraph. Unless written notice is provided to the contrary, the last addressee and address provided under this Purchase Agreement will continue to be in effect.

25. **Performance By And Liability Of Seller.** Purchaser's acceptance of the deed for the Club Interest shall be deemed to be a full performance and discharge of each and every agreement and obligation on the part of Seller to be performed pursuant to the provisions of this Purchase Agreement, the Offering Plan, 13 NYCRR, Part 24 (the regulations of the Attorney General of the State of New York governing the acceptance for filing of the Offering Plan) and General Business Law, Section 352-e, except those (if any) herein or therein expressly stated to survive delivery of such deed.

26. **Further Assurances.** Either party shall execute, acknowledge and deliver to the other party such instruments, and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Purchase Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

27. **Entire Agreement.** This Purchase Agreement supersedes any and all understandings and agreements between the parties with respect to the subject matter hereof.

28. **Limited Warranty/Disclaimer.**

    (a) **Restrictions on Warranties.** Seller did not construct the building containing the Club Units ("Building"). Rather, it was constructed in 1904 by an unrelated party. Seller therefore cannot and does not warrant the Building and disclaims any warranty except for the Limited Warranty (defined below). The statute of limitations for bringing claims against the party that constructed the Building have expired, however, Purchaser makes no representations regarding same. EXCEPT AS STATED IN THIS PARAGRAPH BELOW, PURCHASER IS ACCEPTING THE CLUB UNIT IN ITS "AS IS" CONDITION, AND SELLER MAKES NO WARRANTY OR REPRESENTATION OF ANY NATURE, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THOSE OF WORKMANLIKE CONSTRUCTION, HABITABILITY, DESIGN, CONDITION, OR QUALITY AS TO THE PROPERTY UNDERLYING THE CONDOMINIUM, THE CLUB UNIT, OR, THE OTHER IMPROVEMENTS CONSTITUTING THE CONDOMINIUM, AND SELLER HEREBY EXPRESSLY DISCLAIMS ANY SUCH REPRESENTATIONS OR WARRANTIES. SELLER SPECIFICALLY DISCLAIMS, AND PURCHASER SPECIFICALLY RELEASES SELLER FROM, ANY LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES TO ANY PERSON OR THE CLUB UNIT OR ANY OTHER REAL OR PERSONAL PROPERTY RESULTING FROM A DEFECT. WITH REGARD TO THE APPLIANCES AND ANY OTHER ITEMS OF TANGIBLE PERSONAL PROPERTY, SELLER DISCLAIMS ALL WARRANTIES INCLUDING, BUT NOT LIMITED TO, THOSE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. IN ADDITION, SELLER MAKES NO REPRESENTATION OR WARRANTY AND SPECIFICALLY DISCLAIMS ANY REPRESENTATION OR WARRANTY CONCERNING ANY GEOLOGICAL OR ENVIRONMENTAL MATTERS.

    (b) **Limited Warranty.** Seller has engaged a general contractor to renovate the Club Units. For a period of one-year from Closing, Seller warrants to Purchaser that materials and equipment furnished in connection with such contractor's work and incorporated into the Club Unit will be of good quality and new, unless otherwise required under the contractor's construction contract, that the contractor's work will be free from defects in workmanship and quality not inherent in the quality required under the contractor's construction contract for a period of one year from the date of issuance of a certificate of completion for the Club Unit. Seller shall cause the correction, by repair or replacement, of any defective or non-conforming work which result from faulty material or workmanship claimed within one year of the date of issuance of a certificate of completion for the Club Unit, at no cost to Purchaser, provided that Purchaser gives Seller written notice of any such defect within ten (10) days after Purchaser's discovery of the defect ("Limited Warranty"). This Limited Warranty excludes any remedy for defect, non-conforming work, or damage caused by modifications not performed by Seller or Seller's contractor, or due to normal wear and normal usage occurring after the Closing. Purchaser's sole remedy (in lieu of all remedies implied by law or otherwise) against Seller in connection with such defects shall be to require Seller to cause the defects in material or workmanship to be corrected. Purchaser shall have no right to assert claims against Seller or its general contractor for any other monetary damages arising out of any defect in workmanship or materials. The Limited Warranty does not extend or relate to any items of tangible personal property in the Club Unit (regardless of whether such property is attached to or installed in the Club Unit).

    (c) **Magnuson-Moss Warranty Act Compliance.** This Limited Warranty has been prepared to comply with the disclosure requirements of the federal Magnuson-Moss Warranty-Federal Trade Improvement Act (15 U.S.C. § 2301, as amended). With respect to any Appliances finally determined by a court to be within this Limited Warranty described above, all implied warranties are limited in duration to the period of the Limited Warranty. This includes, without limitation, the implied warranties of merchantability and fitness for a particular purpose if created or recognized in New York. Some states do not allow limitations on how long an implied warranty lasts or the exclusion or limitation of incidental or consequential damages so the above limitation may not apply to Purchaser. This Limited Warranty gives specific legal rights, and Purchaser may also have other rights which vary from state to state.

    (d) **No Other Representations.** PURCHASER REPRESENTS THAT PURCHASER HAS READ THIS PURCHASE AGREEMENT AND THE PROVISIONS REFERRED TO ABOVE AND, NO OTHER AGREEMENT, PROMISES, REPRESENTATIONS OR WARRANTIES, EXCEPT THOSE EXPRESSLY SET FORTH IN THIS PURCHASE AGREEMENT IN WRITING, HAVE BEEN MADE BY SELLER OR ITS SALESMEN, AGENTS OR EMPLOYEES TO PURCHASER. PURCHASER ACKNOWLEDGES THAT HE/SHE IS NOT RELYING UPON ANY STATEMENT, REPRESENTATION, OR WARRANTY NOT SET FORTH IN THIS PURCHASE AGREEMENT. FURTHER, PURCHASER ACKNOWLEDGES THAT NO SALES COUNSELOR, EMPLOYEE, AGENT OF SELLER OR BROKER HAS AUTHORITY TO MODIFY THE TERMS HEREOF OR TO MAKE ANY AGREEMENTS, REPRESENTATIONS, WARRANTIES OR PROMISES REGARDING THE CLUB UNIT, THE CONDOMINIUM, THE SURROUNDING PROPERTIES, OR ANY OTHER ITEM RELATING TO THIS PURCHASE AGREEMENT, UNLESS THE SAME ARE EXPRESSLY SET FORTH IN THIS PURCHASE AGREEMENT.

    (e) **Acknowledgment; Survival of Covenants.** Purchaser hereby acknowledges and accepts the foregoing disclaimers and agrees to waive any and all rights Purchaser may have by virtue of the representations and warranties disclaimed. Except as otherwise provided in the Limited Warranty, Purchaser assumes the risk of damage occurring in the Club Unit after the Closing regardless of the cause. The provisions of this Paragraph 28 shall survive Closing.

29. **Attorneys' Fees and Costs.** In the event of any litigation, arbitration, or other legal proceeding between Purchaser and Seller to enforce this Purchase Agreement or related documents, the prevailing party will be entitled to recover and shall be awarded all costs and reasonable attorneys' fees from the non-prevailing party and such amounts will be included in any judgment or award obtained.

- 8 -

SFR0012 (Rev. 02-05-16)

30.  <u>Severability</u>.  Except as set forth in the Arbitration Provision, if any non-material provision of this Purchase Agreement is determined to be invalid or unenforceable under applicable law, it will be stricken from this Purchase Agreement and will in no way affect the other provisions of this Purchase Agreement. This Purchase Agreement will remain in full force and effect and will be construed in all respects as if the invalid or unenforceable non-material provision was intentionally omitted. If any material provision of this Purchase Agreement is declared invalid or unenforceable, Seller shall have the right to terminate this Purchase Agreement in its sole and absolute discretion.

31.  <u>Termination of Agreement with Blocked Persons</u>.  Pursuant to United States Presidential Executive Order 13224 (the "Executive Order"), Seller is required to ensure that Seller does not transact business with persons or entities determined to have committed, or to pose a risk of committing or supporting, terrorist acts and those identified on the list of Specially Designated Nationals and Blocked Persons (the "List") generated by the Office of Foreign Assets Control of the U.S. Department of the Treasury.  The names or aliases of these persons or entities (Blocked Persons") are updated from time to time.  In the event Seller learns that Purchaser's name (or Purchaser's assigned party's name) appears on the List, Seller reserves the right to delay the Closing pending Seller's investigation into the matter.  If Seller is advised and/or determines that Purchaser (or Purchaser's assigned party) is a Blocked Person, Seller reserves the right to terminate this Purchase Agreement and/or to take all other actions necessary to comply with the requirements of the Executive Order.  The provisions of this paragraph will survive Closing and/or termination of this Purchase Agreement.

