```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/21/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
FLORA GILLESPIE, *et al.*,                            :
                                                      :
                                          Plaintiffs, :
                                                      :                1:16-cv-9390-GHW
                       -against-                       :
                                                      :              MEMORANDUM OPINION
ST. REGIS RESIDENCE CLUB, NEW YORK                    :                   AND ORDER
INC., *et al.*,                                       :
                                                      :
                                         Defendants.  :
-------------------------------------------------------------------X

GREGORY H. WOODS, United States District Judge:

Plaintiffs own fractional interests in the Fifth and Fifty-Fifth Residence Club (the "Club"), a

collection of luxury suites in the St. Regis New York Hotel. Plaintiffs purchased their interests

starting in 2006—a time of relative economic prosperity. When the Great Recession began in 2008,

however, sales slowed and eventually stopped altogether. Defendants—the owners and operators of

the Club—effectively abandoned their effort to sell interests in the Club and instead rented out the

Club units to the public for overnight use, as was permitted under the contracts executed by the

parties. Defendants failed to restart their efforts to sell Club Interests even after the economy

recovered.

Eventually, Plaintiffs sued, alleging that Defendants had denied them the benefits associated

with their Club membership by ceasing the sale of Club Interests. Plaintiffs also seek to rescind

their Purchase Agreements based on a clause in the Club's offering plan that states that they have a

right to rescind in limited circumstances. Because the parties' contracts specifically disclaim that

Defendants have a responsibility to support the rental or resale value of Plaintiffs' Club Interests,

and because Plaintiffs lost their right to rescind when their transactions closed, Defendants' motion

for summary judgment is GRANTED.

# I. BACKGROUND[1]

## A. Facts[2]

### 1. The Club

The Fifth and Fifty-Fifth Residence Club (the "Club") is a fractional vacation ownership offering developed by St. Regis Residence Club New York, Inc. (the "Sponsor").  Defendants' Local Rule 56.1 Statement ("Defs 56.1") ¶ 1; *see also* Fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club ("Plan"), Ex. 1 to Declaration of Robin Suarez ("Suarez Decl."), Dkt Nos. 141-1–141-16, at 435-76 ("Club Declaration").  The Club is part of a condominium located within The St. Regis, New York Hotel (the "Building").  Defs 56.1 ¶ 2; *see also* Plan at 11 ("Introduction"), 591-636 ("Condo Declaration").  The Sponsor first sold fractional interests (the "Club Interests") in the Club in early 2006 and recorded the deeds related to those transactions in August 2006.  Defs 56.1 ¶ 3; *see also* Ex. A to Declaration to Thorp Thomas ("Thomas Decl."), Dkt No. 159-1.  Plaintiffs are purchasers of Club Interests.  The Club operates like a timeshare.  Each owner of a Club Interest owns a fraction of a Club Unit that entitles her to stay at the Club for a certain amount of time in any given year.

Initially, the Club consisted of 22 rooms (the "Club Units"), which are located on eighth and ninth floors of the Building.  Defs 56.1 ¶ 4; *see also* Plan at 35.  Each Club Unit was divided into 52 weeks ("Club Weeks"), and the Interests sold by the Sponsor were comprised of four Club Weeks each.  Defs 56.1 ¶ 5; *see also* Plan at 12.  The Sponsor made twelve Interests available for sale to the public in each Club Unit; thus, 264 total Club Interests were available for sale to the general public at the Club's inception.  Defs 56.1 ¶ 6; *see also* Plan at 12, 35.

---

[1] The Court has issued two prior opinions in this case that provide further background.  *See Gillespie v. St. Regis Residence Club* (*Gillespie I*), 343 F. Supp. 3d 332 (S.D.N.Y. 2018); *Gillespie v. St. Regis Residence Club, New York Inc.* (*Gillespie II*), No. 1:16-CV-9390-GHW, 2019 WL 4747185 (S.D.N.Y. Sept. 30, 2019).

[2] Unless otherwise noted, the following facts are undisputed.

### 2. The Plan and the Purchase Agreements

The Club Units are governed by the Fractional Offering Plan for the Fifth and Fifty-Fifth Residence Club (the "Plan"). The Plan states that "each Purchaser of a Club Interest will acquire a 4/52 undivided interest in a Club Unit, as tenant-in-common with all other Purchasers of Club Interests in such Club Unit." Defs 56.1 ¶ 66; *see also* Plan at 12 ("Introduction-The Club"). The Plan defines a "Purchaser" as "a purchaser of a Club Interest under a Purchase Agreement with Sponsor." Defs 56.1 ¶ 73; *see also* Plan at 24 ("Definitions"). A "Purchase Agreement" is defined as "the agreement to purchase a Club Interest entered into between Sponsor and Purchaser." Defs 56.1 ¶ 72; *see also* Plan at 24. Each Plaintiff entered into a Purchase Agreement with the Sponsor. *See* Exs. 23-131 to the Declaration of Chris LaRocco ("LaRocco Decl."), Dkt Nos. 150-23–152-26 (the "Purchase Agreements"). The Purchase Agreements incorporate the Plan by reference. *See* Purchase Agreements at 1 § 1. If there is a conflict between the Plan and the Purchase Agreements, the Plan controls. *See* Plan at 81 § ff.

Each Plaintiff also executed a Buyer's Certification as part of his or her Purchase Agreement. *See, e.g.*, Purchase Agreement of Flora and Bruce Gillespie, Dkt No. 150-23, at 11. The Buyers' Certifications state that "[t]he Seller believes that Club Members need to fully understand certain key points about their rights and duties as a Club Member" and lists eighteen points that a purchaser must certify she has read and understands. *See, e.g., id.* The Buyer's Certifications state that "[t]he ability of a Club Member to rent Club Weeks will be extremely limited. Club Members will be competing with Seller for the rental of Club Weeks. Club Members SHOULD NOT purchase a Club Interest with any expectation of rental for Club Weeks reserved as part of the Club Interest" and that "[m]y Club Interest is for my use and enjoyment. Seller makes no representations about my Club Interest's potential for future profit, rental income, tax benefits, investment potential or other financial advantages." *See, e.g., id.* (emphasis omitted).; *see also* Defs 56.1 ¶¶ 119-20.

3

Ownership of a Club Interest

> gives the Club Member the right to reserve up to twenty-eight (28) days (four Club
> Weeks) in a Club Unit every Use Year.  Each Club Interest includes the right to
> confirm the reservation of seven (7) consecutive days for the time period and Club
> Unit references on the Club Member's deed.  This period of time is called "Fixed
> Time."  The Club Interest also includes the right to use a maximum of fifteen (15)
> weekdays and six (6) weekend days . . . for a maximum total of twenty one (21) days.
> This period of time is called "Float Time."

Defs 56.1 ¶ 23; *see also* Plan at 12 ("Introduction-The Club"), 89 ("Club Reservation Procedures-

Club Weeks"), 504-05 ("Reservation Policies and Procedures-Making a Reservation").

The Plan is a statement drafted and filed under New York's Martin Act and the regulations

promulgated thereunder.  The Plan was therefore required to, and did, make certain disclosures.

The Plan discloses:

> The purchase of a Club Interest should be based upon its value as a vacation
> experience, for spending leisure time, or for other personal use, and not considered
> for purposes of acquiring an appreciating investment or with an expectation that the
> Club Interest may be rented or resold at a profit.  Generally, there is no established
> market for the rental or resale of Club Interests and the rental and resale value, if any,
> is uncertain.  Any Club Member attempting to rent or resell a Club Interest would have
> to compete, at a substantial disadvantage, with Sponsor in the rental and sale of its
> Unsold Club Interests.  Sponsor may have a large inventory of Unsold Club Interests.

Defs 56.1 ¶ 56; *see also* Plan at 3, § 1(a) ("Special Risk Factors").  The Plan further states:

> Notwithstanding the fact that Club Members may rent their Club Interests and/or
> confirmed reservations, the Club Interests:  (i) are not being offered and sold by
> Sponsor with emphasis on the economic benefits, if any, to a Club Member to be
> derived from the managerial efforts of Sponsor or a third party designated or arranged
> for by Sponsor, for rental of Club Interests; (ii) do not involve the offering by Sponsor
> of participation in a rental pool arrangement; and (iii) do not require a Club Member
> to hold the Club Interest available for any part of the year, or use an exclusive rental
> agent or to be materially restricted in Owner's use or rental of the Club Interest.