32.  <u>Assignment</u>.  This Purchase Agreement is personal to Purchaser and may not be assigned by Purchaser to any unrelated third party prior to Closing. This Purchase Agreement may be assigned by Purchaser to a related party only with Seller's written approval, prior to the assignment, which approval shall not be unreasonably withheld. Seller shall not unreasonably withhold its consent if the proposed assignment is to a person related to Purchaser or to an entity in which Purchaser has a significant economic interest, provided Purchaser shall not be released by such assignment. In any event, however, Seller reserves the right to withhold approval of an assignment to any person or entity whose name appears on the List as defined in Paragraph 31 of this Purchase Agreement in Seller's sole and absolute discretion.

33.  <u>Governing Law</u>.  This Purchase Agreement will be governed by, construed and enforced in accordance with, the laws of New York.  Jurisdiction and venue will be proper only in the County of New York.

34.  <u>Arbitration Provision ("Provision")</u>.  Any dispute, controversy or claim ("Claim") between Purchaser and Seller, whether preexisting, present or future, arising from or relating to the Purchase Agreement or the Club interest shall, at the election of either party, be arbitrated on an individual basis before JAMS (www.jamsadr.org, 1-800-352-5267) pursuant to its Streamlined Rules.  If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction will select the arbitrator.  The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., shall govern the interpretation and enforcement of this Provision.  A single neutral arbitrator shall be appointed.  The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and have a written reasoned decision which will be final and binding except for any review under the FAA.  The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court).  The rules of some arbitration forums may impose time limits for filing a claim in arbitration and the ability of the parties to obtain documents, witness statements and other discovery may be more limited in arbitration than in court proceedings.  In general, arbitration awards are final and binding and the ability to have a court reverse or modify an arbitration award is very limited.  An arbitrator is not necessarily required to explain the reasons for the award.  In addition, unlike in litigation, New York law does not authorize the filing of a notice of pendency based on ongoing arbitration proceedings.  Any in-person hearing will be held in the County of New York unless otherwise agreed in writing.  If Purchaser initiates an individual arbitration, Seller will pay all administrative and arbitrator fees exceeding $250.  Solely for purposes of this Provision, "Seller" also means Seller's parent companies, subsidiaries and affiliates; Seller's and their employees, officers and directors; and any other person or entity designated as a defendant or respondent in a Claim by Purchaser against Seller.  "Purchaser" also means Purchaser's heirs, successors and assigns.

"Claim" shall be broadly construed and includes, without limitation, disputes concerning: purchase, financing, ownership or occupancy; breach, termination, cancellation or default; condition of the property; the Vistana Signature Network or other exchange programs; reservations, points or rewards programs; applications and personal information; marketing or sales solicitations, representations, advertisements, promotions or disclosures; and collection of delinquent amounts and the manner of collection.  "Claim" includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity.  "Claim" does not include: (i) disputes about the validity, enforceability, coverage or scope of this Provision or any part thereof, which are for a court to decide.  But disputes about the validity or enforceability of the Purchase Agreement as a whole are for the arbitrator to decide; (ii) any individual action by Purchaser in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court; or (iii) Seller's use of judicial or non-judicial relief to enforce a security agreement, mortgage or deed of trust relating to the collateral secured in a transaction underlying the Purchase Agreement, including, without limitation, foreclosure on the collateral.  The institution and maintenance of any such action shall not waive any party's right to compel arbitration of any other Claim subject to arbitration, including, without limitation, the filing of a counterclaim in a suit brought by Seller.  In any such action commenced by Seller, Purchaser may assert any cognizable defense permitted by applicable law which does not seek any form of affirmative relief from Seller, including, without limitation, damages.

<u>Class Action Waiver</u>.  If a Claim is arbitrated, neither Purchaser nor Seller will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member; (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity.  The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding or to issue any relief that applies to any person or entity except Purchaser and Seller individually.

An arbitration award may be enforced in any court with jurisdiction.  In the event a final arbitration award is rendered allowing the disposition of escrowed funds (including deposits or advance received by Seller), such funds shall not be released from escrow for 90 days from the issuance of the final arbitration award.  This Provision shall survive the breach, cancellation, termination or rescission of the Purchase Agreement, and any bankruptcy to the extent permitted by law.  This Provision governs if it conflicts with the Purchase Agreement or the arbitration rules.  If any part of this Provision other than the Class Action Waiver is declared unenforceable, the remainder shall be enforceable.  If the Class Action Waiver is declared unenforceable in a proceeding between Purchaser and Seller, without impairing the right to appeal such decision, this entire Provision (except for this sentence) shall be null and void in such proceeding.  Seller will not amend this Provision in a manner that adversely affects Purchaser's rights unless Seller gives Purchaser a right to reject the amendment.

<u>Right to Reject Arbitration Provision</u>: Purchaser may reject this Provision by sending Seller a written notice which gives Purchaser's name and Purchase Agreement number and states that Purchaser rejects the Arbitration Provision.  The rejection notice must be sent by certified mail, return receipt requested, to St. Regis Residence Club, New York Inc. at 9002 San Marco Court, Orlando, Florida 32819; Attention: Legal Department.  A rejection notice must be signed by Purchaser and received by Seller within thirty (30) days after the date of this Purchase Agreement.  Rejection of arbitration will not affect any other term of this Purchase Agreement.

Each Purchaser has read, understands and voluntarily agrees to this Arbitration Provision and acknowledges that if a Claim is arbitrated, there will be no right to have a court or jury trial or participate in a class action.

- 6 -

SRR6012 (Rev. 02-08-16)

**CONFIDENTIAL**

**DEF00011111**

35. <u>Seller's Right of First Refusal before Resale.</u> For three (3) years from the Closing Date, Purchaser is required to offer Purchaser's Club Interest(s) to Seller upon the same terms and conditions (including financing) as offered by or to a bona fide third party before Purchaser may resell, transfer or assign the Purchaser's Club Interest to a bona fide third party. This restriction shall not apply to transfers, assignments or sales to members of Purchaser's immediate family or other entities related to Purchaser, such as affiliates or subsidiaries. Further, this restriction shall not apply to the mortgage, collateral grant, pledge, hypothecation, collateral assignment of the Club Interest for the purpose of securing purchase money financing nor to any subsequent transfer by foreclosure, by similar proceeding or by deed in lieu of same.  Purchaser must notify Seller in writing no less than thirty (30) days in advance of any proposed Closing date, of Purchaser's intention to sell the Club Interest and must include a copy of the fully executed contract for sale. Seller shall notify Purchaser within ten (10) days of receipt of such notice and written contract whether Seller wishes to exercise its right of first refusal. If Seller elects to exercise its right of first refusal, the Seller's purchase of Purchaser's Club Interest shall be closed no later than thirty (30) days of the date that Seller's response is mailed to Purchaser, unless both parties agree to an extended date. If the sale of the Club Interest fails to close, through no fault of the Seller, this restriction shall continue and be binding on Purchaser, pursuant to this Purchase Agreement. If Seller fails to timely notify Purchaser of its election to exercise its right to purchase, Purchaser may consummate its sale with the bona fide third party. This provision shall survive Closing and shall bind any of Purchaser's immediate family or related entities to whom title is transferred.

36. <u>Use of the St. Regis Name.</u>  Vistana Signature Experiences, Inc., ("Vistana") has entered into a License Agreement with Starwood Hotels & Resorts Worldwide, Inc., ("Starwood") pursuant to which Vistana has been granted the limited right to use the "St. Regis" name, trademarks and related logos ("Brand") (including the limited right for Vistana to use Starwood's service marks and trademarks associated therewith ("Marks"), in connection with Vistana's operation of the Club Property and Plan of Club Ownership and the marketing and sales of Club Interests in the Plan of Club Ownership ( the "License Agreement").