Defs 56.1 ¶ 57; *see also* Plan at 3 § 1(d).

The Plan contains a section entitled "Rights and Obligations of Sponsor."  Plan at 77-81.  In

that section, the Plan states that "all obligations of Sponsor pursuant to the General Business Law

and such additional obligations under the Offering Plan which are to be performed subsequent to

closing, will survive delivery of the deed." *Id.* at 81 § ee.  That section further provides that "[u]nless

expressly provided to the contrary herein, the obligations of Sponsor under the Offering Plan shall

survive the delivery of respective deeds to the Club Interests to Purchasers." *Id.* at 81.  The Rights

and Obligations of Sponsor section of the Plan also states "[t]he foregoing sets forth the entire

obligations of Sponsor hereunder and no others shall be implied, except that nothing contained

herein shall be deemed to limit the rights of Club Members under their respective Purchase

Agreements." *Id.*

The Plan also contains other disclosures.  The Plan provides that:

The acceptance of a deed by a Purchaser shall be deemed an acknowledgement that
Sponsor has performed and discharged every agreement and obligation on the part of
Sponsor to be performed under the Offering Plan except those (if any) which may be
expressly stated in the Offering Plan, in the Purchase Agreement, in 13 NYCRR, Part
24 (the regulations of the Attorney General of the State of New York governing the
acceptance for filing of the Offering Plan) and in General Business Law Section 352-
e to survive delivery of the deed.

*Id.* at 74 ("Closing of Title").  The Plan also states

Club Members may rent their Club Week(s) using the rental program operated by Club
Manager, using a third party unrelated to Club Manager or may rent their Club Week(s)
themselves.  Only Fixed Time or Floating Time reserved as a full Club Week may be
rented. A Club Member may rent up to fourteen (14) days of time associated with their
Club Interest each Use Year using the rental agent affiliated with Club Manager.  THE
ABILITY OF A CLUB MEMBER TO RENT CLUB WEEKS WILL BE
EXTREMELY LIMITED.  CLUB MEMBERS WILL BE COMPETING WITH
SPONSOR FOR THE RENTAL OF CLUB WEEKS.  CLUB MEMBERS
SHOULD NOT PURCHASE A CLUB INTEREST WITH ANY EXPECTATION
OF RENTAL FOR CLUB WEEKS RESERVED AS PART OF THE CLUB
INTEREST.

*Id.* at 90 ("Club Reservation Procedures-Rental of Club Weeks") (capital letters in original).  The

Plan states that "[t]he successful operation and maintenance of the Club depends upon the ability of

the Sponsor to meet its financial obligations with respect to Unsold Club Interests.  Defs 56.1 ¶ 58;

*see also* Plan at 3 § 2 ("Special Risk Factors").

The Plan provides that the Club is governed by a Club Association, which is defined as "the Fifth and Fifty-Fifth Residence Club Association Inc., a not-for-profit corporation organized under the Laws of the State of New York, and its successors, which is responsible for the maintence of the Club Property, the Club reservation system and the operation of the Club." Plan at 18 ("Definitions"). Owners of Club Interests automatically become members of the Club Association. Defs 56.1 ¶ 99; *see also* Plan at 483 § 2.2 ("Club Bylaws-Membership"). The Club Association provides for the operation, administration, use, and maintenance of the Club. Defs 56.1 ¶ 99; *see also* Plan at 483 § 1.1 ("Club Bylaws-Purposes, Assent of Club Members, and Definitions"). The Board of the Club Association (the "Club Board") governs the affairs of the Club Association. Plan at 486 § 4.1 ("Club Bylaws-Club Board"); *see also* Thomas Decl. ¶¶ 4-5. The Club Board is controlled by duly elected Club Members and has been since 2011, in accordance with the provisions of the Club Declaration. Defs 56.1 ¶ 101; *see also* Plan at 486 § 4.2; Thomas Decl. ¶ 6.

The Plan provides a right of rescission to Purchasers in certain, limited circumstances. The Plan states:

> Sponsor reserves the right, from time to time prior to the First Closing of a Club Interest, without obtaining the consent of Purchasers or others, to substantially revise the terms and conditions upon which the Club Interests are to be sold, including changes affecting the rights, obligations and liabilities of Sponsor, the Purchasers and/or prospective Purchasers under the Offering Plan. However, Sponsor may not unilaterally cancel a Purchase Agreement which is in effect, except as therein provided, as in the case of an uncured default, nor unilaterally change the purchase price or payment terms contained in such Purchase Agreement. All substantive or material revisions will be contained in a duly filed amendment to the Offering Plan. If there is a substantial amendment to the Offering Plan that materially and adversely affects Purchasers, except as otherwise provided herein, Purchasers will have a right of rescission for a period of fifteen (15) days from the Presentation Date of such amendment to them. Sponsor shall promptly return any Deposit to Purchasers who rescind, except that Sponsor shall retain the Deposit (and any interest thereon) of any Purchaser who is in default under the Purchase Agreement beyond any applicable grace period.

Defs 56.1 ¶ 90; *see also* Plan at 103 ("General"). This opinion refers to this provision as the "Rescission Clause." The Plan defines the "First Closing of a Club Interest" as the "Closing of Title

with respect to the first Club Interest in a particular Club Unit."  Defs 56.1 ¶ 71; *see also* Plan at 21 ("Definitions").  The Plan defines "Closing of Title" and "Closing" as "the date upon which, among other things, a Club Interest in a Club Unit is conveyed to a Purchaser."  Plan at 18.

Club Members also have several options for redeeming the value of their Club Interests if they do not wish to stay at the Club.  First, Club Members may elect to convert up to fourteen days' worth of their time into "Starpoints," which are hotel reward points that can be used to stay at Starwood and Marriott-branded properties anywhere in the world.  Defs 56.1 ¶ 24; *see also* Thomas Decl. ¶ 16; Ex. D to Thomas Decl. ("Starpoints Disclosure Statements"), Dkt No. 159-5; Plan at 508 ("Reservation Policies and Procedures-SPG Conversion Program").  Second, Club Members can exchange up to two Club Weeks each year to stay at the St. Regis Aspen or Phoenician residence clubs.  Defs 56.1 ¶ 25; *see also* Ex. 18 to Suarez Decl. (Second Amendment to Plan), Dkt No. 141-18, at 1 § 1; Ex. 7 to Suarez Decl. (Sixth Amendment), Dkt No. 141-22, at 1 § 3.  Third, Club Members may rent any of their Club Weeks, either by themselves or through a third party.  Defs 56.1 ¶ 26; *see also* Plan at 90 ("Club Reservation Procedures-Rental of Club Weeks"), 507 ("Reservation Policies and Procedures-Rental Program").  Finally, Club Members can submit up to two Club Weeks into a rental program run by the Club Managers, which are then rented to the general public—though the Sponsor's Club Interests have priority.  Defs 56.1 ¶ 27; *see also* Thomas Decl. ¶ 17; Plan at 507-08 ("Reservation Policies and Procedures-Rental Program"); Ex. 20 to Declaration of Tyler Meade ("Meade Decl."), Dkt No. 165-21.  To participate in the Rental Program, a Club Member must execute a separate Rental Agreement with the Club Manager.  Defs 56.1 ¶ 28; *see also* Thomas Decl. ¶ 17; Plan at 507-08 ("Reservation Policies and Procedures-Rental Program").

### 3. The Parties' Conduct

After the initial offering of Club Interests to the public, the Sponsor filed amendments adding additional Club Units.  From April 2007 to April 2008, the Sponsor filed amendments

memorializing the addition of 16 Club Units.  Defs 56.1 ¶ 7; *see also* Ex. 5 to Suarez Decl. (Fourth Amendment), Dkt No. 141-20; Ex. 8 to Suarez Decl. (Seventh Amendment), Dkt No. 141-23; Ex. 9 to Suarez Decl. (Eighth Amendment), Dkt No. 141-24.[3]  The Sponsor sold Interests in 2007, 2008, and 2009.  Defs 56.1 ¶ 8; *see also* Ex. A to Thomas Decl. ("Life to Date Closings"), Dkt No. 159-1. Among Plaintiffs are current and former owners of 107 Interests.  Defs 56.1 ¶ 9; *see also* Purchase Agreements; Thomas Decl. ¶ 19.