Pursuant to such right and in accordance with and subject to the terms and conditions of the License Agreement and the Management Agreement, the Club Property and Plan of Club Ownership will be managed and operated in accordance with the "License Standards" (defined below) as a "St. Regis," or under such other similar names and marks as Vistana is permitted to use to identify the Club Property and Plan of Club Ownership as part of the club ownership system operated, managed, or owned by Starwood and its subsidiaries (including Management Company, and Seller).  Management Company may use the Brand and the Marks for such purposes, and for any other purpose it determines in its sole discretion, provided, in each case, such use is in accordance with the License Agreement.  Seller also has certain limited rights to use the Brand and the Marks with respect to the development, sale, and marketing of Club Interests in the Plan of Club Ownership and the operation of certain property which has not been declared as part of the Club Property.  As used in this Agreement, "License Standards" refers generally to any standards, policies, procedures, programs, instructions, management, requirements and guidance relating to the design, construction, development, maintenance, and operation of club properties which are owned or operated by Vistana, its successors, assigns, or any of its affiliates, subsidiaries or licensees and which are designated as "St. Regis"," or similar names or marks and including those standards, policies, procedures, programs, instructions, management, requirements and guidance specified under the License Agreement.

Owners acknowledge that Starwood may terminate the License Agreement if, among other reasons, the Club Property is not managed, operated, and maintained in a manner consistent with the License Standards, (which could occur, among other reasons because of the failure of the Association or Owners to approve budgets sufficient to cover required maintenance expenses). Additionally, Owners acknowledge that Starwood may terminate the License Agreement in the event of the Association's bankruptcy or insolvency; the Association's liability for a large adverse court judgment, the Association's dissolution or liquidation, failure by Vistana to pay the mandatory licensing fee owed to Starwood or for any other reason permitted under the License Agreement.  Further, and as noted above, the availability and use of the Brand and Marks are subject to the terms, conditions, and requirements set forth in the Management Agreement and License Agreement.  If the Management Agreement or License Agreement is terminated, the Club Property and Plan of Club Ownership will no longer be associated with, nor will Owners or the Association have any right to use, the Brand or Marks. The costs and expenses incurred by Management Company to comply with the terms, conditions, and requirements of the License Agreement and Management Agreement may be part of the Club Charges.

None of the Brand, the Marks, or the License Agreement are part of the Club Property or otherwise included in the Club Interest.  Neither the Association nor any Owner has any right, title, or interest in the Brand, the Marks, or the License Agreement, and all use of the Brand and the Marks in association with the Club Property inure exclusively to the benefit of Starwood or Vistana, whichever the case may be.  None of the Association, any Owner, and Purchaser shall have the right to license, advertise, market or otherwise use the Brand or Marks, and shall not use the Brand or Marks in association with any other business, service, or property.  Purchaser acknowledges and agrees that Purchaser is not acquiring Purchaser's Club Interest with the expectation that the Brand or the Marks will continue to be associated with the Club Property or the Plan of Club Ownership during the Purchaser's entire period of ownership. The Club Interests, Residence Network, Plan of Club Ownership and Club Property are not owned, developed, maintained or sold by Starwood or any of its affiliates.

In addition, and in accordance with the terms and conditions of the Residence Network Affiliation Agreement for the Club Property, Association and Management Company have agreed to manage, operate, and maintain the Club Property and Plan of Club Ownership in a manner consistent with the standards of quality and customer service established, imposed or adopted by VRN Operator and published by VRN Operator for all VRN Resorts from time to time ("Network Standards"), which may incorporate or adopt all or a portion of the License Standards.  The VRN Affiliation Agreement may be terminated by VRN Operator, resulting in the deletion of the Club Property and Plan of Club Ownership from the Residence Network, if, among other reasons, the Club Property and Plan of Club Ownership are not managed, operated, and maintained in a manner consistent with the Network Standards, (which could occur, among other reasons because of the failure of the Association or Owners to approve budgets sufficient to cover required maintenance or operating expenses).

37. <u>Damage Before Closing.</u> If prior to Closing, the Club Unit shall be destroyed or damaged by fire or other casualty, Seller shall repair the damage to the Club Unit or may terminate this Purchase Agreement and refund all monies paid by Purchaser. This Purchase Agreement shall remain in full force and effect, and the Closing shall be delayed as necessary to allow the completion of such repair.

38. <u>Seller Changes to Club Documents.</u>  Seller reserves the right to modify and amend the Club Documents at any time and from time to time prior to Closing as Seller may deem necessary or advisable, including without limitation for the following reasons: to make any necessary corrections to comply with the laws of any jurisdiction or to meet the requirements of any governmental agency (whether federal, state, local or foreign), to meet the requirements of any lending institutions or marketing programs; provided that, in each event, such modifications or amendments do not materially adversely affect the value of Club Interest.  Purchaser acknowledges that Seller has reserved rights, at any time after Closing, to amend the Club Documents in the exercise of Seller's Special Rights set forth in the Club Declaration or to amend the Club Documents to comply with the real estate laws of any jurisdiction or the requirements of any governmental agency (whether federal, state, local or foreign).

-7-

SRI#012 (Rev. 02-06-16)

39. <u>Vistana Residence Network Exchange Program.</u> The Club Association has endorsed through an affiliation agreement, the Vistana Residence Network or VRN as the Club's exchange program. The Club will not recognize or honor any exchanges from any entity, other than VRN. VRN will permit Club Members to exchange or "interchange" Club Weeks associated with their Club Interest with Club Members at other Vistana Residence Club locations, provided such location is also affiliated with VRN. Club Members should review the VRN Disclosure Guide for a current listing of affiliated Vistana Residence Club locations. VRN Interchanges will be made strictly on a voluntary, first come, first served basis for available Club Weeks that are placed for interchange by other Club Members. An affiliation fee will be assessed against the Club Association for the VRN Affiliation; however, each member's participation in VRN is voluntary. Each Club Member should carefully review the VRN Disclosure Guide and Rules and Regulations for complete details of the VRN exchange program, including each Club Member's allocated portion of the current VRN fees.

40. <u>Additions and Addenda.</u> This Purchase Agreement includes the following additional provisions and all addenda attached hereto specifically listed below, if any, all of which are incorporated herein by this reference.

Purchaser has read this Purchase Agreement, acknowledges receipt of a copy of it, and agrees to all the terms, conditions and provisions herein.   Purchaser and Seller executed this Purchase Agreement as of the _____ day of _____.

SELLER:

ST. REGIS RESIDENCE CLUB, NEW YORK INC.,
a Florida corporation

By:_____
                                    Authorized Agent

Acceptance Date:_____

PURCHASER MAY CANCEL THIS PURCHASE AGREEMENT AT WILL AND WITHOUT EXPLANATION WITHIN SEVEN (7) BUSINESS DAYS AFTER PURCHASER SIGNS THE PURCHASE AGREEMENT, IN WHICH EVENT PURCHASER WILL RECEIVE A FULL REFUND. SEE PAGE 1 OF THE OFFERING PLAN.

PURCHASER(S):

_____
                                              Date

_____
                                              Date

_____
                                              Date

_____
                                              Date

### REMAINDER OF PAGE LEFT INTENTIONALLY BLANK

-6-

SRN0312 (Rev. 02-08-16)

CONFIDENTIAL

DEF00011113

EXHIBIT "A"

Club Unit No: _____

Accomodation Type: _____ _____

Club Week: _____ ("Fixed Time")

Assigned Priority Designation: _____

- 9 -

SRM012 (Rev. 02-09-16)

CONFIDENTIAL

DEF00011114

SCHEDULE "A"

PERMITTED ENCUMBRANCES

1.  Building restrictions and zoning and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted.

2.  Any state of facts shown on a survey of the Property, provided such state of facts would not prevent the use of the Club Unit for its permitted purposes.

3.  Any state of facts which an accurate survey of the Club Unit would show, provided such state of facts would not prevent the use of the Club Unit for its permitted purposes.

4.  The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Condominium Documents, the Condominium Power of Attorney from the Purchaser to the Condominium Board, and the Floor Plans as all of the same may be amended from time to time.

5.  The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations, all as set forth in the Club Documents and the Club Power of Attorney from Purchaser to the Club Board, as the same may be amended from time to time.

6.  Consents by Seller or any former owner of the Land for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

7.  Any easement or right of use in favor of any utility company for construction, use, maintenance or repair of utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles and other equipment and facilities on, under and across the Property.

8.  Revocability of licenses for vault space, if any, under the sidewalks and streets.

9.  Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property, and the rights of governmental authorities to require the removal of any such projections and variations.

10. Leases and service, maintenance, employment, concessionaire and license agreements, if any, of the Club Unit, or other Club Units or portions of the Common Elements or Common Areas.