After the beginning of the Great Recession, the Sponsor decided to close the on-site sales office at the Club and stopped marketing unsold Club Interests.  Defs 56.1 ¶ 14; *see also* Ex. C to Declaration of Heather McGill ("McGill Decl."), Dkt No. 140-3.  The Sponsor made its last sale of a Club Interest in 2009.  Defs 56.1 ¶¶ 190-91; *see also* Deposition of Lauren Garzon, Ex. 8 to Meade Decl., Dkt No. 165-9, at 57:5-24.  When the Sponsor received inquiries from potential buyers, it referred them to independent brokers who might be listing units on the resale market.  Defs 56.1 ¶ 192; *see also* Ex. 16 to Meade Decl., Dkt No. 165-17.

In 2011, seven Club Units were removed form the Club; consequently, 372 Interests remained available.  Defs 56.1 ¶ 15; *see also* Ex. 15 to Suarez Decl. (Fourteenth Amendment), Dkt No. 141-30.  The Sponsor closed sales on 301, or 80.9%, of these Interests, by the time Plaintiffs filed their initial complaint in this case in December 2016.  Defs 56.1 ¶ 16; *see also* Thomas Decl. ¶ 8; Ex. A to Thomas Decl. ("Life to Date Closings"), Dkt No. 146-1.  The Sponsor had also recovered 27 Club Interests as a result of inventory exchanges and foreclosures and thus owned 98, or 26.3%, of the available Interests.  Defs 56.1 ¶ 17; *see also* Thomas Decl., ¶ 11; Ex. B to Thomas Decl.

---

[3] Plaintiffs dispute that the amendments were presented to Plaintiffs in the manner required by the Offering Plan.  Defs 56.1 at 3; *see also* Plan at 11 (promising to serve amendments on Purchasers and Club Members); *id.* at 23 (defining the "Presentation Date" as the "date on which the Offering Plan or an amendment thereto, as the case may be, is personally delivered or the fifth day after mailing to prospective Purchasers and Club Members following acceptance of the Offering Plan or an amendment thereto for filing the Department of Law")

("Sponsor Recoveries"), Dkt No. 146-2.  Hence, non-Sponsor Club Members controlled 274 of the 372 Interests.  Defs 56.1 ¶ 18; *see also* Thomas Decl. ¶ 11; Sponsor Recoveries.

The Sponsor has continued to file regular amendments to the Plan.  Defs 56.1 ¶ 20; *see also* Suarez Decl. ¶¶ 8-38.  The Sponsor has also fulfilled its financial obligations—including paying maintenance fees and taxes—on the unsold Club Interests.  Defs 56.1 ¶ 21; *see also* Thomas Decl. ¶ 14.

Between 2007 and 2016, Plaintiffs used 43,196 of the 45,472, or approximately 95 percent, of their aggregate vacation days allotted to them annually pursuant to their respective Purchase Agreements.  Defs 56.1 ¶ 32; *see also* Thomas Decl. ¶ 23; Ex. E to Thomas Decl. ("Usage Chart"), Dkt No. 159-6.  Club Members or their guests occupied 80.6% of the nights available to them at the Club since its inception.  Defs 56.1 ¶ 44; *see also* Thomas Decl. ¶ 33; Ex. F to Thomas Decl. ("Updated Usage Chart"), Dkt No. 159-7.  The vast majority of Club Members also converted their time into Starpoints in at least one year of ownership, and most did so in most of their years of ownership.  Defs 56.1 ¶¶ 44-46; *see also* Usage Chart; Updated Usage Chart.  Some Plaintiffs have also rented time in their Interest, either by themselves or through third parties.  Defs 56.1 ¶ 50; *see also* Exs. 13-21 to LaRocco Decl., Dkt Nos. 150-13–150-21.

The Sponsor has also rented time in unsold Club Interests to the general public.  Defs 56.1 ¶ 52; *see also* Thomas Decl. ¶ 36.  The Sponsor rented between 1,053 and 2,615 nights each year from 2007 to 2015.  Defs 56.1 ¶ 53; *see also* Ex. H to Thomas Decl. ("Rental Data"), Dkt No. 159-9. Plaintiffs who have participated in the Club Rental Program have generally been able to rent a similar or greater percentage of their Interests than the Sponsor.  Defs 56.1 ¶ 51; *see also* Rental Data. However, in absolute rather than percentage terms, the Sponsor has placed thousands of nights into the rental program, while Club Member—including Plaintiffs—have placed only 207 nights into the program.  *See* Rental Data; *see also* Ex. 19 to Meade Decl., Dkt No. 165-19.

Club Members have been able to sell some of their Interests on the resale market.  There have been at least 55 resales of Interests since June 2009.  Defs 56.1 at 72; *see also* Ex. 47 to Meade Decl., Dkt No. 165-51.  However, several Plaintiffs testified that they have had difficulty selling their Club Interests on the resale market.  Defs 56. ¶¶ 194-99.

### B. Procedural History

Plaintiffs filed their complaint on December 5, 2016.  Dkt No. 1.  Defendants filed their first motion to dismiss on April 21, 2017.  Dkt Nos. 46-47.  The Court issued its decision on that motion in *Gillespie I.*  The Court dismissed Plaintiffs' claim for breach of an express contractual provision based on Plaintiffs' allegations that the Sponsor had both "abandon[ed] sales efforts and rent[ed] out Club Units to the general public."  *Gillespie I*, 343 F. Supp. 3d at 339.  The Court held that because there was no "express contractual provision to sell all Club Interests, or a sufficient number of Club Interests to make the offering viable," and because "the offering documents provide clear warning that the Sponsor may rent Club Units owned by it[,]" Plaintiffs had not adequately pleaded a breach of an express contractual provision.  *Id.* at 340-41, 345.

The Court held that Plaintiffs had sufficiently alleged a breach of the implied covenant of good faith and fair dealing under New York law, however.  *See id.* at 341-44.  The Court noted that "[u]nder New York law, all contracts contain an implied covenant of good faith and fair dealing in the course of performance."  *Id.* at 341 (citing *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153-54 (2002) (collecting cases); *Carvel Corp. v. Diversified Mgmt. Grp.*, 930 F.2d 228, 230 (2d Cir. 1991)).  Relying on the New York Court of Appeals' decision in *Jennifer*, the Court held that "Plaintiffs have adequately pleaded that the Sponsor had an implied duty to sell sufficient units to make the offering viable[.]"  *Id.* at 343.  The Court also noted that "the ultimate question"—though not at issue at the motion to dismiss stage—was "whether the Sponsor's failure to sell 20% of the Club Interests actually undermined the 'viability' of the offering[.]"  *Id.*

The Court also held that Plaintiffs had adequately alleged a claim for rescission based on the Rescission Clause. *See id.* at 348.  The Court held that the Rescission Clause was ambiguous with respect to the meaning of the term "Purchaser."  *Id.* at 350.  The Court also held that "the conversions of Suite Units into Club Units and changes in expense allocations, which were endorsed formal amendments to the Plan—namely, the Seventh and Eighth Amendments" could form the basis of a claim for rescission.  *Id.*  However, the Court held that "the Sponsor's decision to abandon sales and instead pursue a large-scale rental program, which Plaintiffs classif[ied] as a 'de facto' amendment" could not support a rescission claim because "the plain language of the rescission provision . . . limit[ed] the right of rescission to Purchasers who have been subjected to 'substantive or material revisions' that are contained in duly filed amendments."  *Id.* at 351.

Finally, the Court dismissed Plaintiffs' unjust enrichment claim but granted Plaintiffs leave to replead that claim.  Plaintiffs did so, and the Court again dismissed Plaintiffs' claim for unjust enrichment in *Gillespie II*.  The Court again granted Plaintiffs leave to replead, but Plaintiffs chose not to do so.