11. The lien of any unpaid Club Charge, real estate tax, water charge or sewer rent, or vault charge, provided the same are adjusted at the closing of title.

12. The lien of any unpaid assessment payable in installments (other than assessments levied by the Condominium Board or the Club Board), except that Seller shall pay all such assessments due to the Club Board prior to the Closing Date (with the then current installment to be apportioned as of the Closing Date) and the Purchaser shall pay all assessments due from and after the Closing Date.

13. Any declaration or other instrument affecting the Property which Declarants deem necessary or appropriate to comply with any Law, ordinance, regulation, zoning resolution or requirement of the Department of Buildings, the City Planning Commission, the Board of Standards and Appeals, or any other public authority, applicable to the demolition, construction, alteration, repair or restoration of the Building.

14. Any encumbrance as to which Purchaser's title company (a New York Board of Title Underwriters member title insurance company which insures the Purchaser's title to the Club Interest) would be willing, in a fee policy issued by it to the Purchaser, to insure the Purchaser that such encumbrance (a) will not be collected out of the Club Unit or the Club Interest if it is a lien or (b) will not be enforced against the Club Unit or the Club Interest if it is not a lien.

15. Any other encumbrance, covenant, easement, agreement, or restriction against the Property other than a mortgage or other lien for the payment of money, which does not prevent the use of the Club Unit for its permitted purposes.

16. Any violations against the Property which is the obligation of the Condominium Board, Club Board or Unit Owners or Club Members to correct.

- 10 -

SFR0212 (Rev. 02-09-16)

CONFIDENTIAL

DEF00011115

SCHEDULE "B"

DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND/OR LEAD-BASED PAINT HAZARDS

LEAD WARNING STATEMENT

Every Purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The Seller of any interest in residential real property is required to provide buyer with information on lead-based paint hazards from risk assessments or inspections in the Seller's possession and notify the buyer of any known lead-based hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended poor to purchase.

SELLER'S DISCLOSURE

(a)     Presence of lead-based paint and/or lead-based paint hazards. (check (i) or (ii) below)

   (i)   _____  Known lead-based paint and/or lead-based paint hazards are present in the housing (explain on  attached sheet).
   (ii)   _X_   Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

(b)     Records and reports available to Seller (check (i) or (ii) below):

   (i)   _X_   Seller has provided Purchaser with all available records and reports pertaining to lead-based paint and/or
               lead-based paint hazards in the housing (See the Lead-Based Paint Survey dated May 31, 2005 prepared by
               Atlantic Environmental Incorporated).
   (ii)   _____  Seller has no records or reports pertaining to lead-based paint and/or lead-based paint hazards in the housing.

PURCHASER'S ACKNOWLEDGEMENT (initial)

(c)   _____  Purchaser has received copies of all information listed above.
(d)   _X_   Purchaser has received the pamphlet Protecting Your Family from Lead in Your Home.
(e)   _____  Purchaser has (check () or (ii) below):
   (i)   _____  Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the
               presence of lead-based paint and/or lead-based paint hazards; or
   (ii)   _____  Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead
               based paint hazards.

SELLING AGENT'S ACKNOWLEDGMENT (initial)

(f)   _N/A_   Selling Agent has informed Seller of Seller's obligation under 42 U.S.C. 4852d and is aware of Selling Agent's independent
               responsibility to ensure compliance.

CERTIFICATE OF ACCURACY

   The following parties have reviewed the information above and certify, to their best of their knowledge, that the information they have provided is true and accurate.

SELLER:                                           PURCHASER(S):

ST. REGIS RESIDENCE CLUB, NEW YORK INC.,
a Florida corporation                             _____

                                                 _____
By: _____
          Authorized Agent                       _____

Date: _____                   _____

                                                 _____

                                                 Date: _____

- 11 -

SRR-0012 (Rev. 02-09-16)

CONFIDENTIAL                                                                      DEF00011116

EXHIBIT "I"

RESIDENCE NETWORK GUIDE

00047998.DOCX

CONFIDENTIAL

DEF00011117

Vistana Signature Network Disclosure Guide

For Members of the Vistana Residence Network

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION REGARDING THE EXCHANGE PROGRAM OWNED AND OPERATED BY VISTANA SIGNATURE NETWORK, INC. IN ACCORDANCE WITH APPLICABLE LAW.

This does not constitute an offer to sell or a solicitation of an offer to buy securities or any interest in real estate.  For further information, please contact:

VISTANA SIGNATURE NETWORK, INC.
9002 San Marco Court
Orlando, Florida 32819

SRN GUIDE R-13

CONFIDENTIAL

DEF00011118

### I.  Definitions

The capitalized terms used in this Disclosure Guide shall have the same meaning as the identical terms defined in the Vistana Residence Network ("Residence Network") Rules and Regulations attached as Exhibit "A" unless the context otherwise requires.

### II.  Information about Residence Network Operator

Residence Network Operator, Vistana Signature Network, Inc., is a Delaware corporation with principal offices located at 9002 San Marco Court, Orlando, Florida 32819.  The sole shareholder of Residence Network Operator is Vistana Signature Experiences Inc.  ("Parent").  The officers and directors of Residence Network Operator are as listed on the attached Exhibit "B."  Residence Network Operator has no legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in the Residence Network.  However, one or more of the developers, sellers, or managing entities for Residence Network Resorts may also be subsidiaries or affiliates of the Parent.  None of the officers and directors of Residence Network Operator have any legal or beneficial interest in any developer, seller, or managing entity for any fractional or vacation ownership plan participating in the Residence Network, although one or more of them may also be an officer or director of such entities and/or a stockholder of the Parent.  Residence Network Operator and its shareholder, officers, and directors reserve the right to act as developers or sellers of fractional and/or vacation ownership plans and multisite vacation ownership plans for future resorts which plans may or may not be affiliated with the Residence Network.

### III.  Membership in Residence Network

Each purchaser of a Club Interest in a Residence Network Resort is eligible for enrollment as a Residence Network Member either at the time the purchaser acquires such Club Interest or sometime thereafter.  To use and enjoy benefits of membership in the Residence Network, such purchaser must execute an Owner Use Agreement, which is separate and distinct from such purchaser's purchase contract with purchaser's seller.  The terms and conditions of such membership are set forth in the Residence Network Documents and also may be set forth in the Resort Documents for that Residence Network Resort.  A Residence Network Member's decision to use the Residence Network by requesting an Interchange at a Residence Network Resort is strictly voluntary.  However, Residence Network Members must affirmatively make an Interchange Request in order to make an Interchange.  All Residence Network Resorts are affiliated with Residence Network by means of a Residence Network Affiliation Agreement between the Residence Network Resort's homeowners association and Residence Network Operator.  Residence Network Operator may charge the homeowners association an affiliation fee for operating Residence Network.  Membership in the Residence Network automatically terminates if the Residence Network Member voluntarily or involuntarily transfers the Residence Network Member's Club Interest and owns no other Club Interest; if the Residence Network Member's Home Resort ceases to be a Residence Network Resort; or if the Residence Network is cancelled by Residence Network Operator.  Although Residence Network Membership is not transferable, resale purchasers may be eligible to enroll in the Residence Network.

### IV.  Residence Network Procedures and Obligations

The terms and conditions of the procedures for using the Residence Network program are set forth in the Residence Network Rules attached to this Disclosure Guide as Exhibit "A."

**The terms and conditions of this Disclosure Guide and the Residence Network Rules, including fees, benefits, and reservation procedures, are subject to change by Residence Network Operator without advance notice.**

**Among the changes in these Residence Network Rules is the addition of an Arbitration Provision.**

1

SRN GUIDE R-13

CONFIDENTIAL

DEF00011119

PLEASE READ THE ARBITRATION PROVISION CAREFULLY. IT PROVIDES THAT EITHER PARTY CAN REQUIRE THAT CERTAIN DISPUTES BE RESOLVED BY BINDING ARBITRATION.   ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO A JURY AND THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING.  IN ARBITRATION, A DISPUTE IS RESOLVED BY A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY. ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT.