Plaintiffs filed their third amended complaint ("TAC") on October 11, 2019.  Dkt No. 123. The TAC asserts two claims for relief.  First, the TAC asserts a claim for breach of the implied covenant of good faith and fair dealing against the Sponsor because the Sponsor allegedly "increase[ed] the inventory of Club Units and Club Interests while ceasing sales efforts, and then rent[ed] this inventory for their own profit[.]"  TAC ¶ 189.  Plaintiffs allege that this "frustrated Plaintiffs' rights and reasonable expectations under the parties' contract, deprived Plaintiffs of the value of their Club Interests, and allowed Defendants . . . to profit at Plaintiffs' expense."  *Id.* Second, Plaintiffs assert a claim for rescission against the Sponsor.  *Id.* ¶¶ 196-205.[4]

---

[4] Plaintiff also attempt to assert a breach of the implied covenant of good faith and fair dealing because the Sponsor has "rent[ed] time associated with unsold Club Interests in violation of the Club Offering Plan."  *Id.* ¶ 194.  However, the

Plaintiffs filed a motion for partial summary judgment on January 10, 2020.  Dkt Nos. 134-36.  Defendants cross-moved for summary judgment on the same date.  Dkt Nos. 137-41, 145-52, 159.  Defendants also filed a motion to exclude testimony by two purported experts retained by Plaintiffs.  Dkt No. 142-44.  Plaintiffs subsequently filed an opposition to Defendants' motion to exclue expert testimony, Dkt No. 153, and Defendants filed a reply.  Dkt No. 155.  On February 28, 2020, both Plaintiffs and Defendants filed oppositions to the motions for summary judgment.  Dkt Nos. 161-63, 165-66.  On April 10, 2020, both Plaintiffs and Defendants filed their replies.  Dkt Nos. 167-70.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))).  A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact[,]" and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir.

---

Court dismissed that claim in *Gillespie I*.  *See* 343 F. Supp. 3d at 344-48.  Therefore, the Court does not address that claim in its opinion on this motion.

2008) (citing *Celotex*, 477 U.S. at 323).  To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted) (quoting former Fed. R. Civ. P. 56(e)).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts[,]" *Matsushita*, 475 U.S. at 586, and he "may not rely on conclusory allegations or unsubstantiated speculation."  *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Johnson*, 680 F.3d at 236 (quotation omitted).  The Court's job "is not to weigh the evidence or resolve issues of fact."  *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002) (citation omitted); *see also Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.") (citation omitted).  "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."  *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citation omitted).

## III. DISCUSSION

### A. Breach of the Implied Covenant of Good Faith and Fair Dealing

Defendants are entitled to summary judgment on Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing because the plain language of the contract refutes Plaintiffs' arguments that Defendants had a duty to support the rental or resale markets for their Club Interests.  "Under New York law, all contracts contain an implied covenant of good faith and fair

dealing in the course of performance." *Gillespie I*, 343 F. Supp. 3d at 341 (citations omitted).  As

noted by the Court in *Gillespie I*, the New York Court of Appeals has held that a plaintiff may

succeed on a claim for breach of the implied duty of good faith and fair dealing under New York

law by proving that a defendant's actions "so drastically undermined the contract that its

fundamental objective—the creation of a viable cooperative—has been subverted."  343 F. Supp. 3d

at 341-42 (quoting *Jennifer*, 98 N.Y.2d at 153); *see also 511 W. 232nd Owners Corp. v. Jennifer Realty Co.*,

729 N.Y.S.2d 34 (1st Dep't 2001) (New York Appellate Division decision in *Jennifer*), *aff'd in part*, 98

N.Y.2d 144 (2002).  "The rule established in *Jennifer* has been applied in the context of sales of

condominiums—including high cost apartments." *Gillespie I*, 343 F. Supp. 3d at 342 (citing *Bauer v.

Beekman Int'l Ctr. LLC*, No. 110211-2011, 2013 WL 4779566, (N.Y. Sup. Ct. Aug. 16, 2013), *aff'd*, 1

N.Y.S.3d 808 (1st Dep't 2015); *Bd. of Managers of the Warren House Condo. v. 34th St. Assocs. LLC*, No.

152052/13, 2015 WL 4915600, at *1 (N.Y. Sup. Ct. Aug. 18, 2015), *aff'd*, 61 N.Y.S.3d 480 (1st Dep't

2017)).

Neither *Jennifer* nor subsequent New York cases applying *Jennifer* have articulated a bright-line

test for when a cooperative or condominium is "viable."  Nonetheless, there are several uncontested

facts that weigh in favor of the conclusion that the Club is viable.  The Sponsor has closed sales on

301 of 372 Interests at the Club that are available for sale.  *See* Defs 56.1 ¶¶ 15-16.[5]  By contrast, in

*Jennifer*, the developer sold only 38 percent of the cooperative's shares.  *See* 98 N.Y.2d at 150; *see also

Bauer*, 1 N.Y.S.3d at 808 (granting summary judgment to defendant on breach of implied good faith

and fair dealing and distinguishing *Jennifer* on the basis that it "involv[ed] a cooperative conversion of

a rent-stabilized building where the owner sold a minority of the shares").[6]  Moreover, the Board of

---

[5] The Court previously noted that *Jennifer* does not require "that the Sponsor sell 'all' of the Club Interests." *Gillespie I*, 343 F. Supp. 3d at 343.

[6] The evidence offered by Defendants that members have used 95 percent of their available vacation time at the Club is only weakly probative of viability.  Plaintiffs persuasively argue that "they kept their units and booked stays at the Club *because* they could not rent or sell them like they would have preferred."  Plaintiffs' Opposition to Defendants' Motion

the Club Association is controlled by duly elected Club Members in accordance with the provisions of the Club Declaration.  *See* Defs 56.1 ¶¶ 99-101.  This is further evidence that the offering is viable.  *Cf. Bauer*, 2013 WL 4779566, at *5 (holding that the sponsor had not retained control of the project, "because a majority of the units are tenant-owned, the owners have the ability, should they so choose, to gain effective control and management of the condominium through the condominium board").

Furthermore, the Sponsor has fulfilled its financial obligations—including paying maintenance fees and taxes—on the unsold Club Interests. Defs 56.1 ¶ 21; *see also* Thomas Decl. ¶ 14.  The unsold Interests are not creating a drag on the economics of the Club as a whole.  The owners of the sold Club Interests, including Plaintiffs, are not being forced to pay a disproportionate amount of maintenance because some Club Interests remain unsold.  The fact that Sponsor is contributing financially to the maintenance of the Club, in a manner consistent with the economic support that would have been provided had the Sponsor's Interests been sold to third parties, substantially undermines Plaintiffs' argument that the Club is not viable.  Finally, the Club consists of two floor in a luxury hotel, and Plaintiff does not suggest that the Club or the other floors of the hotel have been poorly maintained.  *Cf. Warren House*, 2015 WL 4915600, at *2 (observing that "certain renters in unsold units allow their dogs to urinate and defecate in the hallways" and that this contributed to the court's conclusion that the offering in that case was not viable).[7]  None of these

---

for Summary Judgment ("Opp.")., Dkt No. 165, at 10; *see also, e.g.*, Defs 56.1 ¶ 177 (citing Ex. 4 to Meade Decl. (Deposition of Gale Higgs) at 25:13-26:13)).

[7] Moreover, as the Court observed in *Gillespie I*, the facts in *Jennifer* are a far cry from the facts presented in this case.  In *Jennifer*, the case involved "formerly rent-stabilized apartments[.]" *Gillespie I*, 343 F. Supp. 3d at 342.  Here, by contrast, the "Club Units are expensive and available only to the well-heeled, unlike the formerly rent-stabilized tenants affected by the sponsor's alleged misconduct in *Jennifer*." *Id.*  Therefore, although "[t]he rule established in *Jennifer* has been applied in the context of sales of condominiums[,] including high cost apartments" by lower New York courts—and the Court applies it in this case—the Court observes that the New York Court of Appeals has not definitely extended its holding in *Jennifer* to circumstances like those presented in this case.  *Id.* (citations omitted).  Furthermore, the factual differences between this case and *Jennifer* are relevant to the Court's application of the test for viability to the facts of this case.

factors, viewed in isolation, is necessarily sufficient to support the conclusion that the Club offering is viable.  But taken together, the Court concludes that no reasonable jury could conclude that the Club was anything but viable.

Plaintiffs offer two arguments for why the Club is not viable, both of which founder on the plain language of the Offering Plan.  Plaintiffs focus their arguments for why the Club is not viable on two points:  Their inability to rent and to resell their Club Interests.  *See* Opp. at 10 ("The Sponsor's evidence that Plaintiffs enjoyed some benefits under the contract must be weighed against the abundant evidence that Plaintiffs have not received what they bargained for *in terms of their rental and resale rights*." (emphasis added and omitted)); *see also id.* at 3-10.