EXCEPT AS SET FORTH IN THE ARBITRATION PROVISION, THE TERMS AND CONDITIONS OF MEMBERSHIP IN THE RESIDENCE NETWORK WILL BE GOVERNED EXCLUSIVELY BY THE LAWS OF THE STATE OF FLORIDA.  ANY ACTION AT LAW OR IN EQUITY BY A RESIDENCE NETWORK MEMBER TO CHALLENGE OR ENFORCE THE TERMS AND CONDITIONS OF MEMBERSHIP IN THE RESIDENCE NETWORK MUST BE SUBMITTED EXCLUSIVELY TO THE JURISDICTION OF THE COURTS OF ORANGE COUNTY, FLORIDA, AND BY MAINTAINING MEMBERSHIP WITH THE RESIDENCE NETWORK, EACH RESIDENCE NETWORK MEMBER CONSENTS TO THE PERSONAL JURISDICTION OF THOSE COURTS.  IF AN ACTION AT LAW OR IN EQUITY IS INITIATED BY EITHER A RESIDENCE NETWORK MEMBER OR RESIDENCE NETWORK OPERATOR, THE LOSING PARTY SHALL PAY ALL COSTS INCURRED BY THE PREVAILING PARTY IN DEFENDING OR PURSUING SUCH ACTION, INCLUDING REASONABLE ATTORNEYS' FEES AND LEGAL COSTS.

Each Residence Network Member recognizes and acknowledges that:

1.  Residence Network Operator does not sell, lease, or otherwise convey any interest in real property;

2.  Because not all owners of Club Interests in all Residence Network Resorts will participate in the Residence Network, only a limited number of Club Weeks at such Residence Network Resorts, if any, will be available from time to time for reservation by Residence Network Members.  Consequently, purchasers should not rely on the status of a particular resort as a Residence Network Resort in determining whether to purchase a Club Interest in a Residence Network Resort;

3.  Residence Network Resort accommodations and facilities vary by location and resort.  In addition, Residence Network Resort accommodations that have been reserved may differ in unit size, design, furnishing, or amenities from the Club Interest accommodations a particular Residence Network Member owns due to variations between resorts.  Residence Network Operator will assign an Interchange Value to each Club Week and each Club Unit at all Residence Network Resorts;

4.  Fees, if any, incurred by a Residence Network Member for the use of amenities at a host Residence Network Resort are determined and collected by the host Residence Network Resort;

5.  A Residence Network Member is responsible for payment of any personal expenses incurred while occupying a Club Unit received through a reservation confirmation, as well as for any damage, theft, or loss caused by the Residence Network Member or the Residence Network Member's guests;

6.  If the Interchange Selection becomes unavailable due to natural disaster, act of God, war, insurrection, or any other reason beyond Residence Network Operator's control, the Residence Network Member waives any and all claims against Residence Network Operator; and

SRN GUIDE R-13

2

CONFIDENTIAL

DEF00011120

7. Residence Network Operator is not liable for any claim or loss incurred in connection with participation in the Residence Network or with respect to ownership of a Club Interest.

## V. Fees

Pursuant to a Residence Network Affiliation Agreement between the Residence Network Resort's homeowners association and Residence Network Operator, a Residence Network Affiliation Fee will be assessed to each Residence Network Resort's homeowners association so that Owners at that Residence Network Resort may be eligible to participate in Residence Network. The Residence Network Affiliation Fees to be charged per Club Interest participating in Residence Network is disclosed in the Residence Network Affiliation Fees Chart attached to this Disclosure Guide as Exhibit "C." Residence Network Members themselves have no contractual obligation to Residence Network Operator for the payment of any fees for membership in Residence Network. **Currently, there are no transaction fees charged by Residence Network Operator. However, Residence Network Operator reserves the right to amend the Residence Network Rules and charge transaction fees in its sole discretion.** Use of the Residence Network may be restricted by Residence Network Operator if the Residence Network Member is not current in the payment of the Residence Network Member's Home Resort maintenance fees and taxes, and Club Interest mortgage or purchase money payments. Furthermore, use of the Residence Network may be restricted by Residence Network Operator if the Residence Network Member's homeowners association is not current in the payment of the Residence Network Affiliation Fee. Residence Network Operator also will require advance payment of estimated maintenance fees and taxes to the Residence Network Member's Home Resort Managing Entity before permitting use of Interchange privileges.

## VI. Residence Network Resorts

Residence Network Members may request reservations in accordance with the Residence Network Documents and Resort Documents for any Residence Network Resort that is affiliated with Residence Network from time to time by Residence Network Operator. The names and addresses of all Residence Network Resorts currently participating in Residence Network are as follows:

Resorts with 1-20 Units

| Name and Address Network Members | Number of Club Units | Residence |
|---|---|---|
| Camelback Residence Club Condominium 4515 North Phoenicia Place Scottsdale, AZ 85251 | 7 | 64 |

Resorts with 21-50 units

| Name and Address Network Members | Number of Club Units | Residence |
|---|---|---|
| Fifth and Fifty-Fifth Residence Club Two East 55th Street New York, New York 10022 | 38 | 548 |
| Aspen Residence Club and Hotel Condominium 315 East Dean Street Aspen, Colorado | 25 | 506 |

As of December 31, 2015, there were 1,118 Residence Network Members enrolled in Residence Network. If required by applicable law, an independent audit of Residence Network operations will be performed and reported through the period ending December 31st each year. The Residence Network Operator calculates the number of Residence Network Members based on the number of Club Interests enrolled in Residence Network at each Residence Network Resort.

SRN GUIDE R-13

3

CONFIDENTIAL

DEF00011121

For the calendar year ending December 31, 2015, the percentage of confirmed exchanges (which is the number of reservations confirmed by Residence Network Operator divided by the number of reservation requests properly applied for) was 100%.

All Interchanges are based on availability and Residence Network does not guarantee that Residence Network Members will receive a specific Interchange Request. The Residence Network program is based on a Residence Network Member trading one of Residence Network Member's reserved Club Weeks in exchange for an available Club Week. In order to make an Interchange Request, a Residence Network Member must: (a) pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the Residence Network Member's Club Interests; (b) not have placed the Club Week with another exchange company or program; and (c) obtain a confirmed reservation at Residence Network Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day. Residence Network Operator may receive improperly submitted Interchange Requests in the normal course of business. Interchange Requests cannot be honored if the Residence Network Member does not follow Residence Network's procedures by either improperly completing an Interchange Request or failing to submit an Interchange Request within the minimum time required.

**The percentage of confirmed reservations contained in any annual audit report will be only a summary of the reservation requests entered in the year reported, and such percentage should not be relied on as an indication of the probability of a Residence Network Member being confirmed to any specific choice or range of choices.**

SRN GUIDE R-13

4

**CONFIDENTIAL**

**DEF00011122**

Exhibit "A"

Vistana Residence Network Rules and Regulations

These Residence Network Rules are binding on all Residence Network Members, their guests, invitees, lessees, licensees, and designees.

I.  Definitions

The following capitalized terms have the meaning set forth below unless the context requires a different meaning:

Alternate Use means Interchange, conversion to use through the Starwood Preferred Guest Program (if available at a given Residence Network Resort), or rental.

Biennial Club Interest means a Club Interest in which the Residence Network Member's Use Year occurs every other year. Currently, the only Biennial Club Interests are in the Aspen Residence Network Resort, which Biennial Club Interests also are known as Lifestyle Interests.

Check-in Day means the first day of use of a given seven day Club Week. Each Residence Network Resort has established Check-in Days.

Club Interest means a fractional ownership interest in a Residence Network Resort. Unless the context dictates otherwise, the term will include Biennial Club Interests.

Club Unit means an accommodation of a Residence Network Resort that is subject to exclusive occupancy by one or more persons pursuant to the Resort Documents and available for reservation by Residence Network Members pursuant to the Residence Network Documents.

Club Week means seven consecutive days, or a one-week increment of time, that must begin on a Check-in Day, as described in the Resort Documents, and pursuant to which a Residence Network Member is entitled to the use and occupancy of a Club Unit.

Confirmation Notice means a written or electronic acknowledgment from Reservation Services that an Interchange Request has been fulfilled.

Disclosure Guide means the Vistana Signature Network Disclosure Guide for the Residence Network promulgated by Residence Network Operator from time to time.

External Exchange Company means any company that provides services to the Residence Network or to Residence Network Members under an External Exchange Program. Currently there are no External Exchange Companies affiliated with the Residence Network.

External Exchange Program means the contractual arrangement, if any, pursuant to which a Residence Network Member may exchange the use of a Club Week, under certain conditions, for the use of accommodations in resorts other than Residence Network Resorts.

Home Resort means, as to a particular Club Interest, the Residence Network Resort in which a Residence Network Member's Club Interest is located.