As an initial matter, it is not clear that Plaintiffs' ability to rent and resell is related to the "viability" of the Club under *Jennifer*.  As explained in *Gillespie I*, *Jennifer* held that a seller had a "duty in good faith to timely sell so many shares in the building as necessary to create a fully viable cooperative."  *Gillespie I*, 343 F. Supp. 3d at 342 (quoting *Jennifer*, 98 N.Y.2d at 152).  For that reason, the Court held in *Gillespie I* that "the ultimate question [was] whether the Sponsor's failure to sell 20% of the Club Interests actually undermined the 'viability' of the offering[.]"  343 F. Supp. 3d at 343.  Thus, it is an open question under *Jennifer* whether rental and resale rights are relevant to whether an offering is viable.

In any event, because the duty of good faith and fair dealing cannot imply a duty "which would be inconsistent with other terms of the contractual relationship[,]" Plaintiffs' arguments cannot succeed.  *Horn v. N.Y. Times*, 100 N.Y.2d 85, 92 (2003) (quotation and emphasis omitted).  Plaintiffs' argument that the Sponsor has undermined their ability to rent under the Offering Plan is inconsistent with the plain text of the Offering Plan.  Plaintiffs argue that "[t]riable issues exist as to whether the Sponsor has frustrated Plaintiffs' ability to rent under the offering plan[.]"  Opp. at 3 (capitalization altered).  However, the Plan states that

> [t]he purchase of a Club Interest should be based upon its value as a vacation experience, for spending leisure time, or for other personal use, and not considered for purposes of acquiring an appreciating investment or with an expectation that the Club Interest may be rented or resold at a profit.  Generally, there is no established market for the rental or resale of Club Interests and the rental and resale value, if any, is uncertain.  Any Club Member attempting to rent or resell a Club Interest would have to compete, at a substantial disadvantage, with Sponsor in the rental and sale of its Unsold Club Interests.  Sponsor may have a large inventory of Unsold Club Interests.

Defs 56.1 ¶ 56 (quoting Plan at 3 § 1(a) ("Special Risk Factors")).[8]  At a different point, the Plan also discloses that "THE ABILITY OF A CLUB MEMBER TO RENT CLUB WEEKS WILL BE EXTREMELY LIMITED.  CLUB MEMBERS WILL BE COMPETING WITH SPONSOR FOR THE RENTAL OF CLUB WEEKS.  CLUB MEMBERS SHOULD NOT PURCHASE A CLUB INTEREST WITH ANY EXPECTATION OF RENTAL FOR CLUB WEEKS RESERVED AS PART OF THE CLUB INTEREST."  *Id.* ¶ 89 (quoting Plan at 90 ("Club Reservation Procedures-Rental of Club Weeks") (capital letters in original)).

The Purchase Agreements contain a similar disclaimer.  In a section titled "Representations, Acknowledgments, Warranties, and Covenants," the Purchase Agreements state:

> Purchaser is purchasing the Club Interest and the rights and privileges associated with it for Purchaser's own personal use and account and not for any other purpose and Purchaser does not anticipate or expect to make a profit from the ownership or rental of the Club Interest.  Purchaser understands that the purchase of a Club Interest should be based solely upon its value as a vacation experience or for spending leisure time and not for its potential liquidity or as an appreciating investment, including potential for rental income or for resale at a profit.  Purchaser acknowledges that Seller and its representatives have made no representations to Purchaser regarding the Club Interest's potential for future profit, rental potential, tax advantages, depreciation, or Investment potential.

---

[8] *See also id.* ¶ 111 ("Purchaser understands that the purchase of a Club Interest should be based solely upon its value as a vacation experience or for spending leisure time and not for its potential liquidity or as an appreciating investment, including potential for rental income or for resale at a profit.  Purchaser acknowledges that Seller and its representatives have made no representations to Purchaser regarding the Club Interest's potential for future profit, rental potential, tax advantages, depreciation, or investment potential.") (citing Purchase Agreements).

Defs 56.1 ¶ 111 (quoting Purchase Agreements).  Similarly, the Buyer's Certifications, executed by

Plaintiffs as part of the Purchase Agreement, state that "[t]he ability of a Club Member to rent Club

Weeks will be extremely limited.  Club Members will be competing with Seller for the rental of Club

Weeks.  Club Members SHOULD NOT purchase a Club Interest with any expectation of rental for

Club Weeks reserved as part of the Club Interest." *Id.* ¶ 119 (quoting Purchase Agreements).  The

Buyer's Certifications further state that "[m]y Club Interest is for my use and enjoyment.  Seller

makes no representations about my Club Interest's potential for future profit, rental income, tax

benefits, investment potential or other financial advantages." *Id.* ¶ 120 (quoting Purchase

Agreements).  Moreover, the Court held in *Gillespie I* that "the offering documents provide clear

warning that the Sponsor may rent Club Units owned by it."  343 F. Supp. 3d at 345.

This language in the Plan and the Purchase Agreements forecloses Plaintiffs' argument that

Defendants had an implied duty to support the rental market for their fractional interests.  As noted

above, the implied duty of good faith and fair dealing cannot imply a duty "which would be

inconsistent with other terms of the contractual relationship," *Horn*, 100 N.Y.2d at 92 (emphasis

omitted).  Plaintiffs' arguments concerning their ability to rent run counter to the clear language of

the Plan.  Consequently, those arguments cannot support the existence of an implied duty of good

faith and fair dealing.

Plaintiffs' second argument—that Defendants' actions have left them unable to resell their

Club Interests—also runs aground on the text of the Plan.  Plaintiffs argue that "[t]he Sponsor's

conduct has frustrated Plaintiffs' ability to resell their interests, essentially eliminating any viable

market." Opp. at 5 (capitalization altered).  However, the Offering Plan specifically warned

Plaintiffs that "there is no established market for the . . . resale of Club Interests and the . . . resale

value, *if any*, is uncertain.  Defs 56.1 ¶ 56 (emphasis added).  The Court held in *Gillespie I* that "[t]he

offering documents specifically advise purchasers of the prospect that the Sponsor will not be able

to sell all of the Club Interests" and that "[t]here is similarly no basis to imply the existence of an obligation on the Sponsor to support the resale value of the Club Interests." 343 F. Supp. 3d at 343-44.[9] Again, because Plaintiffs attempt to imply a duty of good faith and fair dealing that is inconsistent with the plain terms of the contract, their argument is unavailing.

Plaintiffs' citation of the New York state trial court's decision in *Warren House* is also unavailing. In *Warren House*, the defendants retained 37 percent of the units in a condominium. *See* 2015 WL 4915600, at *2. The defendants then argued that because they had sold a majority of the condominium units, the condominium was viable. *Id.* The Warren House court rejected that argument, holding "[t]hat defendants have retained a minority of the shares in the Condominium is not dispositive of the issues in this case." *Id.* at *3. The Court agrees that *Jennifer* does not support the establishment of a bright-line rule that a development is viable whenever a sponsor sells at least bare majority of the interests in a unit.

But *Warren House* does not support Plaintiffs' arguments in this case because it is distinguishable on its facts. The *Warren House* court noted that Fannie Mae and Freddie Mac adopted new lending protocols after the Great Recession, which "require[d] that a sponsor have no more than a 10% ownership interest in the Condominium's residential units." *Id.* at *1. "Because the sponsor owned a large percentage of units in the Condominium[,]" the court noted, "the newly adopted regulations discouraged lenders from making loans secured by mortgages on apartments in the Condominium." *Id.* On appeal, the First Department specifically noted the 10 percent threshold, holding that "[i]ssues of fact exist as to whether defendants' ownership of more than 10%

---

[9] These holdings from *Gillespie I* are sufficient to defeat Plaintiffs' argument that "[t]here is ample evidence showing that the Sponsor's conduct caused diminution in Plaintiffs' property values." Opp. at 11. Plaintiffs attempt to distinguish between "support[ing] the resale value of the Club Interests," *Gillespie I* 343 F. Supp. 3d at 343, and "tak[ing] steps to cripple the resale market." Opp. at 8. But that distinction is artificial in the context of this case. Plaintiffs argue that their property values are lower than they would otherwise be because of Defendants' conduct. However, the Offering Plan clearly warned Plaintiffs that they should purchase Club Interests for their value as a vacation experience and not for any perceived resale value. How Defendants' conduct is framed does not alter the Court's underlying conclusion that they were under no obligation with respect to the resale value of their units.