Interchange means the exchange of a Residence Network Member's Club Week for another Club Week through Residence Network Operator.

Interchange Request means a Club Week requested by a Residence Network Member for an Interchange.

Interchange Selection means a Club Week requested by a Residence Network Member for an Interchange and for which a reservation is confirmed.

SRN GUIDE R-13

5

CONFIDENTIAL

DEF00011123

Interchange Value means the value assigned by Residence Network Operator to each Club Week and Club Unit at each Residence Network Resort.

Managing Entity means the condominium or homeowners association, management company, or other entity responsible for operating and maintaining a given Residence Network Resort.

Owner means the owner of a Club Interest.  During any period of time in which a purchaser has entered into a valid contract for the purchase of a Club Interest with a developer of a Residence Network Resort, has passed any applicable rescission period, and has not defaulted, such purchaser shall be considered an Owner.

Owner Use Agreement means an agreement executed by an Owner and Residence Network Operator, pursuant to which agreement the Owner may enroll and participate in the Residence Network on a voluntary basis in accordance with the terms of such agreement and the other Residence Network Documents.

Primary Owner means the individual designated by the multiple Owners of a single Club Interest as having the exclusive right to make decisions regarding the use of Residence Network with respect to the Club Interest.

Reservation Services means the division of Residence Network Operator that handles and processes Interchange requests and other Residence Network Member services from time to time.

Resort Documents means all of the documents, other than Residence Network Documents, that create and govern the rights of Owners in, and the use and operation of, a given Residence Network Resort.

Starwood means Starwood Hotels & Resorts Worldwide, Inc., a Maryland corporation.

Starwood Preferred Guest® Program means the vacation and travel benefits program created by Starwood, as more particularly set forth in the Terms & Conditions for the Starwood Preferred Guest Program.  The Starwood Preferred Guest Program is a separate program and is not part of Residence Network.  Eligible Residence Network Members may access the Starwood Preferred Guest Program as set forth in the applicable Resort Documents.

Residence Network means the Vistana Residence Network, the service name given to the variety of exchange and reservation services and vacation and travel benefits currently offered and the restrictions currently imposed by Residence Network Operator for Residence Network Resorts.  Residence Network is an exchange program offered by Residence Network Operator, an exchange company.  Residence Network Members may reserve the use of Club Weeks through Residence Network, which may or may not include access to an External Exchange Program, as set forth in the applicable Residence Network Documents.  Residence Network is not a legal entity or association of any kind.

Residence Network Affiliation Agreement means an agreement setting forth the terms and conditions that Residence Network Operator establishes from time to time, to make membership in Residence Network available to owners in Residence Network Resorts.

Residence Network Affiliation Fee means the amount assessed by Residence Network Operator to each Residence Network Resort's homeowners association each calendar year.

Residence Network Documents means those instruments governing the use and operation of the Residence Network, including each Residence Network Affiliation Agreement, Owner Use Agreement, if applicable, the Disclosure Guide, and the Residence Network Rules, as promulgated, executed, or amended by Residence Network Operator from time to time.

Residence Network Member means an Owner who meets all of the terms and conditions for membership in Residence Network as determined by Residence Network Operator from time to time.

Residence Network Operator means Vistana Signature Network, Inc., a Delaware corporation, its successors and permitted assigns.

SRN GUIDE R-13

6

DEF00011124

Residence Network Resort means all or such portion of a resort that is affiliated with the Residence Network.

Residence Network Rules means the Vistana Residence Network Rules and Regulations governing the reservation and use of Club Units and Residence Network Resort facilities, as promulgated, adopted, or amended from time to time by Residence Network Operator pursuant to the Residence Network Documents.

Use Year has the meaning given in the Resort Documents.   Residence Network Members owning a Biennial Club Interest will have a Use Year that occurs every other year.

## II. Residence Network Operation

2.1     Membership.  Pursuant to a Residence Network Affiliation Agreement between the Residence Network Resort's homeowners association and Residence Network Operator, a purchaser of a Club Interest is eligible to enroll in the Residence Network to enjoy the benefits of membership in the Residence Network.  To enroll in the Residence Network, purchasers of Club Interests will be required to execute an Owner Use Agreement.  Membership in the Residence Network automatically terminates if the Residence Network Member voluntarily or involuntarily transfers the Residence Network Member's Club Interest and owns no other Club Interest, or if the Residence Network Member's Home Resort ceases to be a Residence Network Resort.  Residence Network Membership is not transferable.

2.2     Management.  The Residence Network is operated and managed by Residence Network Operator pursuant to the Residence Network Documents.  Residence Network Operator expressly is authorized to take such actions as it deems necessary or appropriate for the operation of the Residence Network, including the implementation of all exchange program and reservation duties as outlined in the Residence Network Rules.

2.3     Primary Owner.  The Owners of each Club Interest which is owned by more than one person or by a business entity must designate a Primary Owner from time to time by notifying Reservation Services of same through a writing executed by all individuals holding the membership or by an authorized representative of the business entity. Reservation Services may charge an administrative fee as Residence Network Operator may determine from time to time, each time it is requested to change a Primary Owner designation.

2.4     Residence Network Affiliation Fees.  Charges incurred by Residence Network Operator in connection with the operation of the Interchange program and the delivery of other Residence Network services and benefits at Residence Network Resorts will be charged as Residence Network Affiliation Fees to each Residence Network Resort's homeowners association, as more specifically provided in the applicable Residence Network Affiliation Agreement.

2.5     Transaction Fees.  In addition to Residence Network Affiliation Fees, Residence Network Operator has the right to charge such other transaction fees as it deems appropriate in its sole discretion from time to time.  Such fees may be charged for transactions including additional reservation request fees, Interchange fees, daily use fees, fees for additional housekeeping, and such other items as provided in the Residence Network Fees Chart as may be amended by Residence Network Operator from time to time in its sole discretion.

**Currently, there are no transaction fees charged by Residence Network Operator.**

2.6     Basis for Addition.  Residence Network Operator may decide to affiliate additional resorts with Residence Network from time to time.  The affiliation of additional Residence Network Resorts is not subject to the approval of the Residence Network Members.  Residence Network Operator will make any decision to associate resorts with Residence Network, including the terms and conditions under which such resorts are affiliated, in its sole discretion.

2.7     Availability of Residence Network Resorts.  Availability of Club Weeks in a Residence Network Resort, other than a Residence Network Member's Home Resort, is dependent on the number of Owners in

7

**CONFIDENTIAL**                                          **DEF00011125**

such Residence Network Resort who become Residence Network Members and participate in the Interchange program, the continued affiliation of each Residence Network Resort with the Residence Network, and the number of Club Weeks available for reservation in such Residence Network Resort during a given Use Year.

2.8     Assignment of Interchange Value.  For administrative convenience in the operation of Residence Network and in the determination of the respective rights of Residence Network Members to enjoy the benefits of membership in Residence Network, some or all Club Weeks and Club Units at every Residence Network Resort will be divided into categories on a resort specific basis.  Currently, there exist two categories: category "Platinum" and category "Platinum Plus."  Depending on the Residence Network Resort and Residence Network Operator's sole discretion, some Club Weeks will be categorized by demand for use and seasonality regardless of Club Unit type, while other Club Weeks will be categorized based on Club Unit type.   The category assigned represents the Interchange power of a given Club Week within Residence Network.  Accordingly, Club Weeks assigned an Interchange Value of "Platinum" may exchange for other Club Weeks assigned an Interchange Value of "Platinum."  Club Weeks assigned an Interchange Value of "Platinum Plus" may exchange for other Club Weeks assigned an Interchange Value of "Platinum" or "Platinum Plus."

**Accordingly, Residence Network Members whose Club Weeks are assigned an Interchange Value of "Platinum" will have less opportunities for Interchange than Residence Network Club Members whose Club Weeks are assigned an Interchange Value of "Platinum Plus."**

**The Interchange Value assigned represents the reservation power of a given Club Week within the Residence Network.  The assignment of a certain category with respect to Residence Network Resorts is based on such factors as relative Residence Network Member demand for use of certain Club Weeks and the Residence Network Resort, seasonality of the Club Week, Club Unit type, Residence Network Resort type, Residence Network Member use patterns, and availability of Club Weeks ("Assignment Factors").  Residence Network Operator reserves the right, in its sole discretion, to revise the Interchange Value assigned to any Club Weeks and required for reservations of any Club Weeks within Residence Network annually, each without Residence Network Member consent.**

<u>III.  Reservations</u>

3.1     <u>Interchange Selection Process</u>.