of the condominium units has rendered the condominium unviable." *Warren House*, 154 A.D. 3d at 476. There is no comparable requirement in this case.

Moreover, neither the trial court nor the appellate court in *Warren House* discuss express contractual provisions that directly undercut the plaintiffs claim for breach of the implied covenant of good faith and fair dealing. To the contrary, the trial court noted that plaintiffs' claim for breach of the implied covenant of good faith and fair dealing were premised on "promises broken by defendant to create a viable Condominium in which units may be freely mortgaged and sold." *Warren House*, 2015 WL 4915600, at *2.[10] Accordingly, Defendants are entitled to summary judgment on Plaintiffs claim for breach of the implied covenant of good faith and fair dealing.[11]

### B. Rescission

Defendants are entitled to summary judgment on Plaintiffs' rescission claim because the Rescission Clause merged with the deed at closing and extrinsic evidence regarding the Plan shows that the parties did not intend for the Rescission Clause to survive the closing of a transaction for a Club Interest. As noted in *Gillespie I*, Plaintiffs—with the exception of a small subset of "Non-Rescinding Plaintiffs"—seek to rescind their purchase agreements. 343 F. Supp. 3d at 348. The section of the plan on which their arguments for rescission rely states:

> Sponsor reserves the right, from time to time prior to the First Closing of a Club Interest, without obtaining the consent of Purchasers or others, to substantially revise the terms and conditions upon which the Club Interests are to be sold, including changes affecting the rights, obligations and liabilities of Sponsor, the Purchasers

---

[10] The Court also observes that while "in determining how the Court of Appeals would rule on this legal question, the decisions of New York State's Appellate Division are helpful indicators," *Haar v. Nationwide Mut. Fire Ins. Co.*, 918 F.3d 231, 233 (2d Cir. 2019) and "although not authoritative, the judgement of an intermediate appellate state court is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise[,]" *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 210 (2d Cir. 2006) (quotations omitted) (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940)), the same is not necessarily true of state trial courts. *Cf. Phillips v. City of N.Y.*, 453 F. Supp. 2d 690, 744 (S.D.N.Y. 2006) ("[I]n the absence of a decision by the New York Court of Appeals, the rulings of New York's intermediate appellate courts are at least of persuasive authority, but those of a state trial court are usually not binding precedent upon federal courts."). Thus, to the extent that the state trial court decision *Warren House* might be interpreted to support Plaintiff's arguments in this case, the Court respectfully disagrees as to the correct interpretation and application of *Jennifer*.

[11] Because the Court has concluded that Defendants are entitled to summary judgment, it does not address the parties' arguments concerning whether damages or rescission is an appropriate remedy on this count.

and/or prospective Purchasers under the Offering Plan.  All substantive or material revisions will be contained in a duly filed amendment to the Offering Plan.  If there is a substantial amendment to the Offering Plan that materially and adversely affects Purchasers, except as otherwise provided herein, Purchasers will have a right of rescission for a period of fifteen (15) days from the Presentation Date of such amendment to them, sponsor shall promptly return any Deposit to Purchasers who rescind.

*Id.* at 349 (quoting Plan at 103).  In *Gillespie I*, the Court denied Defendants' motion to dismiss because it determind that the term "Purchaser" was ambiguous.  *See id.* at 349-50.  The parties now cross-move for summary judgment regarding the correct interpretation of this provision.

### 1. Merger

The doctrine of merger bars Plaintiffs' claim for rescission.  "Under New York law, in an action for breach of contract arising out of a contract for the sale of real property, upon closing of title to the property and delivery of the deed to the plaintiff, any claims that the plaintiff may have had based on the contract of sale are 'extinguished by the doctrine of merger.'"  *Waverly Props., LLC v. KMG Waverly LLC*, 824 F. Supp. 2d 547, 563 (S.D.N.Y. 2011) (quoting *Rothstein v. Equity Ventures, LLC*, 750 N.Y.S.2d 625, 628 (2d Dep't 2002)); *see also Tencza v. TAG Court Square, LLC*, No. 10 CIV. 3752 (PAE), 2013 WL 2449178, at *8 (S.D.N.Y. June 6, 2013) ("[T]he New York principle of merger serves to extinguish . . . claims based on the pre-deed contract of sale[.]").

"Under the merger doctrine, the obligations and provisions of a contract for the sale of land are merged in the deed and, as a result, are extinguished upon the closing of title unless there is a clear intent evidenced by the parties that a particular provision shall survive delivery of the deed."  *Waverly Props.*, 824 F. Supp. 2d at 563-64 (quoting *Dourountoudakis v. Alesi*, 706 N.Y.S.2d 476, 476 (2d Dep't 2000) (quotation marks omitted)); *see Burkins & Foley Trucking & Storage, Inc. v. Cty. of Albany*, 11 N.Y.S.3d 351, 352 (3d Dep't 2015) ("[A] contract for the sale of real property merges with the deed and, as a result, the terms of the contract do not survive transfer of title unless the parties

clearly specify otherwise.").[12]  Where "the contract of sale has merged into the deed . . . the contract may not be rescinded."  *Gately v. Gately*, 984 N.Y.S.2d 731, 732 (4th Dep't 2014) (citation omitted); *see also Matter of Mattar v. Heckl*, 909 N.Y.S.2d 610, 610 (4th Dep't 2010) ("[T]he contract provisions have merged into the deed, and the contract may not be rescinded.").  The Plan does not specifically identify the Rescission Clause as surviving the closing, so it merged with the deed.

Plaintiffs' arguments against this conclusion are unavailing.  Plaintiffs cite a provision in a section of the Plan entitled "Rights and Obligations of the Sponsor" that states "[u]nless expressly provided to the contrary herein, the obligations of Sponsor under the Offering Plan shall survive the delivery of the respective deeds to the Club Interests to Purchasers."  Plan at 81.  However, in context, this provision is best interpreted to refer only to the provisions listed in the Rights and Obligations of Sponsor section.  Indeed, the very next provision states:

> The foregoing sets forth the entire obligations of Sponsor hereunder and no others shall be implied, except that nothing contained herein shall be deemed to limit the rights of Club Members under their respective Purchase Agreements.  Sponsor makes no representations or warranties other than as set forth in the Offering Plan.

*Id.*  The Rescission Clause is not included in the "Rights and Obligations of Sponsor" section of the Plan.  Therefore, this provision does not support Plaintiffs' argument the the Rescission Clause survived the closing.

Plaintiffs also point to a different provision in the "Rights and Obligations of Sponsor" section of the plan which states "[a]ll representations of Sponsor under the Offering Plan, all

---

[12] *See also Raymond v. Marks*, 116 F.3d 466, 466 (2d Cir. 1997) (summary order) ("[U]nder the merger doctrine, recognized in New York, any breach of contract claim arising from a contract of sale of real property is extinguished unless there is a 'clear intent evidenced by the parties that a particular provision of the contract of sale shall survive the delivery of the deed.'" (quoting *Noufrios v. Murat*, 598 N.Y.S.2d 82, 84 (2d Dep't 1993) (brackets omitted))); *527 Smith St. Brooklyn Corp. v. Bayside Fuel Oil Depot Corp.*, 691 N.Y.S.2d 560, 561 (2d Dep't 1999) (holding that the merger doctrine does not apply only "where there is a clear intent evidenced by the parties that a particular provision will survive delivery of the deed or where there is a collateral undertaking."); *225 W. End Av. Assocs. v. Bittorf*, No. 89 CIV. 7101 (RPP), 1989 WL 140269, at *6 n.2 (S.D.N.Y. Nov. 14, 1989) ("[I]n the absence of a clear intention evidenced by the parties that a particular provision shall survive delivery of the deed, the obligations and provisions for the contract of sale of land are merged in the deed and, as a result, are extinguished upon the closing of title." (quoting *Marino v. Dwyer-O'Berry Construction Co.*, 537 N.Y.S.2d 234, 236 (2d Dep't 1989))).

obligations of Sponsor pursuant to the General Business Law and such additional obligations under the Offering Plan which are to be performed subsequent to closing, will survive delivery of the deed." Plan at 81 § (ee).  But, at most, this provision simply raises the question of whether the Rescission Clause "[was] to be performed subsequent to closing." *Id.*  This question is equivalent to asking whether the Rescission Clause "will survive delivery of the deed[.]" *527 Smith St.*, 691 N.Y.S.2d at 561.  As the Court noted above, provisions in a contract are not subject to merger only "where there is a *clear intent* evidenced by the parties that a *particular provision* will survive delivery of the deed." *Id.* (emphases added).  The Plan does not provide "clear intent" that the particular provision at issue—the Rescission Clause—was intended to survive closing.  Therefore, Plaintiffs' argument is unavailing.