(a)     <u>Requesting an Interchange</u>.  All Interchanges are subject to availability.  Each Residence Network Member will be permitted up to two Interchange Selections per Use Year in accordance with the procedures set forth below.  Pursuant to the Interchange restrictions set forth in Section 3.2, each Residence Network Member may only commit a maximum of two Club Weeks per Use Year to Alternate Use.  All Interchanges must be made for increments of seven consecutive days, which is a full Club Week.  Interchange Requests for particular Club Weeks will be taken on a first-come, first-served basis and Residence Network Manager does not guarantee that Residence Network Members will receive a specific Interchange Request.

(b)     <u>Biennial Restrictions</u>.  Each Residence Network Member owning a Biennial Club Interest may request an Interchange and may be granted a Confirmation Notice for a Club Week occurring only during such Residence Network Member's Use Year, which occurs every other year.

(c)     <u>Submitting an Interchange Request</u>.  The Residence Network Member must submit a valid Interchange Request to Residence Network Operator in writing, by telephone, facsimile, e-mail, or such other electronic means acceptable to Residence Network Operator from time to time.  In order for an Interchange Request to be considered valid, a Residence Network Member must:

8

SRN GUIDE R-13

**CONFIDENTIAL**

**DEF00011126**

(i)     pay all delinquent Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the Residence Network Member's Club Interests;

(ii)     not have subjected the Club Week to a different Alternate Use, placed the Club Week with another exchange company or program, or contributed to or used the Club Week in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the Residence Network Documents); and

(iii)     obtain a confirmed reservation at Residence Network Member's Home Resort at least sixty (60) days in advance of the Home Resort Check-in Day.

Residence Network Operator, on receipt of a valid Interchange Request, will assign the Residence Network Member the use of a designated Club Week if the Club Week requested is available.  A Residence Network Member has no right to make a reservation unless the Residence Network Member has paid all Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments, pursuant to Article IV; furthermore, and as provided in Article IV, Residence Network Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due to the Managing Entity, as a condition to acceptance by Residence Network Operator of an Interchange Request.  In addition, Residence Network Operator may restrict access to the Residence Network if the Residence Network Member's homeowners association has failed to pay the Residence Network Affiliation Fee.  A Residence Network Member may make a reservation in the name of a guest.

If the Club Week requested is available, Residence Network Operator will send the Residence Network Member a Confirmation Notice acknowledging that the Residence Network Member's Interchange Request has been fulfilled.  If the Club Week requested is unavailable, the Residence Network Member will keep the confirmed reservation at Residence Network Member's Home Resort.  As a consequence of this structure, Residence Network Operator will have no Club Weeks which are deposited with it by Residence Network Members which are not used by Residence Network Operator in effecting exchanges.

**Interchange Requests will be taken on a first-come, first-served basis, subject to availability.   Since availability will vary, Residence Network Operator cannot guarantee confirmation of an Interchange Request for any specific Club Week at any specific Residence Network Resort at any time.**

SRN GUIDE R-13

9

CONFIDENTIAL

DEF00011127

### 3.2    Interchange Options and Restrictions

(a)    On receiving a Confirmation Notice, a Residence Network Member may use the Interchange Selection for personal use or for use by a guest. Unaccompanied guests must be registered with Residence Network Operator and must be at least 21 years of age. Residence Network Members are solely responsible for the acts and omissions of any guests or individuals occupying the Club Unit, including any loss or damage to the Club Unit or Residence Network Resort.

(b)    Residence Network Operator reserves the right to restrict and/or prohibit Interchange Requests by each Residence Network Member for such Residence Network Member's Home Resort.

(c)    Interchanges are for seven consecutive days of occupancy, which is one full Club Week.

(d)    Residence Network Operator may prohibit certain club weeks in a given Residence Network Resort from participating in the Residence Network. Currently, club weeks designated as Mid-Season Weeks at the St. Regis Residence Club, Aspen are not eligible for Interchange.

(e)    A maximum of two Club Weeks per Use Year may be committed to Alternate Use. By way of example, if a Residence Network Member converted two Club Weeks to use through the Starwood Preferred Guest Program for the current Use Year, the Residence Network Member is prohibited from committing any remaining Club Weeks to any other Alternate Use for that same Use Year.

(f)    Interchange Selections are not eligible for Alternate Use.

(g)    A Residence Network Member unable to use an Interchange Selection is not relieved of the obligation to pay all maintenance fee assessments, taxes, and mortgage or purchase money payments associated with ownership of a Club Interest.

(h)    The Interchange accommodation received may or may not be comparable in size, layout, furnishings, services, or amenities to those in the Residence Network Member's Home Resort.

(i)    Cancellation of a confirmed reservation is not permitted. A Residence Network Member may request an exchange of the Residence Network Member's Interchange Selection one time, provided the Residence Network Member notifies Residence Network Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the Interchange Selection.

(j)    On acceptance of an Interchange Selection, the Residence Network Member relinquishes the right to use the Club Week which the Residence Network Member exchanged for the Use Year indicated on the Confirmation Notice.

### 3.3    Confirmations; Accommodation Preferences.

Confirmation Notices will be provided to each Residence Network Member or Primary Owner by Reservation Services to confirm all Interchanges. Requests for Club Unit preferences, such as ground level Club Units, cannot be guaranteed, but will be noted as a preference in the Confirmation Notice.

### 3.4    Cancellations, Additional Reservation Requests, and No-Shows.

**Cancellation of a confirmed reservation is not permitted. A Residence Network Member may request an exchange of the Residence Network Member's Interchange Selection, provided the Residence Network Member notifies Residence Network Operator by telephone of such an exchange request at least sixty (60) days prior to the Check-in Day of the confirmed reservation.**

Interchange Selections are not eligible for Alternate Use.

Residence Network Members who fail to arrive on the Check-in Day of the Interchange Selection must notify Residence Network Operator that they will be arriving subsequent to such Check-in Day or risk losing

10

SRN GUIDE R-13

CONFIDENTIAL

DEF00011128

the reservation.  In the event of a no-show, no refund of advance payment of estimated maintenance fees or taxes will be made.

<p style="text-align:center;">IV.  Delinquency</p>

Residence Network Operator reserves the right not to accept an Interchange Request from a Residence Network Member if the Residence Network Member is not current in the payment of all of the Residence Network Member's Home Resort maintenance fees, taxes, and Club Interest mortgage or purchase money payments attributable to the Residence Network Member's Club Interest.  A Residence Network Member who is delinquent in the payment of any maintenance fee assessment, tax assessment, or Club Interest mortgage or purchase money payment shall have no right to reserve a Club Week through Residence Network Operator or any External Exchange Company, and any previously confirmed Interchange Request may be cancelled, until the delinquency is satisfied in full.  Residence Network Operator may collect any delinquent maintenance fee assessments, tax assessments, or Club Interest mortgage or purchase money payments by credit card.  Furthermore, Residence Network Operator may require the advance payment of the estimated current Use Year's maintenance fee assessment and tax assessment which ultimately will become due the Managing Entity, as a condition to acceptance by Residence Network Operator of an Interchange Request, provided that any such prepaid maintenance fee and taxes for Residence Network Resorts are held in escrow if required by applicable law.

<p style="text-align:center;">V.  Miscellaneous Provisions</p>

5.1    Personal Use; Commercial Purposes.  Use of the Club Units and facilities associated with the Residence Network is limited solely to the personal use of Residence Network Members, their guests, invitees, exchangers, and lessees, and for recreational use by corporations or other similar business entities owning Club Interests.  Purchase of a Club Interest or use of Club Units and facilities associated with the Residence Network for commercial purposes, for contribution to or use in a different vacation ownership plan, fractional ownership plan, non-equity club, destination or luxury program, or vacation or membership club (except as expressly permitted in the Residence Network Documents), or for any purpose other than the personal use described above is prohibited.

5.2    Rental of Club Weeks Reserved Through the Residence Network.  Rental by a Residence Network Member of Club Weeks reserved through Residence Network is prohibited.

5.3    Amendment of the Residence Network Rules.  Except as provided in the Resort Documents, Residence Network Operator expressly reserves the right to amend the Residence Network Rules, with respect to Residence Network Resorts in all respects, in its sole discretion, from time to time, without the consent of Residence Network Members, for any purpose, including permitting banking of Club Weeks and creating Residence Network tiers.  Residence Network Operator shall deliver notice of any material amendment to each Primary Owner at the Primary Owner's last known address.  Notice of amendments may be made by newsletter, annual mailings, facsimile, owner website posting, or e-mail.