Plaintiffs also suggest that the "collateral undertakings" exception to the merger doctrine applies in this case.  "An undertaking that is collateral to the conveyance is not extinguished by the acceptance of the deed, regardless of the terms of the contract because it is not a part of the main purpose of the transaction, that is, the conveyance of real estate, and therefore by its very nature may show an intent that it should not be merged in the deed." *Novelty Crystal Corp. v. PSA Inst'l Partners, L.P.*, 850 N.Y.S.2d 497, 500 (2d Dep't 2008) (citations, quotation marks, and brackets omitted).  Plaintiffs suggest that the "collateral undertakings" exception applies here because the exception precludes the extension of the merger doctrine to obligations that "establish a continuing duty that will outlive the consummation of the sale[.]" *Id.*  But this question-begging argument fails for the same reason as Plaintiffs' prior argument:  It assumes that the Rescission Clause was intended to survive closing.  Because the Plan does not evince a clear intent for the Rescissions Clause to survive the closing, it is subject to merger.

Plaintiffs also argue that the merger doctrine does not apply because this is not "an action for breach of contract arising out of a contract for the sale of real property[.]" *Waverly Props.*, 824 F.

23

Supp. 2d at 563.  Really?  Each Plaintiff purchased Club Interests—indisputably "real property"—pursuant to a Purchase Agreement.  The Purchase Agreements expressly incorporated the Plan. Defs 56.1 ¶ 109; *see also* Purchase Agreements § 1 ("The Offering Plan").  It is difficult to fathom what this lawsuit is if not an action for breach of contract arising out of a contract for sale of real property.

Plaintiffs' interpretation also leads to incongruous results.  The Rescission Clause requires that, upon rescission, the Sponsor "shall promptly return any Deposit to Purchasers who rescind." Plan at 103 ("General").  Deposit is defined as "all deposits, downpayments, advances, payments or loan payments made by Purchasers prior to the Closing of a Club Interest, including any payments made on account of Club Charges, financing arrangements, closing costs and the like."  *Id.* at 21 ("Definitions").  On Plaintiffs' interpretation, a rescinding plaintiff who paid the full purchase price prior to closing would be entitled to the full purchase price upon rescission.[13]  By contrast, a rescinding plaintiff who paid only twenty percent of the purchase price before closing and paid the remainder at the closing woud only be entitled to only twenty percent of the purchase price of her Club Interest.  This differential treatment based on how a plaintiff chose to structure their payment for purchase of a Club Interest is odd, to say the least.

Plaintiffs attempt to resist this conclusion by suggesting that all rescinding Plaintiffs are entitled the full purchase price of their Club Interests because the definition of deposit "includes all money paid upon the closing of escrow."  Opp. at 29.  But that is not true because there is a difference between money paid *prior to* closing and money paid *at* closing.  The Rescission Clause and the definition of Deposit in the Plan require a refund of only money paid prior to closing.

---

[13] Such a rescinding plaintiff would also be entitled to a refund of the entire purchase price of their Club Interests, even though they have enjoyed the benefits of the Club Interests for years.  Indeed, on Plaintiffs' interpretation, any time the Sponsor filed an amendment triggering the right to rescission, an owner would have the option of receiving the full purchase price of their Club Interest—even if an owner owned her Club Interest for years, or even decades.  This eyebrow-raising result is another strike against interpreting the Rescission Clause to survive after closing.

Plaintiffs also argue that applicable Martin Act regulations require the Sponsor to return "any money paid" upon rescission. 13 N.Y.C.R.R. § 24.5(a)(5). But that provision applies only to "purchasers under contract" and thus does not apply after closing. *Id.*; *see also Gillespie I*, 343 F. Supp. 3d at 349. This strange result is further reason to doubt the soundness of Plaintiff's interpretation of the Rescission Clause.

For these reasons, the Rescission Clause merged into the deed as a matter of unambiguous contract interpretation. In *Gillespie I*, the Court held that the Plan term "Purchaser" was ambiguous. The Court's analysis focused on the interpretation of that term because that was the focus of the parties' arguments and it is axiomatic that "[i]n our adversarial system of adjudication, [courts] follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020); *see also id.* ("Courts are essentially passive instruments of government. They do not, or should not, sally forth each day looking for wrongs to right. They wait for cases to come to them, and when cases arise, courts normally decide only questions presented by the parties." (quotations and brackets omitted)). Notwithstanding the ambiguity of the term "Purchaser," however, the Court concludes—as Defendants argue on this motion—that the Rescission Clause unambiguously merged into the deed after closing. *See Chock Full O'Nuts Corp. v. Tetley, Inc.*, No. 94 Civ. 8262 (PKL), 1997 WL 452330, at *5 n.2 (S.D.N.Y. Aug. 8, 1997) ("[W]hen a contract provision is susceptible of multiple interpretations, and one party would prevail as a matter of law under any interpretation, then the ambiguity is not a genuine issue of *material* fact."), *aff'd*, 152 F.3d 202 (2d Cir. 1998).

### 2. Extrinsic Evidence

Even if the contract were ambiguous, Defendants would still be entitled to summary judgment on Plaintiffs' rescission claim. Plaintiffs' principal argument is that any amibiguties in the Plan, including the ambiguity in the term "Purchaser" noted in *Gillespie I*, must be construed against the Sponsor. Plaintiffs derive this argument from the New York Court of Appeals' decision in *305*

*E. 24th Owners Corp. v. Parman Co.*, 69 N.Y.2d 991, 994 (1987), which adopted the dissenting opinion of Presiding Justice Francis T. Murphy Jr. of the Appellate Division below. *305 E. 24th Owners Corp. v. Parman Co.*, 505 N.Y.S.2d 999, 1005-12 (1st Dep't 1986) (Murphy, J., dissenting in part). *Parman* involved an offering plan drafted pursuant to Martin Act regulations like the Plan in this case. *See id.* at 1001 (majority op.). In the intermediate appellate court, the majority held that the offering plan was ambiguous and that, therefore, extrinsic evidence should be considered in its interpretation. *Id.* at 1003-04.

Justice Murphy dissented, and the New York Court of Appeals adopted his dissent. Plaintiffs seize on Justice Murphy's statement:

> If, however, we are to assume for the sake of argument that there is an ambiguity in the subject offering plan, it should, as a matter of law, be construed against the offerer who is ultimately responsible for the plan's preparation.

*Id.* at 1010 (Murphy, J., dissenting in part). Because extrinsic evidence is only admissible to assist a court in construing ambiguities in a contract, Plaintiffs argue that it follows *a fortiori* that extrinsic evidence is not admissible to construe the terms of an offering plan. If all ambiguities must be construed against the offeror, then extrinsic evidence can serve no purpose and is inadmissible.

The Court does not agree that the Court of Appeals necessarily intended to adopt every jot and tittle of Justice Murphy's dissent. Justice Murphy cogently analyzed the *sui generis* contract presented to the Court in *Parman* and concluded that it was unambiguous. *Id.* at 1007-09. Therefore, according to foundational principles of contract interpretation, extrinsic evidence was inadmissible to prove its meaning. *Id.* at 1007. The soundest interpretation of the Court of Appeals' terse opinion adopting Justice Murphy's dissent is not that it adopted a sweeping new rule of law that extrinsic evidence was always inadmissible to interpret the terms of an offering plan. Rather, the Court of Appeals likely intended to adopt only Justice Murphy's analysis of the contract before the Court in that case according to well-established principles of contract law. If the Court of

Appeals intended to set forth the rule that Plaintiffs suggest, it likely would have written more than two cryptic sentences.