5.4    Special Exchange Programs.  Residence Network Operator reserves the right, from time to time, to enter into special exchange relationships with any entity other than an External Exchange Company pursuant to which Residence Network Members may have access to selected non-Residence Network resorts and non-Residence Network owners will have access to Residence Network accommodations.  Any special exchange programs will be governed by their own reservation rules and regulations.

5.5    Amendment of Residence Network Documents.  Each Residence Network Member's participation in Residence Network will be governed by the Residence Network Documents, as amended from time to time by Residence Network Operator.  Residence Network Operator shall have the right to amend any portions of the Residence Network Documents that Residence Network Operator in its sole discretion determines are necessary or desirable to amend from time to time, without the consent of Residence Network Members, except as provided in the Resort Documents.  Residence Network Operator shall deliver notice of any amendment in the same manner as described in Section 5.3.

5.6    Termination.  If the Residence Network Affiliation Agreement, Owner Use Agreement, or other instrument that affiliates a Residence Network Resort with Residence Network is terminated or expires in accordance with its own terms, the terminated Residence Network Resort will no longer be affiliated as a

<p style="text-align:center;">11</p>

SRN GUIDE R-13

CONFIDENTIAL                                        DEF00011129

part of the Residence Network.  However, on termination of such instrument, all confirmed reservations of the Residence Network Members (from the terminating Residence Network Resort and from the non-terminating Residence Network Resorts) will be honored at both the terminating Residence Network Resort and at non-terminating Residence Network Resorts.

5.7    Severability and Conflict.  The invalidity in whole or in part of any covenant or restriction, or any article, section, subsection, sentence, clause, phrase, word, or other provision of the Residence Network Documents shall not affect the validity of the remaining portions.

5.8    Include.  The term "include" and similar terms (e.g., includes, including, included, comprises, comprising, such as, e.g., and for example), when used as part of a phrase including one or more specific items, are used by way of example and not of limitation.

5.9    Arbitration.  Any dispute, controversy or claim ("Claim") between Residence Network Member and Residence Network Operator, whether preexisting, present or future, arising from or relating to the Residence Network Rules, Owner's VOI, the Resort or the Condominium shall, at the election of either party, be arbitrated on an individual basis before JAMS (www.jamsadr.org, 1-800-352-5267) pursuant to its Streamlined Rules.  If JAMS cannot serve and the parties cannot agree on a substitute, a court with jurisdiction will select the arbitrator.  The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., shall govern the interpretation and enforcement of this Section.  A single neutral arbitrator shall be appointed.  The arbitrator shall follow applicable substantive law consistent with the FAA, apply applicable statutes of limitations, honor valid claims of privilege, and issue a written reasoned decision which shall be final and binding except for any review under the FAA.  The arbitrator may award all remedies that would apply in an individual court action (subject to constitutional limits that would apply in court).  Any in-person hearing will be held in Orange County, Florida unless otherwise agreed.  If Residence Network Member initiates an individual arbitration, Residence Network Operator will pay all administrative and arbitrator fees exceeding $250.  Solely for purposes of this Provision, "Residence Network Operator" also means Residence Network Operator's parent companies, subsidiaries and affiliates; Residence Network Operator's and their employees, officers and directors; and any other person or entity named as a defendant or respondent in a Claim by Residence Network Member against Residence Network Operator.  "Residence Network Member" also means Residence Network Member's heirs, successors and assigns and any other person or entity to which a VOI is subsequently resold or otherwise conveyed.

"Claim" shall be broadly construed and includes, without limitation, disputes concerning: purchase, financing, ownership or occupancy; breach, termination, cancellation or default; condition of the property; the Vistana Residence Network or other exchange programs; Owner's VOI, the Resort or the Condominium; reservations, points or rewards programs; applications and personal information; marketing or sales solicitations, representations, advertisements, promotions or disclosures; and collection of delinquent amounts and the manner of collection.  "Claim" includes disputes based upon contract, tort, consumer rights, fraud and other intentional torts, constitution, statute, Uniform Commercial Code, regulation, ordinance, common law and equity.  "Claim" does not include: (i) disputes about the validity, enforceability, coverage or scope of this Section or any part thereof, which are for a court to decide.  But disputes about the validity or enforceability of the Residence Network Rules as a whole are for the arbitrator to decide; or (ii) any individual action by Residence Network Member in small claims or an equivalent court, unless that action is transferred, removed or appealed to a different court.

Class Action Waiver.  If a Claim is arbitrated, neither Residence Network Member nor Residence Network Operator will have the right to (i) participate in a class action in court or in arbitration, either as a class representative or class member, (ii) act as a private attorney general in court or in arbitration, or (iii) join or consolidate Claim(s) with claims of any other person or entity.  The arbitrator shall have no authority to conduct any class, private attorney general or multiple-party proceeding or to issue any relief that applies to any person or entity except Residence Network Member and Residence Network Operator individually.

An arbitration award may be enforced in any court with jurisdiction.  This Section shall survive the breach, cancellation, termination or rescission of the Residence Network Rules, and any bankruptcy to the extent permitted by law.  This Section governs if it conflicts with the Residence Network Rules or the arbitration rules.  If any part of this Section other than the Class Action Waiver is declared unenforceable, the

SRN GUIDE R-13

12

CONFIDENTIAL

DEF00011130

remainder shall be enforceable.  If the Class Action Waiver is declared unenforceable in a proceeding between Residence Network Member and Residence Network Operator, without impairing the right to appeal such decision, this entire Section (except for this sentence) shall be null and void in such proceeding.  Residence Network Operator will not amend this Section in a manner that adversely affects Residence Network Member's rights unless Residence Network Operator gives Residence Network Member a right to reject the amendment.

**Right to Reject Arbitration Provision:** Residence Network Member may reject this Section by sending Residence Network Operator a written notice which gives Residence Network Member's name and Agreement number and states that Owner rejects the Arbitration Provision.  The rejection notice must be sent by certified mail, return receipt requested, to Vistana Signature Network, Inc., 9002 San Marco Ct., Orlando, Florida 32819, Attn: Legal Department - Arbitration Rejection Notice.  A rejection notice must be signed by Residence Network Member and received by Residence Network Operator within thirty (30) days after becoming a Residence Network Member or 30 days after these Residence Network Rules have been updated, whichever date is later.  Rejection of arbitration will not affect any other term of this Agreement.

**Each Residence Network Member has read, understands and voluntarily agrees to this Arbitration Provision and acknowledges that if a Claim is arbitrated, there will be no right to have a court or jury trial or participate in a class action.**

SRN GUIDE R-13

13

**CONFIDENTIAL**

**DEF00011131**

Exhibit "B"

Officers and Directors of Vistana Signature Network, Inc.

Officers

| President, Chief Executive Officer | Craig M. Nash |
| Executive Vice President | Jeanette E. Marbert |
| Executive Vice President | William L. Harvey |
| | |
| Senior Vice President, Chief Operating Officer | Stephen G. Williams |
| Senior Vice President, Chief Financial Officer | Heather McGill |
| Senior Vice President | Thorp S. Thomas |
| | |
| Vice President, Secretary | Angela K. Halladay |
| Vice President, Assistant Secretary | Robin L. Suarez |
| Vice President, Assistant Secretary | Barbara E. Overton |
| Vice President, Treasurer | Lisa Cassin |
| Vice President | Charles Bell |
| Assistant Treasurer | John A. Galea |
| Assistant Secretary | Victoria J. Kincke |

Directors:

Stephen G. Williams
Thorp S. Thomas
Jeanette E. Marbert

SRN GUIDE R-13

14

**CONFIDENTIAL**

**DEF00011132**

Exhibit "C"

Chart for Vistana Residence Network Affiliation Fees

Note: This chart provides a summary of the fees that may be charged for the use of the Vistana Residence Network.  For additional information, please see the Vistana Residence Network Rules and Regulations.

**Affiliation Fees for Vistana Residence Network Members**

Residence Network Yearly Affiliation Fee[1]                     US $149 per year per Club Interest

---

[1] For Owners of Biennial Club Interests,  the equivalent of half of the VRN Yearly Affiliation Fee shall be paid every year, not just in alternate years.

SRN GUIDE R-13                                                               15

**CONFIDENTIAL**                                                            **DEF00011133**