Moreover, Plaintiffs' interpretation is belied by New York cases that have considered extrinsic evidence in the interpretation of offering plans. *See, e.g.*, *Green Harbour Homeowners' Ass'n, Inc. v. G.H. Dev. & Const., Inc.*, 763 N.Y.S.2d 114, 116 (3d Dep't 2003) ("The ambiguity of the contract between the parties, here the offering plan, regarding exactly what property constitutes Lot 20 makes it necessary to consider extrinsic evidence to determine the parties' intent." (citations and footnote omitted)); *One Hundred Grand, Inc. v. Chaplin*, 895 N.Y.S.2d 68, 69 (1st Dep't 2010) ("[T]he relevant provisions of the landlord's offering plan and the parties' lease were ambiguous[.] . . . Thus, Appellate Term properly looked to evidence of the parties' course of conduct[.]"). Thus, Plaintiffs are simply wrong that "there are no New York decisions declining to follow *Parman*[,]" at least if *Parman* stands for the broad proposition that Plaintiffs claim that it does. Opp. at 20.

Plaintiffs point to cases citing *Parman* that, in their view, support the broad interpretation of *Parman* that they advocate. *See id.* (citing *Penny Lane Owners Corp. v. Conthur Dev. Co.*, No. 94 CIV. 0940 (CSH), 2000 WL 178189, at *9 (S.D.N.Y. Feb. 16, 2000)); *River Oaks Marine, Inc. v. River Oaks Marina Assoc.*, 643 N.Y.S.2d 798, 798-99 (4th Dep't 1996); *305 E. 40th Garage Corp. v. 305 E. 40th Owners Corp.*, 833 F. Supp. 991, 998 (S.D.N.Y. 1993). But those cases cannot bear the weight that Plaintiffs would have the Court place on them; none of them explicitly held that extrinsic evidence is always inadmissible in interpreting the terms of an offering plan. Hence, the Court is unpersuaded that these decisions stand for that broad proposition.

Rather, these cases appear to stand for the unremarkable proposition that "as a general rule, the terms of an agreement are construed against the drafter." *Penny Lane*, 2000 WL 178189, at *9. "However, New York applies [the rule of *contra proferentem*] only as a matter of last resort after all aids to construction have been employed without a satisfactory result[.]" *Albany Sav. Bank, F.S.B. v.*

27

*Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) (quotation omitted); *see also, e.g.*, *De Geare v. Alpha Portland Indus.*, 837 F.2d 812, 816 (8th Cir. 1988) ("Ambiguities should be construed against the drafter only if after the ordinary rules of construction *and consideration of extrinsinc evidence*, the ambiguities remain." (emphasis added)).  The Court agrees that if the Court cannot determine a contract's meaning after using other ordinary principles of contract interpretation—including interpreting the text of the contract according to its plain meaning and, if the text of the contract is ambiguous, considering relevant extrinsic evidence—it may be appropriate to construe the terms of an offering plan against the drafter, as would be true with any contract.  But here, both the text and the available extrinsic evidence run counter to Plaintiffs' proposed interpretation; consequently, the rule that contracts are to be construed against the drafter plays no part in the Court's analysis.

Plaintiffs also suggest that Justice Murphy's statement in *Parman* that an offering plan must be interpreted "as it would be reasonably understood by an average purchaser" requires the Court to exclude extrinsic evidence.  505 N.Y.S.2d at 1010.  This argument ignores the context in which Justice Murphy wrote that line and thus substantially overreads it.  Justice Murphy made the quoted statement in the context of noting that an average purchaser would conclude that the offering plan was unambiguous.  Thus, the statement is merely an application of the well-settled principle that contracts must be interpreted according to their plain meaning as understood by an average person. It does not support the novel proposition that extrinsic evidence is never relevant to the interpretation of an offering plan.

Plaintiffs also argue that standard form contracts such as offering plans must be interpreted uniformly.  *See* Opp. at 23 (citing *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1048 (2d Cir. 1982)).  Even if that is always true, it is no help to Plaintiffs because Defendants are not arguing that the Plan should be interpreted differently for different plaintiffs.  Consequently, the Court concludes that it can properly consider extrinsic evidence on this motion for summary judgment.

There is relevant extrinsic evidence that supports Defendants' argument that the Rescission Clause did not survive the closing.  As part of their respective purchases, Plaintiffs exected a document called "St. Regis Residence Club Rewards Details of Participation."  Defs 56.1 ¶ 127; *see also* Ex. C to Thomas Decl. ("Club Rewards"), Dkt Nos. 159-3–159-4; Ex. 9 to LaRocco Decl. ("Rewards Referrals"), Dkt No. 150-9.  That document describes a referral rewards program and states:

> If you have provided the name of an Eligible Guest who purchases a Club Interest at a Residence Club and closes the purchase (pays the full down payment, has all contractual rescission periods pass, and, where financing has been provided by St. Regis, has made at least one (1) mortgage payment), you are entitled to receive a onetime Credit of one-half of the next annual maintenance fee on your Club Interest.

Defs 56.1 ¶ 127.  In this passage, Plaintiffs acknowledge that to "close[] the purchase . . . all contractual rescission periods [must] pass[.]"  *Id.*  This is probative evidence that the parties understood that Plaintiffs' right of rescission would terminate at closing.  *See GEM Holdco, LLC v. Changing World Techs., Ltd. P'ship*, 8 N.Y.S.3d 119, 121 (1st Dep't 2015) ("Since neither party's interpretation is clearly correct as a matter of law, the agreement is ambiguous and the court may consider extrinsic evidence, such as the other contracts entered into by the parties at the same time . . . to interpret the intent of the parties.").

Plaintiffs repeatedly attempt to resist the effect of disclosures such as the one quoted above by citing *Kennedy v. Tallant*, a decades-old Eleventh Circuit case, for the proposition that "[f]ull and fair disclosure cannot be achieved through piecemeal release of subsidiary facts."  710 F.2d 711, 720 (11th Cir. 1983).  *Kennedy* is inapposite.  That case was about whether disclosures that were fragmented and spread over several prospectuses were adequate under the securities laws.  *See id.* at 719-20.  Whatever persuasive value *Kennedy* might have in the securities law context, it is not persuasive here.  Plaintiffs are asserting a breach of contract claim under a specific provision of the Plan, which is incorporated by reference into their Purchase Agreements.  *See* Defs 56.1 ¶ 109.

Plaintiffs cannot now complain that, in effect, they did not read the Plan or their Purchase Agreement closely enough. *See Keep on Kicking Music, Ltd. v. Hibbert*, No. 15-CV-7464 (WHP), 2016 WL 4386047, at *3 (S.D.N.Y. Aug. 17, 2016) ("Under New York law, a person who signs an agreement is conclusively bound by it even if he did not read the agreement or understand its terms." (quoting *Kearins v. Panalpina, Inc.*, 570 F. App'x 9, 10 (2d Cir. 2014))); *see also Gillman v. Chase Manhattan Bank*, 73 N.Y.2d 1, 11-12 (1988). Hence, Plaintiffs' attempt to ignore the disclosures in the Plan and in their Purchase Agreements is unavailing.

It is also relevant that—although Plaintiffs allege they were materially and adversely affected by the Seventh and Eighth Amendments in 2008, Defs 56.1 ¶ 131; *see also* Ex. G to Thomas Decl. ("Budget Notice"), Dkt No. 159-8; LaRocco Decl. ¶ 6—no Plaintiff inquired about the Sponsor's purported duty to offer rescission until this litigation commenced in 2016. Defs 56.1 ¶ 132; *see also* Thomas Decl. ¶ 35. That delay is further evidence that Plaintiffs did not understand the Seventh and Eighth Amendments to be material and adverse changes, did not understand their right of recission to have survived the closing, or both. *See W. Alton Jones Found. v. Chevron U.S.A., Inc.*, 97 F.3d 29, 34 (2d Cir. 1996) (party's three-and-a-half year delay in asserting rights under its proposed interpretation was "powerful evidence" of its understanding of the disputed provision).

In sum, the extrinsic evidence considered by the Court bolsters the interpretation that Plaintiffs' right of rescission did not survive the closing. That conclusion is also supported by the unambiguous text of the Plan and the Purchase Agreements. Consequently, Defendants are entitled to summary judgment on Plaintiffs' claim for rescission.[14]

---

[14] Because the Court has determind that Defendatns are entitled to summary judgment on both of Plaintiffs' remaining claims, it need not address Defendants' motion to exclude the testimony of Plaintiffs' purported experts.

**IV. CONCLUSION**

Defendants' motion for summary judgment is GRANTED.  The Clerk of Court is directed to enter judgment for Defendants, terminate all pending motions, and to close this case.

SO ORDERED.

Dated:  May 21, 2020

_____
GREGORY H. WOODS
United States District Judge